**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No. 3:24-CV-00137-RJC-DCK**

| | |
|---|---|
| CMT USA, INC. and CMT UTENSILI S.p.A., | |
| Plaintiffs, | |
| v. | **MEMORANDUM IN SUPPORT OF CMT'S MOTION FOR SUMMARY JUDGMENT OF TRADEMARK INFRINGEMENT** |
| APEX TOOL GROUP LLC and APEX BRANDS, INC. | |
| Defendants. | |

# TABLE OF CONTENTS

I.  Introduction ................................................................................................................ 1

II.  Statement of Facts ...................................................................................................... 2

    A.  CMT Has Used Orange as a Brand Color and
    Source Identifier Since the 1960s ........................................................................ 2

    B.  CMT's Orange Mark Has Been Used Since 1997,
    Registered Since 2006, Incontestable Since 2011, and
    Is Recognized and Respected by Others in the Industry ....................................... 5

    C.  Apex Learned of CMT's Orange Mark, Appropriated It, and
    Then Continued Infringing It Despite CMT's Demand To Stop ............................ 6

III.  Argument .................................................................................................................... 8

    A.  Summary Judgment Is Appropriate Because There Is No
    Genuine Dispute That Apex Is Infringing CMT's Orange Mark ......................... 9

        i.  CMT's Orange Mark is Federally Registered,
        Incontestable, and Valid ............................................................................ 9

        ii.  Apex Uses CMT's Orange Mark in Commerce
        Without Authorization ............................................................................... 9

        iii.  Apex Uses CMT's Orange Mark in Connection With the Sale,
        Distribution, and Advertisement of the Accused Products ...................... 10

        iv.  Apex's Use of CMT's Orange Mark Is Likely to Cause Confusion .......... 11

            a.  CMT's Orange Mark is Strong and Distinctive ............................. 11

            b.  Apex's Mark Is Nearly Identical to CMT's Orange Mark ........... 13

            c.  Apex's Accused Products Are Identical to
            CMT's Covered Goods ................................................................. 14

            d.  Apex's Accused Products Are Sold in the Same Facilities
            and Channels of Trade as CMT's Covered Goods ........................ 14

            e.  Apex's Accused Products Are Advertised in the
            Same Ways as CMT's Covered Goods ......................................... 15

            f.  Apex Intended to Infringe CMT's Orange Mark ......................... 16

            g.  Anecdotal Evidence and Survey Evidence
            Demonstrate Significant Actual Confusion .................................. 18

– i –

h.     The Accused Products and Covered Goods
Are of the Same Quality ............................................... 21

i.     Consumers Are As Sophisticated As the General Public ............. 22

B.     Summary Judgment Is Appropriate on Apex's Fraud on the PTO Claim
Because There Are No False Representations and No Evidence of Intent .......... 22

C.     Summary Judgment Is Appropriate Because Apex Has
Conceded That CMT's Orange Mark Is Not Functional ..................................... 23

D.     Summary Judgment Is Appropriate Because CMT's Orange Mark
Is Not Abandoned by Text and Graphics Being Placed on Top of It ................... 24

E.     Summary Judgment Is Appropriate Because the Alleged Delay Does Not
Amount to Laches and Waiver Is Not Available as a Defense ............................. 24

IV.     Conclusion ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*,
    944 F.2d 1446 (9th Cir. 1991) ................................................................. 16, 17

*Akiro, LLC v. House of Cheatham, Inc.*,
    946 F. Supp. 2d 324 (S.D.N.Y. 2013) ........................................................... 21

*All. for Good Gov't v. Coal. for Better Gov't*,
    901 F.3d 498 (5th Cir. 2018) ................................................................. 16, 17

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .............................................................................. 8, 9

*Belmora LLC v. Bayer Consumer Care AG*,
    987 F.3d 284 (4th Cir. 2021) ...................................................................... 25

*CareFirst of Maryland, Inc. v. First Care, P.C.*,
    434 F.3d 263 (4th Cir. 2006) .......................................................... 11, 12, 15

*Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*,
    897 F.3d 413 (2d Cir. 2018) ....................................................................... 25

*George & Co., LLC v. Imagination Ent. Ltd.*,
    575 F.3d 383 (4th Cir. 2009) ........................................................................ 9

*Grayson O Co. v. Agadir Int'l LLC*,
    856 F.3d 307 (4th Cir. 2017) ................................................................. 11, 12

*In re Bose Corp.*,
    580 F.3d 1240 (Fed. Cir. 2009) ................................................................... 22

*Keds Corp. v. Renee Int'l Trading Corp.*,
    888 F.2d 215 (1st Cir. 1989) ...................................................................... 24

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*,
    43 F.3d 922 (4th Cir. 1995) ........................................................... 5, 9, 17, 18

*Lyons Partnership, L.P. v Morris Costumes, Inc.*,
    243 F.3d 789 (4th Cir. 2001) ...................................................................... 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................... 9

*Mobile Tech Inc. v. InVue Sec. Prods. Inc.*,
    2019 WL 3001285 (W.D.N.C. 2019) ............................................................. 9

*Nallapati v. Justh Holdings, LLC*,
    2023 WL 2436008 (E.D.N.C. Mar. 9, 2023) ................................................................. 22

*Perini Corp. v. Perini Const., Inc.*,
    915 F.2d 121 (4th Cir. 1990) ........................................................................................ 22

*Qualitex Co. v. Jacobson Prods. Co.*,
    514 U.S. 159 (1995) ............................................................................................. 12, 23

*Reply All Corp. v. Gimlet Media, LLC*,
    843 F. App'x 392 (2d Cir. 2021) ...................................................................................... 9

*Retail Servs., Inc. v. Freebies Publ'g*,
    364 F.3d 535 (4th Cir. 2004) ........................................................................................ 23

*Rosetta Stone, Ltd. v. Google, Inc.*,
    676 F.3d 144 (4th Cir. 2012) ........................................................................ 9, 11, 14, 18

*SafeRack, LLC v. Bullard Company*,
    350 F. Supp. 3d 438 (D.S.C. 2018) ......................................................................... *passim*

*Sara Lee Corp. v. Kayser-Roth Corp.*,
    81 F.3d 455 (4th Cir. 1996) ......................................................................................... 25

*Savin Corp. v. Savin Grp.*,
    391 F.3d 439 (2d Cir. 2004) ......................................................................................... 21

*T-Mobile US, Inc. v. AIO Wireless LLC*,
    991 F. Supp. 2d 888 (S.D. Tex. 2014) ............................................................................ 14

*Variety Stores, Inc. v. Walt-Mart Stores, Inc.*,
    888 F.3d 651 (4th Cir. 2018) ........................................................................................ 16

*VonRosenberg v. Lawrence*,
    412 F. Supp. 3d 612 (D.S.C. 2019) ................................................................................ 21

**Statutes**

15 U.S.C. § 1114(a) .............................................................................................................. 9

15 U.S.C. § 1115(b) .......................................................................................................... 9, 25

**Other Authorities**

Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 510.02(a) ........................ 22

**Rules**

Fed. R. Civ. P. 30(b)(6) .................................................................................................. 13, 19

# I.    Introduction

Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A. (collectively "CMT") move for summary judgment under Rule 56 against Defendants Apex Tool Group LLC and Apex Brands, Inc. (collectively "Apex") on Counts I and II of the Second Amended Complaint (Dkt. 37). Count I asserts infringement of U.S. Trademark Registration No. 3,038,625 ("the '625 Registration") under the Lanham Act and Count II asserts common-law trademark infringement.

The mark at issue consists "of the color orange as applied to" "[c]ircular blades for power saws for cutting wood" ("CMT's Orange Mark").  *See* Ex. I at 94.  CMT has exclusively used its Orange Mark since 1997, building widespread recognition of it, to the point where the Mark is immediately associated with CMT before consumers even recognize a brand name or logo.  Color is known to play a decisive role in consumer purchasing decisions; Apex's own color expert stated that, in general, 60% of the reason a person purchases an item is based on color.

Apex learned of CMT's Orange Mark in 2017, appropriated the Mark for its own saw blades in 2021, and after CMT demanded the infringement stop, Apex used predatory pricing to expand its infringement in 2023, targeting CMT's largest customer.  As explained below, there are no genuine factual disputes about any element of infringement.  Among other things, CMT's Orange Mark is conceptually and commercially strong, Apex's mark is strikingly similar and applied to identical goods, and the anecdotal and survey evidence of actual confusion is robust and clearly demonstrates a likelihood of confusion.  This case is closely analogous to *SafeRack, LLC v. Bullard Company*, where another Fourth Circuit court granted summary judgment based on the unauthorized use of an orange trademark.  350 F. Supp. 3d 438 (D.S.C. 2018).  The same result is warranted here, except CMT's case is even stronger than the plaintiff's case in *SafeRack*.

CMT also moves for summary judgment on several of Apex's meritless defenses and counterclaims, which CMT requested weeks ago that Apex withdraw.  Because Apex refused,

CMT is now forced to seek summary judgment on them as well.

## II. Statement of Facts

### A. CMT Has Used Orange as a Brand Color and Source Identifier Since the 1960s

"[T]he color orange is, and has long been, central to [CMT's] brand identity." Ex. E ¶ 57. In addition to its Orange Mark, CMT uses the color orange in many other aspects of its business. Ex. E ¶¶ 15-16, 50-52, 58. As such, the color orange has come to "act[] as a source identifier and allows CMT to stand out from various other competitors." Ex. E ¶¶ 51-52. CMT has also "repeatedly used slogans and other marketing copy containing the word 'orange,' reinforcing in the minds of consumers that orange is a source identifier for CMT products." Ex. E ¶¶ 52, 58-65.

Since its founding in 1962, CMT has used the color orange as a central element of its brand identity. The covers of its catalogs are exemplary and are dominated by the color orange:



Ex. H at 34, 66 (images excerpted), 69, 79; Ex. A 48:13-19 (CMT's CEO noting that his "father always used the color orange for his catalogues"). While CMT's brand aesthetic has evolved over the years, CMT's commitment to orange has remained central to its brand and is prominently used in logos, in its domain name, and on websites, product displays, and elsewhere. *E.g.*, Ex. H at 34-35, 68; Ex. I at 1, 71-74. In 1991, for instance, CMT updated its logo to include orange (see 1991 catalog, above) and, in 2003, it incorporated the word "Orange" into its brand name:



Ex. H at 66; *see also* Ex. Z 384:21-385:13. "CMT Orange Tools" remains the dominant name and logo that CMT uses to this day on its circular saw blades. *E.g.*, Ex. I at 77.

Since at least 1998, CMT has reinforced its brand identity through taglines and slogans incorporating the word "orange." For example:



Ex. I at 93 (image cropped);
*see also* Ex. E ¶ 59, Fig. 7.



Ex. I at 1 (image cropped);
Ex. E ¶ 60, Fig. 8.

Other examples include "If it's CMT you are looking for, you want the orange one" (Ex. I at 87) and "The orange in action" and "When Quality matters, go orange" (Ex. E ¶¶ 60-63).

Since 1991, CMT has also applied the color orange to its tools, beginning with industrial router bits and expanding to the goods at issue in this case (circular woodworking saw blades) in 1997. Ex. H at 66; Ex. A 28:19-30:2, 48:5-8; Ex. I at 94 (stating a first-use date of April 1, 1997). Today, CMT has many product lines that are orange in color. Ex. I at 75-76.

Since 1997, CMT has continuously sold saw blades bearing its Orange Mark. *E.g.*, Ex. A 29:11-30:2, 48:5-8; Ex. H at 36, 73, 81. Today, CMT sells an "ITK Plus" line of saw blades (example shown below), all but one of which is orange in color. Ex. H at 52-65; Ex. I at 77-79. The orange color comes from CMT's durable "Orange Shield" coating, which is non-stick, heat dispersing, and made from a polymer called polytetrafluoroethylene (PTFE). Ex. I at 24-25 (showing a CMT blade with the silk screening removed by acetone). The Orange Shield coating is also applied to CMT's "Industrial Orange Shield" blades. Ex. H at 37-49.

 

Ex. I at 80 (image cropped).      Ex. I at 77 (image cropped).

While the PTFE coating provides certain functionality,[1] "the color of the coating does not" provide any functionality. Ex. E ¶¶ 52-54; *see also* Ex. R 121:25-122:12. On top of CMT's "Orange Shield" coating, other text and graphics are applied via a silk-screening process.[2]

    CMT also currently sells "Xtreme" and "ITK Xtreme" saw blades, some of which are also fully orange in color. Ex. H at 50-51. But even the Xtreme or ITK Xtreme saw blades that are not orange in color (example shown below), incorporate orange-colored accents and use CMT's "Orange Chrome" coating, which is composed of a thin layer of chromium.

 

Ex. I at 82 (image cropped).      Ex. I at 82

While these blades are not primarily orange in color, the name "Orange Chrome" emphasizes the centrality of the color orange to CMT's brand and its business.

---

[1] PTFE is sometimes known by the brand name Teflon™. Neither Teflon™ nor the owners of the Teflon™ mark are involved in this case.

[2] The silk screening frequently rubs off after the blades are used a few times, while the "Orange Shield" coating generally remains intact. *E.g.*, Ex. I at 26-27 (showing a CMT blade after use).

**B. CMT's Orange Mark Has Been Used Since 1997,**
**Registered Since 2006, Incontestable Since 2011, and**
**Is Recognized and Respected by Others in the Industry**

By April 1997, CMT began applying the color orange to circular woodworking saw blades sold in the United States. Ex. H at 2. In May 1999, CMT applied for a federal registration of its Orange Mark. Ex. I at 94. CMT's Orange Mark was registered in January 2006 (Ex. I at 94), and became incontestable in October 2011, after five years of continuous, unchallenged use (Ex. H at 27-30; *see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir. 1995)).

CMT has since successfully enforced its rights to its Orange Mark, ███████████

███████████████████████████████████████████████████████████

███████████████████ Ex. C ¶¶ 65-72; Ex. Y at 83-84. CMT has also ███████

███████████████████. Ex. C ¶¶ 58-64; Ex. Y at 81-82. In ████, for example,

CMT ████████████████████████████████████████████████████████

███████████████████████████████████████████████████. Ex. J

at 4-15. In ████, CMT ████████████████████████████████████

████████████████████████████████████████████████████████

Ex. J at 1-3. Two weeks after CMT ████████████████████ was contacted by

Marksmen Brand Protection Services ("Marksmen"), who were working on behalf of Apex.[3]

Dkt. 117-1 at APEX00025125-132. Marksmen asked ████ whether it "offer[s] any saw blades

in the orange color," to which ████ responded "we [do] not [have] any saw blades in the orange

color" and that "saw blades in the orange color are CMT tools['] trademark." Ex. DD at 10.



---

[3] Marksmen conducted an extensive global effort to purchase various saw blades chosen by Apex's counsel. The Marksmen Report records interactions with sales representatives and describes the processes by which 35 saw blades were acquired. *See* Dkt. 117-1 at APEX00025075-79.

**C.   Apex Learned of CMT's Orange Mark, Appropriated It, and
Then Continued Infringing It Despite CMT's Demand To Stop**

In 2017, Apex consolidated various tool brands under the Crescent name and introduced a

new brand color palette. As part of that work, Apex ████████████████████████████

████████████. Ex. BB at 18-27 ████████████████. Ex. P 150:24-153:2, 158:4-7.

For Crescent's new color palette, Apex selected a new "primary" color, which it uniformly

referred to as "orange." Ex. F ¶¶ 38-56 (digest of relevant Apex design documents). During the

design process, Apex ████████████████████████████████████████████████

████████████████████.4



Ex. F ¶ 47 (image cropped). By September 2017, Apex settled on Pantone 2349c (also called

PMS 2349c) as Crescent's new primary brand color.



Ex. F ¶ 46 (image cropped). By November 2017, Apex dubbed its new primary color "Rawhide,"

---

4 ████████████████████████████████████████████████████████

████████████████████████. Ex. P 158:4-7.

also referring to it as "Rawhide Orange" and "Crescent Rawhide Orange":

| RAWHIDE ORANGE Pantone 2349 C | CRESCENT RAWHIDE ORANGE PMS 2349 C |
|---|---|

Ex. F ¶¶ 50, 52-53 (images cropped).

Consistent with Apex's 2017 design documents, every Apex witness in this litigation—including its Rule 30(b)(6) designee, a Senior Director at Apex, Brendan Walsh, and its color expert, Mr. Steven Bleicher—has testified that Apex's PTFE coating, like CMT's Orange Shield, is orange in color. Ex. P 70:1-12; Ex. S at 5; Ex. T at 1 (stating that whether "the two colors in question could both be considered shades of orange" is a "fact" that "is not in dispute"); Ex. U 213:11-14, 217:14-16, 262:9-263:7; Ex. R 122:13-16; Ex. L 20:2-6; Ex. M 158:9-22, 241:14-17; Ex. N 76:16-18; Ex. O 23:11-24:1; Ex. Q 45:21-46:19.

In December 2017, Apex publicly launched its rebrand, including the Rawhide orange color. *See* Ex. K at 1. Apex later decided that Crescent would enter the circular saw blade business. *See* Ex. M 14:8-15:3; Ex. L 15:10-13 (testifying that he started working on saw blade designs in 2020). Like CMT's Orange Shield blades, the final design for Apex's circular woodworking saw blades included a Rawhide-orange-colored PTFE coating applied to the bare metal blade with other text and graphics applied on top:



Ex. I at 88 (image cropped); Ex. P 79:22-81:17, 94:8-97:4. Apex's PTFE coating, like CMT's Orange Shield, is durable and applied to both sides of the blades. Ex. P 212:14-25; Ex. R 91:24-

92:1, 123:21-124:5; Ex. I at 28-29 (showing an Apex blade with the silk screening removed by acetone). Also as with CMT's blades, the text and graphics applied on Apex's PTFE coating are applied via a silk-screening process and rub off of the blades after a few cuts, while the orange PTFE coating remains. Ex. R 123:3-124:5; Ex. I at 30-31 (showing an Apex blade after use).

Since March 2021, Apex has been selling orange-colored circular woodworking saw blades under the Crescent Tools brand (the "Accused Products"). Ex. Y at 65-66 (stating that "infringement began" on "March 25, 2021," when "Lowe's gave an award of business to Apex to provide 240,000 saw blades to Lowe's"); Ex. CC at 1-2. The Accused Products first appeared in Lowe's stores in September 2021. Ex. CC at 1-2.

After the Accused Products first appeared in stores, CMT sent Apex several cease-and-desist letters. Ex. BB at 8-11, 12-13, 14-17. In spite of CMT's letters and the continued dialogue with CMT about infringement, in 2023, Apex began selling saw blades in Menards. Ex. CC at 14-16; Ex. P 121:12-16; Ex. N 104:7-9. ██████████████████████████

██ *See* Ex. A 113:7-10; Ex. B 26:9-11, 91:20-92:8.

Even in light of this lawsuit, Apex has not changed the design of its saw blades and intends to continue selling the Accused Products. Ex. P 143:19-144:10. Apex has confirmed as of February 2025 that it still sells Accused Products. Ex. Z 159:18-164:17; *see also* Ex. P 142:2-7 (testifying in September 2024 that Apex still sells Accused Products).

## III. Argument

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party cannot prevail by relying on "mere[] assert[ions]," but must present "concrete evidence" of

a genuine factual dispute. *Id*. at 256; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### A. Summary Judgment Is Appropriate Because There Is No Genuine Dispute That Apex Is Infringing CMT's Orange Mark

"To establish trademark infringement under the Lanham Act, a plaintiff must prove: (1) that it owns a valid mark; (2) that the defendant used the mark 'in commerce' and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers." *Rosetta Stone, Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012) (quoting 15 U.S.C. § 1114(a)).

Common-law trademark infringement is essentially the same as infringement under the Lanham Act. *Mobile Tech Inc. v. InVue Sec. Prods. Inc.*, 2019 WL 3001285, at *3 (W.D.N.C. 2019) (North Carolina law); *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 400 (2d Cir. 2021) (New York law). As set out below, the record evidence strongly favors CMT on each of the infringement elements and there are no genuine disputes as to any material fact.

### i. CMT's Orange Mark is Federally Registered, Incontestable, and Valid

CMT's Orange Mark is incontestable under 15 U.S.C. § 1115(b), which provides "conclusive evidence" of its validity, and of CMT's ownership and right to use it. Part II.B, *supra*; *see also Lone Star*, 43 F.3d at 930. CMT filed its registration application in May 1999, meaning CMT's ownership dates back over 25 years. *See George & Co., LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 400, n.15 (4th Cir. 2009).

### ii. Apex Uses CMT's Orange Mark in Commerce Without Authorization

Apex admits that it first used CMT's Orange Mark on March 25, 2021, when Lowe's awarded it a contract for the Accused Products. Ex. Y at 65-66; *see also* Ex. CC at 1-2. The

Accused Products hit Lowe's shelves in September 2021. Ex. CC at 1-2. As of February 19, 2025, Apex was still in the business of marketing and selling orange-colored saw blades. Ex. Z 160:14-161:7; *see also* Ex. P 142:2-144:7.

CMT has never authorized Apex (or anyone) to use its Orange Mark. CMT sent Apex multiple cease-and-desist letters in 2021. Ex. BB at 8-11, 12-13, 14-17. Moreover, Apex has not even pled that it is authorized to use CMT's Orange Mark. *See generally* Dkt. 42. Accordingly, Apex's unauthorized use of the mark in commerce is indisputable.

### iii. Apex Uses CMT's Orange Mark in Connection With the Sale, Distribution, and Advertisement of the Accused Products

The record overwhelmingly confirms that Apex uses CMT's Orange Mark "in connection with" the sale, distribution, and advertisement of the Accused Products. From July 2021 through December 2023, Apex sold $6.92M worth of Accused Products. Ex. Y at Ex. 2.3, p. 8; Ex. C at Ex. 6, p. 2. Approximately 70% of Apex's Accused Products were distributed through major home improvement centers like Lowe's and Menards. Ex. C at Ex. 6.1, p. 1. And Apex has no plans to stop selling its infringing products. Part II.C, *supra*.

Likewise, there can be no dispute that Apex uses CMT's Orange Mark "in connection with" advertising the Accused Products. Between 2021 and 2022, Apex ██████████████████████ ████████ its saw blades. Ex. AA at 5-6; Ex. EE (revising Apex's response to Interrogatory No. 6 (citing Ex. CC at 17)). Of that money, $1.3M is attributable to Accused Products. Ex. E ¶¶ 93-95 (citing Ex. CC at 17). Apex advertises the Accused Products through trade shows, product catalogs, email campaigns, and various websites and social media. Ex. AA at 5; *see also* Ex. N 89:17-90:18, 107:9-108:4; Ex. CC at 18-46 (2023 trade show attendance); Ex. BB at 11 (sample trade show attendance), 28 (same); Ex. K at 3-7 (2024 product catalog); Ex. I at 16-23 (sample 2023-2024 social media posts); Ex. BB at 1-2 (same), 3-4 (sample email), 5-7 (same).

#### iv.    Apex's Use of CMT's Orange Mark Is Likely to Cause Confusion

While likelihood of confusion is often a fact-intensive inquiry, courts grant summary judgment "in appropriate cases," like this one. *Rosetta Stone*, 676 F.3d at 153; *see also SafeRack*, 350 F. Supp. 3d at 457. Here, like in the analogous *SafeRack* case, the undisputed facts establish a strong likelihood of confusion under the well-known factors:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*Rosetta Stone*, 676 F.3d at 153. This list "is not intended to be exhaustive or mandatory," and "there is no need for each factor to support the plaintiff's position." *Id.* at 154 (cleaned up). CMT's Orange Mark is both conceptually and commercially strong, Apex admits that it uses orange on directly competing goods, and there is strong evidence of actual confusion—even Apex's own witnesses concede the potential for confusion here.

#### a.    CMT's Orange Mark is Strong and Distinctive

"The strength of a mark is the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source." *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006). A mark's strength is assessed both conceptually and commercially. *Id.*

Conceptual strength "focuses on the linguistic or graphical peculiarity of the mark, considered in relation to the product" covered by the mark. *Id.* (cleaned up). CMT's Orange Mark is conceptually strong because the color orange "is unrelated to" circular woodworking saw blades, just "like Exxon®" is unrelated to "gasoline" and "Apple®" is unrelated to "computers." *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 315 (4th Cir. 2017) (cleaned up). The undisputed

record confirms that before CMT adopted its Orange Mark in 1997, "no one had ever used the color orange for circular saw blades for woodworking." Ex. A 49:4-10, 50:2-11. While color alone is not inherently distinctive, a color may be registered as a mark, "where that color has attained 'secondary meaning'." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995). The U.S. Trademark Office has already recognized that CMT's Orange Mark has acquired secondary meaning. *See* Ex. I at 94.

Commercial strength depends on whether "a substantial number of present or prospective customers" understand the mark to refer to a particular source. *CareFirst*, 434 F.3d at 269. Courts consider factors such as: "advertising expenditures," "sales success," "attempts to plagiarize the mark," and "the length and exclusivity of the mark's use." *Grayson O*, 856 F.3d at 316; *SafeRack*, 350 F. Supp. 3d at 449 (finding SafeRack's orange mark (unconfined to a single shade) to be strong because SafeRack uses "orange" in its slogan, used its mark in commerce for eleven years, invested over $925,000 each year in advertising, presented consumer testimony associating orange with SafeRack, and until defendant, no competitor used orange in the same way).

"[T]he color orange is, and has long been, central to [CMT's] brand identity," so much so that orange has come to "act[] as a source identifier and allows CMT to stand out from various other competitors." Part II.A, *supra* (quoting, e.g., Ex. E). At significant effort and expense, CMT "has worked to establish its distinctive orange color as a source identifier for its brand," including for its circular woodworking saw blades, and has "attach[ed] positive product and brand associations to that color in the minds of consumers." Ex. E ¶ 65. Through long years of consistent usage, "CMT's slogans, taglines, and other marketing copy reinforce the association with its CMT Orange Mark and the use of its orange throughout its marketing materials together create a strong, coherent brand identity centralized around CMT's distinctive orange color palette." Ex. E ¶ 65;

*see also* Ex. A 35:7-36:2; Ex. B 228:19-230:6.

Between 2017 and 2022, CMT invested ███████ in promotional and advertising efforts of its saw blades, including through "tradeshows, print advertising, catalogs and dealer relations." Ex. E ¶ 96. These efforts paid off because over that same period, CMT sold more than █████████ of its orange-colored circular woodworking saw blades ("CMT's Covered Goods"). Ex. C at Ex. 4.4. From 2021 through mid-2024, ███████████████████ ███████ Ex. Y at Ex. 8.0.1.

CMT's Orange Mark has been in continuous use since 1997, making it one of the longest-standing saw-blade marks in the industry. Even Apex's own industry expert, Leslie Banduch, conceded that the only saw blades he knew of, in which the color orange covers the surface of the blade, were CMT's and Apex's. Ex. R 137:4-23. This admission is devasting for Apex because it confirms that for decades no competitor has sold saw blades that use orange in the same distinctive manner as CMT. CMT has also never licensed its Orange Mark to any third party. Ex. Y at 92. While occasional infringers (like Apex) have tried to copy its distinctive orange blades, CMT has successfully enforced its rights, including by recently ████████████████████████ ██████████████████ Part II.B, *supra*.

**b.  Apex's Mark Is Nearly Identical to CMT's Orange Mark**

Apex's mark is nearly identical to CMT's Orange Mark, consisting of the color orange applied to circular blades for power saws for cutting wood. Ex. I at 28-29, 84, 88. Every Apex witness—including its Rule 30(b)(6) designee and its color expert, Mr. Bleicher—concede that Apex's PTFE coating, like CMT's Orange Shield, is orange in color. Part II.C, *supra*. CMT's color expert, Dr. David Wyble, confirmed empirically that the color of CMT's Covered Goods and Apex's Accused Products are each "perceived as being orange in color" and "can reasonably be called 'orange'." *E.g.*, Ex. F ¶ 12. While Apex and CMT use different shades of orange, this

difference in shade is minor and, as explained below, does not prevent confusion between their blades. *See also* Ex. U 252:9-10 (Q. "Can consumers confuse shades of orange?" A. "Sure."); Ex. R 211:17-212:4 (Q: "It's possible that the likelihood of confusion could exist, right?" A. "Yes."); *SafeRack*, 350 F. Supp. 3d at 450; *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 910-11 (S.D. Tex. 2014).

### c. Apex's Accused Products Are Identical to CMT's Covered Goods

Apex's circular saw blades for cutting wood are, for all relevant purposes, identical to CMT's. As depicted above, CMT's Covered Goods bear its Orange Mark in the form of the Orange Shield PTFE coating, over which text and graphics are silk-screened. Part II.A, *supra*. Likewise, Apex's Accused Products feature an orange-colored PTFE coating applied directly to the blade with text and graphics added on top. Part II.C, *supra*. The text and graphics on each parties' blades rub off after use, leaving the underlying orange PTFE coating intact. Parts II.A and C, *supra*.

Moreover, Apex's own expert, Mr. Banduch, admitted that the Covered Goods and Accused Products "are intended to serve the same purpose." Ex. R 119:17-120:24. Circular saw blades come in various configurations, but the most popular size is the 7¼" diameter blade with 24 teeth. *See* Ex. B 255:6-258:7; Ex. N 58:10-16. Examples of CMT's and Apex's 7¼" blades with 24 teeth are depicted above. Parts II.A and C, *supra*; *see also* Ex. R 119:17-120:24. The overlap extends to blades of other diameters and tooth counts, further evidencing the identical nature of the goods. *See* Ex. J at 17-47 (listing CMT products); Ex. C at Ex. 6 (Apex products).

### d. Apex's Accused Products Are Sold in the Same Facilities and Channels of Trade as CMT's Covered Goods

When considering "the similarity of facilities," the "key question is whether both products are sold in the same channels of trade." *Rosetta Stone*, 676 F.3d at 155 (cleaned up). The answer is unequivocally yes. Apex's Accused Products and CMT's Covered Goods are sold in the same

types of physical stores and by the same types of e-commerce sites.

Indeed, both Apex's and CMT's saw blades are sold in some of the very same physical stores, including Menards, Brannen's, Contractor Tool Supply, Dykes Lumber, Angerstein's, and True Value. Ex. P 121:12-16 (Menards); Ex. R 164:23-165:2 (Menards); Ex. W 127:15-23 ("Menards, but not only Menards"), 248:5-19 ("[I]t never was a question to me that there was some overlap of online and off line proximity of sales in this case . . . ."), 253:2-8 ("I have never disputed that . . . there's been some both in-store and online proximity in this case"); Ex. B 170:22-172:3 (Contractor Tool Supply, Brannen's, Dykes Lumber, True Value, Harmco); Ex. E Fig. 12 (reproducing Ex. J at 48); *see also* Ex. C ¶¶ 20-26.

Apex's and CMT's saw blades are also sold on many overlapping e-commerce sites, such as Amazon, Lowe's, Contractor Tool Supply, and Acme Tools. Ex. R 164:2-165:11 (Q: "So is it fair to say that both CMT and Crescent sell their blades online through overlapping distributors?" A: "Online, correct."); Ex. W 248:5-19, 253:2-8; Ex. AA at 6-7; Ex. I at 32-33, 84; Ex. K at 12-19.

### e. Apex's Accused Products Are Advertised in the Same Ways as CMT's Covered Goods

When comparing advertising, courts consider several factors, including the "media used, the geographic areas in which advertising occurs, the appearance of advertisements, and the content of advertisements." *CareFirst,* 434 F.3d at 273. Apex advertises through the same media as CMT to target the same customers and consumers. Both parties, for example:

1. Attend U.S. trade shows, *e.g.*, Ex. B 358:22-359:23 (CMT); Ex. CC at 18-46 (Apex); Exhibit BB at 11 (Apex);

2. Distribute product catalogs, *e.g.*, Ex. H at 34-68 (CMT); Ex. K at 3-7 (Apex);

3. Provide in-store product displays, *e.g.*, Ex. I at 1-15 (CMT); Ex. CC at 49 (Apex);

4. Are active on social media, *e.g.*, Ex. I at 34-70 (CMT); Ex. I at 16-23 (Apex);

5. Have strong e-commerce presences, including their own websites and the websites of distributors, *e.g.*, Ex. I at 77-79 (CMT): Ex. I at 85-86 (Apex); Ex. K at 15-19 (CMT and Apex).

6. Are readily found through web searches, *e.g.*, Ex. K at 8-14 (CMT and Apex). These advertising activities reach the same U.S. customer base. Moreover, the content and appearance of their advertisements are similar. As seen in the examples above, Apex's advertising for the Accused Products prominently feature the color orange and depict closeups of a worker's hands holding a saw cutting wood or staged, promotional photographs of the saw blades, just like CMT's advertising. Often, the parties use video to promote their products. When the blades are in active use, i.e., rotating several thousand times per minute—or even stationary after being used, i.e., with their text and graphics removed—they become virtually indistinguishable. Below are images from one of CMT's video advertisements and from one of Apex's video advertisements. Without being labeled, an observer cannot tell which image is CMT and which is Apex.





<table>
<tr><td>Ex. I at 92 (image cropped).</td><td>Ex. I at 91 (image cropped).</td></tr>
</table>

**f.      Apex Intended to Infringe CMT's Orange Mark**

Bad faith may be inferred when a junior user has knowledge of the senior user's mark. *Variety Stores, Inc. v. Walt-Mart Stores, Inc.*, 888 F.3d 651, 665 (4th Cir. 2018). And where there is a "striking similarity" between the marks, courts have "correctly inferred" that the junior mark was adopted "with the intent of deriving benefit from" the senior mark. *All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 512 (5th Cir. 2018); *see also Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991).

In 2017, Apex rebranded its Crescent product lines and introduced a new color palette.  As part of the rebrand, Apex ███████████████████████████████████████████████ ████████  Part II.C, *supra*.  The analyst who ███████████████████████████████ ████████████████████████████████████████ (Ex. BB at 23), ████████████████████ ████████████████████████████████████ along with a figure from the '625 Registration (Ex. BB at 22).

For Crescent's new brand palette, Apex selected a "primary" color it uniformly referred to as "orange."  Part II.C, *supra*.  Apex unmistakably intended to shift Crescent's brand from the color red to the color orange.  Part II.C, *supra*; Ex. F ¶¶ 46-47.  By September 2017, Apex settled on Pantone 2349c as Crescent's new primary color, completing its move from "Red" (Crescent's "Previous" color) to "Orange" (Crescent's "Future" color).  Part II.C, *supra* (reproducing a figure from Ex. F ¶ 46).  By November 2017, Apex had renamed Pantone 2349c to "Rawhide," "Rawhide Orange," or "Crescent Rawhide Orange."  Part II.C, *supra*.

In 2020, already knowing about CMT's Orange Mark, Apex decided to enter the saw blade business, directly challenging CMT.  Part II.C, *supra*.  Apex's final saw blade design included a coating that was orange in color.  Part II.C, *supra*.  Apex's own color expert here conceded that "60% of a person's reasoning to purchase an item is usually based on its color."  Ex. U 10:22-11:3.  This "striking similarity" strongly implies that Apex intended to improperly benefit from CMT's Orange Mark.  *All. for Good Gov't*, 901 F.3d at 512; *Acad. of Motion Picture*, 944 F.2d at 145.

But Apex's bad faith did not stop there.  An infringer expanding its use of a mark, despite demands from the owner to stop, is also "evidence that supports a presumption" of "bad faith."  *Lone Star*, 43 F.3d at 937.  Apex launched its saw blades through Lowe's, a large home center in the U.S.  Part II.C, *supra*.  The appearance in Lowe's led CMT to issue several cease-and-desist

letters throughout 2021, demanding that Apex stop using CMT's Orange Mark. Part II.C, *supra*. Rather than stop, however, Apex escalated its infringement. By early 2023, Apex aggressively expanded its sales to Menards— ███████████ █ ███████ — Ex. Q 109:8-110:21. Apex's expansion to █████████████ , combined with its predatory pricing strategy, left CMT no choice but to initiate this lawsuit. Dkt. 1 (filed Aug. 24, 2023). Apex's actions, knowingly adopting CMT's Orange Mark, expanding into saw blades, ignoring cease-and-desist letters, *and then* undercutting CMT's pricing ███████ █ █████ are exactly the type of bad-faith activity contemplated and condemned by the *Lone Star* court. *See* 43 F.3d at 937.

### g. Anecdotal Evidence and Survey Evidence Demonstrate Significant Actual Confusion

"Actual confusion can be demonstrated by both anecdotal and survey evidence." *Rosetta Stone*, 676 F.3d at 156 (cleaned up). "Both types of evidence are relevant, and neither category is necessarily required to prove actual confusion." *Id.*; *see also SafeRack*, 350 F. Supp. 3d at 451.

In July 2022, during a routine sales visit by CMT, the Senior Procurement Executive at Harmco Fasteners, an experienced buyer familiar with CMT's products, reported his mistaken belief that CMT manufactured saw blades for Apex. This episode arose because the orange color of the Accused Products confused Harmco's executive as to their source. Ex. G at 2-4.

In November 2024, CMT attended the STAFDA trade show.[5] While at CMT's booth, a CMT sales manager was told by the owner of A.N.Co. Fastener Sales that he had been attempting to contact CMT for several days to no avail. A.N.Co.'s owner then explained that after failing to contact CMT, he ordered 6,000 "NailSlicer" blades (i.e., an Accused Product, *see* Part II.C, *supra*) on Amazon. A.N.Co.'s owner eventually realized that he mistook CMT's saw blades and orange-

---

[5] "STAFDA" is the Specialty Tools & Fasteners Distributors Association. STAFDA puts on an annual tradeshow. CMT and Apex have both attended various STAFDA trade shows.

themed booth at STAFDA for the Crescent Tools booth.  Ex. G at 2-4.  The Harmco and A.N.Co. anecdotes strongly favor finding a likelihood of confusion among CMT and Apex customers.

Even Apex's own industry expert concedes the possibility of confusion here.  Not only did Mr. Banduch testify that consumers "sometimes make mistakes because they're in a hurry," but agreed that if consumers are "accustomed to only ever seeing one orange blade" (i.e., CMT's), that "they could grab the wrong blade" when presented with two orange blades (i.e., CMT's and Apex's).  Ex. R 190:12-22, 205:3-206:23.

Confusion is not just limited to customers in a point-of-sale environment.  Apex's Rule 30(b)(6) designee could not tell whether an image posted to a Crescent social media account was of a Crescent blade.  Ex. P 100:19-102:11 (discussing Ex. BB at 1).  Mr. Walsh also confirmed that even if he saw "a physical sample of a blade" with just CMT's Orange Mark on it, he would not know if it was a Crescent blade.  Ex. P 294:8-15.  According to Mr. Walsh, it would take "an engineer" to tell who makes a blade if it only has CMT's Orange Mark on it.  Ex. P 294:16-23.

Apex's other witnesses similarly could not identify a blade bearing only the CMT Orange Mark.  Ex. N 207:4-208:17 (Q: "Suppose you're at a construction site and you see this, do you know it's a Crescent blade?"  A: "No."); Ex. M 236:17-237:1 (Q: "Is it a Crescent blade?"  A: "I don't know.").  Even Apex's industry expert could not identify the blade in an image posted to a Crescent social media account.  Ex. R 209:8-20 (discussing Ex. BB at 2; Q: "Do you know if that's a Crescent blade?"  A: "It's not likely a Crescent blade.").  Mr. Banduch also testified generally about a blade with just CMT's Orange Mark on it: "It could be Apex.  It could be CMT."  Ex. R 207:21-208:10.  Whether "[i]t's possible that [a] likelihood of confusion could exist" between CMT's and Apex's blades, Mr. Banduch unequivocally stated "Yes."  Ex. R 211:17-212:4.

Even Apex's own investigator, Marksmen, hired to shop for saw blades, unwittingly

exposed multiple instances of confusion.  The first was in its discussions with ████.  Part II.B, *supra*.  The second was when Marksmen contacted customer support for Craftsman® brand saw blades (Dkt. 117-1 at APEX00025231-38), asking if Craftsman sold a "circular saw blade that is orange" (Ex. DD at 6).  Craftsman replied that "we don't have orange ones."  Ex. DD at 7.  When the Marksmen representative insisted that his father "swears it is orange," Craftsman corrected the representative, noting that "there is a brand that has orange blades" and that "the brand is CMT."  Ex. DD at 7-8.  Marksmen then conceded, saying "I will check with him and see if he might be confused!"  Ex. DD at 8.  These examples leave no doubt that confusion over the source of Apex's orange-colored blades is not hypothetical, it happens in the real world and even to Apex's ████ ████.

Beyond anecdotal evidence, CMT's expert, Dr. Thomas Maronick, conducted a *Squirt*-formatted survey designed to measure whether Apex's use of orange causes a likelihood of confusion with CMT's Covered Goods at the point of sale.  Dr. Maronick reported a "net confusion of 20.6%," far above the 10% threshold recognized in trademark scholarship as indicating a likelihood of confusion.  Ex. D ¶ 4.  Dr. Maronick also noted that written answers provided by survey participants "support the argument that an important driver of the likelihood of confusion is the fact that the two products have a similar color."  Ex. D ¶ 4.

Apex also conducted a survey.  Apex's survey expert, David Franklyn, however, conducted an *Eveready*-formatted survey.  Ex. V at 5.  *Eveready* surveys are used to measure confusion when a mark is "top-of-mind," meaning consumers have unaided awareness of the mark.[6]  But Mr. Franklyn did not empirically assess whether—or otherwise identify **any evidence** that—CMT's

---

[6] "Top of mind" is a term of art in the marketing and survey worlds.  For a general discussion of top-of-mind marks and the use cases for *Squirt* and *Eveready* surveys, see Ex. FF.

Orange Mark is top of mind.  *See* Ex. V at 5-6.  Mr. Franklyn himself has admitted that using an *Eveready* study when the mark is not top-of-mind does "not meaningfully measure[]" likelihood of confusion and "is likely to produce near-zero or total-zero results."  Ex. X at 21; *see also* Ex. FF at 735.  Unsurprisingly, his survey here found exactly that: "0.0%" confusion.  Ex. V at 3.  Paraphrasing Mr. Franklyn from a different litigation in which he served as a survey expert:

> [I]t is entirely possible that [Mr. Franklyn] considered or even piloted *Squirt*-style surveys which he realized would indicate confusion if he showed the respondents [CMT's Covered Goods].[7]
>
> Either way, the [*Eveready*] survey format was fundamentally inappropriate for measuring confusion between [CMT's Covered Goods] and [Apex's Accused Products].  ***The results should be totally disregarded on that basis alone***.

Ex. X at 21 (emphasis added).  Even if not "totally disregarded," Mr. Franklyn's findings should be given little weight because he knowingly chose the wrong survey format and knew the format he chose was wrong.  *See* Ex. FF; *Akiro, LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 333, 335, 340 (S.D.N.Y. 2013) (treating defendant's expert's use of an *Eveready* survey as an admission that plaintiff's mark is strong, but discounting the survey's findings of less than 2% net confusion because the plaintiff's mark may not have been top of mind).  With Mr. Franklyn's survey properly discounted or "disregarded" (as Mr. Franklyn might say), there is no genuine dispute that the survey evidence here strongly favors finding a likelihood of confusion.

### h.    The Accused Products and Covered Goods Are of the Same Quality

Where the infringer's products are "of approximately the same quality as" the mark holder's, it increases the likelihood of confusion.  *VonRosenberg v. Lawrence*, 412 F. Supp. 3d 612, 654 (D.S.C. 2019) (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 461 (2d Cir. 2004)).  Here, the quality of Apex's and CMT's goods are approximately the same.  *See* Part III.A.iv.c, *supra*; *see*

---

[7] Mr. Franklyn had "absolutely no idea" whether Apex had any *Squirt* surveys performed and did not bother to ask.  Ex. W 186:11-20.

*also* Ex. Y at 34-35 ███████████████████████████

### i. Consumers Are As Sophisticated As the General Public

If the products are expensive and consumers are highly sophisticated, it can lessen the likelihood of confusion. *See Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 127-28 (4th Cir. 1990). This factor thus favors a finding of confusion because saw blades are relatively low cost and are sold to the general public, who generally make purchasing decisions quickly. Ex. R 205:3-206:23 (Q: "[I]f you're accustomed to only ever seeing one orange blade and now there are two, is it possible that they could grab the wrong blade?" A: "Yes."); Ex. CC at 5 ("A lot of times I'll run into the store and when I come out, I realized I grabbed the wrong blade.").

### B. Summary Judgment Is Appropriate on Apex's Fraud on the PTO Claim Because There Are No False Representations and No Evidence of Intent

To demonstrate fraud, a defendant must show that "an applicant knowingly ma[de] false, material representations of fact." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009); *see also* 4 McCarthy on Trademarks and Unfair Competition § 31:61 (5th ed.) [hereinafter MCCARTHY]. "Subjective intent to deceive is an ***indispensable element*** in the analysis" and must be "proven ***to the hilt*** with clear and convincing evidence." *Bose*, 580 F.3d at 1243, 1245 (emphases added); *see also Nallapati v. Justh Holdings, LLC*, 2023 WL 2436008, at *4 (E.D.N.C. Mar. 9, 2023).

Apex's fraud claim is baseless. Apex seems to rely on CMT's response to an office action during prosecution of the '625 Registration. Dkt. 42 ¶ 41. In that response, CMT argued that a federal court judgment it submitted "[wa]s binding on the Examining Attorney and the Board." Ex. H at 23 (citing the Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 510.02(a)). This is not a statement of fact at all, it is a recitation of law, i.e., a Trademark Office rule. CMT was very forthcoming that the judgment it submitted "concern[ed] a related trademark" application, still pending at the time, of " 'orange color on router bits'. " Ex. H at 22. The

Examiner was free to review the rule and free to determine whether to accept or reject CMT's argument—it is simply specious for Apex to argue otherwise.

Even if Apex could argue falsity, it still has no evidence—let alone clear and convincing evidence—of an intent to deceive. Attorney Marilyn Brogan prosecuted the '625 Registration (*e.g.*, Ex. H at 25), and yet Apex did not request any discovery from Ms. Brogan, much less secure from her any evidence of intent. Apex also did not seek discovery or secure any evidence from CMT concerning the intent of anyone involved in prosecuting the '625 Registration. Nor does Apex have any expert testimony concerning any aspect of the alleged fraud.

With no factual misstatements and *zero* evidence of intent, Apex's fraud claim fails as a matter of law. And because Apex's unclean hands defense is predicated solely on these spurious fraud allegations, it too fails.

### C. Summary Judgment Is Appropriate Because Apex Has Conceded That CMT's Orange Mark Is Not Functional

A mark is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Qualitex*, 514 U.S. at 165. If different colors can be used on the article, that weighs against finding any color to be functional. *SafeRack*, 350 F. Supp at 453. The defendant bears the burden of rebutting the presumption that a registered mark is valid. *Retail Servs., Inc. v. Freebies Publ'g,* 364 F.3d 535, 543 (4th Cir. 2004).

By obtaining the '625 registration, CMT has already proven that its Orange Mark is not functional, and Apex cannot rebut the presumption of validity. While a saw blade's coating may provide a functional benefit, like a PTFE coating does, the color of the coating provides no benefit other than source identification and, therefore, is not functional. *Qualitex*, 514 U.S. at 165. Apex's Rule 30(b)(6) designee explicitly admitted this:

> Q: [I]s it Apex's position that the color of its saw blades improves the blade's functionality?

A:   No.

Ex. P 89:20-91:4. Apex's other fact witnesses agreed. *E.g.*, Ex. N 203:16-19; Ex. Q 157:15-159:4.

Even Apex's experts agreed. Ex. Y at 25; Ex. R 121:25-122:12. Apex's witnesses also confirmed

that circular woodworking saw blades come in a rainbow of different colors. Ex. R 122:6-8, 129:2-

17; Ex. U 9:15-18; Ex. Q 159:5-159:18; *see also* Dkt. 37 at 10-20.

### D.   Summary Judgment Is Appropriate Because CMT's Orange Mark Is Not Abandoned by Text and Graphics Being Placed on Top of It

Apex argues that CMT's Orange Mark should be held abandoned because CMT has not

sold "monochromatic orange woodworking sawblades" for "at least three consecutive years prior

to" this lawsuit and has no "intent to resume use of" its Orange Mark. Dkt. 42 ¶¶ 76-78. Apex

also asserts that CMT's Covered Goods are "not monochromatically orange" because they "also

contain numerous additional design and literal elements." Dkt. 42 ¶ 1.

CMT has consistently and without interruption used its Orange Mark since 1997.

Parts II.A, B, *supra*. There is no requirement that CMT use its Orange Mark without "additional

. . . elements," and any such requirement would be commercially impracticable, given how saw

blades are often sold without packaging. *E.g.*, Ex. E, Fig. 12; Ex. I at 32-33, 84; Ex. K at 12-18.

Moreover, courts recognize that CMT's limited use of silk screening over its Orange Mark is

permissible and does not compromise the Mark's validity. *See Keds Corp. v. Renee Int'l Trading

Corp.,* 888 F.2d 215, 221 (1st Cir. 1989) ("It has already been settled by this court that two

trademarks can always be used together without invalidating either mark."). Apex further ignores

that the text and other marks silk-screened on to CMT's Covered Goods come off after use.

Part II.A, *supra*. Accordingly, Apex's abandonment claim fails as a matter of law.

### E.   Summary Judgment Is Appropriate Because the Alleged Delay Does Not Amount to Laches and Waiver Is Not Available as a Defense

Laches requires CMT to have *unreasonably* delayed pursuing a remedy and Apex to have

been prejudiced.  *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996).

Neither happened here.  Delays shorter than the applicable statute of limitations will not support a

laches defense.  MCCARTHY § 31:23.  Under the Lanham Act, courts "borrow" the most analogous

state limitations period.  *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 294 (4th Cir.

2021).  Here, Apex alleges only a 20-month delay (Dkt. 42 at 10), which is well short of the

shortest applicable period, i.e., 4 years.[8]  Thus, Apex's laches defense presumptively fails.

Apex's waiver defense fares no better.  The Lanham Act does not recognize a waiver

defense to infringement.  *See* 15 U.S.C. § 1115(b) (listing exclusive defenses, not including

waiver); *see also* MCCARTHY § 31:43.  Apex has no legal basis for asserting laches or waiver.

## IV.   Conclusion

For the foregoing reasons, CMT respectfully requests that the Court grant summary

judgment against Apex on Counts I and II of the Second Amended Complaint (Dkt. 37), grant

summary judgment against Apex on Apex's First, Second, and Fourth Counterclaims

(Functionality, Fraud, Abandonment), as well as Apex's First, Third, and Fourth Affirmative

Defenses (Unclean Hands, Waiver, Laches) (Dkt. 42).  CMT reserves the right to request a

permanent injunction and all other remedies available to it.  *See* Dkt. 37 at 18-20.


Dated: April 2, 2025                          Respectfully submitted,

                                             /s/ Joshua B. Durham
                                             Edward B. Davis (NC Bar ID 27546)
                                             Joshua B. Durham (NC Bar ID 25414)
                                             BELL, DAVIS & PITT
                                             227 W. Trade Street, Suite 1800
                                             Charlotte, NC 28202

---

[8] In North Carolina, the limitations period is four years.  *Lyons Partnership, L.P. v Morris Costumes, Inc.*, 243 F.3d 789, 796 (4th Cir. 2001) (citing N.C. Gen. Stat. § 75-16.2).  In New York, the period is six years.  *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 419 (2d Cir. 2018).

(704) 227-0400
ward.davis@belldavispitt.com
jdurham@belldavispitt.com

Edgar H. Haug (*pro hac vice*)
Robert E. Colletti (*pro hac vice*)
Mark Basanta (*pro hac vice*)
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, NY 10151
(212) 588-0800
ehaug@haugpartners.com
rcolletti@haugpartners.com
mbasanta@haugpartners.com

*Attorneys for Plaintiffs*
*CMT USA, Inc. and CMT Utensili S.p.A.*

<u>**CERTIFICATE OF USE OF ARTIFICIAL INTELLIGENCE**</u>

Pursuant to this Court's order of June 13, 2024 regarding the use of artificial intelligence in court filings, Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A., through their undersigned counsel, hereby certify:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Signed this 2nd of April, 2025 in New York, NY.


<u>/s/ Robert E. Colletti</u>
Robert E. Colletti (*pro hac vice*)
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, NY 10151
(212) 588-0800
rcolletti@haugpartners.com

*Attorney for Plaintiffs CMT USA, Inc.*
*and CMT Utensili S.p.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System. Service of same on any counsel of record will be accomplished through the Court's electronic filing system in accordance with Federal Rule of Civil Procedure 5(b)(2)(E).

*/s/ Joshua B. Durham*
Joshua B. Durham (NC Bar ID 25414)
**BELL, DAVIS & PITT**
227 W. Trade St., Suite 1800
Charlotte, NC 28202
(704) 227-0400
jdurham@belldavispitt.com