# EXHIBIT P

The
# Trademark Reporter®

International Trademark Association

The Law Journal of the International Trademark Association

An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior Marks That Are Not Top-of-Mind
*Hal Poret*

*Commentary:* The Science of Proving Trademark Dilution
*Barton Beebe, Roy Germano, Christopher Jon Sprigman, and Joel H. Steckel*

*Reflection:* Trademark Office: Year-End Wrap-Up
*Mary Boney Denison*

November–December, 2019 Vol. 109 No. 6

# INTERNATIONAL TRADEMARK ASSOCIATION

***Powerful Network Powerful Brands***

**675 Third Avenue, New York, NY 10017-5704**

**Telephone: +1 (212) 642-1733 email: tmr@inta.org Facsimile: +1 (212) 768-7796**

**OFFICERS OF THE ASSOCIATION**

DAVID LOSSIGNOL .......... *President*
AYALA DEUTSCH .......... *President-Elect*
TIKI DARE .......... *Vice President*
ZEEGER VINK .......... *Vice President*
JOMARIE FREDERICKS .......... *Treasurer*
DANA NORTHCOTT .......... *Secretary*
ANNA CARBONI .......... *Counsel*
ETIENNE SANZ DE ACEDO .......... *Chief Executive Officer*

***The Trademark Reporter*** **Committee**

**EDITORIAL BOARD**

**EDITOR-IN-CHIEF, CHAIR**
JESSICA ELLIOTT CARDON

**STAFF EDITOR-IN-CHIEF**
WILLARD KNOX

**Senior Editors**

GLENN MITCHELL
RAFFI V. ZEROUNIAN
PAMELA S. CHESTEK
ELISABETH KASZNAR FEKETE
FABRIZIO MIAZZETTO
BRYAN K. WHEELOCK
ANDREW J. GRAY IV

**Senior Staff Editor**
BEVERLY HARRIS

**Staff Editor**
ELIZABETH VENTURO

**Editors**

TARA AARON
BRUCE W. BABER
JOLIEN BARBIER
MARTIN J. BERAN
DANIEL R. BERESKIN
SHELDON BURSHTEIN
ROBERT H. CAMERON
SUJATA CHAUDHRI
JACQUELINE CHORN
THEODORE H. DAVIS JR.
ANNE DESMOUSSEAUX
MEGHAN DILLON
KAREN L. ELBURG
MATTHEW EZELL
DÉSIRÉE FIELDS
ALFRED C. FRAWLEY
LESLEY MCCALL GROSSBERG
MICHAEL HANDLER
NATHAN HARRIS
GUY HEATH
JANET L. HOFFMAN
BARRY R. HORWITZ
BRUCE ISAACSON
E. DEBORAH JAY
SIEGRUN D. KANE
PETER J. KAROL
J. MICHAEL KEYES
REMCO KLÖTERS
JENNIFER KWON
SCOTT J. LEBSON
JOHN LINNEKER
NELS T. LIPPERT
JOEL G. MACMULL
DOUGLAS N. MASTERS
J. DAVID MAYBERRY
BRYCE J. MAYNARD
J. THOMAS MCCARTHY
MARCOS MERCADO
GEORGE W. MOXON II
AMANDA NYE
BRANDON M. RESS
MICHIEL RIJSDIJK
TOM SCOURFIELD
JENNIFER S. SICKLER
RINITA SIRCAR
RANDEL S. SPRINGER
SARA SULEIMAN
PAUL TACKABERRY
IFEYINWA A. UFONDU
MARTIN VIEFHUES
VERENA VON BOMHARD
JEFFREY A. WAKOLBINGER
RITA WEEKS
JOHN L. WELCH
JIAN XU
JOSEPH S. YANG

**Advisory Board**

MILES J. ALEXANDER
WILLIAM M. BORCHARD
CLIFFORD W. BROWNING
LANNING G. BRYER
SANDRA EDELMAN
ANTHONY L. FLETCHER
ROBERT M. KUNSTADT
THEODORE C. MAX
KATHLEEN E. MCCARTHY
JONATHAN MOSKIN
VINCENT N. PALLADINO
JOHN B. PEGRAM
ROBERT L. RASKOPF
PASQUALE A. RAZZANO
SUSAN REISS
PIER LUIGI RONCAGLIA
HOWARD J. SHIRE
JERRE B. SWANN, SR.
STEVEN M. WEINBERG

The views expressed in *The Trademark Reporter* are those of the individual authors and do not necessarily reflect those of INTA.

*The Trademark Reporter* (ISSN 0041-056X) is published electronically six times a year by the International Trademark Association, 675 Third Avenue, New York, NY 10017-5704 USA. INTA, the INTA logo, INTERNATIONAL TRADEMARK ASSOCIATION, POWERFUL NETWORK POWERFUL BRANDS, THE TRADEMARK REPORTER, and inta.org are trademarks, service marks, and/or registered trademarks of the International Trademark Association in the United States and certain other jurisdictions.

The Trademark Reporter®

# AN EMPIRICAL ASSESSMENT OF THE EVEREADY SURVEY'S ABILITY TO DETECT SIGNIFICANT CONFUSION IN CASES OF SENIOR MARKS THAT ARE NOT TOP-OF-MIND

***By Hal Poret****

**Table of Contents**

I. Introduction ........ 936
II. The Eveready Format ........ 937
III. The Potential Relevance of Consumer Awareness ........ 937
IV. The Issue of Top-of-Mind Awareness ........ 940
V. The Research Design ........ 944
   A. The Unaided Awareness Surveys ........ 944
   B. The Eveready Confusion Surveys ........ 949
VI. The Research Results ........ 952
VII. Conclusion ........ 954

* President, Hal Poret LLC, Sleepy Hollow, New York, Member, International Trademark Association. The author has conducted over 500 trademark surveys and given expert testimony in over 200 U.S. District Court litigations and TTAB proceedings.


Case 3:24-cv-00137-TMR-DCK Document 196-16 Filed 05/09/25 Page 4 of 23

## I. INTRODUCTION

One of the most significant and frequently debated topics in connection with the use of surveys to assess likelihood of confusion in Trademark Trial and Appeal Board (TTAB) and district court trademark infringement cases involves the applicability and reliability of the well-established "Eveready survey" format. One proposition advanced at times by certain commentators and frequently cited by attorneys seeking to challenge survey evidence is that an Eveready survey is appropriate only to test for likelihood of confusion in cases where the senior mark[1] is "top-of-mind."[2] This article presents survey research designed and conducted under this author's direction to empirically test the ability of the Eveready survey to detect significant levels of confusion—that is, levels sufficient to support a finding that there is a likelihood of confusion—in certain scenarios involving senior marks that are *not* top-of-mind. The research described herein empirically demonstrates that Eveready surveys are capable of detecting significant levels of confusion in some cases of senior marks that are *not* top-of-mind. Accordingly, the proposition that an Eveready survey is appropriate[3] only in the case of senior marks that are top-of-mind is not valid, and the fact that a senior mark is not top-of-mind should not, on its own, be grounds for rejection of an Eveready survey.

Part II of this article describes the Eveready survey format. Part III discusses the potential relevance of consumer awareness to the accuracy and reliability of the Eveready survey format's findings regarding likelihood of confusion. Part IV summarizes prior discussion of the issue of "top-of-mind" awareness in the literature

---

1 Such a proposition regarding "top-of-mind" awareness applies to the *senior* mark in the traditional case of forward confusion, because the survey exposes respondents to the junior mark and determines whether respondents report a connection to the senior mark. In the case of reverse confusion, where respondents would instead be exposed to the senior mark, the corresponding proposition would concern whether there is top-of-mind awareness of the *junior* mark. Unless otherwise noted, the discussion herein assumes matters involving forward confusion, and all the surveys conducted for this article measure forward confusion.

2 *See, e.g.*, Phyllis Welter, *Trademark Surveys*, § 24.03[1][c] (1999); Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 TMR 739, 740-43, 745-46 (2008) (hereafter "*Straitened Scope*"). As discussed in more detail below, "top-of-mind" is a common market research concept that measures or reflects the frequency with which a brand comes to a consumer's mind on an *unaided* basis when prompted only with a generic product category.

3 The term "appropriate" is used herein to refer to situations where the Eveready format is capable of detecting significant levels of confusion (if confusion is indeed likely) and, therefore, should not be rejected as either inadmissible or deserving of no weight solely because the Eveready format was employed. "Appropriate" is not intended to mean that the survey format is the correct strategic choice for a particular party or that the survey format is the best or only option that could generate reliable data on the topic of likelihood of confusion. That question is beyond the scope of this paper.

regarding the Eveready survey and explores deficiencies in the theoretical basis for this purported requirement. Part V presents the design and methodology of surveys testing the extent to which the Eveready survey successfully detects confusion at levels meaningful enough to potentially support a finding of likelihood of confusion in certain cases involving the use of trademarks that are similar to senior marks that are not-top-of-mind. Part VI examines the data from these surveys and discusses the implications for the accuracy and reliability of Eveready surveys in cases involving senior marks that do not enjoy top-of-mind awareness.

## II. THE EVEREADY FORMAT

The Eveready survey derives its name from a survey conducted to test whether use of the brand EVER-READY in connection with a lamp was likely to cause confusion with the EVEREADY mark for batteries.[4] Respondents in the survey were shown a picture of the allegedly infringing EVER-READY lamp and were asked who had manufactured it. The survey then asked respondents to name any other products put out by the same concern. While relatively few respondents identified the plaintiff (Union Carbide) as the source of the lamp, a substantial percentage of respondents answered that the concern putting out the lamp also sold batteries. This was seen as establishing that respondents mistakenly connected the defendant's EVER-READY lamp with the maker of EVEREADY batteries.

The term "Eveready" has since come to identify the category of confusion surveys in which respondents view only the allegedly infringing mark and are asked questions to determine whether, without additional stimulus, they report a mistaken connection to the senior mark, in contrast to a survey format (commonly referred to as "Squirt") in which both parties' marks are shown and respondents are directly asked about a potential connection between the parties.[5]

## III. THE POTENTIAL RELEVANCE OF CONSUMER AWARENESS

Because the Eveready survey does not expose respondents to the senior mark, confusion can be evidenced only if respondents, on their own, name the senior user, identify its products or services, or give other answers sufficient to make reasonably certain that they are thinking of the senior user when exposed to the allegedly

4 Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976).

5 *See* Jerre B. Swann & R. Charles Henn Jr., *Likelihood of Confusion Surveys: The Ever-Constant Eveready Format; The Ever-Evolving Squirt Format*, 109 TMR 671, 673 (2019) (hereafter "*Ever-Constant Eveready*").

infringing use. By definition, respondents can identify the senior user during an Eveready survey only if they are already aware of the senior mark prior to the survey, such that a memory of the senior mark can be accessed when triggered by the survey showing respondents a confusingly similar use.[6] For this reason, some commentators have asserted that the Eveready format is appropriate only in cases where there is a certain degree of consumer *awareness* of the senior mark—that is, where the senior mark *is* accessible in the memories of the relevant consumer base.[7]

The first questions this raises are *why* and *when* the level of consumer awareness is relevant to the question of whether an Eveready survey can reliably assess likelihood of confusion. The fundamental purpose of a likelihood-of-confusion survey is to test whether confusion will occur *under realistic marketplace circumstances*.[8] The actual marketplace is full of senior marks lacking high levels of consumer awareness, and there are many instances in which consumers who encounter an allegedly similar junior mark will neither have previous awareness of the senior mark nor gain awareness of the senior mark in the course of encountering and considering a purchase of the product bearing the junior mark. For instance, consider a scenario in which: (1) the senior user's mark is almost entirely unknown to the general public because the senior user exclusively sells advanced weaponry to the U.S. military as part of extremely sophisticated, specialized, and expensive government contracts; (2) the junior user sells an ordinary consumer product through common retail channels (stores and websites); and (3) as a result of (1) and (2), the marketplace reality is that prospective consumers of the junior user's product will not be aware of the senior mark and will not experience confusion with respect to the senior user.[9] Imagine that in such a case an

---

6 Jerre B. Swann, *Eveready and Squirt—Cognitively Updated*, 106 TMR 727, 732-35 (2016) (hereafter "*Cognitively Updated*").

7 *Id.*

8 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:163 (4th ed. 2009) ("the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results.")

9 This scenario is not far afield from the facts of the case of *Valador, Inc. v. HTC Corp.*, 241 F. Supp. 3d 650 (E.D. Va. 2017), in which plaintiff supplied modeling and simulation software to an extremely specialized niche market (primarily NASA and the Department of Veteran's Affairs) and the alleged infringer used the same mark (VIVE) for a virtual reality/video game headset sold at retail to ordinary consumers through electronics stores and websites. The court granted summary judgment to defendant on the trademark infringement claim, relying heavily on the parties' sale of "different things through different channels to different customers." *Id.* at 671. Consistent with the court's assessment of the likelihood of confusion under the true marketplace circumstances, the defendant's Eveready survey confirmed that confusion is not likely under such circumstances. While lack of awareness of the plaintiff's mark might be a chief *reason* for the lack of likelihood of confusion, this does not affect the *accuracy* or *reliability* of a

Eveready survey exposes prospective consumers to the junior user's product and demonstrates prong (3) of the scenario—that is, it shows a zero percent (0%) rate of consumers mistakenly connecting the junior product to the senior user. In such a scenario, the fact that prospective consumers of the junior user may not be aware of the senior mark does not render the finding of the Eveready survey (0% confusion) inaccurate or unreliable. Rather, lack of awareness of the senior mark may serve to explain *why* confusion is not likely to occur—both in the survey and the real world—namely, because confusion simply will not occur when consumers are both unaware of the senior mark and unlikely to encounter the senior mark in reasonably close proximity to the junior mark in the marketplace.[10] With this understood, the proposition that there must *always* be consumer awareness of a senior mark for an Eveready survey to accurately assess whether confusion is likely to occur in the actual marketplace is objectively unsupportable.[11]

The issue of consumer awareness of the senior mark becomes relevant to the accuracy and reliability of the Eveready format where the parties' marks are used in close enough proximity that consumers will encounter both with appreciable frequency[12]—for instance, where the parties' products/services are directly

---

finding that there is no likelihood of confusion. Rather, such lack of awareness is a real marketplace factor that *explains* why confusion is not likely under current market conditions.

10 *See Ever-Constant Eveready*, 109 TMR 671, 672, 683 (2019) (confusion can only occur in the case of lesser-known senior marks where the junior use is proximate enough in the marketplace such that both parties' marks could be encountered in connection with each other and, therefore, exist simultaneously in the consumer's awareness.) The court in *Hypnotic Hats, Ltd. v. Wintermantel Enterprises*, 335 F. Supp. 3d 566, 597 n.10 (S.D.N.Y. 2018), held similarly that "if a senior mark is neither stored in memory nor proximate to a junior use, there is little possibility that it can be compared to the junior use sufficiently to generate a likelihood of consumer confusion."

11 Indeed, many courts have accepted in evidence and/or relied on Eveready surveys in cases where the relevant mark did not have high consumer awareness, but where an Eveready survey was the appropriate replication of marketplace conditions. *See, e.g.*, *Valador*, 241 F. Supp. 3d at 669 n.22 (Valador's VIVE mark) (noting that defendant's Eveready survey finding 0% confusion was conducted in accordance with "well settled and accepted methods" although unnecessary to support the court's finding of no confusion); Joules v. Macy's Merchandising Grp., Civil Action No.: 1:15-cv-03645-KMW (S.D.N.Y. 2016) (accepting Eveready survey where senior mark was JOULES); THOIP v. Walt Disney Co., 690 F. Supp. 2d 218, 2225-27 (S.D.N.Y. 2010) (declining to exclude results of Eveready survey commissioned by defendant); Fancaster, Inc. v. Comcast Corp., 832 F. Supp. 2d 380, 405-07 (D.N.J. 2011) (crediting results of Eveready survey commissioned by defendant). Kelly-Brown v. Winfrey, 95 F. Supp. 3d 350, 362 (S.D.N.Y. 2015) (accepting Eveready survey where senior mark was OWN YOUR POWER); GoSmile, Inc. v. Levine, 769 F. Supp. 2d 630, 643 (S.D.N.Y. 2011) (accepting Eveready survey where senior mark was GOSMILE mark); 3M Co. v. Mohan, No. 09-1413 ADM/FLN, 2010 U.S. Dist. LEXIS 81094, at *21 (D. Minn. Aug. 9, 2010) (accepting Eveready survey where senior mark was Littman stethoscope design mark).

12 *Cognitively Updated*, 106 TMR 727, 743 (2016).

competing or substantially overlapping[13] in the marketplace.[14] In such a scenario, lack of consumer awareness of the senior mark could cause an Eveready survey to fail to detect confusion, even though the actual marketplace conditions may render confusion likely. By presenting *only* the junior mark, the survey would fail to take account of the fact that consumers are reasonably likely to encounter the senior mark (and thus gain awareness of it) while shopping for and encountering the product bearing the junior mark.

For instance, consider a scenario in which the senior mark is not well-known but is used on products directly competing with the product sold under the allegedly infringing mark. In such a scenario, while survey respondents may not be aware of the senior mark, consumers shopping for the relevant type of product may encounter both the senior and junior marks in reasonably close proximity in the actual marketplace and may then be in position to experience confusion. In such a scenario, an Eveready survey may not fully reflect the likelihood of confusion, because the Eveready survey does not attempt to simulate marketplace exposure to both marks, that is, the fact that consumers may encounter the junior mark in close proximity to the senior mark.[15] For this subset of cases in which consumer awareness of the senior mark is relevant to the accuracy and reliability of the Eveready survey format—that is, cases where consumers would be reasonably likely to gain exposure to the senior mark in the course of encountering the junior mark because of the proximity of the parties' goods/services—the question then becomes what constitutes "awareness" of a senior mark.

## IV. THE ISSUE OF TOP-OF-MIND AWARENESS

In discussing the issue of consumer awareness of senior marks in the context of an Eveready survey, it has sometimes been stated that a senior mark must enjoy "top-of-mind" awareness. For

---

13 Cases of goods that are not directly competing but are substantially overlapping could include ones where one party offers a certain product and the other party offers accessories for that product, such as a mobile phone and a mobile phone case or charger. While a mobile phone case or charger is not a directly competing alternative to a mobile phone, such goods may be substantially overlapping in that they will generally be encountered and considered in proximity in the marketplace by the same consumer because of the goods having common channels, customers, and related uses.

14 *Straitened Scope*, 98 TMR at 740 (2008). Swann's latest article (with Henn) discusses the evolving concept of marketplace proximity given the complexities brought about by the online/digital (website and mobile) searching, browsing, and shopping experience. *See Ever-Constant Eveready*, 109 TMR at 673.

15 A further complication due to the chaos and complexity of the marketplace is that there are also cases involving more than one common marketplace scenario, including scenarios *both* where the parties' marks appear in close proximity and where they do not. In such cases, an Eveready survey may accurately and reliably assess confusion under the latter type of conditions but may potentially not apply well to the former type of conditions.

instance, commentator Phyllis Welter has suggested that the question of whether a senior mark is sufficiently accessible in consumer memory is equivalent to the question of whether the mark has unaided "top of mind" awareness.[16] A Southern District of New York court also recently characterized "top of mind" awareness of the senior mark as a requirement of the Eveready format.[17] In his earlier articles exploring the bounds of the Eveready and Squirt formats, Jerre B. Swann has also used the phrase "top-of-mind" in analyzing whether a mark is sufficiently accessible in consumer memory for an Eveready survey to trigger a connection to the senior mark when the respondent is exposed to the allegedly similar mark or use.[18] (In a more recent article, Swann and his coauthor, R. Charles Henn Jr., clarify that a mark does not need to be "top-of-mind" for a consumer to recall and mention the mark when prompted with an allegedly confusingly similar mark in an Eveready survey or in the real world.[19]) As a result of these various uses of the term "top-of-mind" in the literature, this author has frequently observed attorneys representing plaintiffs to challenge opposing Eveready surveys offered by defendants by arguing that a senior mark is not "top-of-mind."

In considering whether there is any theoretical support for a top-of-mind requirement, it is critical to consider what "top-of-mind" awareness means. The most common definition for a mark to be considered "top-of-mind" in the field of market research is that the mark is the *first* to come to a consumer's mind on an *unaided* basis when prompted only with the relevant generic *product category*.[20] For instance, if a certain percentage of consumers identify Apple as

---

16 Phyllis Welter, Trademark Surveys, § 24.03[1][c] (1999).

17 Hypnotic Hats, Ltd. v. Wintermantel Enters., 335 F. Supp. 3d 566, 597 n.10 (S.D.N.Y. 2018). The court in *Hypnotic Hats* gave minimal weight to a Squirt survey (but declined to exclude it) because of the court's finding that the parties' marks would not likely be encountered in close proximity under realistic marketplace conditions. The court, however, expressed the opinion that an Eveready survey would also not have been appropriate because the senior mark is not "top of mind" for consumers. While using the term "top of mind," the court also referred to "the accessibility of the senior mark in memory," apparently making the mistake of equating these two concepts. As discussed in detail herein, a mark does not have to be top-of-mind to be accessible in memory. Indeed, the central proposition established by the research presented in this article is that a mark can be sufficiently "accessible in memory" for an Eveready survey to detect significant levels of confusion even if the mark is not top-of-mind. The court further stated that the supposed inapplicability of *both* the Eveready and Squirt formats is "not troublesome" because it is clear that no confusion will occur under circumstances where the senior mark is not known and the marks are not likely to be encountered in proximity in the marketplace. The *Hypnotic Hats* decision is an outlier in that most courts have not imposed a rigid top-of-mind requirement for the Eveready format. *See supra* note 11.

18 *Straitened Scope*, 98 TMR at 745; *Cognitively Updated*, 106 TMR at 727-28.

19 *Ever-Constant Eveready*, 109 TMR at 672, n.1.

20 Paul W. Farris, Neil T. Bendle, Phillip E. Pfeifer, David J. Reibstein, Marketing Metrics: The Definitive Guide to Measuring Marketing Performance (2010), https://marketing-dictionary.org/t/top-of-mind-awareness/.

Case 3:24-cv-00137-TMR-DCK Document 196-16 Filed 05/09/25 Page 10 of 23

the first company that comes to their mind when the category of smartphones is mentioned, Apple would be top-of-mind for that segment of consumers. A somewhat broader conception of "top-of-mind" would be to equate "top-of-mind" with overall "unaided awareness," which would require not necessarily that a brand be the *first* to come to mind, but that it be at least one of any number of brands that come to mind on an unaided basis.[21] For instance, if consumers identify various brands that come to mind when asked about *athletic sneakers*, the percentage of consumers who mention any particular brand (whether first or not) would constitute an unaided awareness level and reflect the extent to which any brand is top-of-mind in the sense that the brand came to mind unaided based only on mention of the generic product category.[22] Whether "top-of-mind" means that a mark is the *first* brand to come to mind, or that it is one of various brands that come to mind, top-of-mind awareness is a reflection of the frequency with which a mark "comes to mind" on an unaided basis, as opposed to the extent to which a mark is recognized when the mark is supplied to the consumer on an aided basis.[23] As such, the critical aspect of top-of-mind awareness is that the *product category* is the only cue given to respondents. Any definition of "top-of-mind" is based purely on a measurement of whether a mark comes to mind unaided—that is, with no prompting with any stimulus other than mention of a generic category.[24]

The Eveready survey's use of open-ended questions to test for confusion with respect to a senior mark has been analogized to measuring top-of-mind awareness because an Eveready survey is also "unaided" in a certain sense.[25] Presumably it is the perception

---

21 Phyllis Welter, Trademark Surveys, § 24.03[1][c] (1999).

22 In a recent case, the author conducted a survey that asked respondents to name brands that come to mind in the category of vaginal care products. When prompted only with this category, 38.7% identified the senior mark VAGISIL as at least one of the brands that came to mind unaided, by far the highest of any brand in the relevant category. This finding reflected a relatively high unaided awareness level and the author argued that this result meant that VAGISIL was a top-of-mind brand for its category. This unaided finding, along with a net 85% aided awareness level, were relied on by the court in finding that VAGISIL is a famous mark. Combe Inc. v. Dr. August Wolff GMBH & Co., C.A. No. 1:17-cv-00935 (E.D. Va. May 23, 2019).

23 According to Ipsos, a global marketing and research firm, "top-of-mind" is a measurement of spontaneous or unaided awareness, as distinct from a measurement of prompted or "aided" awareness. *See* https://www.marketingstudyguide.com/brand-awareness-metrics/ (top-of-mind awareness is a measurement of brands consumers think of "off the top of their head" on an unaided basis https://www.ipsos.com/en/ipsos-encyclopedia-awareness).

24 There is no particular standard in the abstract for what percentage of consumers would need to think of a brand on an unaided basis for it to be considered "top-of-mind." Indeed, any such standard would vary from category to category depending on numerous factors, including how crowded the field is and the presence or absence of other strong brands.

25 Jacob Jacoby, *Are Closed-Ended Questions Leading Questions? in* Trademark and Deceptive Advertising Surveys: Law, Science, and Design, at 270 (Shari Seidman

that an Eveready survey is unaided in the same sense that a measurement of top-of-mind awareness is unaided that has led some commentators erroneously to cite top-of-mind awareness as a prerequisite for an Eveready survey[26] and has led attorneys for plaintiffs to regularly argue for the exclusion or accordance of little weight to Eveready surveys showing little or no confusion *where the senior mark is not top-of-mind*. This analogy between top-of-mind awareness as an "unaided" measurement and the Eveready survey as an "unaided" format, however, is fatally flawed because of one significant difference. As noted above, an unaided awareness test to assess whether a brand is top-of-mind provides respondents with no cue that could cause them to access a memory of a brand other than the survey's identification of a generic *product category*—for example, respondents are prompted with the term "athletic sneakers" to see which brands they name. A top-of-mind awareness measurement is, therefore, unaided in the purest of senses. The Eveready survey, on the other hand, supplies respondents with a far more specific cue—namely, the mark that is alleged to be confusingly similar. Accordingly, the Eveready survey is "unaided" only in the limited sense that it does not literally mention or show the senior mark. It is quite *aided*, however, in the sense that it cues respondents with a specific mark allegedly *similar to the senior mark*. This exposure to a mark similar to the senior mark (as opposed to exposure to only a generic product category) has a dramatically greater ability to trigger respondents' memory of the senior mark.

Consider the mark FILA for sneakers. When asked on an unaided basis to name sneaker brands (prompted only with the identification of the category "sneakers"), FILA has a relatively low level of unaided awareness, as the sneaker brands at the "top" of most respondents' minds are more likely to be NIKE, ADIDAS, and other more prominent brands.[27] The fact that FILA might not be top-of-mind, however, does not rule out the possibility that the brand FILA is accessible in memory for consumers. If an Eveready survey showed respondents the term "PHEELA" for sneakers or the term "FILA" for a different type of product, such cues should be far more likely to trigger respondents to access the sneaker brand FILA from memory than would the mere mention of the category of athletic sneakers. Accordingly, there is a clear theoretical basis for

---

Diamond & Jerre B. Swann, eds., 2012) ("Open-ended recall questions generally assess top-of-mind contents, while unbiased closed-ended [and aided] recognition questions generally do a more thorough job of assessing what a person has stored in memory.").

26 *Id.* at 271 (depicting open-ended questions such as "evoking what is top-of-mind for most respondents"). Swann cites this discussion from Jacoby in *Cognitively Updated* in discussing the parameters of the Eveready format. *See Cognitively Updated*, 106 TMR at 734-35.

27 *See infra* Part V.A (providing "top-of-mind" survey results).

how an Eveready survey can detect significant levels of confusion even where a senior mark is not top-of-mind and not called to mind on an unaided basis merely by mention of a generic product category. These observations triggered the idea for the research discussed in Part V.

## V. THE RESEARCH DESIGN

The research was designed to test empirically whether an Eveready survey's presentation of a mark can trigger respondents to access a similar senior mark from memory (and thus detect significant levels of confusion) even if the senior mark is not top-of-mind and, accordingly, would not come to mind unaided when prompting respondents solely with the relevant product category. The research design is straightforward, involving two sets of surveys, (1) an unaided awareness survey followed by (2) an Eveready survey using a mark similar to a non–top-of-mind mark identified by the first survey.

### *A. The Unaided Awareness Surveys*

The first phase of research involved conducting online consumer brand awareness surveys to determine the extent to which various marks in various product categories are top-of-mind in the sense that they come to mind for consumers on an unaided basis when the consumers are prompted merely with the product category.[28] Respondents were allowed to take the survey on either a computer (desktop, laptop/notebook, or tablet) or on a mobile phone.[29]

The awareness surveys focused on three product category examples:

- Soda/pop

---

28 For the purposes of this analysis, I adopted a broader conception of "top-of-mind" that equates with overall unaided awareness—that is, a measurement of the extent to which the mark comes to mind on an unaided basis, whether or not it is the *first* to come to mind. Were "top-of-mind" to be more strictly defined to include only the *first* brand to come to mind on an unaided basis, the resulting percentages for all of the brands discussed herein would be even lower, which would even more powerfully compel the conclusion that the marks analyzed herein are not top-of-mind. For instance, nineteen respondents (6.3%) named FANTA on an unaided basis. Only three respondents (1%), however, named FANTA as the *first* brand that came to mind. Accordingly, the FANTA percentage would decrease to 1% if the analysis of "top-of-mind" was limited to brands that come to mind *first*.

29 It is increasingly common practice in the field of market research to allow respondents to take surveys on mobile phones in scenarios where the survey is not showing content that would be overly difficult to display or view on the relatively smaller screen of a mobile phone. The surveys comprising the relevant research here were suitable for mobile phones, as there was no stimulus that would be difficult to view on a small screen. Allowing the survey to be taken on both computers and mobile devices also allowed the author to examine the data to determine whether there was any meaningful variation in the results by device type.

- Athletic sneakers
- Breakfast cereal

For each of these categories, three hundred recent and/or likely future purchasers of the relevant product type were tested as to their awareness of various company or brand names.[30] The consumers for each category were initially instructed to take a few moments to think about any brands of the relevant type of product that they have ever seen or heard of. The "continue" button on the screen containing this instruction was disabled for fifteen seconds. This prevented respondents from advancing to the questions without spending some time thinking about brands in the relevant category. Respondents were then asked to list all brands that they have ever seen or heard of in the relevant category. They were instructed to be as complete as possible and were provided text boxes for up to twenty answers.

This procedure allowed the surveys to measure an unaided awareness level for various brands in each of the three categories, so that an empirical assessment could be made regarding which brands are or are not top-of-mind.

The following table shows the unaided awareness levels for soda/pop brands:[31]

| Brand | # | % |
|---|---|---|
| COKE/COCA-COLA | 269 | 89.7% |
| PEPSI | 255 | 85.0% |
| SPRITE | 143 | 47.7% |
| DR. PEPPER | 129 | 43.0% |
| 7-UP | 98 | 32.7% |
| MOUNTAIN DEW | 95 | 31.7% |
| A&W | 54 | 18.0% |
| RC | 30 | 10.0% |
| CANADA DRY | 28 | 9.3% |
| CRUSH | 26 | 8.7% |
| BARQ'S | 25 | 8.3% |
| SUNKIST | 20 | 6.7% |
| FANTA | 19 | 6.3% |
| SIERRA MIST | 16 | 5.3% |

30 The survey universe for each unaided awareness study was identical to the survey universe for each corresponding confusion survey. For instance, the unaided awareness survey regarding soda/pop brands and the confusion survey regarding soda/pop brands used identical survey universes, namely, recent and likely future purchasers of soda/pop.

31 Only results for brands named by more than 1% of respondents are shown.

| Brand | # | % |
|---|---|---|
| SHASTA | 15 | 5.0% |
| SQUIRT | 12 | 4.0% |
| MELLOW YELLOW | 11 | 3.7% |
| MR. PIBB | 11 | 3.7% |
| SCHWEPPES | 11 | 3.7% |
| MUG | 10 | 3.3% |
| SEAGRAMS | 10 | 3.3% |
| FAYGO | 8 | 2.7% |
| TAB | 8 | 2.7% |
| CHEERWINE | 7 | 2.3% |
| DAD'S | 7 | 2.3% |
| FRESCA | 6 | 2.0% |
| SUN DROP | 6 | 2.0% |

As this table shows, the mark FANTA is not top-of-mind, with only a 6.3% rate of unaided awareness, as opposed to the most top-of-mind marks such as COKE and PEPSI (which were named unaided by 80% to 90% of respondents) and marks such as SPRITE, DR. PEPPER, 7-UP, and MOUNTAIN DEW (which had strong unaided awareness levels in the 30% to 50% range).[32] FANTA, on the other hand, is a brand that may be accessible in the memories of significant percentages of consumers, despite not being top-of-mind. Accordingly, I selected the brand FANTA as the senior mark for the purposes of studying a hypothetical scenario in which a defendant uses a mark that the senior mark's owner alleges creates a likelihood of confusion with its FANTA mark for soda/pop.

The following table shows the *unaided* awareness levels for athletic sneakers:

| Brand | # | % |
|---|---|---|
| NIKE | 277 | 92.3% |
| ADIDAS | 203 | 67.7% |
| REEBOK | 109 | 36.3% |

---

32 While there is no objective standard for what level of unaided awareness is required to meet a top-of-mind standard, it is clear that figures such as 6.3% for FANTA (and the even lower rates for the other marks discussed below) are sufficiently low so as to conclude that the mark is not top-of-mind. The conclusion that FANTA is not top-of-mind is also supported by the fact that FANTA (and the other marks discussed below) were not even in the top-ten most commonly cited brands. As already noted, if a stricter definition of "top-of-mind" (requiring that a brand be *first* to come to mind) were used, the top-of-mind awareness levels for FANTA would be even lower and would even more powerfully compel the conclusion that such marks are not top-of-mind.

| Brand | # | % |
|---|---|---|
| NEW BALANCE | 99 | 33.0% |
| PUMA | 88 | 29.3% |
| SKECHERS | 87 | 29.0% |
| CONVERSE | 63 | 21.0% |
| ASICS | 44 | 14.7% |
| JORDAN | 24 | 8.0% |
| VANS | 19 | 6.3% |
| CHAMPION | 16 | 5.3% |
| FILA | 16 | 5.3% |
| KEDS | 16 | 5.3% |
| BROOKS | 15 | 5.0% |
| AVIA | 12 | 4.0% |
| SAUCONY | 8 | 2.7% |
| K-SWISS | 5 | 1.7% |

As this table shows, the mark FILA is not top-of-mind, with only a 5.3% rate of unaided awareness, as opposed to the most top-of-mind marks, such as NIKE (92.3% unaided awareness) and ADIDAS (67.7% unaided awareness) or even marks such as REEBOK and NEW BALANCE (which have unaided awareness levels above 30%). Based on these results, I selected the brand FILA as the senior mark for the purposes of studying a hypothetical scenario in which a defendant uses a mark that the senior mark's owner alleges creates a likelihood of confusion with its FILA mark for athletic sneakers.

The following table shows the *unaided* awareness levels for breakfast cereals:

| Brand | # | % |
|---|---|---|
| KELLOGG | 139 | 46.3% |
| CHEERIOS | 121 | 40.3% |
| POST | 84 | 28.0% |
| GENERAL MILLS | 66 | 22.0% |
| FROSTED FLAKES | 56 | 18.7% |
| RAISIN BRAN | 49 | 16.3% |
| FROOT LOOPS | 41 | 13.7% |
| LUCKY CHARMS | 40 | 13.3% |
| RICE KRISPIES | 39 | 13.0% |
| CAP'N CRUNCH | 38 | 12.7% |
| SPECIAL K | 38 | 12.7% |

| Brand | # | % |
|---|---|---|
| CORN FLAKES | 36 | 12.0% |
| QUAKER | 35 | 11.7% |
| CINNAMON TOAST CRUNCH | 27 | 9.0% |
| WHEATIES | 26 | 8.7% |
| CHEX | 25 | 8.3% |
| KASHI | 24 | 8.0% |
| HONEY BUNCHES OF OATS | 19 | 6.3% |
| APPLE JACKS | 17 | 5.7% |
| COCOA PUFFS | 17 | 5.7% |
| LIFE | 16 | 5.3% |
| SHREDDED WHEAT | 16 | 5.3% |
| TRIX | 16 | 5.3% |
| FRUITY PEBBLES | 15 | 5.0% |
| REESE'S | 10 | 3.3% |
| GRAPE-NUTS | 9 | 3.0% |
| KIX | 9 | 3.0% |
| CORN POPS | 8 | 2.7% |
| HONEYCOMB | 8 | 2.7% |
| MALT-O-MEAL | 7 | 2.3% |
| POPS | 7 | 2.3% |
| COOKIE CRISP | 6 | 2.0% |
| GOLDEN GRAHAMS | 6 | 2.0% |
| GREAT VALUE | 6 | 2.0% |
| SMACKS | 5 | 1.7% |
| TOTAL | 5 | 1.7% |
| COUNT CHOCULA | 4 | 1.3% |
| OREO | 4 | 1.3% |

As this table shows, the mark KIX is not top-of-mind, with only a 3.0% rate of unaided awareness, as opposed to the most top-of-mind brands such as KELLOGG'S (46.3%) and CHEERIOS (40.3%).[33] Based on these results, I selected the brand KIX as the

[33] Cereal is an example of a category containing so many brands that even relatively popular brands have lower levels of unaided awareness than top-of-mind brands in categories with fewer products. Cereal is also a category in which some of the most top-of-mind "brands" are company names or house marks (KELLOGG, POST, and GENERAL MILLS), rather than brands of specific cereal products. It is also noteworthy that "Raisin Bran" was named unaided by 16.3% of respondents, despite the fact that "Raisin Bran" has been judged to be a generic term and is used by multiple manufacturers of cereal products. "Shredded Wheat" (5.3%) was held by the U.S.

senior mark for the purposes of studying a hypothetical scenario in which a defendant uses a mark that the senior mark's owner alleges creates a likelihood of confusion with its KIX mark for breakfast cereal.[34]

### *B. The Eveready Confusion Surveys*

The next phase of the research involved designing and conducting Eveready-style surveys to test the extent to which the surveys detect confusion in the case of hypothetical trademarks that are confusingly similar to the three senior marks selected from the first phase, because they lack top-of-mind awareness. Surveys were constructed to test three hypothetical scenarios:

- Use of the mark FANTA for *juice*, which is alleged to create a likelihood of confusion with respect to the senior mark FANTA for soda/pop. This scenario tests the use of the *identical* mark in a *different* product category. A group of two hundred juice consumers (the relevant universe for a forward confusion survey where the accused product is a juice product, and the identical universe used to assess the level of unaided awareness of the senior FANTA mark) participated in this survey.
- Use of the mark KIXX for *snack bars*, which is alleged to create a likelihood of confusion with respect to the mark KIX for breakfast cereal. This scenario tests the use of a *similar but non-identical* mark in a *different* product category. A separate group of two hundred snack bar consumers (the relevant universe for a forward confusion survey where the accused product is a snack bar, and the identical universe used to assess the level of unaided awareness of the senior KIX mark) participated in this survey.
- Use of the mark PHEELA for *athletic sneakers*, which is alleged to create a likelihood of confusion with respect to the mark FILA for athletic sneakers. This scenario tests the use of a *similar but non-identical* mark in the *same* product

Supreme Court in 1939 to be generic. Similarly, although the leading brand of corn flakes is KELLOGG'S Corn Flakes, the term "corn flakes" may be considered generic, as there are multiple registrations for CORN FLAKES–formative marks, and even Kellogg disclaims the term in its U.S. Trademark Registration (U.S. Reg No 1,411,563).

34 Notably, the levels of unaided awareness did not differ meaningfully based on whether respondents took the survey on a computer or mobile phone. The following table shows the breakdown of results for each of the three key marks by device type:

| Brand | Total | Computer | Mobile |
|---|---|---|---|
| FANTA | 6.3% | 6.0% | 7.0% |
| FILA | 5.3% | 5.0% | 6.0% |
| KIX | 3.0% | 3.5% | 2.0% |

category. A separate group of two hundred athletic sneaker consumers (the relevant universe for a forward confusion survey where the accused product is an athletic sneaker, and the identical universe used to assess the level of unaided awareness of the senior FILA mark) participated in this survey.

No respondents who participated in any of the awareness surveys were allowed to participate in any of the confusion surveys.

The confusion surveys generally followed the Eveready format in that they presented respondents with the accused use and asked open-ended questions to determine the extent to which, if at all, respondents on their own make a mental connection to and mention the senior mark or product. In the interest of simplicity and clarity, the surveys followed standard practice for TTAB surveys addressing registrability, which require presenting only the mark at issue along with an identification of the relevant product category.[35] The following screenshots display the presentation of the allegedly confusing mark in each survey:







35 *See* OMS Invs., Inc. v. Cent. Garden & Pet Co., 2006 WL 2066583, at *14 (T.T.A.B. July 10, 2006); McDonough Power Equip., Inc. v. Weed Eater, Inc., 208 U.S.P.Q. 675, 685 (T.T.A.B. 1981) (mark in a survey must be presented as it appears in the application or registration). On the other hand, confusion surveys for civil infringement actions must present a mark as it appears in real-world marketplace conditions, such as on product packaging, on websites, in advertising, or elsewhere. Valador, Inc. v. HTC Corp., 242 F. Supp. 3d 448, 462 (2017).

Case 3:24-cv-00137-TMR-DCK Document 196-16 Filed 05/09/25 Page 19 of 23




Respondents were then asked two question series to assess the following:

- Whether they think any other products are made or put out by the same brand as the product they were told about and, if so, what products.
- Whether they think the product they were told about is affiliated with, or sponsored or approved by, any other brand or company and, if so, what brand or company.[36]

This research design tests whether the Eveready format successfully detects significant levels of confusion in various scenarios in which a junior mark is very similar to a senior mark that is not top-of-mind, including:

- An identical junior mark used in a different product category.
- A similar but non-identical mark used in a different product category.
- A similar but non-identical mark used in the same product category.

In the interest of simplicity and brevity, the surveys purposefully omitted certain measures that are typical or standard in the case of surveys that are intended to serve as evidence in connection with legal proceedings. First, surveys often include open-ended follow-up questions asking respondents to explain why they named a certain brand, company, or product.[37] Second, surveys purporting to find confusion typically require a *control* to assure that any tendency to name the senior mark is *caused by* the confusing similarity of the accused mark as opposed to other factors, such as unrelated textual or trade dress elements or guessing a

---

36 Eveready surveys often also include a question asking respondents what company or brand makes or puts out the product. *See Cognitively Updated*, 106 TMR at 729. This question was not included for the sake of brevity and simplicity and because the purpose of the research was to test *whether* the Eveready survey can detect confusion, without need to precisely quantify the full amount of such confusion.

37 *Cognitively Updated*, 106 TMR at 729.

Case 3:24-cv-00137-TMR-DCK Document 196-16 Filed 05/09/25 Page 20 of 23

brand simply because it is a popular brand in the relevant category.[38] Here, considering that the senior marks at issue are *not* top-of-mind and that respondents were shown only the mark at issue with no extraneous content (no product image, packaging, webpages, etc.), it is clear enough for the purposes of this research that the similarity of the marks is the most likely cause of respondents naming the senior mark. Accordingly, while controls are very important in surveys purporting to find confusion and would be necessary to accurately quantify a precise level of confusion, they were not necessary here to reach the conclusion that the Eveready format was capable in these instances of detecting levels of confusion that are significant enough to potentially support a finding of likelihood of confusion.

There is also an even more important reason that the lack of controls poses no problem for the interpretation of the results in the context of this research and the proposition it is testing. The reason a control is typically necessary in an Eveready survey that purports to show confusion is to account for the concern that the senior mark comes to mind and is named at *exaggeratedly high* rates that might not be fully attributable to the alleged infringement. In other words, the concern is that the survey *overstates* confusion. The proposition that the Eveready format is appropriate only for top-of-mind marks, however, reflects the opposite concern—that a senior mark that is not top-of-mind will *not* come to mind and will, accordingly, be named in the survey at deflated or negligible rates. Accordingly, the possibility that the Eveready results discussed herein could be somewhat inflated as a result of lack of a control would not undermine the conclusion drawn from the research—namely, that an Eveready survey can show significant rates of confusion (naming the senior mark) even in the case of senior marks that are not top-of-mind. To the contrary, if the Eveready rates of naming the senior marks were inflated rates, this would only underscore and strengthen the conclusion that the Eveready format is capable of showing significant levels of confusion (naming the senior mark) even in certain cases of senior marks that are not top-of-mind.

## VI. THE RESEARCH RESULTS

The following table demonstrates the rates of confusion detected by the Eveready surveys for each of the marks/scenarios tested:

---

[38] *See* Shari Seidman Diamond, *Control Foundations: Rationales and Approaches*, *in* Trademark and Deceptive Advertising Surveys: Law, Science, and Design (Shari Seidman Diamond & Jerre B. Swann, eds. American Bar Association, 2012).

| Mark Tested | Confusion Rate |
|---|---|
| FANTA for juice | 56.0% |
| KIXX for snack bars | 25.0% |
| PHEELA for athletic sneakers | 30.5% |

In the case of the mark FANTA for juice, respondents were counted as confused if they mentioned the following or equivalent variations:

- FANTA orange soda
- FANTA grape soda
- FANTA flavored soda (other)
- FANTA soda
- Soda/pop

All of these answers clearly reflect that respondents made a mental connection to the FANTA mark for soda/pop.

In the case of the mark KIXX for snack bars, respondents were counted as confused if they mentioned the following or equivalent variations:

- KIX cereal
- Breakfast cereal
- Cereal

All of these answers clearly reflect that respondents made a mental connection to the KIX mark for breakfast cereal.

In the case of the mark PHEELA for athletic sneakers, respondents were counted as confused if they mentioned the following or equivalent variations:

- FILA
- FILA shoes or sneakers
- FILA sports wear
- FILA tennis sneakers/clothing

All of these answers clearly reflect that respondents made a mental connection to the FILA brand for athletic sneakers or related goods.

The following table shows the unaided awareness rates of each senior mark compared with the rates at which that senior mark was named or referenced in the Eveready confusion survey.

| Brand | Named Unaided in Awareness Survey | Named in Confusion Survey |
|---|---|---|
| FANTA | 6.3% | 56.0% |
| FILA | 5.3% | 30.5% |
| KIX | 3.0% | 25.0% |

The respective confusion results of 25%, 30.5%, and 56% empirically demonstrate the capability of the Eveready survey format to detect significant confusion rates in at least some cases of senior marks that are not top-of-mind.[39] Specifically, these results demonstrate the dramatic difference between the likelihood that a senior mark is called to mind merely based on mention of the relevant product category (unaided awareness) and the likelihood that a senior mark is called to mind by exposure to a similar junior mark. For instance, while the mark FANTA was called to mind unaided for only 6.3% of respondents who were asked to think of soda/pop brands, a significantly higher 56.0% of respondents made a mental connection to the FANTA mark for soda/pop when exposed to a highly similar use (FANTA for juice). The fact that FANTA is not a top-of-mind brand did not prevent the Eveready format from detecting a very high rate of confusion cause by a confusingly similar junior use.[40]

## VII. CONCLUSION

In conclusion, the research described herein empirically demonstrates that Eveready surveys may be appropriate for senior marks that are *not* top-of-mind. Even in situations where awareness of the senior mark—or the lack thereof—is relevant to consideration of the confusion format, the research establishes that the Eveready format can detect substantial confusion levels in some cases of senior marks that are not top-of-mind. Accordingly, the issue of whether a senior mark is top-of-mind is not, on its own, a suitable metric for assessing whether an Eveready survey is appropriate.

---

39 As noted already, the possibility that these confusion rates could be somewhat inflated because of a lack of a control only underscores the fact that respondents in an Eveready survey can identify the senior mark at significant (perhaps even artificially high) rates even when the senior mark is not top-of-mind.

40 It is also worth noting that the levels of confusion did not differ meaningfully based on whether respondents took the survey on a computer or mobile phone. The following table shows the breakdown of results for each of the three key marks by device type:

| Brand | Total | Computer | Mobile |
|---|---|---|---|
| FANTA | 56.0% | 54.0% | 58.0% |
| FILA | 30.5% | 29.5% | 31.5% |
| KIX | 25.0% | 26.0% | 24.0% |

Case 3:24-cv-00137-TMR-DCK Document 196-16 Filed 05/09/25 Page 23 of 23