# EXHIBIT Q

# THE EFFECT OF SURVEY METHOD ON LIKELIHOOD OF CONFUSION ESTIMATES: CONCEPTUAL ANALYSIS AND EMPIRICAL TEST

*By Itamar Simonson**

## I. INTRODUCTION

The test of likelihood of confusion is "the touchstone of trademark infringement."[1] Professor McCarthy suggests that, of the three main methods of proving likelihood of confusion—"survey evidence; evidence of actual confusion; and/or argument based on a clear inference arising from a comparison of the conflicting marks and the context of their use"—survey evidence is perhaps the best.[2] Indeed, surveys are now routinely employed to prove likelihood of confusion, and a failure to introduce a survey into evidence often leads to harsh criticism by the courts.[3]

Given their growing importance, the principles and techniques involved in conducting professional surveys have received much attention in the trademark literature.[4] The main purpose of many surveys is to examine confusion about source, that is, to test whether consumers form the mistaken belief that the junior user's goods or services originated from or are supported by the senior user.[5] Such confusion may arise if a consumer believes that the junior user's product is the senior user's product, or that the junior

---

* Associate Professor of Marketing, Graduate School of Business, Stanford University, Stanford, California.

1. 2 J. Thomas McCarthy, Trademarks and Unfair Competition, 23:1 at 44 (2d ed 1984).

2. Id §23:1 at 45 and 54 (footnotes omitted).

3. Lawrence E. Evans, Jr. and David M. Gunn, Trademark Surveys, 79 TMR 1 (1989); see cases cited id at 2 fn 5; Peter Weiss, The Use of Survey Evidence in Trademark Litigation: Science, Art or Confidence Game?, 80 TMR 71 (1990); see cases cited id at 72-73 fn 4.

4. See, eg, Jacob Jacoby, Survey and Field Experimental Evidence, in Saul M. Kassin and Lawrence S. Wrightsman, The Psychology of Evidence and Trial Procedure (Sage Publications, Beverly Hills, California 1985); John Paul Reiner, The Universe and Sample: How Good Is Good Enough?, 73 TMR 366 (1983); Robert C. Sorensen, Survey Research Execution in Trademark Litigation: Does Practice Make Perfection?, 73 TMR 349 (1983); Evans and Gunn, supra note 3.

5. See McCarthy, supra note 1, §24:1 at 160; Michael J. Allen, Who Must Be Confused and When?: The Scope of Confusion Actionable Under Federal Trademark Law, 81 TMR 209 (1991).

Case 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 2 of

user's product is put out or approved by the maker of the senior product.[6]

Confusion is a complex psychological state, and while research in the psychological literature reviewed below provides some insights, there is much that we still do not know about the conditions that lead to confusion. Related to the conceptual questions, there is the practical problem of how to measure confusion. Asking consumers directly whether they (or others) are likely to confuse marks A and A' is an invalid measure, because of the likely inference that confused consumers are stupid[7] and because, in many cases, consumers are unlikely to have the self-insight necessary to answer such a question.[8] Alternatively, it might be possible to infer the existence of confusion from answers to questions that use more indirect tests.

Different techniques for ascertaining confusion have been accepted by the courts in specific cases, although no general standard has yet been established.[9] Examination of the survey techniques that have been used indicates that there are significant differences among them in terms of the respondent's task. Research on human judgment and decision making and on measurement errors in surveys suggests that consumers' responses are highly contingent on the specific task and context characteristics.[10] Often, a minor wording change can lead to very different findings. In one famous example,[11] respondents were asked, "Do you think the United States should forbid public speeches against democracy?," and 54 percent of them said yes. A second group of respondents were asked, "Do you think the United States should allow public speeches against democracy?," and 75 percent of them said no. Examination of the various techniques for surveying likelihood of confusion indicates that the differences among them are much less subtle than the wording manipulation in this example. For instance, the difference between "What is the first thing that comes to mind when you see this brand name?," and

6. R. Bradlee Boal, Techniques for Ascertaining Likelihood of Confusion and the Meaning of Advertising Communications, 73 TMR 405 (1983).

7. Id at 405.

8. See, eg, Richard E. Nisbett and Timothy D. Wilson, Telling More Than We Can Know: Verbal Reports on Mental Processes, Psychological Review 84, 231 (1977).

9. For reviews, see Boal, supra note 6, and Evans and Gunn, supra note 3.

10. See, eg, Paul P. Biemer, Robert M. Groves, Lars E. Lyberg, Nancy A. Mathiowetz and Seymour Sudman, Measurement Errors in Surveys (John Wiley & Sons, Inc., New York 1991); W. Payne, James R. Bettman and Eric J. Johnson, Behavioral Decision Research: A Constructive Processing Perspective, Annual Review of Psychology 43 (1992); Itamar Simonson, Get Closer to Your Customers by Understanding How They Make Choices, California Management Review (1993).

11. D. Rugg, Experiments in Wording Questions II, 5 Public Opinion Quarterly 91 (1941).

ase 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 3 of

"Which company puts out this brand?," is not only in the wording; these techniques involve different tasks and might be expected to lead to different findings regarding the rate of confusion.

The main purpose of the present article is to analyze and contrast some of the commonly used techniques for assessing trademark confusion.[12] These techniques are referred to hereafter as the "Exxon Format,"[13] the "Eveready Format,"[14] and the "Squirt Format."[15] In addition to these techniques, a new procedure for assessing confusion in which respondents' main task is to choose between the junior brand and a competing brand, is proposed. Before (or after) making a choice, respondents are asked to evaluate each alternative, and these evaluations are used to infer whether they confused the junior brand with the senior brand. This technique is referred to below as "simulated choice."

When examining these techniques, it is important to remember that measuring confusion is a very difficult task and any specific estimation procedure is likely to have some flaws and is at best an approximation.[16] However, a technique with some limitations may still be the best available in a particular case. In the following section, the advantages and limitations of each technique are discussed. Then, an empirical study that directly contrasted these techniques is presented. The article concludes with a discussion of the findings and the implications for likelihood of confusion surveys.

## II. TECHNIQUES FOR ESTIMATING LIKELIHOOD OF CONFUSION

The focus here is on four techniques, including: (1) The Exxon Format, in which respondents are asked to indicate what is the first thing that comes to mind when seeing the junior mark; (2) The Eveready Format, in which respondents are asked to name the company that they think puts out the junior mark; (3) The Squirt Format, in which respondents are asked whether the junior and senior marks are put out by the same or different companies; and (4) A procedure involving a simulated choice task, in which confusion between the junior and senior marks is determined

---

12. See also Boal, supra note 6.

13. "What comes to mind . . . ?" etc.; Exxon Corp. v. Texas Motor Exchange of Houston, Inc., 628 F2d 500, 504, 208 USPQ 384, 391 (CA 5 1980).

14. "Who puts out . . . ?" etc.; Union Carbide Corp. v. Ever-Ready, Inc., 531 F3d 366, 381-82, 188 USPQ 623, 640-41 (CA 7 1976), cert denied 429 US 830, 191 USPQ 416 (1976).

15. "Are [these brands] put out by the same or different companies?," etc.; Squirt Company v. Seven-Up Company, 207 USPQ 12, 20-21 (ED Mo 1979), affd 628 F2d 1086, 207 USPQ 897 (CA 8 1980).

16. McCarthy, supra note 1, §32:51 at 779.

Case 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 4 of

based on the respondents' evaluations of the junior brand. Each of these techniques is discussed in more detail next.

### *A. What Comes to Mind? What Makes You Say That? —The Exxon Format*

The courts had not been receptive to surveys involving word association tests[17] until the Fifth Circuit approved the survey used in the Exxon v. Texon case.[18] Briefly,[19] with the Exxon Format respondents are shown the junior mark and asked, "What is the first thing that comes to your mind when looking at [this name/sign]?" If respondents do not mention the name of a company, they are asked explicitly which company comes to mind. The differentiating feature of the Exxon Format compared to earlier word association surveys is the follow-up question asking for explanation: "What was there about the sign that made you [say that]?"

This test is based on the assumption that, if the senior mark comes to mind when seeing the junior mark, then the two marks are likely to be confused. An argument that might be used to support this assumption is that, when asked about what comes to mind, respondents are likely to answer with the most similar name. Indeed, the study reported below indicates that the similarity between the names is by far the most common response to the question, "What makes you say that?" At the same time, similarity between items is positively correlated with likelihood of confusion.[20] Studies have shown that confusion errors are well predicted by mathematical models that are based on similarity.[21] A typical study examining the effect of similarity on confusion involves showing respondents items such as characters or numbers for a very short duration and asking them to identify what they saw. Since similarity affects both what comes to mind and the likelihood of confusion, one might be able to estimate likelihood of confusion by asking what comes to mind.

---

17. See Boal, supra note 6; Evans and Gunn, supra note 3.

18. Supra note 13.

19. Evans and Gunn, supra note 3 at 11-12, present the survey verbatim.

20. See McCarthy, supra note 1, §23 at 42.

21. See, eg, R. Duncan Luce, Detection and Recognition, in Handbook of Mathematical Psychology 103-89 (Editors: R. Duncan Luce, R.R. Bush and Eugene Galanter, John Wiley & Sons, Inc., New York 1963); G. Keren and S. Baggen, Recognition Models of Alphanumeric Characters, 29 Perception and Psychophysics 234-46 (1981); Robert M. Nosofsky, Attention, Similarity, and the Identification-Categorization Relationship, 115 Journal of Experimental Psychology: General 39-57 (1986).

A closer examination of this argument, however, suggests that what comes to mind is likely to be a poor predictor of confusion in the context of consumer purchase decisions. As Professor McCarthy notes, "'Confusion' means more than that the junior user's mark merely 'calls to mind' the senior user's mark."[22] A person who is shown a brand name and asked what comes to mind is likely to retrieve from memory the most similar name,[23] which is determined primarily by the common features of the two names.[24] In contrast, a buyer is unlikely to confuse two marks unless the two are perceived as identical or the buyer is convinced that the junior mark can only be used by the company that puts out the senior mark. For example, the name Wanasonic is likely to bring to mind the familiar brand name Panasonic. However, the name Wanasonic has a salient distinctive feature, and consumers will probably recognize that the company that puts out Panasonic is unlikely to also use the name Wanasonic. These arguments suggest that the Exxon Format tends to inflate confusion estimates.

Furthermore, as Judge Rich observed, "The very fact of calling to mind may indicate that the mind is distinguishing, rather than being confused by, two marks."[25] In other words, if the senior and junior marks are truly confused, then the junior mark is unlikely to bring to mind the correct senior mark. For example, if asked what comes to mind when seeing the name Ever-Ready, only those respondents who distinguish between Ever-Ready and Eveready are likely to give the answer Eveready that will be regarded as reflecting confusion. The Fifth Circuit explained the approval of the Exxon survey based on the follow-up explanation of the responses. However, since most explanations are likely merely to mention the similarity between the marks, it is not clear how this follow-up question resolves any of the limitations of word association-based tests.

### *B. Who Puts Out This Brand?— The Eveready Format*

The Eveready Format[26] involves showing respondents the junior product (or brand name) and asking: (1) Who do you think

22. McCarthy, supra note 1, §23:1 at 47.

23. Joseph W. Alba, J. Wesley Hutchinson and John G. Lynch, Jr., Memory and Decision Making, in Handbook of Consumer Behavior 1-49 (Editors: Thomas S. Robertson and Harold H. Kassarjian, Prentice-Hall, Englewood Cliffs, NJ 1991) [hereinafter cited as Alba].

24. Amos Tversky, Features of Similarity, 84 Psychological Review 327-52 (1977).

25. In re P. Ferrero & C. S.p.A., 479 F2d 1395, 178 USPQ 167, 168 (CCPA 1973).

26. Supra note 14.

ase 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 6 of

puts out [this brand]? (2) What makes you think so? and (3) Name any other products put out by the same concern which puts out this [brand]. With this technique, unlike the Exxon Format, the questions focus more directly on the issue of confusion. As the court observed,[27] responses naming the senior manufacturer or its products provide evidence of likelihood of confusion. Examination of the Eveready Format suggests that it is most likely to reveal confusion between two marks if (1) respondents believe that the junior mark is the senior mark and they know the name (and/or other products) of the company that puts out the senior mark, or (2) respondents distinguish between the junior and senior marks (e.g., Holiday Out and Holiday Inn)[28] but believe the two marks are put out by the same company, in which case they can simply name the senior mark. This technique is less likely to reveal confusion if respondents think that the junior mark is the senior mark (e.g., that Ever-Ready is Eveready) and do not know the name (or products) of the company that puts out the senior mark.

In some cases, courts have found questions similar to those employed in the Eveready case to be leading and suggestive.[29] A possible concern is that respondents who mention the maker of the senior mark would not have associated the junior and senior marks when making normal purchase decisions without being asked these questions. That is, the survey questions cause respondents to think of possible connections, which may lead them to mention (or imply) the senior mark. A related concern is that respondents feel they have to answer the survey questions given to them rather than say that they do not know, so they often provide guesses that are associated with low confidence. If actual purchase decisions were involved, respondents would make the necessary effort to ascertain whether the junior and senior marks were indeed put out by the same company. On the other hand, it might be argued that the mere fact that a reasonable consumer forms the hypothesis that two marks are related is sufficient evidence of likelihood of confusion; consumers do not have "to dissect and analyze trademarks in order to avoid confusion."[30]

A comparison of the question "who puts out this product?" with the Exxon Format question, "what comes to mind?" suggests that, in both cases, a greater similarity between the junior and

---

27. Id at 387, 188 USPQ at 643.

28. Holiday Inns, Inc. v. Holiday Out in America, 481 F2d 445, 178 USPQ 257 (CA 5 1973).

29. General Motors Corp. v. Cadillac Marine & Boat Co., 226 F Supp 716, 736, 140 USPQ 447, 462 (WD Mich 1964); Wuv's International, Inc. v. Love's Enterprises, Inc., 208 USPQ 736 (D Colo 1980).

30. McCarthy, supra note 1, §23:27 at 127, and see fns 8-9.

Case 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 7 of

senior marks will tend to increase confusion estimates,[31] as long as the confusion between the two marks is not so great that they are indistinguishable. However, unlike the Exxon Format, respondents are expected to consider whether it is likely that the company that puts out the senior mark (e.g., Panasonic) will also use the junior mark (Wanasonic) before answering the question "who puts out this product?" As an example, suppose that respondents are shown the brand name Tuna of the Sea and are asked who puts it out. In this case, although the first name that comes to mind is Chicken of the Sea, respondents may determine that it makes no sense that the makers of Chicken of the Sea will also use the name Tuna of the Sea. The reliance on such logical considerations represents an advantage of the Eveready over the Exxon Format, although it may lead in some cases to underestimation of the likelihood of confusion. For example, it is possible that shoppers at a supermarket would fail to notice the difference between Tuna of the Sea and Chicken of the Sea, especially if they are not displayed side by side. In sum, whether the Eveready Format leads to accurate, over, or underestimation of the likelihood of confusion appears to depend on the specific characteristics of the marks and on consumers' familiarity with the marks and their manufacturers.

### *C. Are These Products Put Out By the Same or Different Companies?— The Squirt Format*

In the Squirt v. Quirst case,[32] respondents were asked "Do you think SQUIRT and QUIRST are put out by the same company or by different companies?" The trial court relied on the survey as demonstrating "the possibility of confusion between the . . . marks."[33] An advantage of this format is that it represents probably the most direct measure of confusion short of asking people whether they are likely to confuse the two marks. Although this format is different than the Eveready Format, there are similarities between the two tasks. With both formats, responses are likely to be made on the basis of assessments of similarity and logic, as discussed above. Thus, as with the Eveready technique, the Squirt Format may lead to underestimation of the likelihood of confusion when two names are confusingly similar, yet it is illogical that the same company will use both

31. Alba, supra note 23.

32. Supra note 15. For another case where a similar format was used, see La Maur, Inc. v. Revlon, Inc., 245 F Supp 839, 842, 146 USPQ 654, 656 (D. Minn 1965).

33. 628 F2d at 1089, 207 USPQ at 899.

Case 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 8 of 31

names. One difference between the two techniques is that the Squirt Format presents the junior and senior marks side by side and thus guarantees that respondents distinguish between the two.

A potential limitation of the Squirt Format is that it explicitly leads respondents to consideration of the association between the two marks, a question that might not have occurred to them in a normal purchase situation. In particular, even a consumer who is unfamiliar with the senior mark and thus could not have confused the two marks may still respond that the two marks are put out by the same company (suggesting confusion) when asked that question.

### *D. Using Simulated Brand Choice to Infer Confusion*

Most of the techniques that have been used to determine likelihood of confusion focus the respondents' attention on the marks in question and their origins. For example, respondents are asked what comes to mind when seeing the mark, who puts out the mark, or whether the junior and senior marks are put out by the same or different companies. It could be argued that such tasks cause respondents to think about associations between marks that they would not have considered in normal purchase situations[34] and may thus lead to inaccurate estimates of likelihood of confusion. As an alternative to such surveys, one might try to conduct in-store experiments and infer confusion from consumer purchases.[35] An advantage of this approach is that estimates of confusion are based on actual purchase behavior in the consumer environment of interest, rather than derived from questions about trademarks. Such experiments, however, can be difficult to implement and require cooperative retailers. More importantly, it may often be difficult to determine whether confusion occurred and estimate the likelihood of confusion on the basis of consumer purchases in a store environment.

A compromise approach, which is based on a task that consumers are accustomed to from everyday life and which is easy to implement, involves simulated purchase decisions. Specifically, respondents are shown the junior brand and a competing brand (not the senior brand) and are asked, assuming they needed to purchase that product, which of the two brands they would choose. Either before or after indicating their choice, respondents are asked to evaluate the brands and explain their decisions.

34. See discussion in Boal, supra note 6.
35. For examples of such experiments, see Boal, supra note 6.

Case 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 9 of 31

Evaluation of considered alternatives is a very common task in everyday life, and respondents are unlikely to recognize that the real purpose of the task is to assess trademark confusion.

The specific brand evaluation questions need to be tailored to the particular case and are designed to allow the researchers to determine unambiguously whether the respondent thinks that the junior brand is or is not associated with the senior brand. Such questions might include an evaluation of the advantages and disadvantages of each brand, what if anything respondents know about the quality of other products made by the same company, whether they had any previous experience with these brands, what they think about the quality of products made in the country where these brands are made (if relevant), what they know and think about its advertising, and so on. This information can be used to determine whether the respondent confuses the junior mark with the senior mark. For instance, to determine whether Cleo Cola is confused with Coca-Cola, respondents can be asked to choose between Cleo Cola and Pepsi-Cola and to indicate their evaluation of each brand's taste and advertising, their previous experience with each brand, where they usually buy it, and so on. Thus, a necessary condition for using simulated choice to establish confusion is that there are differentiating characteristics of the senior mark that might be captured in brand evaluations.

In order to disguise the purpose of the study and not focus too much attention on the junior brand, the respondents should be first given other choice problems involving familiar brands in different product categories. When explaining the task, it needs to be emphasized that the respondents may be unfamiliar with some of the brands they are asked to evaluate, in which case they should simply note that they do not know the brand. For example, respondents might be told that "some of the brands are only sold in certain parts of the country and may thus be unfamiliar to you." This information is designed to legitimize a response that a brand is unfamiliar, so that respondents do not feel they are expected to know every brand.

In addition to providing confusion estimates, this methodology can generate other information pertinent to the case under study. For example, it might be of interest to find out what share of the junior brand's sales is due to confusion with the senior brand. This could be calculated by examining the percentage of choices of the junior brand by respondents who confused it with the senior brand. For instance, one might find that 30 percent of the respondents chose Cleo Cola over Pepsi-Cola, 90 percent of whom confused Cleo Cola with Coca-Cola. It is also easy to estimate with simulated choice the degree of confusion and loss of sales

when the junior and senior brands (as well as the competing brand) are included in the choice set side by side. Or, one may want to examine the extent to which confusion between the junior and senior marks is influenced by the price or other features of the junior brand.

Research methodologies involving simulated choice tasks have been employed extensively for predicting consumer purchase behavior by both managers and marketing researchers.[36] For example, the most commonly used technique today for predicting consumer response to new products and for estimating the importance of various product characteristics is conjoint analysis.[37] In conjoint analysis, respondents evaluate different hypothetical product profiles by choosing between pairs of alternatives or by ranking or rating alternatives in terms of preference. Research has shown that conjoint analysis provides quite accurate and valid predictions of actual purchase behavior.[38]

In sum, each of the techniques for estimating likelihood of confusion has both advantages and limitations and may lead to different estimates. A question that naturally arises is how different are the likelihood of confusion estimates derived from these techniques? If all estimates are relatively close (e.g., within plus/minus 5 percent), then the same conclusion would be reached in most cases, regardless of which method was employed. If, however, the derived estimates are significantly different, then the choice of estimation technique may determine the outcome of the investigation.

An empirical study was conducted to investigate this question by contrasting directly the various survey techniques and to improve our understanding of factors that influence consumer confusion among trademarks. This study is described next.

## III. A COMPARISON OF TECHNIQUES FOR ESTIMATING LIKELIHOOD OF CONFUSION: AN EMPIRICAL INVESTIGATION

### A. *Overview*

The respondents in this study were 992 consumers. The techniques investigated include the Exxon Format, the Eveready Format (two variations), the Squirt Format, and a preliminary

---

36. Numerous examples of the use of simulated choice methodologies have appeared in leading marketing journals such as the Journal of Marketing Research, the Journal of Consumer Research, and Marketing Science.

37. See Paul E. Green and V. Srinivasan, Conjoint Analysis in Marketing Research: New Developments and Directions, 54 Journal of Marketing 3-19 (1990).

38. Ibid.

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 11 of

application of simulated choice. Twelve senior marks and twelve junior (infringing) marks were selected, thus allowing to compare the techniques across a variety of trademarks. The simulated choice format also provided evidence regarding the effect of confusion on product choices, the effect on confusion of having the senior and junior marks side by side, and the effect of the price of the junior brand (whether it is similar to or lower than the senior brand's price) on confusion. The focus in this research is on confusion between trade names rather than confusion associated with other aspects of the products, such as physical characteristics. The study also examined the effect of consumer demographic characteristics and product familiarity on the likelihood of confusion estimates derived from the various techniques.

## *B. Methodology*

The 992 respondents included consumers intercepted at two shopping centers (most of them approached when exiting a supermarket), visitors to a popular science museum, members of religious organizations, and PTA members. The introduction to each task illustrated the difference between a brand, a manufacturer, and a product category. Respondents were told that all brands that they would encounter were real brands; however, some of the brands were only sold in certain parts of the country and may thus be unfamiliar.[39] They then received instructions specific to their task. On the last page of the questionnaire, respondents were asked regarding each product category included in the questionnaire whether they: (1) used that product before, (2) bought the product before, and (3) were very familiar, somewhat familiar, or not familiar with that product category. Finally, respondents entered their age, education level, sex, and from which state they were.

The respondents were randomly assigned to one of several task versions, which are briefly described next (as well as the example in Appendix A at the end of this article).[40]

### 1. The Exxon Format

The task included two parts, with the same twelve (junior) brand names in both parts. In the first part, respondents were asked: "(1) What is the first thing that comes to mind when

39. Whenever possible, respondents received after completing the questionnaire a debriefing sheet, which explained the purpose of the study.

40. There was one additional task, not described here, in which respondents assessed the likelihood that the company that puts out the senior mark will also use the junior mark. More details about the study are available from the author.

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 12 of

looking at this brand name? (2) What was that about the brand name that made you say that?" In the second part of the questionnaire, the same brand names were presented again, and respondents were asked: "(1) What is the first company that comes to mind when looking at this brand name? (2) What was that about the brand name that made you say that?" It was expected and later confirmed that, in virtually all cases in which the response in the first part of the questionnaire mentioned a company name, the same name was entered in the second part. Each brand name was preceded by the name of the product category and a brief description of the product.

In addition to the twelve junior (infringing) brand names, the questionnaire included familiar names, such as Tylenol analgesic, V-8 vegetable juice, and Sprite soft drinks. These names, which were scattered among the junior names, were designed to support the claim that all names represented real brands. Indeed, the written answers of the respondents showed that none of them questioned the fact that all brand names represented real brands. To account for the possibility that the order of the brand names in the questionnaire influenced the responses, there were two versions of the Exxon Format, with the names in the two versions appearing in reversed orders.[41]

### 2. The Eveready Format

Two variants of the Eveready Format were used. One version followed the standard format with the questions: "(1) Which company do you think puts out this brand? (2) What makes you think so?, (3) Name other products, if any, put out by the same company." As suggested earlier, the question about other products by the same company may lead respondents to name companies that have other familiar products. Furthermore, this question is expected to provide additional information about confusion only when respondents do not know the name of the company that puts out the senior brand but are familiar with other products put out by the same company. For many of the senior names selected for this study, however, it was expected that the question regarding other products put out by the same company would not add much useful information about the likelihood of confusion. For example, most respondents are more likely to know the names of Chicken of the Sea canned tuna, Rolex watches, or Dannon yogurt than to know other products put out by the companies that put out these brands.

---

41. A similar order manipulation was used in all other tasks as well. In all cases, the results showed no statistically significant differences based on order.

Case 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 13 of

As suggested earlier, with the Eveready Format, respondents may give answers about the company that puts out the brand that is associated with low confidence. Clearly, actual confusion is more likely to occur if consumers believe they know with certainty the identity of the company that puts out a particular brand than if they can only provide a low probability guess. Thus, in the second version of the Eveready Format, the third question was replaced with the question, "How confident are you about the company?" Responses were entered in percents on a 0 - 100 scale.

### 3. The Squirt Format

In each product category respondents were asked two questions: (1) whether they thought the junior and senior brands were put out by the same or different companies, and (2) what made them think so. For example, in the deodorant category, the first question was, "Do you think OLD SPICE deodorant and NEW SPICE deodorant are made by the same or different companies?" In each case respondents answered by circling SAME or DIFFERENT and provided an explanation.

### 4. Simulated Choice

Respondents made a series of choices in different product categories. Prior to making a choice, they were told to list the advantages of each brand in the choice set on the basis of the reputation and their familiarity with the brand and its manufacturer. They were instructed to indicate that they did not know a brand if they had no information about it.

The simulated choice task was designed, in addition to estimating likelihood of confusion, to examine influences on and consequences of confusion. That included:

(a) The effect of presenting the senior and junior trademarks side by side—In the market place, senior and junior marks sometimes appear side by side, whereas in other cases, consumers are exposed to the junior mark without also seeing the senior mark. Courts have recognized that this factor may influence the likelihood of confusion.[42] As the Fifth Circuit observed: "[T]he inability to compare the products side by side and observe the precise differences in appearance may increase the likelihood of confusion, . . . [because] the consumer must rely on memory rather than a visual comparison [of the two marks]."[43] This argument

42. See McCarthy, supra note 1, §23:17 at 98.

43. Sun-Fun Products, Inc. v Suntan Research & Development, Inc., 656 F2d 186, 213 USPQ 91, 96 (CA 5 1981).

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 14 of

is tested in this study by contrasting the rate of confusion between the junior and senior brands when the choice set includes only the junior mark and a competing brand with the rate of confusion when the senior brand is also included in the choice set.

(b) The price of the junior brand—If the price of the junior brand (e.g., a Ronex watch) is lower than the price expected of the senior brand (e.g., a Rolex watch), then consumers might be less likely to confuse the two. To investigate this question, different choice sets were used in different questionnaires, such that the price of the junior mark was either higher than or equal to the price of the competing brand.

(c) The effect of confusion on the popularity of the junior brand—This question was examined by comparing the share of the junior brand among respondents who confused it with the senior brand and among those who did not.

(d) The rate of confusion relative to the awareness of the senior brand—The level of awareness of the senior brand is the upper limit on the likelihood of confusion estimate and is thus relevant to the assessment of confusion. For example, a 10 percent confusion between a junior brand and a senior brand that is recognized by only 20 percent of consumers may be regarded as significant, whereas 10 percent confusion with a senior brand that is recognized by 100 percent of consumers may be seen as negligible. The rate of awareness of the senior brand can be determined in the same manner that confusion is estimated, on the basis of brand evaluations. That is, in each case included in this study, there were choice sets in which the senior rather than the junior brand was included (with the same competing brand), and respondents provided brand evaluations. For example, one group of respondents made a choice between Reo cookies and Keebler cookies, whereas a second group chose between Oreo cookies and Keebler cookies.

All together there were six different choice set versions for each product category. Respondents either chose between the junior and a competing brand, with the junior brand priced either equal to or higher than the competing brand, or they chose between the senior (at one of two prices) and the same competing brand, or they chose among the senior, junior, and the competing brand (with the junior at one of two prices). Each respondent chose from just one of the six choice set versions for each category, using a between-subjects experimental design.[44]

---

44. In a between-subjects design, there are different versions of each problem such that the differences across versions allow a test of the hypotheses. Each respondent is randomly assigned to one version of a problem and the hypotheses are tested by comparing the responses to the different versions. The advantage of a between-subjects design over

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 15 of

## C. *Method of Analysis*

The analysis of the data gathered in this study focused on the confusion rates derived from each method. In addition, several other analyses were conducted in order to investigate (1) the reasons provided by respondents for their answers, (2) the effect of product familiarity and demographic characteristics on confusion rate estimates derived from the various methods, and (3) the effect of confusion on the likelihood of choosing the junior brand.

With the Exxon Format, confusion estimates are based on the percentage of respondents who name the senior mark when answering the questions, "What is the first thing that comes to mind . . . ?" and "What company first comes to mind . . . ?" Since the first thing that comes to mind is often something other than a company name, the confusion estimates derived from the question focusing explicitly on the company that comes to mind tend to be higher. With the Eveready Format, the confusion rate is based on the percentage of respondents who name the senior mark or its manufacturer. The question, "What other products, if any, are put out by the same company that puts out this brand?" (in one of the two Eveready versions included in this study) may provide additional information about confusion. With the Squirt Format, the confusion rate is based on the percentage of respondents who indicate that the senior and junior brands are made by the same companies.

With the simulated choice format, confusion is inferred from the respondents' evaluations of the junior brand prior to (or after) choosing between the junior brand and another brand. In this study's preliminary application of the simulated choice technique, brand evaluations involved a listing of the advantages of each alternative. In most cases, it was possible to determine whether the respondent confused the junior and senior marks. Specifically, the listed advantages were analyzed by two independent judges, who were unaware of the study's objectives. The judges indicated in each case whether the respondent thought that the junior brand was or was not associated with the senior mark. A few examples of brand evaluations that were coded as reflecting confusion include (1) about Oral Z toothpaste—"I like their toothbrushes"; (2) about Reo cookies—"I grew up with them. They have white cream in the middle and are fun to eat"; (3) about Danfree yogurt—"I ate Dannon yogurts before and liked them"; and (4)

a design in which the same respondent receives different versions of the same problem (a within-subjects design) is that it guarantees that the response to one version of the problem does not affect and is independent of the response to other versions.

Case 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 16 of 31

about Tuna of the Sea canned tunafish—"I like their mermaid commercials."

The judges compared their analyses of the responses and found that, in 98 percent of the cases (including cases in which they could not reach a conclusion), they made the same judgments about confusion. They reached agreement on the remaining 2 percent after discussion. In 15 percent of the cases, the judges could not determine whether confusion occurred. For example, if the respondent indicated that the junior brand had no advantages, it could not be unambiguously determined that the junior mark was not confused with the senior mark. It seems likely, however, that most of these cases represent situations in which respondents did not confuse the two brands; if they had recognized the junior brand they would have probably given an indication of that in their responses, especially because all of the senior brands were well-known.[45] This method of analysis, using two independent judges, is commonly employed for analyzing responses consisting of verbal protocols.[46]

In addition to deriving confusion estimates, several additional analyses were conducted. The Exxon, Eveready, and Squirt Formats include the question, "What makes you think so?" The explanations provided were analyzed by two independent judges, as described above, who assigned the explanations into one of several reason categories. The judges (independently) assigned 87 percent of the explanations into the same categories. Disagreements were resolved by discussion.

The effects of demographic variables and product familiarity on confusion were examined using a statistical technique called logit analysis.[47] This technique allows the researcher to separate the effect of each factor on the likelihood of confusing the junior and senior brands. In addition, one could examine the rates of confusion in different groups defined by the explanatory variables. For example, one could contrast the confusion rates derived from the Exxon Format among those who were familiar with the product categories compared to unfamiliar respondents. Finally, analysis of the simulated choice data provides information about

---

45. A pilot study was conducted, in which 81 consumers rated the senior brands used in this study, on a 0 (very poor) to 10 (very good) scale, in terms of how well-known they were, their quality reputation, and how distinctive the names were. In all cases, the average ratings were greater than five, with an average across all brands of 8.0.

46. See, for example, K. Anders Ericsson and Herbert A. Simon, Protocol Analysis: Verbal Reports as Data (MIT Press, Cambridge, Massachusetts 1984).

47. See, eg, Daniel McFadden, Conditional Logit Analysis of Qualitative Choice Behavior, in Frontiers in Econometrics 105-42 (Editor: Paul Zarembka, Academic Press, New York 1973).

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 17 of

the effect of confusion and other factors (e.g., the junior brand's price) on the choice probability of the junior brand.[48]

### *D. Results*

As can be seen in the Table, Appendix B, at the end of this article, there were large differences among the confusion estimates derived from the various techniques. Furthermore, correlations (across the 12 cases) among the confusion estimates generated by the Exxon, Eveready, Squirt, and simulated choice formats were relatively low (between -.57 and .56), which indicates that the differences among the methods tended to be non-systematic (e.g., one method may show higher confusion in one case versus another whereas a second method shows the opposite trend). In particular, the confusion estimates derived from the Exxon Format are negatively correlated with those derived from most other techniques. Interestingly, the estimates generated by the Squirt and simulated choice formats, which are very different techniques, were most highly (positively) correlated (r=.56). Next, the results of each method are described and are contrasted with those derived from other techniques.

#### 1. Exxon Format

The confusion rates in the Table were based on the question, "What is the first company that comes to mind . . . ?," and the numbers in parentheses were derived from answers to the question, "What is the first thing that comes to mind . . . ?" The Exxon Format generates by far the highest confusion estimates. On average, the confusion rates derived from this format are about twice as large as those derived from other methods.

Name similarity was the most common reason given by respondents, accounting for 61 percent of the responses of those who said that the senior brand (or manufacturer) was the first thing that came to mind and 81 percent of those who said that the senior brand was the first company that came to mind. The second most common explanation for entering the senior brand's name was the fact that the junior brand seemed like a fake or a cheap imitation of the senior brand, accounting for 20 percent of the responses of those who said that the senior brand was the first thing that came to mind.

Analysis of the demographic and product familiarity effects revealed that prior usage of the product, prior purchase of the

48. More details about the method of analysis and statistical results may be obtained from the author.

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 18 of

product, greater stated familiarity with the product, and higher education were associated with a higher likelihood of naming the senior brand. For example, those who used the product before (e.g., those who have used camcorders) were, on average, 21 percent more likely to name the senior brand (e.g., RCA) when shown the junior brand name (RC-CAM). Older age, on the other hand, was associated with a lower likelihood of naming the senior brand. In other words, according to the Exxon Format, consumers with greater product familiarity and experience and those who are better educated are more likely to confuse the junior and senior brands, whereas older consumers are less likely to be confused.

### 2. Eveready Format

The confusion rates in the Table for the two Eveready versions were derived based on answers to the question, "Which company do you think puts out [the junior brand]?" One version followed the standard Eveready Format, including a question about other products put out by the same company. In the other version, respondents were asked how confident they were about the company that put out the (junior) brand. Generally, the Eveready Format led to confusion rate estimates that were significantly lower than those derived from the Exxon Format, but slightly higher than the Squirt and simulated choice estimates.

The confusion estimates derived from the version that includes the question about other products were higher, by an average of 7 percent, than those derived from the other Eveready version. This difference might reflect the influence of the question about other products, which might lead respondents to enter names of companies with other known products.[49] The inclusion of the confidence question, conversely, may or may not affect the derived confusion estimates. On the one hand, mentioning the confidence about the responses may make the possibility of an error more salient and suggest that the answers are not as obvious as they might seem, thus making respondents more cautious. On the other hand, the fact that respondents can indicate that their responses are associated with low confidence may legitimize entering mere guesses. The average confidence rating of respondents who named the senior brands (or their manufacturers) as the companies that put out the corresponding junior brands ranged between 30 percent and 70 percent; in 9 out of the 12 cases, the average confidence rating was less than 50 percent.

In this study, the question about other products did not affect the confusion estimates that were derived on the basis of answers

---

49. See Bohn, supra note 6.

Case 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 19 of 31

to the first question ("Which company puts out . . ."). Respondents who did not know the name of the company that put out the junior brand also did not know other products put out by the same manufacturer. The Texon motor oil represented a special case, because more respondents associate the name Texon with Texaco than with the senior brand in this study, Exxon. Since Texaco like Exxon sells gasoline (and other products), one cannot use the answers to the question about other products to infer confusion between Texon and Exxon. The same problem, though to a much smaller extent, arose with the Packard name, where a minority of respondents associate this name with Packard Bell rather than Hewlett Packard (although in this case, Hewlett Packard sells products such as printers and calculators that Packard Bell does not offer).

The most common explanations provided by respondents for their answers about the companies that put out the junior brands were name similarity and the other products put out by these companies. Analysis of demographic and product familiarity effects (across both Eveready versions) revealed that respondents who stated that they were more familiar with the product categories were significantly more likely to name the senior brand as the company that put out the junior brand. Specifically, those who indicated they were very familiar with the products were 15 percent more likely to name the senior brands than those who indicated they were not familiar with the products. Respondents who used the products before were 12 percent more likely to name the senior brands than nonusers, and respondents under 30 years old were more likely to name the senior brands than those over 30.

### 3. Squirt Format

The confusion rates derived from the Squirt Format, based on the percentage of respondents who thought the junior and senior brands were put out by the same companies, were comparable to those derived from simulated choice, and to a lesser extent, to estimates derived from the Eveready Format. There were large differences between the Squirt and simulated choice estimates for Danfree yogurt and Oral Z toothpaste, moderate differences in three cases, and small differences in five cases (the simulated choice confusion estimates for Texon and to a lesser extent Packard are inconclusive, as explained below).

The most common explanation for answers that the two brands were put out by the same company was name similarity, followed by the arguments that the junior and senior brands were logical extensions and that trademark laws would not allow

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 20 of

another company to use that name. The lack of name similarity was the most common explanation as to why the two brands were put out by different companies, followed by the arguments that the junior brand appeared like a "copycat" or an imitation of the senior brand and that it was illogical that the senior brand would use the junior brand name. Analysis of the demographic and product familiarity effects revealed that none of these factors had a significant influence on the likelihood of indicating that the junior and senior brands were put out by the same companies.

**4. Simulated Choice**

The confusion rate estimates derived from the simulated choice format are comparable to those based on the Squirt Format, and they are similar on average to the estimates derived from the confidence version of the Eveready Format. As was the case with the Squirt Format, none of the demographic and product familiarity characteristics had a significant effect on the confusion estimates derived from simulated choice.

As indicated, in this preliminary application of the simulated choice format, confusion between the junior and senior brands was determined based on an analysis of the advantages of the junior brands that were listed by respondents. In the case of Texon motor oil, it was not possible to determine in many cases whether respondents confused Texon with Exxon or with Texaco. That is, although Exxon does have some distinctive characteristics, the similarities between Exxon and Texaco are too great and do not permit us to determine with which of the two senior brands Texon was confused. The results in the Eveready versions suggest that Texon was confused with Texaco more than twice as often as with Exxon. The same problem, though to a much lesser extent, occurred with the Packard personal computer, which some respondents associated with Packard Bell rather than Hewlett Packard. Thus, the confusion estimate for Packard in the Table, 61 percent, is somewhat (probably around 10 percent) higher than it should be.

In addition to measuring the absolute percentage of respondents who confuse the junior brand with the senior brand, it might be of interest to calculate the degree of confusion relative to the share of respondents who are aware of the senior brand. That is, the senior brand's awareness is the upper limit on the likelihood of confusion estimate. The rate of awareness of the senior brands can be estimated in the same way that confusion rates were measured, based on an analysis of the listed advantages of the senior brands in the choice set versions that included these brands (rather than the junior brands) and a competitor. For example, in

se 3:24-cv-00137-TMR-DGK Document 196-17 Filed 05/09/25 Page 21 of

one of the simulated choice versions in the cookies category, respondents chose between Oreo (rather than Reo) and the competing brand, Keebler. Analysis of the listed advantages of Oreo cookies can be used to determine whether respondents recognized that brand. As can be seen in the Table, confusion rates calculated relative to the senior brands awareness were, in most cases, just slightly higher than the absolute confusion rates. However, in some cases (e.g., in the tooth paste category), the confusion estimates are significantly higher if the (relatively low) awareness rates of the senior brands (e.g., the 62 percent awareness of Oral B) are taken into consideration.

The results in the simulated choice task were also used to evaluate the effect on confusion of (1) having the junior and senior brands side by side, and (2) the price of the junior brand relative to a competitor. As can be seen in the Table, the likelihood of confusing or associating the junior brand with the senior brand decreased significantly and was negligible in many cases when the senior brand was presented as well. With respect to price effect, the results indicate that respondents were slightly more likely to confuse the junior with the senior brand when it was priced higher rather than equal to the competing brand, but this effect did not have statistical significance.

The simulated choice results also provided information regarding the effect of confusion between the junior and senior brands on the likelihood of choosing the junior brand over a competing brand. As would be expected, confusion between the two brands significantly increased the probability of choosing the junior brand, from 9 percent to 56 percent.[50] Finally, although higher product familiarity, prior usage, and prior purchase of the products did not affect the likelihood of confusion, they were associated with a lower probability of selecting the junior brand (differences of around 10 percent).

## IV. DISCUSSION

The results of the present study indicate that assessments of likelihood of confusion are highly sensitive to the estimation method employed. In other words, in many cases, the choice of a survey technique may determine the outcome. Unfortunately, there is no one "correct" method that generates the most accurate likelihood of confusion estimates in all situations, and each method has some limitations. In order to select an appropriate

50. Some respondents (included in the 9 percent) selected the junior brand because of objections to the competing brand, even though they were not familiar with the junior brand and did not confuse it with the senior brand.

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 22 of

survey technique for a particular case, it is necessary to understand the advantages and limitations of the various methods on the basis of a careful analysis of the respondent's task.

One technique, the Exxon Format, stands out as being generally inappropriate for estimating likelihood of confusion. It tends to overestimate the likelihood of confusion, often by a significant amount. Moreover, the derived estimates were negatively correlated with those generated by most other techniques; that is, the Exxon estimates were relatively high in cases where the estimates based on other techniques were relatively low, and vice versa. For example, in the case of the junior brands Wanasonic and Ronex, the other techniques and common sense suggest low likelihood of confusion (with Panasonic and Rolex, respectively), whereas the Exxon derived estimates were 83 percent for Wanasonic and 71 percent for Ronex. In addition, the finding that the likelihood of confusion derived from the Exxon Format is higher among consumers who are better educated and have greater product familiarity raises further doubts about the validity of this method.

The underlying limitation of the Exxon Format appears to be that what comes to mind is a highly inaccurate indicator of likelihood of confusion. If confusion between two marks is such that consumers do not distinguish between them, then the Exxon Format is unlikely to capture that confusion because naming the senior mark when seeing the junior mark requires respondents to distinguish between the two.[51] If, on the other hand, there is confusion between two marks that are similar but distinguishable, then the Exxon Format may reveal that confusion. However, in answering the question on what comes to mind, respondents, unlike consumers, do not have to consider whether it is likely that the name they indicate is the manufacturer of or is associated in the market place with the provided (junior) name. Indeed, 20 percent of the respondents in the Exxon task, who named the senior brands, explicitly explained that the brand names given to them appeared to be cheap imitations of the senior marks.

The Eveready Format is superior to the Exxon Format in that it directly addresses the question of confusion. In situations in which consumers do not distinguish between the junior and senior marks and know the name of the company that puts out the senior mark, or if they do not know the company but are familiar with other products put out by that company (as in the original Eveready case), this procedure provides a way to reveal confusion. An advantage of the Eveready Format compared to the Squirt

51. Supra note 25.

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 23 of

Format is that respondents are not given both the junior and senior marks, and thus, only those who already know the senior mark and might actually confuse the two can provide responses that would be regarded as reflecting confusion. Compared to simulated choice, the Eveready Format provides an estimate of likelihood of confusion that does not require any judgments.

The Eveready Format, however, also has some limitations. One concern is that this technique tends to inflate confusion estimates, though not as much as the Exxon Format. Respondents may feel that they should give an answer and are expected to know the name of the company that puts out the junior brand. Consequently, many of the responses that identify the senior mark might be mere guesses that would not have resulted in actual confusion in the market place. Indeed, the results of the present study suggest that most responses naming the senior mark were associated with relatively low confidence. Furthermore, the finding that those who have greater familiarity with the product category are more likely to name the senior mark (i.e., greater familiarity is associated with a higher likelihood of confusion) suggests that respondents try to demonstrate their knowledge by providing the names that appear like the best guesses.

In other cases, the Eveready Format may lead to confusion estimates that are too low. For example, the Eveready estimate for Tuna of the Sea was lower than those derived from all other techniques. Apparently, many respondents realized that the maker of Chicken of the Sea would be unlikely to use the name Tuna of the Sea. However, consumers in the market place may fail to distinguish the two marks and buy Tuna of the Sea thinking they are buying Chicken of the Sea.

An apparent advantage of the Squirt Format is that, in many cases, it generated confusion estimates that were relatively close to those derived from other formats, especially simulated choice. It appears that respondents are often quite good at judging whether two marks are put out by the same or different companies, although it is not at all clear that they would have considered this question in a normal purchase situation. A limitation of the Squirt Format is that, unlike most purchase situations, respondents are shown the junior and senior marks side by side. Consequently, even respondents who are unaware of the senior mark and thus could not have confused the two in actual purchase situations, might still indicate that the two marks are put out by the same company. This limitation can have a significant effect on confusion estimates when the awareness level of the senior mark is low. For example, among all senior names used in the present research, Oral B had the lowest recognition

Case 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 24 of 31

level.[52] As shown in the Table, the Squirt confusion estimate for Oral Z was higher than those derived from other formats (excluding Exxon). This finding suggests that some of those who indicated that Oral Z and Oral B were put out by the same company would not have thought about Oral B had it not been mentioned in the question.

The proposed simulated choice technique avoids many of the limitations of the other formats. However, in order to apply simulated choice effectively, the researcher should be able to determine unambiguously, on the basis of the respondents' brand evaluations, whether confusion between the junior and senior marks occurred. Unlike other techniques, the simulated choice task does not focus attention on possible associations of trademarks, but rather, it puts respondents in their familiar role of consumers making purchase decisions. Consequently, this task is less likely to cause respondents to consider trademark associations that they would not have thought about and to show confusion that would not have occurred in ordinary purchase situations.

Simulated choice may also be more balanced in terms of the types of trademark confusion it can reveal. As noted earlier, confusion estimates derived from the Exxon Format are driven by the similarity of the junior and senior names. The Eveready and Squirt tasks, conversely, tend to focus on whether it is logical that the two marks are likely to be put out by the same company. Thus, the Eveready and Squirt Formats tend to lead to relatively high confusion estimates when the senior and junior marks appear as logical extensions (e.g., Dannon and Danfree and RCA and RC-CAM), even though many consumers might not have thought about the senior brand had they not been asked about name associations. These formats are expected to lead to relatively low confusion estimates when the two marks are confusingly similar, but it appears unlikely that the same company will use both names (e.g., Chicken of the Sea and Tuna of the Sea). Compared to these techniques, simulated choice appears to offer a way to capture confusion both when the two marks are so similar that they are almost indistinguishable as well as in cases where the junior mark appears like an extension of the senior mark. Finally, as illustrated in the present study, the simulated choice technique allows the researcher to collect other pertinent information regarding various influences on the likelihood of confusion.

The fact that with the simulated choice format confusion is inferred indirectly in the context of a choice task is a strength of

52. On the basis of a pilot study; see supra note 45.

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 25 of

this technique but also its main potential limitation. With other techniques, the criterion for confusion is usually clear and unambiguous. With the simulated choice format, on the other hand, confusion is determined on the basis of analysis of respondents' evaluations of the alternatives before or after choice. The challenge for the researcher is to design the task such that the existence of confusion can be decided unambiguously. As suggested earlier, the specific brand evaluation questions should be tailored to the particular case so that they maximize the likelihood of demonstrating any confusion that might exist without revealing the purpose of the study. Such questions might include an evaluation of the advantages and disadvantages of each brand, what if anything respondents know about the quality of other products made by the same company, whether they had any previous experience with these brands, what they know and think about its advertising, and so on. It is expected that, in most cases, the researchers conducting the study will be able to identify appropriate questions that will allow using the simulated choice format effectively.

## V. CONCLUSION

This article examined the differences among a number of commonly used techniques for estimating likelihood of trademark confusion and assessed the sensitivity of confusion estimates to the methodology used. Given the significant differences among the various techniques, it was expected that they would lead to systematically different confusion estimates. Indeed, the empirical study showed substantial method sensitivity, with estimates derived from one technique often two to three times greater than those generated by other techniques.

Unfortunately, all methods are bound to have some flaws and no one technique is likely to provide the perfect estimates in all cases. Researchers in the social sciences have long recognized that all methods are flawed, especially when they are designed to measure complex and unobservable constructs such as confusion. To get around this problem, research methodology experts proposed using multiple methods, each having different strengths and weaknesses.[53]

In the context of trademark confusion, one might be able to reduce the severity of the method sensitivity problem by using, whenever possible, two rather than just one method for estimating

---

53. Scc, for example, Donald T. Campbell and Donald W. Fiske, Convergent and Discriminant Validation by the Multitrait-Multimethod Matrix, 56 Psychological Bulletin 81-105 (1959).

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 26 of

likelihood of confusion. Attorneys may be concerned that presenting two different estimates will weaken their position. However, one should recognize that all methods have limitations and no one estimate is precisely correct. Different techniques therefore are expected to generate different confusion estimates. By combining two estimates, it is possible to reach conclusions that are less method dependent and are closer to the true likelihood of confusion.

## APPENDIX A

## EXAMPLE OF THE SURVEY TECHNIQUES INCLUDED IN THE STUDY

### *Exxon Format*

Product Category: VCR (4-head, 30 day/4 event, on-screen program, remote, $259)

Brand Name: WANASONIC

(a) What is the first thing that comes to mind when looking at this brand name?

(b) What was that about the brand name that made you say that?

(c) What is the first company that comes to mind when looking at this brand name?

(d) What was that about the brand name that made you say that?

---

### *Standard Eveready Format*

Product Category: VCR (4-head, 30 day/4 event, on-screen program, remote, $259)

Brand Name: WANASONIC

(a) Which company do you think puts out this brand?

(b) What makes you think so?

(c) Name other products, if any, put out by the same company which puts out WANASONIC VCR:

---

### *Eveready Format: Confidence Version*

Product Category: VCR (4-head, 30 day/4-event, on-screen program, remote, $259)

Brand Name: WANASONIC

(a) Which company do you think puts out this brand?

(b) How confident are you about the company (0-100%)?

(c) What makes you think so?

---

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 28 of

### *Squirt Format*

Product Category: VCR (4-head, 30 day/4 event, on-screen program, remote, $259)

(a) Do you think "WANASONIC" VCRs and "PANASONIC" VCRs are made by the same or different companies?

SAME DIFFERENT

(b) What makes you think so?

---

### *Simulated Choice Format*[54]

PRODUCT CATEGORY: VCR

Imagine that you would like to buy a 4-head VCR, with on-screen programming, 1 month/4 event timer, and remote control. At the store you have a choice between the following two brands:

| | |
|---|---|
| WANASONIC<br>(Price: $259) | GOLDSTAR<br>(Price: $259) |

1. Advantages of "WANASONIC":

2. Advantages of "GOLDSTAR":

3. Which of these brands would you buy?

---

54. In other versions of the simulated choice format (evaluated by different groups of respondents; see supra note 44) the Panasonic brand appeared instead of Wanasonic, or both Panasonic and Wanasonic (as well as Goldstar) were included in the choice set (see discussion at supra Section III.B.4).

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 29 of

# APPENDIX B
## TABLE
### A COMPARISON OF LIKELIHOOD OF CONFUSION ESTIMATES DERIVED FROM DIFFERENT TECHNIQUES

| Senior Brand | Junior (Infringing) Brand | Exxon format (a) | Eveready format with other products question (b) | Eveready format with confidence question (b) | Squirt format (c) | Simulated choice (d) | Simulated choice as % of senior brand awareness (e) | Simulated choice with senior & junior brands side-by-side (d) |
|---|---|---|---|---|---|---|---|---|
| HOLIDAY INN | HOLIDAY OUT (campgrounds) | 73% (43%) | 20% | 24% | 12% | 6% | 8% | 3% |
| OREO | REO (cookies) | 80% (61%) | 48% | 37% | 12% | 21% | 22% | 3% |
| RCA | RC-CAM (camcorder) | 42% (15%) | 23% | 33% | 32% | 20% | 24% | 4% |
| OLD SPICE | NEW SPICE (deodorant) | 73% (64%) | 28% | 23% | 31% | 33% | 37% | 17% |
| RUBBERMAID | PLASTICMAID (food container) | 52% (22%) | 47% | 38% | 24% | 23% | 26% | 5% |
| DANNON | DANFREE (light yogurt) | 66% (34%) | 70% | 55% | 60% | 19% | 22% | 5% |
| EXXON | TEXON (motor oil) | 40% (31%) | 17% | 15% | 14% | | | |
| HEWLETT PACKARD | PACKARD (PC) | 47% (36%) | 44% | 53% | 49% | 61% | 65% | 13% |
| ORAL B | ORAL Z (tooth paste) | 55% (33%) | 22% | 16% | 37% | 14% | 23% | 6% |
| CHICKEN OF THE SEA | TUNA OF THE SEA (tuna) | 47% (31%) | 28% | 16% | 37% | 52% | 65% | 18% |
| PANASONIC | WANASONIC (VCR) | 83% (53%) | 53% | 24% | 7% | 7% | 7% | 3% |
| ROLEX | RONEX (watch) | 71% (61%) | 26% | 16% | 3% | 10% | 10% | 1% |
| **TOTAL** | | **61% (40%)** | **36%** | **29%** | **26%** | **24%** | **28%** | **6%** |

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 30 of

TABLE (continued)

*Notes*

(a) The Exxon confusion estimates are based on the share of answers indicating the senior mark (or its manufacturer) in response to the question "What is the first company that comes to mind . . .?"; the numbers in parentheses are based on the question, "What is the first thing that comes to mind . . .?"

(b) Eveready estimates are based on answers to the question, "Which company puts out . . .?"

(c) Squirt estimates are based on the share of responses indicating that both brands are put out by the same company.

(d) Simulated choice estimates are based on the rate of confusion between the junior and senior marks in choice sets in which respondents chose between the junior and a competing brand, or (in the side by side versions) between the junior, senior, and competing brand.

(e) Simulated choice as percent of senior brand awareness is calculated by dividing the simulated choice confusion estimate by the percent awareness of the senior brand (as determined from evaluations of the senior brands).

se 3:24-cv-00137-TMR-DCK Document 196-17 Filed 05/09/25 Page 31 of