CMT USA, INC. and CMT UTENSILI S.p.A.,

     Plaintiffs,

     v.

APEX TOOL GROUP LLC and APEX
BRANDS, INC.

     Defendants.

**MEMORANDUM IN SUPPORT OF**
**CMT'S MOTION TO EXCLUDE**
**OPINIONS AND TESTIMONY OF**
**APEX'S PROPOSED EXPERT**
**DAVID FRANKLYN**

# TABLE OF CONTENTS

I. Introduction ........................................................................................................... 1

II. Background ............................................................................................................ 2

III. Argument .............................................................................................................. 3

    A. The *Eveready* Format Is Inappropriate for Marks That <u>Are</u> Proximate in the Marketplace When the Senior Mark Is <u>Not</u> Top-of-Mind ............................... 4

        i. Courts and Commentators, Including Mr. Franklyn, Recognize That Consumer Awareness Underpins the *Eveready* Methodology ............ 5

        ii. CMT's Covered Goods and Apex's Accused Products Are Proximate in the Marketplace .............................................................. 9

        iii. Mr. Franklyn Relied on Contested Allegations Instead of Evidence of Consumer Awareness ........................................... 10

        iv. Mr. Franklyn's *Eveready* Survey Is Unsupported, Unreliable, and Should Be Excluded ......................................................... 12

    B. Mr. Franklyn's 0% Margin of Error Renders His Survey Unreliable ................... 13

    C. Mr. Franklyn's 80% Professional-User Quota  Created an Underinclusive and Improper Universe ................................................................. 16

    D. Mr. Franklyn's Survey Measured Reading Ability, Not Confusion Stemming From CMT's Orange Mark ......................................... 17

        i. Mr. Franklyn Primed Respondents to Focus on Extraneous Word Marks Rather Than CMT's Orange Mark ....................................... 18

        ii. Mr. Franklyn Did Not Correct for the "Anonymous Source" Problem Created by His Survey Design .................................................. 22

    E. Mr. Franklyn is Not a Marketing Expert and Is Not Qualified to Critique Dr. Winer's Opinions ............................................... 23

IV. Conclusion ........................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Akiro v. House of Cheatham Inc.*,
   946 F. Supp. 324 (S.D.N.Y. 2013) ................................................................ 6

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2002) ........................................................................................ 12

*Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*,
   383 F.3d 110 (3rd Cir. 2004) ........................................................................ 12

*Combe Inc. v. August Wolff GMBH & Co. KG Arzneimittel*,
   382 F. Supp. 3d 429 (E.D. Va. 2019) ............................................................ 7

*Cooper v. Smith & Nephew, Inc.*,
   259 F.3d 194 (4th Cir. 2001) .......................................................................... 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ................................................................................. *passim*

*Gen. Motors Corp. v. Lanard Toys, Inc.*,
   468 F.3d 405 (6th Cir. 2006) ........................................................................ 18

*Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*,
   335 F. Supp. 3d 566 (S.D.N.Y 2018) .............................................................. 7

*Kreation Juciery, Inc. v. Shekarchi*,
   2014 WL 7564679 (C.D. Cal. 2014) ................................................................ 6

*Kumho Tire v. Carmichael*,
   526 U.S. 137 (1999) .......................................................................................... 4

*McClain v. Metabolife Intern., Inc.*,
   401 F.3d 1233 (11th Cir. 2005) .................................................................... 12

*People for the Ethical Treatment of Animals v. Doughney*,
   263 F.3d 359 (4th Cir. 2001) ........................................................................ 17

*Simon & Schuster v. Dove Audio*,
   970 F. Supp. 279 (S.D.N.Y. 1997) ............................................................ 6, 23

*Superior Consulting Servs., Inc. v. Shaklee Corp.*,
   2021 WL 4438518 (11th Cir. 2021) ................................................................ 4

*Synder's Lance, Inc. v. Frito-Lay N. Am., Inc.*,
   542 F. Supp. 3d 371 (W.D.N.C. 2021) .......................................................... 13

*The Learning Network, Inc. v. Discovery Commc's, Inc.*,
    153 F. Supp. 2d 785 (D. Md. 2001) ................................................................ 18

*Therapeutics MD., Inc. v. Evofem Biosciences, Inc.*,
    2022 WL 1013285 (S.D. Fla. 2022) ............................................................... 7

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010) ............................................................ 13

*Union Carbide Corp. v. Ever-Ready Inc.*,
    531 F.2d 366 (7th Cir. 1976) ......................................................................... 16

*Valador, Inc. v. HTC Corp.*,
    242 F. Supp. 3d 448, 457 (E.D. Va. 2017) ..................................... 4, 7, 12, 18

*Vital Pharms., Inc. v. Monster Energy Co.*,
    553 F. Supp. 3d 1180 (S.D. Fla. 2021) .......................................................... 7

**Statutes**

15 U.S.C. § 1114 ...................................................................................................... 17

15 U.S.C. § 1114(1)(a) ............................................................................................. 17

15 U.S.C. § 1127 ...................................................................................................... 22

**Other Authorities**

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5TH ED.) ........................... 5, 7, 16, 22

**Rules**

FED. R. EVID. 702 ............................................................................................... 3, 12

# I.    Introduction

In accordance with Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A. (collectively "CMT") move to exclude the testimony of Professor David Franklyn, the proposed survey expert for Defendants Apex Tool Group LLC and Apex Brands, Inc. (collectively "Apex"). His opinions should be excluded because they are not grounded in reliable methodology, are irrelevant to the issues being decided at trial, and/or fall outside the scope of his expertise.

CMT challenges Mr. Franklyn's likelihood-of-confusion survey and related testimony on the grounds that they are unreliable and irrelevant under *Daubert*.  Mr. Franklyn's use of the *Eveready* methodology in this case contradicts authoritative scholarly literature, violates foundational principles of survey design and execution, and is grounded on allegations unsupported by empirical data.  In fact, prevailing scholarship—and Mr. Franklyn's own prior work—acknowledge that *Eveready* surveys are incapable of disproving a likelihood of confusion under the realities of the saw blade marketplace.

Compounding those flaws, Mr. Franklyn applied a quota that skewed respondents and selectively favored people already familiar with Apex's "Crescent Tools" brand name and less likely to be confused.  His survey design also improperly directed respondents to treat his survey as a reading test rather than focus on CMT's color-based mark.  His resulting data also produced a 0% margin of error, an outcome that is statistically impossible for a properly conducted sample survey.  Lastly, Mr. Franklyn is not a marketing or branding expert and yet submitted a report ostensibly rebutting the testimony of CMT's highly credentialed and widely respected branding and marketing expert.

Admitting the challenged testimony would not aid the trier of fact but instead risk misleading the jury and prejudicing CMT.  For these reasons, and as explained more fully below,

Mr. Franklyn should not be permitted to testify at trial about his survey or about marketing issues.

## II. Background

This is primarily a trademark-infringement case. *See, e.g.*, Dkt. 37 ¶¶ 62-75. The mark at issue consists "of the color orange as applied to" "[c]ircular blades for power saws for cutting wood" ("CMT's Orange Mark"). Dkt. 150-9 at 94 ('625 Registration Certificate). CMT's Orange Mark is federally registered as U.S. Trademark Registration No. 3,038,625 and is incontestable. Dkt. 159 (CMT's brief in support of motion for summary judgment) at 5. In 1997, CMT began applying the color orange to its circular woodworking saw blades and has exclusively done so ever since. Dkt. 159 at 3. Apex became aware of CMT's Orange Mark in 2017, appropriated the Mark for its own circular woodworking saw blades ("Accused Products") in 2021, and after CMT demanded the infringement stop, Apex expand its infringement in 2023. Dkt. 159 at 6-8. CMT filed suit shortly thereafter, asserting Lanham Act and common-law infringement claims, among others.

As part of its defense, Apex retained David Franklyn to conduct a consumer survey, which he purportedly did in accordance with the well-known *Eveready* methodology. His stated goal was to test the likelihood-of-confusion between Apex's circular woodworking saw blades and products from any other company. Mr. Franklyn screened for age, gender, and geography based on U.S. Census data and further screened for 80% professional users of saws. Ultimately, Mr. Franklyn identified a sample of 479 consumers who claimed to have purchased a circular saw blade in the past twelve months or planned to purchase one in the next twelve months, at either a retail store or online. As is standard with *Eveready* surveys, both test and control respondents were shown only the junior user's mark (here, Apex saw blades) and were asked who makes the product and whether the product was sponsored or affiliated with another company. Those questions were asked while the saw-blade images (stimuli) remained in full view. Deviating from standard

*Eveready* methodology, Mr. Franklyn failed to ask whether any other products were made by the company who made the depicted saw blades. Mr. Franklyn reported that 0% of consumers believed CMT made Apex's saw blade and that 0% of consumers believed Apex's saw blade was sponsored or affiliated with CMT. Mr. Franklyn also calculated a 0% margin of error, an outcome inconsistent with basic principles of statistical analysis.

As explained below, Mr. Franklyn's survey suffers from serious methodological flaws, which render his survey and related testimony unreliable. *First*, an *Eveready* survey cannot disprove a likelihood of confusion where, as here, the two marks are proximate in the marketplace and the senior mark (CMT's Orange Mark) is not readily accessible in the memory of consumers (i.e., it is not "top of mind"). *Second*, no valid scientific experiment, especially a sample survey, can yield a zero margin of error. *Third*, Mr. Franklyn's 80% quota for professional users improperly stacked his universe with respondents having specialized characteristics, which skewed his results in favor of Apex. *Fourth*, while the Lanham Act requires that any confusion stem from the mark in question, Mr. Franklyn's survey design measured reading comprehension, not confusion based on color, the feature protected by CMT's Orange Mark.

## III.  Argument

Courts must exclude expert testimony that is unreliable or irrelevant. Rule 702 permits testimony by qualified experts only if it is based on reliable principles and methods, and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. FED. R. EVID. 702. Because an expert has the potential to be "quite misleading," the trial court must act as a gatekeeper to ensure an expert's methodology is scientifically valid and applied properly to the facts at issue in the trial. *Daubert*, 509 U.S. at 589, 594; *see also Cooper v. Smith*

& *Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). If in assessing the *Daubert* factors,[1] the court

finds the expert's methodology to be unreliable, it is required to exclude the opinions at issue.

*Daubert*, 509 U.S. at 589. As the proponent of Mr. Franklyn's testimony, Apex "must establish

its admissibility by a preponderance of proof." *Cooper*, 259 F.3d at 199.

The gatekeeping function applies to survey evidence in trademark cases. Where a

likelihood of confusion survey is not "conducted according to accepted principles" or is not

conducted "in a statistically correct manner," it is unreliable and must be excluded. *Valador, Inc.*

*v. HTC Corp.,* 242 F. Supp. 3d 448, 457 (E.D. Va. 2017), *aff'd* 707 F. App'x 138 (4th Cir. 2017);

*see also Superior Consulting Servs., Inc. v. Shaklee Corp.*, 2021 WL 4438518, at *12 (11th Cir.

2021) (affirming exclusion of a likelihood of confusion survey because "where the methodology

is unreliable, the district court has a duty under rule 702 to exclude the expert's testimony."). Mr.

Franklyn's survey is unreliable and should be excluded because it was not conducted according to

accepted principles and was not conducted in a statistically correct manner.

### A. The *Eveready* Format Is Inappropriate for Marks That <u>Are</u> Proximate in the Marketplace When the Senior Mark Is <u>Not</u> Top-of-Mind

Mr. Franklyn "utilized an *Eveready*-style survey," which he believed "was the appropriate

methodology for a confusion survey in this case." Dkt. 163-23 (Franklyn Op. Report) at 5. He

was wrong. The scholarly consensus is that an *Eveready* survey cannot disprove a likelihood of

confusion for marks that <u>are</u> proximate in the marketplace when the senior mark does <u>not</u> have

top-of-mind awareness among relevant consumers.[2] Mr. Franklyn himself agrees that a

---

[1] While neither definitive nor exhaustive, the *Daubert* factors include: (1) testability, (2) peer review and publication, (3) the known or potential error rate, (4) standards and controls, and (5) general acceptance. *See Kumho Tire v. Carmichael*, 526 U.S. 137, 149-50 (1999).

[2] Importantly, a mark can be strong even without having top-of-mind awareness, and Mr. Franklyn admits as much. Dkt. 170-12 (Franklyn Tr.) at 145:24-146:1; *see also* Ex. F at 20-21. As demonstrated in CMT's summary judgment briefing, its Orange Mark is strong. Dkt. 159

foundational principle of the *Eveready* methodology is that consumers must be sufficiently aware of the senior mark. *See* Part II.A.i., *infra*. Courts likewise have noted the impropriety of an *Eveready* survey on facts like those presented in this case.

The record shows that CMT's and Apex's products are sold in the same stores and routinely appear together on e-commerce sites. Mr. Franklyn does not dispute that. Yet, Mr. Franklyn made no effort to investigate consumer awareness of CMT's Orange Mark, a prerequisite before using the *Eveready* format. Instead, Mr. Franklyn relies exclusively on disputed allegations from the complaint. Without **evidence** of consumer awareness of CMT's Orange Mark, much less evidence that it is top of mind, Apex cannot show that the *Eveready* methodology is reliable for disproving confusion in this case. This is not a minor quibble. The facts here call for a *Squirt*-style survey, which is designed for competing products that appear side by side. By choosing a format that he knows is inappropriate, Mr. Franklyn's survey does not measure confusion. It would be unhelpful and misleading to a jury to allow it because it cannot be shown to be reliable. The Court should therefore exclude Mr. Franklyn's *Eveready* survey and his related testimony.

### i. Courts and Commentators, Including Mr. Franklyn, Recognize That Consumer Awareness Underpins the *Eveready* Methodology

Jerre Swann is recognized as an authority by survey experts and commentators, including both experts in this case, Dr. Maronick[3] and Mr. Franklyn,[4] as well as Professor J. Thomas McCarthy.[5] Professor Swann has cautioned against misapplying the *Eveready* methodology:

> For marks that are not readily accessible in memory [i.e., not top-of-mind], an Eveready may substantially underestimate the likelihood of real world confusion. Where marks, for example, are

---

at 11-13; Dkt. 176 (CMT's opposition to Apex's motion for summary judgment) at 14-16.

[3] *See, e.g.*, Dkt. 156-1 (Maronick Op. Report) at 7 n.5.

[4] *See, e.g.*, Dkt. 163-23 at 5 n.1; *see also* Dkt. 170-12 at 20:23-22:4

[5] *E.g.*, McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed.) [hereinafter McCarthy].

in physical or temporal proximity (that is, with an appreciable degree of frequency, are seen side-by-side or in close sequence in the marketplace), **an Eveready** *alone*, exposing respondents only to a junior use, may not reflect market (dual exposure) reality and **cannot suffice alone to *disprove* a likelihood of confusion**—and recent judicial observations to that effect are heartening.

Dkt. 150-32 (Swann, *Eveready and Squirt–Cognitively Updated*) at 735-36 (footnotes omitted) (bolding added, italics original).  Professor Swann goes so far as to call attempts to use the *Eveready* methodology where, like here, the marks are proximate and the senior mark is not readily accessible in memory "a distorted deployment of the Eveready format," which "may . . . expose both the survey expert and counsel to adverse comment" by a court.  Dkt. 150-32 at 736.

Courts have echoed these concerns regarding using the *Eveready* methodology without sufficient consumer awareness.  In one such case, *Simon & Schuster v. Dove Audio*, the court determined that an *Eveready* can "significantly underestimate the likelihood of confusion" for marks lacking top-of-mind awareness, especially in instances in which the goods are not "common household products" where consumers may "not know the name . . . of the company that puts out the senior mark."  970 F. Supp. 279, 290, 299 (S.D.N.Y. 1997).  In another case, *Kreation Juciery, Inc. v. Shekarchi*, the court found that defendants did not meet "the burden of showing that the [senior mark] is well-known under the Eveready standard," noting that defendants' expert "should have screened respondents to confirm that they knew the [plaintiff's] brand."  2014 WL 7564679, at *7 n.4 (C.D. Cal. 2014).  As the *Kreation Juicery* court reasoned, "[u]nless the [senior] mark is well known by the Eveready standard, the survey format cannot accurately measure confusion."  2014 WL 7564679, at *7 n.4.  In a third case cited by Professor Swann, *Akiro v. House of Cheatham Inc.*, the court similarly acknowledged that "by design [an *Eveready* survey] will underestimate confusion for marks that are not highly accessible in a consumer's memory."  946 F. Supp. 324, 339 (S.D.N.Y. 2013).

More recent decisions reiterate the principle that the *Eveready* format cannot reliably measure confusion if the senior mark is not top of mind. *See e.g.*, *Combe Inc. v. August Wolff GMBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 462 (E.D. Va. 2019); *Valador*, 242 F. Supp. 3d at 457; *Therapeutics MD., Inc. v. Evofem Biosciences, Inc.*, 2022 WL 1013285, at *5 (S.D. Fla. 2022); *Vital Pharms.*, *Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1229 (S.D. Fla. 2021); *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 597 n.10 (S.D.N.Y 2018).

Hal Poret, another recognized authority cited by Professor McCarthy[6] and relied on by Apex in this case,[7] also agrees with this view. Mr. Poret explains why the *Eveready* methodology cannot capture confusion between proximate marks without consumer awareness of the senior mark:

> The issue of consumer awareness of the senior mark becomes relevant to the accuracy and reliability of the Eveready format where the parties' marks are used in close enough proximity that consumers will encounter both with appreciable frequency—for instance, where the parties' products/services are directly competing or substantially overlapping in the marketplace. ***In such a scenario, lack of consumer awareness of the senior mark could cause an Eveready survey to fail to detect confusion, even though the actual marketplace conditions may render confusion likely.*** By presenting only the junior mark, the survey would fail to take account of the fact that consumers are reasonably likely to encounter the senior mark (and thus gain awareness of it) while shopping for and encountering the product bearing the junior mark.

Ex. P at 939-40 (footnotes omitted) (emphasis added) (citing Dkt. 150-32 at 743). Mr. Poret confirms that this is a reliability issue, reflecting Professor Swann's warning about "distorted deployment of the Eveready format." *See* Dkt. 150-32 at 736.

Mr. Franklyn, in lockstep with Professor Swann and Mr. Poret, has repeatedly and

---

[6] McCarthy § 32:174 (citing Ex. P at 935, 954).

[7] Dkt. 189 (Apex's summary judgment reply brief) at 22-23 (citing Ex. P at 954).

unequivocally asserted—under penalty of perjury—that the *Eveready* methodology is fundamentally inappropriate when there is no evidence that the senior mark enjoys unaided (or top-of-mind) awareness.[8]  In fact, in a different litigation, Mr. Franklyn advocated for the wholesale exclusion of an *Eveready* survey based on the same flaw presented here—no evidence of top-of-mind awareness.  Specifically, he stated that "the [*Eveready*] survey format was fundamentally inappropriate for measuring confusion" and that "[t]he results should be totally disregarded on that basis alone."  Ex. F at 21.  As he previously put it, "the entire theory underlying the methodology of an *Eveready* survey is that the plaintiff's product is well-known enough in the relevant marketplace that it is so-called top-of-mind."  Ex. G 115:14-117:9, 38:7-39:16 (calling unaided awareness the "heart and soul" of the *Eveready* methodology).  Mr. Franklyn has repeatedly expressed this view across multiple cases.  *See, e.g.*, Ex. J at 5 ("The Eveready survey . . . requires that consumers would have awareness of the mark not shown within the stimuli."; "[I]n cases involving top-of-mind marks, the Eveready format is, to repeat, the gold standard for fundamental cognitive and marketing reasons."); *see also* Ex. I 23:9-25 ("[W]hen the senior user has a particularly famous mark it can be considered appropriate or perhaps more appropriate to do an Eveready survey.").

Yet in this case, Mr. Franklyn abandons that position entirely.  Despite acknowledging that "*Eveready* surveys are advisable where the senior mark is commercially strong enough to be readily accessible in memory with 'top of mind' (unaided) awareness," he offers no empirical support whatsoever that CMT's Orange Mark is top of mind.  Dkt. 163-23 at 5.  This is a stark contradiction, Mr. Franklyn is defending a methodology he has repeatedly condemned in other

---

[8] If anything, Mr. Franklyn seems to be ***more restrictive*** than Professor Swann or Mr. Poret.  Mr. Franklyn's requirements for using an *Eveready* do not include marketplace proximity.

cases.  *See e.g.*, Ex. F at 21.  Mr. Franklyn found 0% confusion in his test cell—on all three confusion measures in this case.  This finding is the exact result Mr. Franklyn has previously criticized as making a survey so unreliable that it should be excluded.  When CMT questioned him about this contradiction, Mr. Franklyn was unwilling (or unable) to explain it.  *See* Dkt. 170-12 at 269:12-288:21.

> ### ii.     CMT's Covered Goods and Apex's Accused Products Are Proximate in the Marketplace

There is no question that the parties' products are proximate in the marketplace.  Apex has conceded that there are physical "retail stores which sell saw blades from both Plaintiffs and Apex."  Dkt. 164 (Apex's brief in support of motion for summary judgment) at 22.  This is corroborated by evidence showing availability in the same stores, such as Contractor Tool Supply, Brannen's, Dyke's Lumber, True Value, and Harmco.  Dkt. 151-2 (Ricci Tr.) at 170:22-172:3; *see also* Dkt. 151-5 (Winer Op. Report) Fig. 12; Dkt. 151-3 (Henz Op. Report) ¶¶ 20-26.

Moreover, Apex and CMT saw blades are sold on many overlapping e-commerce sites, such as Amazon, Lowe's, Contractor Tool Supply, and Acme Tools.  Dkt. 150-27 (Apex's responses to CMT's first set of interrogatories) at 6-7; Dkt. 150-9 at 32-33 (Acme Tools website); Dkt. 150-11 at 12-19 (Google Shop, Lowe's website).  Even Mr. Franklyn acknowledged the parties' proximity in the marketplace.  When he searched for "orange circular saw blade" on Google, both plaintiffs' and defendants' products "c[a]me up" and that is an "indication of proximity."  Dkt. 170-12 at 125:21-128:4.  It is therefore no surprise that Mr. Franklyn admitted he "was absolutely aware that there was in-store proximity and that there was search result proximity" before designing his survey.  Dkt. 170-12 at 125:21-128:4.

Due to the marketplace proximity of the parties' goods, Mr. Franklyn "ha[s] never taken the position in this case" that "it wouldn't be appropriate to do a *Squirt* survey."  Dkt. 170-12

at 125:21-128:4. Quite the opposite, in fact. It is Mr. Franklyn's ordinary practice to use a *Squirt* survey when there is marketplace proximity. Ex. I 22:18-23:8 ("[W]hen you have evidence of proximity in sales in either online or offline or both, that is a factor weighing heavily in the favor of doing a Squirt."); Ex. F at 20 (opining that "[plaintiff's mark] and [defendant's mark] occur in close marketplace proximity to each other," and, thus, "it would have been more appropriate to conduct a *Squirt*-style survey"). It is therefore inexplicable that Mr. Franklyn chose not to follow his usual practice here, especially given he has previously critiqued other experts for not running *Squirt* surveys when the facts indicate they should. Ex. F at 21 ("[I]t is entirely possible that [defendant's expert] considered or even piloted *Squirt*-style surveys which he realized would indicate confusion if he showed respondents the [defendant's mark].") Notably, CMT's survey expert, Dr. Maronick, conducted a *Squirt* survey, which found significant consumer confusion. Dkt. 156-1 ¶¶ 22, 41.

### iii.  Mr. Franklyn Relied on Contested Allegations Instead of Evidence of Consumer Awareness

Mr. Franklyn's decision to use the *Eveready* methodology was not based on empirical data or any investigation, but instead on a selective reading of the following three ***allegations*** in CMT's complaint:

1.  "CMT is specifically recognized by consumers worldwide and in the United States for its unique orange colored tools,"

2.  "Among its numerous products, CMT offers circular woodworking blades in its *well-known* orange color," and

3.  "[W]hen consumers see orange woodworking tools, they immediately recognize them as originating from CMT."[9]

Dkt. 163-23 at 6 (cleaned up) (quoting Dkt. 37 ¶¶ 12, 13, 20). He cites no other document and no

---

[9] Notably, the caveat of "when consumers see orange" would be an example of so-called "aided" awareness, whereas the *Eveready* methodology is predicated on "unaided" awareness. *See* Dkt. 163-23 at 5.

evidence of any kind to support his choice to use an *Eveready* survey. Mr. Franklyn acknowledged that those paragraphs were mere allegations and that Apex explicitly denied the pertinent part of each paragraph. Dkt. 170-12 at 103:3-8; *see also* Dkt. 42.

Notably, this is not how Mr. Franklyn has approached consumer awareness in past cases. In *Kodiak Cakes*, for instance, he tested consumer awareness of the senior brand directly with a question at the end of his *Eveready* survey. Ex. H at 59-60 (asking respondents: "Prior to taking this survey, were you aware of Kodiak Cakes?"); Ex. G 115:14-117:17. He has also faulted other survey experts for failing to include brand awareness questions at the end of their *Eveready* surveys, where there could be no risk of "bias[] or priming harm." Ex. G 115:14-117:17. Here, by contrast, he admitted he could have conducted an "initial survey of relevant market participants to see their degree of awareness" (Dkt. 170-12 at 93:19-95:1) or simply asked his respondents "at the end of the survey whether they were aware of CMT" (Dkt. 170-12 at 117:15-19), but he did neither and did "not recall" why. Dkt. 170-12 at 98:8-10, 114:6-120:14. Mr. Franklyn further concedes he could have looked at "market share" or other "circumstantial evidence of the prevalence of knowledge a particular brand,"[10] but chose not to. Dkt. 170-12 at 94:6-104:12. He also could have looked at "industry data," "social media metrics," or discovery materials, such as "answers to interrogatories," "document requests or depositions," but again, he did none of that. Dkt. 170-12 at 94:6-104:12. Mr. Franklyn's decision to put his head in the sand and not investigate consumer awareness of CMT's Orange Mark does not satisfy (or eliminate) the *Eveready* methodology's foundational requirement to have sufficient consumer awareness.

---

[10] As Dr. Maronick points out, "if you don't have a survey," "a pretty good proxy for top of mind is market share" or "advertising." Ex. A at 51:22-56:8.

### iv. Mr. Franklyn's *Eveready* Survey Is Unsupported, Unreliable, and Should Be Excluded

Mr. Franklyn offers no valid justification for using the *Eveready* methodology without first investigating consumer awareness of CMT's Orange Mark. Mr. Franklyn knows full well that his "choice of the type of survey that was used" is "one of the key criteria that's used to evaluate whether the survey ought to be admitted into court." Dkt. 170-12 at 54:15-56:8. As a former litigator and a professor of civil procedure (Dkt. 170-12 at 10:12-12:12), he is aware of discovery that happens in a litigation and could have reviewed—or requested—information bearing on consumer awareness, but he chose not to (Dkt. 170-12 at 97:4-99:1). Despite knowing that (i) he had no evidentiary basis for running an *Eveready*, (ii) he had all the tools needed to investigate consumer awareness of CMT's Orange Mark, and (iii) courts closely scrutinize the reliability of survey instruments, Mr. Franklyn pressed forward with a strategic gamble instead of methodological rigor. This Court should not allow Mr. Franklyn's gamesmanship and should exclude his survey. *See Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2002) ("The *Daubert* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*."); *see also McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (considering an expert's failure to prove the reliability of a preliminary step in his analysis on which he "heavily relies" a "fatal defect under *Daubert*" and excluding his overall conclusion).

Even if this flaw alone does not warrant exclusion, when considered with CMT's other arguments, it confirms that Mr. Franklyn's testimony fails to meet the reliability and relevance standards of Rule 702 and should be excluded. *Valador*, 242 F. Supp 3d at 457 ("An expert's survey and conclusions may be excluded under Rule 702 if the survey was fundamentally flaws

and suffers from fatal flaws as opposed to mere technical flaws."); *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3rd Cir. 2004); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 219 (S.D.N.Y. 2010).

### B.  Mr. Franklyn's 0% Margin of Error Renders His Survey Unreliable

Mr. Franklyn touts a 0% margin of error, which he believes "indicat[es] that we can be highly confident that the true confusion percentage is 0%." Dkt. 163-23 at 32.  But nothing could be further from the truth.  Some amount of error is inherent in all scientific measurement, including in sampling surveys like the *Eveready* one that Mr. Franklyn conducted.  The fact that Mr. Franklyn's data yields a 0% margin of error signals profound flaws in his work.  *See Synder's Lance, Inc. v. Frito-Lay N. Am., Inc.*, 542 F. Supp. 3d 371, 398 (W.D.N.C. 2021) ("The 'margin of error' in surveys should be considered in whether and how much to rely on their results.").

The Federal Judicial Center's Reference Manual on Scientific Evidence ("the Manual"), an authority recognized by survey experts including Mr. Franklyn (and by courts across the country) makes clear that error is inherent to all scientific data collection.  Dkt. 170-12 at 223:19-224:2 ("Everybody in my field is familiar with [the Manual].").  In particular, it states that:

> Error [as scientists use the term] is intrinsic to any measurement, and far from ignoring it or covering it up or even attempting to eliminate it, authors of every paper about a scientific experiment will include a careful analysis of the errors to put limits on the uncertainty in the measured result.  To make mistakes is human, one might say, but error is intrinsic to our interaction with nature, and is therefore part of science.

The Manual at 51-52.  In other contexts, the Manual cautions that "Objections . . . should be raised to testimony about zero error rates."  The Manual at 29.

Literature specific to surveys conclusively supports the view that the margin of error from a sample survey cannot be zero.  In general, all surveys are subject to "sampling errors" and

"nonsampling errors."[11]  Ex. S at 75; *see also* Ex. N at 3-4.  ("All of these types of survey errors are to some extent present in the data we collect via survey methods.").  Sampling error is the "[e]rror that results from the fact that a subset of the population is used to represent the population rather than the population itself."  Ex. N at 3; *see also* Ex. S at 53; Ex. O at 3 ("[S]ampling error in survey estimates" is "the error arising because only a subset of the population is measured.").

The U.S. Census Bureau is a prominent survey practitioner.  One survey it compiles is the annual American Community Survey (ACS), which addresses "the needs of policymakers, business leaders, planners, and others" by "provid[ing] a detailed portrait of the social, economic, housing, and demographic characteristics of America's communities."  Ex. S at 1.  Concerning sampling error, the Census Bureau states: "All estimates produced from sample surveys have uncertainty associated with them as a result of being based on a sample of the population rather than the full population."  Ex. S at 53.  That error "means that estimates derived from the ACS will likely differ from the values that would have been obtained if the entire population had been included in the survey."  Ex. S at 53.

The American Association for Public Opinion Research (AAPOR), the leading association of public opinion and survey research professionals, agrees with the Census Bureau and the relevant literature:

> The margin of sampling error is the price you pay for not talking to everyone in the population you are targeting.  It describes the range that the answer likely falls between if we had talked to everyone instead of just a sample.  For example, if a statewide survey of adults with a margin of error of plus or minus 3 percentage points finds that 58% of the public approve of the job their governor is doing, we would be confident that the true value would lie somewhere between 55% and 61% if we had surveyed to the whole

---

[11] "Broadly speaking, nonsampling error refers to any error affecting a survey estimate outside of sampling error."  Ex. S at 75.

adult population in the state.

Ex. R at 1.

In light of such authority, Mr. Franklyn's claim of a 0% margin of error is indefensible. There is no doubt that Mr. Franklyn conducted a sample survey. *See* Dkt. 163-23 at 4 (discussing his "sample of survey respondents"), 27 (discussing a "Sampling Plan"). A properly run sample survey inherently experiences some non-zero sampling error, but Mr. Franklyn's data resulted in the calculation of a zero percent error. Mr. Franklyn has never said that the standard equation he used to calculate his margin of error is in any way inadequate for his data or for the *Eveready* methodology, so that means that ***the data*** generated by his survey is flawed. Garbage in, garbage out. Mr. Franklyn's flawed data is due either to his particular implementation of the *Eveready* methodology or the *Eveready* methodology itself being improper for the facts of this case (*see* Part II.A.i, *supra*) or both. Regardless, with no *bona fide* error calculation possible from Mr. Franklyn's data, the Court cannot have any idea how closely Mr. Franklyn's data maps to reality. *See Daubert*, 509 U.S. at 594 ("[I]n the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error . . . ."). The unavoidable conclusion from Mr. Franklyn's 0% margin of error, therefore, is that his survey is unreliable and must be excluded.

Dr. Maronick's survey is a useful contrast because he employed the *Squirt* methodology[12] and found a 20.6% likelihood of confusion. Dkt. 156-1 ¶ 4. Mr. Franklyn calculated a 7.7% margin of error on Dr. Maronick's data. Dkt. 163-23 at 19. The Court can therefore be confident that if Dr. Maronick had polled all relevant consumers, instead of just a sample, 95% of the time the actual likelihood of confusion would be between 12.9% and 28.3%. Dkt. 163-23 at 19.

---

[12] Mr. Franklyn "ha[s] never taken the position in this case" that "it wouldn't be appropriate to do a Squirt" survey. Dkt. 170-12 at 127:15-128:4.

Mr. Franklyn's 0% margin of error directly contradicts "accepted principles" of survey analysis and cannot be "statistically correct," so his survey should be excluded for this reason alone, even more so when considered in conjunction with the other reasons provided in this brief. *Valador*, 242 F. Supp. at 457.

### C. Mr. Franklyn's 80% Professional-User Quota Created an Underinclusive and Improper Universe

"Selection of a proper universe is a crucial step" in survey design because "if the wrong persons are asked, the results are likely to be irrelevant." MCCARTHY § 32:159. Where "[a]lmost anyone would be likely to have purchased" the goods at issue, "a survey of the general population [i]s appropriate." *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 388 (7th Cir. 1976). Surveys that limit participation to narrow segments of consumers are "routinely rejected or discounted where the segment of consumers tested has specialized knowledge or characteristics likely to skew the results in favor of the party conducting the survey." Ex. M at 49.

Mr. Franklyn's survey fails this test. Although he began appropriately by screening for "past or prospective purchasers of circular saw blades to be used for cutting wood" (Dkt. 163-23 at 6), he then applied multiple unsupported and/or unjustified filters. First, he split his respondents into "in stores versus online," allegedly to "conform with the proportion of Apex's saw sales." Dkt. 163-23 at 6. Mr. Franklyn provides no evidence to support the proportion of Apex's saw blades that are sold in store versus online, nor did he review any document that would provide that proportion. Then, without disclosing any rationale, he applied an "~80%" quota, selecting for "[p]rofessional users of saws," revealing it only in an appendix to his report.[13] *See* Dkt. 163-23 at 6, 27 (discussing his "Sampling Plan"); Dkt. 170-11 at 1, 3.

---

[13] The actual proportion of professional users among Mr. Franklyn's respondents was 82.3%. Dkt. 156-2 (Maronick Rebuttal Report) ¶ 11.

If professional users truly made up 80% of the relevant population, the sample naturally would have reflected that without the need for a quota. The imposition of a quota, without any rationale, suggests a deliberate attempt to skew reported confusion in Apex's favor by oversampling respondents more likely to recognize the Crescent brand name and identify Crescent as putting out the goods pictured in Mr. Franklyn's stimuli. If Crescent is indeed "a household name" (Dkt. 164 at 5), that would undoubtedly be more true of households with professional saw blade users than of households without.

Dr. Maronick's universe provides a useful comparison because it was not constrained by any artificial quota. Of Dr. Maronick's 320 respondents who purchased woodworking saws and blades, only 143 (about 44.7%) were carpenters, woodworking professionals, or employed in another building trade. Dr. Maronick's naturally achieved 45% professionals is materially smaller than Mr. Franklyn's artificially achieved 82%. Notably, Apex does not criticize this aspect of Dr. Maronick's universe. *See* Dkt. 153, 156 (moving to exclude Dr. Maronick under *Daubert*). The U.S. Bureau of Labor Statistics also offers a real-world benchmark, estimating that people employed in construction represent about 5% of U.S. employment. Ex. T (showing total U.S. employment in April 2025 at about 164 million people with about 8.5 million people working "construction and extraction occupations").

Mr. Franklyn's skewed and underinclusive universe is squarely among those surveys that are "limited to participants having expertise not possessed by ordinary consumers of the relevant products" and are routinely rejected by courts. Ex. M at 49. The Court should exclude Mr. Franklyn's survey for that reason alone as well as the other independent reasons provided herein.

### D. Mr. Franklyn's Survey Measured Reading Ability, Not Confusion Stemming From CMT's Orange Mark

Infringement under the Lanham Act occurs when the unauthorized "use" of "a registered

mark" is "likely to cause confusion." 15 U.S.C. § 1114(1)(a); *see also People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (citing 15 U.S.C. § 1114) ("the defendant used the mark in a manner likely to confuse consumers" (emphasis added)). In other words, "the confusion must stem from the mark in question." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006). Here, the mark in question is a single color, orange, applied to circular woodworking saw blades. Dkt. 37 ¶¶ 62, 67; Dkt. 150-9 at 94. Apex concedes that this case requires the parties and their experts to "isolate the color of Apex's blade as the source of any alleged confusion." Dkt. 156 at 13 (emphasis added); *see also* Dkt. 156 at 12-13 ("A properly constructed likelihood of trademark confusion survey will isolate confusion arising specifically from the contested mark . . . .") (quoting *Valador,* 242 F. Supp. 3d at 463). Even Mr. Franklyn agrees that a proper survey must test for confusion caused by the mark in question. Dkt. 170-12 at 45:8-12.

But Mr. Franklyn designed a survey that could not measure color-based confusion because it functioned as nothing more than a reading test. *See The Learning Network, Inc. v. Discovery Commc's, Inc.*, 153 F. Supp. 2d 785, 789 (D. Md. 2001) ("Expert testimony concerning survey results may not be reliable if the survey format does not accurately gauge consumer confusion between the marks at issue.").

### i. Mr. Franklyn Primed Respondents to Focus on Extraneous Word Marks Rather Than CMT's Orange Mark

"Priming refers to a generally nonconscious process in which exposure to one piece of information influences (i.e., 'primes') the interpretation of other information that a person subsequently encounters." Ex. M at 284. Priming is a source of bias "when a survey makes certain mental content more or less salient in people's thinking than plausibly occurs in the relevant real word context." Ex. M at 284-85. That is precisely what happened here. Mr. Franklyn's survey

design forced repeated exposure to extraneous word marks, bringing them to the forefront, and then asked questions that required a ***written*** response while respondents were still able to look at the word marks.  Naturally, respondents did exactly what Mr. Franklyn wanted; they read the word marks in his images and then typed those marks into the answer space provided.  This design flaw is "fatal" to Mr. Franklyn's survey because it "make[s] it impossible to know whether the results are driven by improper priming" or by the unprimed truth. Ex. M at 285.

Mr. Franklyn's test-cell stimuli consisted of "several images of various circular saw blades made by Apex that contained the Crescent Saw Blade Trade Dress."[14]  Dkt. 163-23 at 6.   In particular, Mr. Franklyn's stimuli contained "three separate images, each of which had the defendant's 'Crescent' brand name on it multiple times."  Dkt. 156-2 ¶ 18.  The in-store version of Mr. Franklyn's stimuli displayed "the Crescent name five times," along with the stylized "CT" logo and one instance of the tradename "NailSlicer."   Dkt. 156-2 ¶ 18; Dkt. 156-2 at Ex. E (Maronick Ex. E), p. 1.  The online versions of Mr. Franklyn's stimuli displayed "the Crescent name eight times," along with the stylized "CT" logo.  Dkt. 156-2 ¶ 18; Dkt. 156-2 at Ex. E, p. 2. Control-cell stimuli were the same images "with the exception that the Crescent Saw Blade Trade Dress was shown in grayscale." Dkt. 163-23 at 6.  This repetition primed respondents to focus on brand names, not color.

Compounding the problem, respondents were not briefly shown the images, but instead could review the three images as long as they wanted[15] and "were advised that they could adjust the size of the image[s] using the standard zooming feature on their device."  Dkt. 163-23 at 23.

---

[14] Mr. Franklyn never defines "Crescent Saw Blade Trade Dress," other than to say it includes Apex's Rawhide orange color.

[15] Respondents were "required to view each image for at least 10 seconds" before they could continue.  Ex. C at 5.

Respondents were then asked "what brand they think makes or puts out the saw blades shown in the stimuli" they were provided, whether in-store, online-desktop, or online-mobile. Dkt. 163-23 at 23. Notably, that "question was accompanied by the stimuli images" (Dkt. 163-23 at 23), meaning that respondents were able to "move between" and enlarge the three different images of Apex's saw blades while answering the question about who makes it. Ex. C at 7 (showing image "1/3" (i.e., one of three images), "the 'left' and 'right' arrows to move between the images," and the "what brand" prompt), 26 (same); *see also* Dkt. 170-12 at 163:17-168:7.

These design choices had the effect of putting the word marks depicted on the images front and center in the minds of respondents, improperly priming them to respond to Mr. Franklyn's questions with the written answer he wanted, i.e., the name "Crescent." Dkt. 156-2 ¶ 18 (discussing Mr. Franklyn's "contaminated survey design"). Unsurprising, respondents did exactly what Mr. Franklyn's survey design encouraged: they read the visible word marks and typed those names into the response box. And respondents told Mr. Franklyn that that is what they did. Here is an example:

| | BU | BV |
|---|---|---|
| | Q103_on | Q104_on |
| | What brand do you think makes or puts out the circular saw blade shown above? | Why do you say that? |
| 8 | Crescent Tools | I see it on the blade and on the packaging the blade comes in. |

Dkt. 170-4 (Franklyn verbatim data) at cells BU8-BV8 (excerpted); *see also* Dkt. 170-4 at cells CT17-CU17 ("Ripping"; "It is written there"), cells CT158-CU158 ("Lowe's"; "The brand logo is at the top of the image"), cells AV198-AW198 ("Nail slicer"; "Its [sic] on the blade"). In fact, of Mr. Franklyn's 310 in-store respondents, both test and control cells, 248 answered "Why do you say that?" (Q104) with something like the following:

    1.      "Because it has the name in the middle of the blade,"

2.  "Because the name is on the top left corner of the package,"

3.  "It's at the top left of the package," and

4.  "It says Crescent Tools on the packaging."

Ex. D.  In other words, 80% of in-store respondents explicitly referenced visible text as the basis for their answer, confirming that they thought they were taking a reading test.  Even worse, almost one-third of Mr. Franklyn's 479 respondents indicated that they got their answers solely from text on ***the packaging*** of the depicted saw blades.  *See* Exs. D-E.  Not even Apex's overbroad definition of the "Crescent Trade Dress" includes elements from ***the packaging*** of saw blades.  *See* Dkt. 164 at 6.  Any such answer further exposes that Mr. Franklyn's methodology took the focus off of the color of the blades, where it should have been.

Mr. Franklyn claims that "[o]f the 235 respondents in the test cell, 207 (87.7%) answered with some iteration of 'Apex' or 'Crescent' " to his "What brand" question.[16]  Dkt. 163-23 at 31. For comparison, of those same 235 test-cell respondents, 177 (75.3%) indicated that they were taking a reading test.  Exs. D-E.  Moreover, many of the answers other than "Crescent" were not even saw-blade brands, but merely other words or names they found on the stimuli.  Only Mr. Franklyn's in-store cohort were shown stimuli with, for instance, the names "Nailslicer" and "True Value" or the phrase "General Purpose," and only they responded with those names.  Dkt. 170-4 at cells AV146, AV144, AV155.  The same is true of his online cohort and the words "Ripping" and "Lowe's."  Dkt. 170-4 at cells CT224, CT158.  These results confirm that respondents were inappropriately focused on textual cues rather than color.

Surveys that amount to no more than a reading test are sharply criticized by the relevant

---

[16] In actuality, only three people answered "Apex" (Dkt. 170-4 at cells AV169, AV226, AV332), each of whom was in the in-store cohort and was exposed to the name "Apex Tool Group LLC" printed in very small font near the barcode on the back of the package for the 10", 40 Tooth "General Purpose" blade.  *See* Ex. B at 1.  The Court likely will have to zoom in to see it, just like respondents were able to do.

literature as being improper, even in disputes where the mark in question is not directed to a singular color. *See* Dkt. 170-19 at 11 (Swann, *A Reading Test or a Memory Test*) ("A 'reading' test is inappropriate, however to disprove likely confusion among normally inattentive consumers, particularly where the stimulus conveys information that might not otherwise come to a consumer's attention."); Dkt. 170-19 at 16-17 (Ostberg, *Response to the Article: A Reading Test or a Memory Test*). Mr. Franklyn's work in this case tested reading comprehension, not color. As such, it should be excluded as unreliable and/or irrelevant.

### ii. Mr. Franklyn Did Not Correct for the "Anonymous Source" Problem Created by His Survey Design

The Lanham Act defines a trademark to include words, symbols, and devices that, among other things, are used "to indicate the source of the goods, ***even if that source is unknown***." 15 U.S.C. § 1127 (emphasis added). Hence, a valid trademark can indicate a single source even when consumers cannot name the source. Mr. Franklyn's survey did not allow for the possibility that respondents knew that CMT's Orange Mark indicated the source of circular woodworking saw blades, but did not know that the source was "CMT Utensili," "CMT USA," or even "CMT Orange Tools." The only operative prompts from Mr. Franklyn's survey asked respondents to supply written answers rather than involve colors in some way, as Dr. Maronick did. If respondents did not know those names, they could not have supplied an answer indicating CMT. And it seems likely that most of Mr. Franklyn's respondents did not even consider color. The "most common reason" Mr. Franklyn's respondents gave for why they believed a company made the depicted saw blade "appears to be the verbal trademark" and "not the color." Dkt. 170-12 at 175:24-179:18. Here too Mr. Franklyn could have asked if color factored into responses, but did not. Dkt. 170-12 at 175:24-179:18.

A "standard" *Eveready* survey asks respondents to "[n]ame other products, if any, put out

by the same company."  Ex. Q at 364, 375; *see also* McCarthy § 32:174 ("Please name any other products put out by the same concern which puts out the lamp shown here.").  This standard question "is expected to provide additional information about confusion only when respondents do not know the name of the company that puts out the senior brand but are familiar with other products put out by the same company."  Ex. Q at 375.  Mr. Franklyn did not ask any such corrective question.  Accordingly, Mr. Franklyn's survey could not "ascertain whether respondents believed that defendant's and plaintiffs' products emanated from a common, albeit anonymous, source."  *Simon & Schuster*, 970 F. Supp. at 291.  This oversight further compounds the reading-test problem discussed above.

### E.   Mr. Franklyn is Not a Marketing Expert and Is Not Qualified to Critique Dr. Winer's Opinions

CMT's marketing expert, Dr. Russell Winer, is a professor emeritus at NYU's Stern School of Business and a foremost authority in his field.  Dkt. 151-5 ¶¶ 1-7.  Dr. Winer has taught marketing for almost 50 years at some of the world's most-prestigious schools, including Berkeley, Vanderbilt, Columbia, MIT, and Stanford.  He has authored over 80 articles and four books on marketing, and he has received numerous awards for his contributions to the field of marketing.  Dr. Winer has been an expert witness in many cases involving brands, consumer confusion, and trademark infringement.  His report in this case is well researched and supported by 139 footnotes over 45 pages.

Mr. Franklyn, by contrast, is not a marketing expert and has expressly disclaimed acting as a marketing expert in this case.  Dkt. 170-12 at 41:16-21.  Despite that, Mr. Franklyn submitted a five-page rebuttal report purporting to critique Dr. Winer's views on marketing and branding with respect to CMT, its Orange Mark, and other related matters.  Mr. Franklyn's critiques are outside his expertise and should be excluded.  Courts have previously barred Mr. Franklyn for exceeding

his qualifications and offering marketing and branding opinions. In *Jaguar Land Rover Ltd. v Bombardier Recreation Products, Inc.*, while acknowledging Mr. Franklyn's experience teaching certain marketing courses, the court "[wa]s not persuaded that Mr. Franklyn is a marketing and branding expert" and excluded his rebuttal testimony. Ex. K at 6-7. The court excluded Mr. Franklyn's testimony, including his critique that the other party's marketing expert's conclusions "could have and should have been empirically tested" and that he lacked "empirical evidence." Ex. L at ¶¶ 10, 33. Those are largely the same critiques Mr. Franklyn has of Dr. Winer. Frankly Rebuttal 22-25. Mr. Franklyn's rebuttal testimony critiquing Dr. Winer should similarly be excluded.

## IV. Conclusion

For the foregoing reasons, CMT respectfully requests that the Court exclude Mr. Franklyn's improper *Eveready* survey, his testimony concerning his improper *Eveready* survey, and his testimony concerning Dr. Winer.

Dated: May 9, 2025

Respectfully submitted,

/s/ Joshua B. Durham
Ward Davis (NC Bar ID 27546)
Joshua B. Durham (NC Bar ID 25414)
**BELL, DAVIS & PITT**
227 W. Trade Street, Suite 1800
Charlotte, NC 28202
(704) 227-0400
ward.davis@belldavispitt.com
jdurham@belldavispitt.com

/s/ Mark Basanta
Edgar H. Haug (*pro hac vice*)
Robert E. Colletti (*pro hac vice*)
Mark Basanta (*pro hac vice*)
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, NY 10151
(212) 588-0800

ehaug@haugpartners.com
rcolletti@haugpartners.com
mbasanta@haugpartners.com

*Attorneys for Plaintiffs*
*CMT USA, Inc. and CMT Utensili S.p.A.*

## CERTIFICATE OF USE OF ARTIFICIAL INTELLIGENCE

Pursuant to this Court's order of June 13, 2024 regarding the use of artificial intelligence in court filings, Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A., through their undersigned counsel, hereby certify:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Signed this 9th of May, 2025 in New York, NY.

/s/ Robert E. Colletti
Robert E. Colletti (*pro hac vice*)
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, NY 10151
(212) 588-0800
rcolletti@haugpartners.com

*Attorney for Plaintiffs CMT USA, Inc.*
*and CMT Utensili S.p.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System. Service of same on any counsel of record will be accomplished through the Court's electronic filing system in accordance with Federal Rule of Civil Procedure 5(b)(2)(E).

/s/ Joshua B. Durham
Joshua B. Durham (NC Bar ID 25414)
**BELL, DAVIS & PITT**
227 W. Trade St., Suite 1800
Charlotte, NC 28202
(704) 227-0400
jdurham@belldavispitt.com