UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:24-CV-00137-RJC-DCK

| | |
|---|---|
| CMT USA, INC. and CMT UTENSILI S.P.A., | **DEFENDANTS' OPPOSITION TO PLAINTIFFS MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DAVID FRANKLYN** |
| Plaintiffs, | |
| v. | |
| APEX TOOL GROUP LLC and APEX BRANDS, INC., | |
| Defendants. | |

Plaintiffs' motion seeks to exclude the reports and opinion of Defendants' expert Prof. David Franklyn on the basis of four alleged errors in Prof. Franklyn's likelihood of confusion survey, and yet they can't cite to **a single case** in which any survey expert's opinion has been excluded due to any of those alleged errors. And when properly examined, none of the alleged "errors" are errors at all—let alone errors significant enough to exclude a report and testimony. Instead, what is clear is that Prof. Franklyn conducted a well-designed and well-run survey that properly took into account the facts surrounding Plaintiffs' allegations in this case, and found zero percent confusion. While Plaintiffs might not like the outcome of the survey, that is no basis for exclusion of an expert.

Therefore, Defendants Apex Tool Group LLC and Apex Brands, Inc. (collectively, "Apex") hereby submit this Opposition and Response to Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A.'s (collectively, "CMT") Motion to Exclude Opinions and Testimony of Apex's Proposed Expert David Franklyn (the "Motion").

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN
3:24-CV-00137-RJC-DCK

Case 3:24-cv-00137-RJC-DCK    Document 229    Filed 05/30/25    Page 1 of 22
WBD (US) 4900-7604-4100v5

# I.   INTRODUCTION

CMT's memorandum in support of the Motion (ECF No. 198, the "Memorandum") asserts that Prof. Franklyn's testimony, report, and survey within the report (the "Franklyn Survey") should be excluded due to four alleged errors: (1) the Franklyn Survey used an *Eveready* format; (2) the Franklyn Survey had a zero percent margin of error; (3) the Franklyn Survey accounted for Defendants' customers by ensuring a sufficient percentage of respondents were professional users; and (4) the Franklyn Survey showed respondents unaltered photographs of Apex's saw blades while asking them which brand makes the saw blades.  (Memorandum at 3.)

None of these elements of the Franklyn Survey are errors, let alone errors significant enough to warrant exclusion of Prof. Franklyn's report and testimony.  Instead, as explained below, they merely show that the Franklyn Survey was a properly-designed and properly-conducted likelihood of confusion survey.

Additionally, the Memorandum seeks exclusion of Prof. Franklyn's rebuttal report that discussed the insufficiencies of the report of CMT's expert Prof. Russell Winer, and the lack of any survey or empirical evidence supporting Prof. Winer's conclusions. (*Id.* at 23.) But the Memorandum doesn't point to a single flaw in Prof. Franklyn's rebuttal analysis, and instead merely claims that the "critiques are outside his expertise" without any support.

Therefore, Apex respectfully asserts that CMT's Motion should be denied.

# II.   ARGUMENT

## A.   An Expert Report Should be Excluded Only if Unreliable or Irrelevant

"Pursuant to Federal Rule of Evidence Rule 702, expert testimony is admissible if it will assist the trier of fact and is (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the principles and methods [have been applied] reliably to the facts

2

of the case." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123 (4th Cir. 2011) (quotation marks omitted). "As the Supreme Court has explained, evidence is admissible under Rule 702 if 'it rests on a reliable foundation and is relevant.'" *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

"A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001). The Supreme Court in *Daubert* "identified several factors that may bear on a judge's determination of the reliability of an expert's testimony," including "(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Id.* at 199 (4th Cir. 2001).

Consumer surveys are generally admissible in trademark infringement cases. *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 457 (E.D. Va.), aff'd, 707 F. App'x 138 (4th Cir. 2017). A likelihood of confusion survey may be excluded only if "the witness does not qualify as an expert, or if the survey was not 'conducted according to accepted principles' and in 'a statistically correct manner.'" *Valador, Inc.*, 242 F. Supp at 457 (citing *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005)). However, "[w]hile there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare." *PBM Prods., LLC*, 639 F.3d at 123 (citing *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir.1993)). "Usually, objections based on flaws in the survey's methodology are properly addressed by the trier of fact." *Id. See also Belk, Inc. v. Meyer Corp.*,

127944938.1

*U.S.*, 679 F.3d 146, 163 (4th Cir. 2012), *as amended* (May 9, 2012) ("Belk's laundry list of alleged technical deficiencies includes exclusion of relevant consumers, inadequate sample size, geographic representativeness, leading questions and side-by-side exposure. . . . these methodological objections 'are properly addressed by the trier of fact.'"); 6 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 32:170 ("The majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence.").

Here, the Memorandum does not claim that Prof. Franklyn is not an expert, and only claims that the Franklyn Survey is improper for a few discrete reasons. Because as described below those reasons are not errors, let alone errors significant enough to warrant exclusion, CMT's Motion should be denied.

B. **The Franklyn Survey's Use of the *Eveready* Format was Not an Error, Let Alone an Error Significant Enough to Warrant Exclusion**

The Memorandum's primary allegation for why Prof. Franklyn's opinion and testimony should be excluded is that the Franklyn Survey used the *Eveready* format. (Memorandum at 4.) But this argument is legally meritless—the Memorandum doesn't cite to a single case where a properly-designed *Eveready* survey has been excluded, and *Eveready* surveys have been widely accepted by courts within every circuit for evaluating a likelihood of confusion in trademark infringement cases, regardless of the strength of the mark. *See* McCarthy § 32:174 (5th ed.) (collecting cases). *Eveready* surveys are particularly apt in cases where the plaintiff has asserted its mark is famous, well-known, and/or instantly recognized by consumers, all three of which are the case here. *See, e.g.*, *Valador, Inc.*, 242 F. Supp. 3d at 464 (citing McCarthy § 32:173:50–174); McCarthy § 32:174 (5th ed.) ("The

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN

WBD (US) 4900-7604-4100v5

"Eveready" format is especially useful when the senior mark is readily recognized by buyers in the relevant universe.").

1.      The *Eveready* Survey Format is the Gold Standard in the Fourth Circuit

The *Eveready* survey format is widely used and accepted by courts around the country for likelihood of confusion surveys.  *See, e.g.,* McCarthy § 32:173 (5th ed.) ("Two survey formats which have become commonly used to test for confusion of source or connection are commonly referred to as the "Eveready" format and the "Squirt" format.").

This includes in the Fourth Circuit, where it has been recognized as the "gold standard" survey format for assessing a likelihood of confusion. *See, e.g.*, *RXD Media, LLC v. IP Application Development LLC*, 986 F.3d 361, 374 (4th Cir. 2021) ("[T]he 'Eveready model,' . . . has 'become a standard and widely accepted survey format' to test likelihood of confusion."); *Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 462 (E.D. Va. 2019), *aff'd* 851 Fed. Appx. 357 (4th Cir. 2021) (An *Eveready* survey format "has been widely accepted by courts and commentators as a reliable approach for surveying consumer confusion."); *Wreal, LLC v. Amazon.com, Inc.*, 2016 WL 8793317, *12 (S.D. Fla. 2016) ("Eveready surveys have become the 'gold standard.'"); *Anheuser-Busch, LLC v. Innvopak Systems Pty Ltd.*, 2015 WL 5316485 (T.T.A.B. 2015) (An Eveready-type survey is a "widely used and well-accepted format for likelihood of confusion surveys.").

2.      Use of the Eveready Format is Not a Legitimate Reason for Excluding a Survey

The Franklyn Survey's use of an *Eveready* format for the survey is not a reason to exclude Prof. Franklyn's report and testimony, even if the use was in error (which it was not).  Alleged use of an incorrect survey format goes to the weight of the survey, not its admissibility. *See e.g.,*

127944938.1

Case 3:24-cv-00137-RJC-DCK   Document 229   Filed 05/30/25   Page 5 of 22
WBD (US) 4900-7604-4100v5

*Valador, Inc.*, 242 F. Supp. 3d at 457 ("Consumer surveys are generally admissible in trademark infringement cases. Indeed, '[u]sually, objections based on flaws in the survey's methodology are properly addressed by the trier of fact.'").

Apex is not aware of any court in the United States that has ever excluded an *Eveready* survey on the grounds that it was the incorrect format, and CMT did not cite to any in the Memorandum. *See Orgain, Inc. v. N. Innovations Holding Corp.*, 2022 WL 2189648, at *5 (C.D. Cal. Jan. 28, 2022) ("[T]he Court is not persuaded that Defendants' failure to demonstrate that Orgain's trade dress is "top-of-mind" requires the Court to exclude Ezell's survey and testimony. Orgain has cited no case excluding an Eveready survey on the grounds that the mark or dress being tested was not strong enough to be considered top-of-mind.").

### 3. Use of the Eveready Format in the Franklyn Survey was Correct

Not only should the Franklyn Survey not be excluded on the basis of its use of the *Eveready* format, but in this case it was the best format to use. As courts and commentators have repeatedly held, the use of an *Eveready* format survey is particularly appropriate where the party asserting infringement also asserts that its mark is famous, well-known, and/or instantly recognized by consumers. *See, e.g.*, *Valador, Inc.*, 242 F. Supp. 3d at 464; *Dewberry Engineers, Inc. v. Dewberry Group, Inc.*, 2021 WL 3721343, at *1–2 (E.D. Va. July 29, 2021). In this case, CMT has alleged that all three are present here.

CMT has alleged many times in this case that its alleged mark (the "CMT Orange Trade Dress") is well-known, famous, and instantly recognized by consumers. Indeed, as just a sample, CMT has asserted or admitted that:

- The CMT Orange Trade Dress is "famous" at least seven times in its Second Amended Complaint (ECF No. 37.);

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN

3:24-CV-00137-RJC-DCK

WBD (US) 4900-7604-4100v5

- "CMT is specifically recognized by consumers worldwide and in the United States for its unique orange colored tools," *Id.*;

- "CMT offer circular woodworking blades in its well-known orange color," *Id.*;

- "[W]hen consumers see orange woodworking tools, they immediately recognize them as originating from CMT," *Id.*; and

- the CMT Orange Trade Dress "is immediately associated with CMT before consumers even recognize a brand name or logo" (CMT's Memorandum in support of Motion for Summary Judgment, ECF No. 159 at 6.)

CMT is bound by these allegations. *See* 31 C.J.S. Estoppel and Waiver § 6 ("As general rule, parties to action are bound by their pleadings and judicial declarations and are estopped to deny or contradict them where other parties relied thereon and changed their position by reason thereof.").

According to commentator Jerre Swann, a mark is "top of mind" when it is "readily accessible in memory." Swann, Eveready and Squirt—Cognitively Updated, 106 Trademark Rptr 727, 733-734 (2016) (**Exhibit A**, the Declaration of Aaron D. Johnson ("Johnson Decl."), Exhibit 1.) Here, CMT's allegations that the CMT Orange Trade Dress is "well known" and "immediately associated with CMT before consumers even recognize a brand name or logo" are assertions that the CMT Orange Trade Dress is "readily accessible in memory" as described by Mr. Swann. As stated by Prof. Franklyn, "[w]hen a party makes a claim like that, it is pretty good evidence that an Eveready survey would be an appropriate methodology." (Johnson Decl., Exhibit 2 ("Franklyn Depo.") at 51:7-9.)

Based on CMT's assertions alone, an *Eveready* survey was the "appropriate" format. *Dewberry Engineers,* 2021 WL 3721343, at *1–2 (E.D. Va. July 29, 2021) ("Because this dispute

7

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN
3:24-CV-00137-RJC-DCK

Case 3:24-cv-00137-RJC-DCK   Document 229   Filed 05/30/25   Page 7 of 22
WBD (US) 4900-7604-4100v5

centers on **Plaintiff's assertion** that Defendant is attempting to take advantage of Plaintiff's more established name and reputation, the Eveready method is appropriate.") (emphasis added).

Even CMT has acknowledged that an *Eveready* survey is proper "in cases involving widely known marks." (ECF No. 185 at 14.) And in addition to the CMT admissions and assertions noted *supra*, the record is rife with yet more claims by CMT that its alleged mark is well-known—for example, ███████████████████████████████████████████████ ██████████████ (Johnson Decl., Exhibit 3 ("Tommassini Depo.") at 76:7–13.)

Accordingly, even if a senior mark had to be "well known" or "widely recognized" for an *Eveready* format survey to be admitted (it does not), CMT itself has provided abundant grounds for its use. This is not a case where the choice of an *Eveready* survey was premised on a few incidental statements or corporate puffery. *Cf. Vital Pharms., Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1229 (S.D. Fla. 2021) (admitting *Eveready* survey even where the senior mark's strength was premised solely on a couple of statements deemed to be "puffery").

### 4. There is No Requirement That a Mark be "Top of Mind" for Use of an Eveready Format

CMT's contention that the *Eveready* format is not appropriate unless the mark is "top-of-mind" is not supported by case law or scholarship. *See, e.g.,* McCarthy § 32:174 ("courts have rejected such a [top of mind] restriction on use of an *Eveready* survey."); *Limited v. Macy's Merchandising Group Inc*, 2016 WL 4094913, *10 (S.D. N.Y. 2016), *aff'd*, 695 Fed. Appx. 633 (2d Cir. 2017) (Rejecting plaintiff's argument that defendant's Eveready format was "inappropriate where a mark is not widely known or recognized" and should be used "only when the senior mark has 'top-of-mind' awareness." No likelihood of confusion was found.); and Poret, *An Empirical Assessment of the Eveready Survey's Ability to Detect Significant Confusion in Cases of Senior*

*Marks That Are Not Top-of-Mind,* 109 Trademark Rptr. 935, 954 (2019) (summarizing research showing the Eveready format can detect confusion with senior marks that are not "top-of-mind.") (attached as Johnson Decl., Exhibit 4.)

The same is true in the Fourth Circuit, and CMT does not cite a single decision from the Fourth Circuit excluding an *Eveready* survey on the grounds that the plaintiff's mark was not "top-of-mind"—indeed, CMT does not cite to a single court *anywhere* that has excluded an *Eveready* survey on these grounds. *See e.g., Vital Pharms.*, *Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1229 (S.D. Fla. 2021) (admitting *Eveready* survey even though senior mark not top of mind); *Therapeutics MD., Inc. v. Evofem Biosciences, Inc.*, 2022 WL 1013285, at *5 (S.D. Fla. 2022) ("Disputes over the parameters used in each survey are not an adequate basis to exclude the surveys and their results from the jury. Rather, these issues go to the weight a jury decides to afford the expert's testimony and are more properly addressed through vigorous cross-examination [and] presentation of contrary evidence.").

There simply is no "foundational requirement" that a senior mark must be "top of mind" for an *Eveready* survey to be probative on the likelihood of confusion. Prof. Franklyn accordingly cannot be excluded on the grounds he failed to meet an imaginary requirement for using an *Eveready* format survey.

### 5. Proximate Goods Do Not Justify Exclusion

CMT does not substantively challenge the use of *Eveready* where there is marketplace proximity, instead alleging that Prof. Franklyn's prior testimony, in other cases, under different facts, conflicts with his testimony and choices in this case. Importantly, CMT does not point to or cite a single case wherein an *Eveready* survey was excluded because the goods were proximate.

127944938.1

And CMT is wrong on the merits, as Prof. Franklyn clearly stated in his deposition: "[I]f the goods are proximate, it does not mean, by contrast, that an Eveready survey is inappropriate, so long as the plaintiff's mark is claimed to be well known and would be likely to be recognized by relevant consumers." (Franklyn Depo at 52:15–19.) Prof. Franklyn's position has been consistent on this point, and CMT's many claims that the CMT Orange Trade Dress is well-known support Prof. Franklyn's use of the *Eveready* survey format.

None of the Prof. Franklyn's previous reports or transcripts cited in the Memorandum on contrary to this position. For example, while CMT claims "It is Mr. Franklyn's ordinary practice to use a Squirt survey when there is marketplace proximity," he **never** said that in either of the documents CMT cites. (Memorandum at 10.) Instead, in the *PTK* case he noted that a *Squirt* survey would be more appropriate since there were no allegations that plaintiff's mark was well-known or famous (which is not the case here), and in the *Emerson Radio* case he said that there are no "hard-and-fast rules" while noting that proximity supports a Squirt survey and a well-known mark supports an Eveready survey. (ECF No. 196, Exs. F and I.)

Therefore, the Franklyn Survey's use of the *Eveready* format for the survey was not in error and is not a reason to exclude Prof. Franklyn's report and testimony. *See* McCarthy § 32:173 (5th ed.) ("While a *Squirt* survey is sometimes used when the two marks are likely to be seen in the marketplace sequentially or side-by-side, there is no general rule that an *Eveready* survey cannot be used and admitted as evidence in these situations.").

## C. The Franklyn Survey's Zero Percent Margin of Error Is Evidence of Reliability, Not an Error, Let Alone an Error Significant Enough to Warrant Exclusion

The Memorandum claims that the Franklyn Survey's zero percent margin error shows that the Franklyn Survey is "unreliable" and should be excluded. (Memorandum at 12.) This is incorrect,

127944938.1

and shows that CMT misunderstands both the law and how margin of error is calculated. First, CMT does not cite to a single case where a survey has been excluded based on a low margin of error. CMT also does not cite to a single case where a survey has been given a lower weight due to a low margin of error. That is because, in general, the larger the margin of error, the less reliable the survey. *See Snyder's Lance, Inc. v. Frito-Lay N. Am., Inc.*, 542 F. Supp. 3d 371, 399 (W.D.N.C. 2021) (reviewing cases). And yet CMT wishes to flip this proposition on its head, claiming that a low (0%) margin of error is somehow indicative of an unreliable survey. There is no case law supporting that assertion.

Second, the Memorandum incorrectly describes what "margin of error" is. The phrase is a scientific term of art that specifically means "twice the standard error." (Johnson Decl., Exhibit 5, Federal Judicial Center's Reference Manual on Scientific Evidence (the "Judicial Scientific Evidence Manual") at 245.) As that manual states, "Standard error"—often referred to by courts as "standard deviation"—is a measure of the magnitude of random error in surveys based on a sample of a population, "with smaller standard errors indicating better estimates." (*Id.* at 243.) Standard error "comes into play by measuring heterogeneity," and the "less heterogeneity in the values, the smaller the standard error." (*Id.*) As summarized by the Judicial Scientific Evidence Manual:

> [A]n estimate based on a sample will differ from the exact population value, because of random error. The standard error gives the likely size of the random error. If the standard error is small, random error probably has little effect. If the standard error is large, the estimate may be seriously wrong.

*Id.* at p. 246.

127944938.1

WBD (US) 4900-7604-4100v5

As a result, the "margin of error" is calculated via a specific formula and does not mean that there would not be statistical variance if the survey was run 100 times. Instead, what it reveals is the likely 95% confidence rate – which means if the survey were repeated 100 times, we would expect that 95 of those times would also have zero percent confusion. (*Id* at 247, n. 91.)

The Franklyn Survey revealed a 0% rate of confusion—in other words, not one respondent was confused as to the source of Apex's products. When you use the scientifically-accepted margin of error formula with 0% of respondents reporting confusion, the result of the formula is 0% margin of error. Scientifically, the Franklyn Survey margin of error value indicates that, were the sampling process to be repeated many times, and were the sample to be an exact probability sample under ideal conditions, 95% of those samples would result in values within plus or minus the margin of error of the calculated value (namely, zero). As Prof. Franklyn stated in his deposition, the 0% margin of error is a simply a result of the 0% total confusion found in both the control and test cells—when "you have no gap between X and not X, you're not going to have a margin of error." Franklyn Depo at 188:16–18.

CMT cites no case or authority supporting the exclusion of an *Eveready* survey on the grounds that it had a 0% margin of error. Indeed, CMT's citations— including to the Federal Judicial Center's Reference Manual on Scientific Evidence, U.S. Census Bureau, and American Association for Public Opinion Research—at no point state that a zero percent margin of error shows a survey is unreliable, much less excludable. And the U.S. Census Bureau, and American Association for Public Opinion Research references do not discuss likelihood of confusion surveys. It is unclear why CMT believes that literature discussing the margin of error in *different* type of surveys is authority to the contrary.

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN
3:24-CV-00137-RJC-DGK

WBD (US) 4900-7604-4100v5

Accordingly, the Franklyn Survey, which employed proper controls and methods for the accepted *Eveready* survey format, is not excludable on the grounds that it found a 0% margin of error. *Cf. Valador, Inc.*, 242 F. Supp. 3d at 459–462 (excluding survey because it did not follow either *Squirt* or *Eveready* formats, did not include a control sample, included an improper universe for a reverse confusion case, and "did not show the marks as they appear in commerce.").

### D. The Franklyn Survey Properly Used Defendants' Customers as its Universe

"As the *McCarthy* treatise makes clear, the first step in designing a survey to gauge actual confusion is to determine the 'universe' to be studied, that is, the segment of the population whose perceptions and state of mind are relevant in this case." *Valador, Inc.*, 242 F. Supp. 3d at 460 (quotation marks removed). "If plaintiff asserts . . . that defendants have attempted to trade on plaintiff's goodwill and reputation—the 'proper universe to survey is the potential *buyers* of the *junior user's* goods or services.'" *Id.*

Here, CMT has alleged that Apex has attempted to trade on CMT's goodwill and reputation. *See* ECF No. 35. Accordingly, the proper universe to survey is the potential buyers of Apex's goods. *Valador, Inc.*, 242 F. Supp. at 460.

Apex's products are sold to industrial, professional, sophisticated hobbyists, and DIY enthusiasts, with the vast majority of Apex's sales (███) coming from professional users—and those professional user sales account for ███ of Apex's revenue. (ECF No. 178-055, ¶ 13.) Therefore, the Franklyn Survey's universe of survey respondents demographically matched consumers of the accused products, and is not grounds for exclusion of the survey. If anything, the Franklyn Survey somewhat underestimated the percentage of professional users and could have a survey universe of between ███████ professionals—the actual "potential buyers" of Apex's

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN
3:24-CV-00137-RJC-DCK

goods. *Valador, Inc.*, 242 F. Supp. at 460 ("Ultimately, the survey sample need not 'exactly match' the correct universe; the survey need only cover a 'sufficiently close approximation.'").

Tellingly, while the Franklyn Survey balanced the survey respondents between professional and non-professional users of saw blades in order to make sure respondents were representative of Apex's customers, there was zero percent confusion **in both groups of respondents**. As a result, even with a larger share of non-professional respondents, the total confusion would still be zero.

E.   **The Franklyn Survey's Use of Unaltered Photographs of Apex's Saw Blades Was Not an Error, Let Alone an Error Serious Enough to Warrant Exclusion**

CMT alleges that the Franklyn Survey should be excluded because it "primed" respondents with word marks, permitted the respondents to review the test stimuli "as long as they wanted," and as a result, the Franklyn Survey should be excluded because it tested "reading comprehension, not color." (Memorandum at 18-19.) This is incorrect, and shows a misunderstanding both of the law and what "priming" is.

First, as the materials cited in the Memorandum itself state, "priming is a normal and unproblematic part of interpreting and responding to questions within the flow of a survey." (Memorandum, Exhibit M, p. 284.) It is only a problem and a "source of bias" when "a survey makes certain mental content more or less salient in people's thinking than plausibly occurs in the relevant real-world context." (*Id.*)

But the Franklyn Survey did show respondents Apex's accused products as they appear in the marketplace. The Memorandum does not complain that the photographs are not how Apex's products appear in real life (because it can't say that)—instead, it objects that the photographs "had the defendant's 'Crescent' brand name on it multiple times." (Memorandum at 19). But this is **how Apex's products look in real life**. And courts are clear that a confusion survey "must examine the

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN
3:24-CV-00137-RJC-DCK

WBD (US) 4900-7604-4100v5

allegedly infringing use in the context in which it is seen by the ordinary consumer." *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 319 (4th Cir. 1992); *see also CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263 (4th Cir. 2006); *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307 (4th Cir. 2017).

This use of real-world photographs did not "prime[] respondents to focus on brand names, not color," as CMT alleges. (Memorandum at 19.) Instead, it showed them the actual trade dress at issue, as it actually appears in the marketplace. What CMT appears to have preferred (modifying the real-world photographs to emphasize only the trade dress elements it believes help its case), would have been actual, and improper, priming.

 Second, the ability of respondents to review the photographs while answering the question about which brand puts out the saw blades was also not an error and not priming. Because consumers can review products at the time of purchase (whether in physical retail stores or online), it's proper for a survey measuring confusion in those instances to allow respondents to go back and review a previous photograph if they would like. *See Union Carbide Corp. v. Ever-Ready. Inc.*, 531 F.2d 366, 385 (7th Cir. 1976), cert. denied, 191 USPQ 416 (1976) (the seminal *Eveready* case, where respondents were allowed to view the test stimuli while answering the survey questions).

The fact that multiple respondents to the Franklyn Survey cited the large "CRESCENT" marks as the reason why they believed the saw blades were from Apex's CRESCENT TOOL brand does not show that the Franklyn Survey improperly primed the respondents. Instead, it supports Apex's claim throughout this case: that purchasers of circular saw blades are used to seeing saw blades from many different brands covered in the same color, whether red, orange, yellow, or another color, and as a result they look to brand names to determine which company makes a blade.

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN

WBD (US) 4900-7604-4100v5

Third, CMT cites to no case excluding (or even criticizing) an *Eveready* survey on the basis that the survey used real-world photographs of the products at issue or allowed respondents to go back and review photographs of the products. In fact, the relevant case saw supports these elements of the Franklyn Survey.

The most foundational part of a likelihood of confusion survey is that it should attempt to replicate, as closely as possible, the conditions that a consumer will encounter in the marketplace. *Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 463 (E.D. Va. 2019), aff'd, 851 F. App'x 357 (4th Cir. 2021) ("a likelihood of confusion survey must replicate market conditions"). As a result, product images used as stimuli in the survey should match as closely as possible the products and packaging in the marketplace. Surveys that do not use images that reflect the marketplace are unreliable and frequently excluded by courts within the Fourth Circuit and around the country. *See, e.g., Valador*, 242 F. Supp. 3d at 463 (granting a motion to exclude the expert when the expert "deliberately altered defendants' mark to make it appear more similar to plaintiff's before asking questions about the marks' likelihood of confusion" and noting "[t]hat approach is antithetical to trademark infringement analysis." (footnote omitted)).

CMT's own citations support allowing respondents to continue to view the test stimuli while answering the survey questions. Indeed, commentator Swann, cited throughout CMT's Motion, has expressly investigated whether and in what circumstances a survey should remove or keep the test stimuli in view while the respondent answers the written questions. (Johnson Decl., Exhibit 6, J.B. Swann, *A "Reading" Test or a "Memory" Test: Which Survey Methodology is Correct?*, 95 Trademark Rptr. 876 (2005).) Swann suggests that keeping the stimuli in view is appropriate to assess point-of-sale confusion under circumstances where consumers make involved, deliberate, thoughtful decisions. *Id.* This is precisely the case here, and there is no dispute that the consumers

16

are largely professionals, and that any purchaser of a circular saw blade must exercise care and expertise when choosing a circular saw blade—such as ensuring the blade they purchase is for the correct material to be cut, the correct size for the saw in which it will be used, the correct width of the cut, and the correct design for how fine or rough the cut is. (ECF No. 179 at 20.)

Finally, CMT also misstates when an *Eveready* format survey asks respondents if they are aware of other products put out by the same company. As shown by the McCarthy section cited in the Memorandum, such a question is used when the two companies at issue have similar names (for example, the cited McCarthy section involved "Eveready" and "Ever-ready") (Memorandum at 23.) In that case, the follow up question is needed because otherwise it might be unclear whether a survey respondent is referring to "Eveready" or "Ever-ready." But in this case, in a survey testing trade dress confusion where the relevant companies have very different names, that follow up question would not provide any additional information and therefore is neither relevant nor necessary.

CMT claims that this question "is expected to provide additional information about confusion only when respondents do not know the name of the company that puts out the senior brand but are familiar with other products put out by the same company." This makes no sense. Not one respondent—*zero*—named CMT as the brand of Apex's circular saw blades. In fact, almost 90% of respondents correctly answered with some iteration of "Apex" or "Crescent." If these respondents were asked to "name any other products, if any, put out by the same company," the possible answers could have been saw blades, router bits, jigsaw blades, or reciprocating saw blades—or wrenches, tool bags, or automotive specialty tools. There is *no* overall product category sold by CMT that Apex does not itself also sell (and in many cases, has sold in the United States for over a century), while there are many, many products that Apex sells and CMT does not. Any

127944938.1

WBD (US) 4900-7604-4100v5

possible answer to the posed question would have been incapable of showing anything, except perhaps familiarity with Apex.

CMT's inapposite citation to a 30-year-old law review article notwithstanding (which merely referenced the "Eveready v. Ever-Ready" survey without specifying distinctions in survey format when companies don't have similar brand names), there is no modern scholarship suggesting this question could "correct" the "anonymous source" "problem," and CMT does not spend any effort explaining how it would.

Therefore, the Franklyn Survey properly followed established guidelines for conducting an *Eveready* survey, including showing the trade dress as it is actually used in the marketplace, permitting respondents to view photographs of the trade dress when answering the survey, and asking which brand they believe puts out the products. And the Memorandum does not cite to a single example of a court excluding an *Eveready* survey on the above grounds.

### F. Prof. Franklyn's Rebuttal of Mr. Winer's Report Is Within His Expertise

The Memorandum alleges that Prof. Franklyn's rebuttal of Mr. Winer's report should be excluded because the "critiques are outside his expertise." (Memorandum at 23.) This is incorrect. Courts exclude rebuttal testimony as being outside an expert's expertise only when he or she does not have "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Belk, Inc. v. Meyer Corp.*, U.S., 679 F.3d 146, 162 (4th Cir. 2012), as amended (May 9, 2012). To determine whether an expert has sufficient specialized knowledge, courts must "consider the proposed expert's full range of experience and training, not just his professional qualifications." *Id.* (citing *Richmond Med. Ctr. for Women v. Herring*, 527 F.3d 128, 134 n. 1 (4th Cir.2008)) (quotation marks omitted).

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN
3:24-CV-00137-RJC-DCK

WBD (US) 4900-7604-4100v5

When Prof. Franklyn's full range of experience and training is considered, there is no doubt that the limited rebuttals Prof. Franklyn made were well within his expertise. Prof. Franklyn's rebuttal of Mr. Winer's report focuses on issues and subjects for which Prof. Franklyn has sufficient specialized knowledge. And notably, CMT does not rebut any of the criticisms of Prof. Franklyn's rebuttal, nor explain why he doesn't have such expertise.

Prof. Franklyn is an expert in empirical analyses in trademark infringement cases. Franklyn Rebuttal Report, p. 3–4 (describing Prof. Franklyn's experience and expertise with trademark law, branding, consumer perceptions relating to brands, the empirical study of trademark law, and consumer perception surveys). Indeed, Prof. Franklyn was the Director of the Center for the Empirical Study of Trademark Law (CEST). *Id.*

This expertise directly supports the rebuttal of Mr. Winer, as in that rebuttal Prof. Franklyn specifically critiques Mr. Winer's lack of empirical evidence. Prof. Franklyn also critiques Mr. Winer on the grounds that (1) Mr. Winer's assertion that CMT's shade of orange is "distinctive and non-functional" is supported by no marketplace evidence; (2) Mr. Winer conducted no empirical experiment or survey to support his claim that the Apex saw blade is "likely to cause confusion;" (3) Mr. Winer provides no empirical basis for claiming that Apex's actions have decreased the alleged uniqueness of CMT's shade of orange on saw blades for cutting wood; and (4) Mr. Winer provides no empirical evidence that CMT's alleged rights in the shade of orange it uses have been harmed by Apex's actions. Each of these critiques are premised on a lack of empirical evidence for a claim relating to trademark law— topics solidly within Prof. Franklyn's expertise.

## III.   CONCLUSION

As shown above, none of the alleged errors of the Franklyn Survey are errors at all, let alone errors significant enough to warrant exclusion of Prof. Franklyn's report and testimony. Instead,

127944938.1

they merely show that the Franklyn Survey was a properly-designed and properly-conducted likelihood of confusion survey that found zero percent confusion. While CMT might not like the outcome of the survey, that is no basis for exclusion of an expert.

Therefore, the Motion should be denied.

DATED: May 23, 2025                    **WOMBLE BOND DICKINSON (US) LLP**

By: /s/ Aaron D. Johnson
Jason M. Sneed (NC Bar ID 29593)
Megan E. Sneed (NC Bar ID 38525)
SNEED PLLC
445 S. Main St., Suite 400
Davidson, North Carolina 28036
(844) 763-3347
Jsneed@Sneedlegal.com
Msneed@Sneedlegal.com

Michael J. McCue
Aaron D. Johnson
David A. Jackson
Joy Tacy Allen Woller
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2750
San Francisco, California 94111
(650) 687-8426
Michael.McCue@wbd-us.com
Aaron.Johnson@wbd-us.com
David.Jackson@wbd-us.com
Joy.Woller@wbd-us.com

Attorneys for Defendants
Apex *Tool Group LLC and Apex Brands, Inc*

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN
3:24-CV-00137-RJC-DCK

WBD (US) 4900-7604-4100v5

## CERTIFICATE OF USE OF ARTIFICIAL INTELLIGENCE

Pursuant to this Court's order of June 13, 2024 regarding the use of artificial intelligence in court filings, Defendants Apex Tool Group LLC and Apex Brands, Inc. hereby certify:

1.     No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexus, FastCase, and Bloomberg;

2.     Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Signed May 23, 2025.

**WOMBLE BOND DICKINSON (US) LLP**

/s/ Aaron D. Johnson
Jason M. Sneed (NC Bar ID 29593)
Megan E. Sneed (NC Bar ID 38525)
SNEED PLLC
445 S. Main St., Suite 400
Davidson, North Carolina 28036
JSneed@sneedlegal.com
MSneed@sneedlegal.com

Michael J. McCue
Aaron D. Johnson
David A. Jackson
Joy Tacy Allen Woller
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2750
San Francisco, California 94111
Michael.McCue@wbd-us.com
Aaron.Johnson@wbd-us.com
David.Jackson@wbd-us.com
Joy.Woller@wbd-us.com

*Attorneys for Defendants/Counter-Plaintiffs*
*Apex Tool Group LLC and Apex Brands, Inc*

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN
3:24-CV-00137-RJC-DCK

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 23rd day of May, 2025, the foregoing

DEFENDANTS' OPPOSITION TO PLAINTIFFS MOTION TO EXCLUDE OPINIONS AND

TESTIMONY OF DAVID FRANKLYN was served via electronic means through CM/ECF on

the following counsel of record:

> Ward Davis (NC Bar ID 27546)
> Joshua B. Durham (NC Bar ID 25414)
> BELL, DAVIS & PITT
> 227 W. Trade St., Suite 1800
> Charlotte, NC 28202
> (704) 227-0400
> ward.davis@belldavispitt.com
> jdurham@belldavispitt.com
>
> Edgar H. Haug (*pro hac vice*)
> Robert E. Colletti (*pro hac vice*)
> Mark Basanta (*pro hac vice*)
> HAUG PARTNERS LLP
> 745 Fifth Avenue
> New York, NY 10151
> (212) 588-0800
> ehaug@haugpartners.com
> rcolletti@haugpartners.com
> mbasanta@haugpartners.com
>
> *Attorneys for Plaintiffs CMT USA, Inc.*
> *and CMT Untensili S.p.A.*

> /s/  Aaron D. Johnson

127944938.1

DEFENDANTS' OPPOSITION TO MOTION
TO EXCLUDE DAVID FRANKLYN
3:24-CV-00137-RJC-DCK

WBD (US) 4900-7604-4100v5