# EXHIBIT X

# TRADEMARK and DECEPTIVE ADVERTISING SURVEYS

SECOND EDITION

## Law, Science, and Design

**Shari Seidman Diamond**
and **Jerre B. Swann**
Editors

ABA AMERICAN BAR ASSOCIATION
Intellectual Property
Law Section

# TRADEMARK and DECEPTIVE ADVERTISING SURVEYS

SECOND EDITION

## Law, Science, and Design

**Shari Seidman Diamond**
and **Jerre B. Swann**
Editors

AMERICANBARASSOCIATION
Intellectual Property Law Section

Case 3:24-cv-00137-TMR-DCK Document 222-4 Filed 05/30/25 Page 3 of 9

Cover design by Jill Tedhams/ABA Design

The materials contained herein represent the opinions of the authors and/or the editors and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Intellectual Property Law, unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2022 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission, complete the request form at www.americanbar.org/reprint or email ABA Publishing at copyright@americanbar.org.

Printed in the United States of America.

26 25 24 23 5 4 3 2

A catalog record for this book is available from the Library of Congress.

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

www.shopABA.org

Case 3:24-cv-00137-TMR-DCK Document 222-4 Filed 05/30/25 Page 4 of 9

# THE UNIVERSE 3

By William G. Barber and Giulio E. Yaquinto

*Courts consider the selection of the proper universe as one of the most important factors in assessing the validity of a survey as well as the weight that it should receive.*[1]

Defining the proper universe is a critical step in designing any survey[2]—including surveys used in Lanham Act cases. A survey's "universe" (also referred to as "population") is the group of people from which participants in the survey are selected. Thus, the universe is the group of people whose perceptions the survey is intended to represent. It is crucial to select a universe that corresponds with the group or groups of consumers whose state of mind is relevant to the particular legal issue involved in the case when designing a survey for a Lanham Act case. As discussed in this chapter, the relevant universe for a survey in a Lanham Act case varies depending on what legal issue is being tested.

Failure to define the universe properly can have devastating consequences on the evidentiary weight given to a survey and can even lead

1. Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d 772, 781 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007).

2. MANUAL FOR COMPLEX LITIGATION § 11.493 (Fed. Jud. Ctr., 4th ed. 2004); S. Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 376 n.76 (Fed. Jud. Ctr., 3d ed. 2011) ("Identification of the proper target population or universe is recognized uniformly as a key element in the development of a survey."); Smith v. Wal-Mart Stores, Inc., 537 F. Supp. 2d 1302, 1323 (N.D. Ga. 2008) ("Selection of the proper universe is one of the most important factors in assessing the validity of a survey and the weight that it should receive because the 'persons interviewed must adequately represent the opinions which are relevant to the litigation.' Selection of a proper universe is so critical that 'even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.'" (citation omitted)).

Case 3:24-cv-00137-TMR-DCK Document 222-4 Filed 05/30/25 Page 5 of 9

to its exclusion from evidence in extreme cases.[3] Errors in defining the universe can be grouped into three general categories.[4] First, the universe may be overinclusive, including not only the group of consumers relevant to the legal issue being tested but also other individuals. The weight that a court is likely to give such a survey may depend on whether sufficient data is obtained in the survey to identify those respondents in the relevant subgroup and whether the number of respondents so identified is large enough to be statistically meaningful.

Second, the universe may be underinclusive, including only a subset of the entire group of consumers relevant to the legal issue being tested. The weight given this type of survey may depend heavily on whether the court believes the particular segment tested biased the results in favor of the party who commissioned the survey. If so, the court likely will accord the survey little or no weight. On the other hand, if there is no showing or reason to believe that unrepresented segments of consumers would have reacted differently than those included in the survey, the survey may receive some weight. Further, if the subset tested constitutes a relevant and distinct segment of the overall market for the applicable products or services, the court may deem the universe proper, albeit limiting the survey's relevance or effect to that particular segment.

Finally, the universe may completely miss the mark, consisting of individuals whose state of mind is not relevant to the legal issue being tested. For obvious reasons, courts likely will exclude these types of surveys from evidence or give them no weight.

## DETERMINING THE PROPER UNIVERSE

A number of legal issues involved in Lanham Act litigation lend themselves to survey evidence because they depend upon the perception or state of mind of consumers of the parties' products or services. The proper universe for these surveys depends directly on which issue is in dispute and what group of consumers is relevant to that issue. Thus, it is vital for the survey expert to understand the legal issue he or she has been asked to test and to tailor the universe as closely as possible to the relevant group of consumers.

### Forward Confusion

The classic articulation of the proper universe for determining likelihood of confusion in traditional trademark infringement cases (i.e., cases alleging "forward confusion"[5])

---

3. Diamond, *supra* note 2, at 377–78 ("A survey that provides information about a wholly irrelevant population is itself irrelevant. Courts are likely to exclude the survey or accord it little weight.").

4. Some survey universes may involve a combination of these problems. For example, a universe could be overinclusive in some respects and underinclusive in others.

5. "Forward confusion" (also called "traditional confusion") is used here to refer to cases where the senior user asserts that consumers are likely to be confused that the junior user's products or services are made or sponsored by the senior user. In contrast, "reverse confusion" refers to cases where the senior user

comes from *Amstar Corp. v. Domino's Pizza, Inc.*: "The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged . . . goods or services."[6] The reason for this rule is clear—in cases alleging forward confusion, what is at issue is whether the junior user's mark is likely to confuse consumers. In order to fairly test that issue, one must look at those consumers likely to encounter the junior user's mark in the marketplace.[7,8]

The parties in many trademark cases are direct competitors, selling the same types of products and services to the same types of consumers through the same trade channels and in the same geographic markets. Defining the appropriate universe in such cases is usually straightforward, since both parties' potential purchasers are essentially the same.[9] Similarly, where the junior user competes in a particular segment of the senior user's overall market, the proper universe should focus on that segment.[10] However, where the parties are not direct competitors but instead sell different types

---

asserts that consumers are likely to be misled into believing that the senior user's products or services are made or sponsored by the junior user.

6. 615 F.2d 252, 264 (5th Cir. 1980); see also Citizens Banking Corp. v. Citizens First Bancorp, Inc., No. 07-CV-10985, 2007 WL 4239237, at *5 (E.D. Mich. Dec. 3, 2007) ("In a traditional case claiming 'forward' confusion, not 'reverse' confusion, the proper universe to survey is the potential buyers of the junior user's goods or services.") (alteration omitted) (footnote omitted); Hutchinson v. Essence Commc'ns, Inc., 769 F. Supp. 541, 546 (S.D.N.Y. 1991) ("In evaluating confusion in a trademark infringement case, it is important to remember that . . . the only 'relevant population' is potential purchasers of the junior user's goods or services.").

7. Note that such consumers would include not only purchasers of the junior user's products but also the senior user's customers who later buy the junior user's products thinking they were made or sponsored by the senior user. In the post-sale confusion context, relevant consumers could also include individuals who may not purchase the junior user's products themselves, but rather use or otherwise encounter those products that have been purchased by others.

8. Although this principle seems to be well established, courts sometimes get it wrong. For example, in *IDV North America, Inc. v. S & M Brands, Inc.*, 26 F. Supp. 2d 815 (E.D. Va. 1998), the owner of the mark BAILEYS for liqueurs sued the maker of "Bailey's" cigarettes. The plaintiff commissioned a survey of tobacco consumers within defendant's target geographic area, which seems to be an entirely appropriate universe for a forward confusion survey. Nevertheless, the court believed the universe should have included consumers in the market for both parties' products (tobacco and liqueurs), and that the failure to do so "seriously undercut [] the credibility of the survey" because it (supposedly) excluded people least likely to be confused. *Id.* at 830. In other words, the court wanted a flawed universe that it believed would have skewed the results in the defendant's favor! *See also* Schieffelin & Co. v. Jack Co. of Boca, Inc., 850 F. Supp. 232, 246 (S.D.N.Y. 1994) (court admitted into evidence plaintiff's survey targeting consumer profile for defendant's gourmet popcorn products, but stated that "the better definition of the universe in this case would have been that group of consumers who were in the market for DOM PÉRIGNON, or at least champagne,"—that is, the plaintiff's product).

9. "Because in most trademark infringement cases the senior user and the junior user sell competing products, the courts have rarely needed to address the question of which market should be tested for actual confusion." Vista Food Exch., Inc. v. Vistar Corp., No. 03-CV-5203, 2005 WL 2371958, at *6 (E.D.N.Y. Sept. 27, 2005); *see also* Gross v. Bare Escentuals Beauty, Inc., 90 U.S.P.Q.2d 1448, 1456 (S.D.N.Y. 2008) (survey properly targeted "prospective purchasers of premium skincare products" sold by both parties); *Hutchinson*, 769 F. Supp. at 546 ("Where the senior and junior user's products are of the same kind, the population of consumers is the same.").

10. *See, e.g.*, Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., No. 07-CV-03752, 2008 WL 4614660, at *8 (N.D. Cal. Oct. 16, 2008) (although plaintiff used "Arcuate" stitching design on virtually all Levi's brand jeans, its survey universe was properly limited to the target market and price point of Abercrombie's allegedly infringing jeans, defined as women ages 20 to 45 who had purchased or intended to purchase jeans costing at least $75).

of products or services to different types of consumers, tailoring the survey universe to the junior user's market is critical.

A good illustration of this principle is found in *National Distillers Products Co. v. Refreshment Brands, Inc.*[11] In that case, the plaintiff sold vodka under the mark TETON GLACIER, while the defendant sold vodka coolers under the mark GLACIER BAY. The plaintiff's survey universe was limited to people who indicated they drank "liquor, such as gin, rum, tequila, or vodka" at least once a month, while the defendant's survey was conducted among people "who had [recently] purchased or consumed a cooler product [or intended to do so]."[12] The court found that the plaintiff's universe was not properly defined because the evidence demonstrated that the liquor and cooler markets were not coextensive.[13] In contrast, the court found that the defendant "selected an appropriate universe of respondents, namely, cooler consumers."[14]

The *Amstar* case presents a good example of selecting the wrong universe, both geographically and by consumer demographics. Amstar alleged that the defendant's use of the mark DOMINO'S PIZZA infringed the mark DOMINO for sugar products sold in grocery stores. Amstar conducted a survey in ten cities (eight of which had no DOMINO'S PIZZA outlets) among female heads of households primarily responsible for making food purchases. The Fifth Circuit found the survey "substantially defective" because it "neglected completely defendants' primary customers"—"young, single, male college students."[15] Instead, the survey focused on Amstar's primary customers. Thus, the court concluded that the proper universe was not examined.[16]

Courts have routinely criticized forward confusion surveys that have similarly focused on the senior user's target market instead of that of the junior user.[17] The problem is exacerbated when the universe is limited to actual customers of the senior user,

11. 198 F. Supp. 2d 474 (S.D.N.Y. 2002).
12. *Id.* at 482, 483.
13. *Id.* at 484.
14. *Id.*
15. Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 254, 263–64 (5th Cir. 1980).
16. *Id.* at 264.
17. *See, e.g.*, Powerhouse Marks LLC v. Chi Hsin Impex, Inc., No. 04-CV-73923, 2006 WL 20523, at *6–7 (E.D. Mich. Jan. 4, 2006) (plaintiff operated fitness centers under the mark POWERHOUSE GYM, while defendant sold fitness equipment under the mark POWERHOUSE FITNESS; the court found plaintiff's survey population was "improperly chosen and defined" because it consisted of adults who had worked out in a fitness center, club, or gym in the preceding five years and the survey was conducted in malls within a 12-mile radius of three or more of plaintiff's fitness centers); Vista Food Exch., Inc. v. Vistar Corp., No. 03-CV-5203, 2005 WL 2371958, at *6–7 (E.D.N.Y. Sept. 27, 2005) (plaintiff's survey inadmissible or entitled to de minimis weight where universe was defined as people "who fall within target market characteristics of [plaintiff]" even though the parties served different tiers in food distribution chain); Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 322 (S.D.N.Y.) (senior user used marks PACO and PACO RABANNE for fragrances, while junior user used marks PACO and PACO SPORTS for jeans and casual clothing; the court found that plaintiff's survey "improperly focused on the fragrance market rather than on the jeans or casual clothing market"), *aff'd*, 234 F.3d 1262 (2d Cir. 2000); Hutchinson v. Essence Commc'ns, Inc. 769 F. Supp. 541, 564 (S.D.N.Y. 1991) (the senior user was the publisher of *ESSENCE* magazine, while the junior user was a rap singer who used the stage name "Essence"; the court found the senior user's survey universe was not proper because it reflected "the readership of the magazine, not the listeners of rap").

as courts often believe this biases the results to higher levels of confusion.[18] Senior users who limit a survey's universe to their own actual customers are obviously seen as trying to rig the survey to produce a favorable result, thus violating the objectivity standards so fundamental to reliable survey research.

## Reverse Confusion

As discussed above, where the senior user alleges likelihood of forward confusion, the relevant universe is the junior user's potential customers. However, in cases alleging reverse confusion (i.e., that consumers would likely believe that the senior user's products or services are made or sponsored by the junior user),[19] the relevant universe is the senior user's potential customers.[20]

## Post-Sale Confusion

What is the proper universe for a survey attempting to measure post-sale confusion?[21] This question was addressed in *General Motors Co. v. Urban Gorilla LLC*.[22] GM sued

---

18. *See, e.g.*, Scott Fetzer Co. v. House of Vacuums, Inc., 381 F.3d 477, 488 (5th Cir. 2004) (survey universe was constructed from plaintiff's customer lists, a group the court found to be "uniquely familiar with Scott Fetzer's marketing and distribution techniques"); Parks, LLC v. Tyson Foods, Inc., 186 F. Supp. 3d 405, 419 (E.D. Pa. 2016) (reasoning that plaintiff's survey evidence was entitled to little weight, in part because plaintiff conducted survey only in geographic areas where it sold its products, which "was, in effect, an attempt to survey consumers of [plaintiff's] products"), *aff'd*, 863 F.3d 220 (3d Cir. 2017); Hodgdon Powder Co. v. Alliant Techsystems, Inc., 512 F. Supp. 2d 1178, 1182 (D. Kan. 2007) (excluding from evidence plaintiff's survey whose participants were limited to people who visited plaintiff's promotional booth at a single event, the court noted that "the survey participants are not representative of the universe of prospective buyers because they were all familiar with plaintiff or in close proximity to plaintiff's promotional material").

19. "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." Fisons Horticulture, Inc. v. Vigoro Indus., 30 F.3d 466, 474 (3d Cir. 1994).

20. *See, e.g.*, Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110, 121 (3d Cir. 2004) ("The court should limit survey evidence in reverse confusion cases to the customers of the senior user"; survey conducted outside senior user's geographic area excluded); Valador, Inc. v. HTC Corp., 242 F. Supp. 3d 448, 460 (E.D. Va.) (senior user's survey purportedly testing reverse confusion found unreliable because it surveyed the junior user's target audience, which is "plainly the incorrect universe for a reverse confusion case"), *aff'd*, 707 F. App'x 138 (4th Cir. 2017); *see also* Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 741 (2d Cir. 1994) ("Where . . . the relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user, it is appropriate to survey the senior user's customers."). Although this principle is certainly correct, the survey conducted in the *Sterling Drug* case was not properly designed to test reverse confusion, but rather tested forward confusion. In that case, the plaintiff owned the U.S. trademark rights to the mark BAYER for aspirin, while the defendant used the mark BAYER in the United States for industrial and chemical products. *Sterling Drug*, 14 F.3d at 738. Plaintiff conducted a survey in which it showed shopping mall pedestrians the headquarters sign of defendant's U.S. subsidiary (Bayer USA), and 75 percent of respondents reported that the company shown in the sign makes aspirin. *Id.* at 741. Defendant criticized this survey as focusing on the wrong universe, that is, analgesic customers as opposed to customers of industrial and chemical products. *Id.* The court incorrectly rejected this criticism, stating that the "relevant issue" in the case was reverse confusion. Although plaintiff did allege reverse confusion in the case, the survey it conducted (testing the defendant's mark) did not test that issue. *See id.* at 741–42.

21. "Post-sale confusion" is the term used for confusion of someone who did not purchase the product bearing the allegedly infringing mark or trade dress, but later sees or uses the product and believes it was made or sponsored by the senior user.

22. No. 06-CV-00133, 2010 WL 5395065 (D. Utah Dec. 27, 2010).