| | |
|---|---|
| CMT USA, INC. and CMT UTENSILI S.P.A., <br><br> Plaintiffs, <br><br> v. <br><br> APEX TOOL GROUP LLC and APEX BRANDS, INC., <br><br> Defendants. | **RESPONSE TO CMT'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF APEX'S PROPOSED EXPERT STEVEN BLEICHER** |

Apex's color expert, Professor Steven Bleicher, taught university courses on color for nearly 30 years, authored and updated a "must-have" textbook on color for 20 years, and was previously found by a federal court to be "qualified to render opinions in the fields of color theory." He also died unexpectedly three months ago in March 2025, and per Federal Rules of Civil Procedure 37(c) and 4th Circuit precedent Apex promptly notified the Court (after conferring with CMT) to request leave to designate a substitute expert.

Nevertheless, Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A. ("CMT") filed a motion to exclude Professor Bleicher's reports and testimony on the basis that his opinions (all of which are focused on viewing and comparing colors) were somehow "outside the scope of his expertise." The "Memorandum," ECF No. 217 at 1. But a review of the standards for experts under *Daubert* and Fourth Circuit caselaw, and the actual opinions provided by Professor Bleicher, shows that he was more than qualified to render all of the opinions within his reports. Accordingly, Defendants Apex Tool Group LLC and Apex Brands, Inc. ("Apex") hereby file this Response in opposition to CMT's Motion to Exclude the Opinions and Testimony of Apex's Proposed Expert Steven Bleicher (the "Motion," ECF No. 216) and the supporting Memorandum.

I.  **<u>INTRODUCTION</u>**

This case is about whether Apex's use of a trade dress consisting of white, black, and a red-orange "Rawhide" color on circular saw blades (the "Crescent Trade Dress") infringes CMT's alleged rights in an all-orange trade dress on circular saw blades (the "CMT Orange Trade Dress"), where the parties' use of color is not identical, the trade dresses contain significant differences, and there are many third-party uses of orange on saw blades. See ECF No. 164 (Apex's Memorandum in support of Motion for Summary Judgment).

While there are a number of differences between the CMT Orange Trade Dress and the Crescent Trade Dress, because CMT has alleged that Apex's Rawhide color is similar to the orange used within the CMT Orange Trade Dress (referred to herein as "CMT Orange"), Apex hired Professor Bleicher to opine on comparisons between those two colors, as well as the colors on third party saw blades that also use shades of orange.

Professor Bleicher was well-qualified to issue such opinions. As described more fully below, he not only taught about color at the university level for nearly 30 years, he was also the author of a well-regarded university textbook on color. And a recent federal district court held that he was qualified to opine on topics related to color. To get around these obvious qualifications, CMT's Motion accuses Professor Bleicher of offering opinions he did not offer and focuses on purported mistakes which are irrelevant to his opinions. It also cites to Fourth Circuit law that involves very different factual scenarios. Accordingly, and for the reasons set forth in greater detail below, the Court should deny the Motion.

Additionally, CMT knew when it filed the Motion that it was moot-on-arrival. By that time, nearly a month had passed since Apex had notified CMT of Professor Bleicher's passing, Apex had informed CMT that it intended to seek leave to designate a substitute expert to replace Professor Bleicher, and the parties had met and conferred regarding whether CMT would consent

to the designation of a substitute expert. Indeed, Apex had already filed a motion with the Court for leave to designate a substitute expert prior to CMT filing this Motion. *See* ECF No. 215 (the "Substitution Motion"). Nonetheless, CMT filed the Motion anyway. CMT's motives are transparent: the Memorandum even boldly represents to the Court that Apex would not agree to limit a substitute expert's testimony, despite the prior-filed Substitution Motion demonstrating that to be false. *Compare* Memorandum at 1, n. 1, *with* the Substitution Motion. CMT has sought to turn Professor Bleicher's unfortunate passing into an opportunity for personal gain by filing the instant Motion knowing that Professor Bleicher's death would hinder Apex's ability to respond.

CMT's Motion is moot for two reasons. First, Professor Bleicher's unfortunate passing ensures that he will not be testifying at trial irrespective of CMT's Motion[1]. *See, e.g.*, *Doe v. Bd. Of Cnty. Com'rs of Craig Cnty.*, 11-CV-0298-CVE-PJC, 2012 WL 3061465, at *1 (N.D. Okla., July 26, 2012) ("plaintiff states that . . . he no longer expects to call Dr. Jaggers as a witness at trial. . . . Thus, defendant's motion [to exclude the expert testimony of Dr. Jaggers] is moot.") (internal citation omitted). Second, if the Court grants Apex's motion to designate a substitute expert, its arguments within this Motion would not apply to the new expert's analysis and methodology. This is because the Rule 702 standard *obligates* the substitute expert to conduct their own analysis and testing, and not simply demonstrate "unblinking reliance" on Professor Bleicher's opinions, even if the conclusions are the same. *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 719 (D.S.C. 2019) (quoting *In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999), *amended,* 199 F.3d 158 (3d Cir. 2000)); *Mooring Capital Fund, LLC v. Knight*, 388 F. App'x 814, 820 (10th Cir. 2010) ("An expert is not entitled to testify to opinions that rely on the opinion of another expert, simply because the other is an expert.").

---

[1] In the event the Court were to deny Apex's Substitution Motion, then in the alternative Apex would seek to introduce Professor Bleicher's testimony at trial. Nonetheless, as fully set forth in the earlier filed Substitution Motion, Apex believes the proper procedure under Fourth Circuit precedent when an expert unexpectedly dies before trial is to designate a substitute expert.

3

Although Apex is unable to use Professor Bleicher's assistance in rebutting CMT's attacks on his credentials and opinions, it is clear that Professor Bleicher **was** qualified in offering the opinions in his reports. Furthermore, CMT provides nothing but quibbles and grievances with Professor Bleicher's calculations and visual aids, which do not affect his admissibility under settled Fourth Circuit law. Accordingly, the Motion should be denied.

## II. <u>BACKGROUND</u>

Apex hired Professor Steven Bleicher to offer certain opinions about the colors at issue in this case. *See* Exhibit 1, Declaration of Aaron D. Johnson ("Johnson Decl."), ¶ 3. His initial report (the "Bleicher Report," ECF No. 218-14) consisted of only three opinions:

1) The CMT Orange color, the Rawhide color, and the colors of numerous third-party competitor saw blades could all be described as shades of orange;

2) Numerous third-party saw blades use colors of orange that are closer to CMT Orange than Rawhide is to CMT Orange; and

3) The difference between CMT Orange and Rawhide is visually distinct enough that ordinary observers are likely to easily distinguish between the two colors.

*See* Bleicher Report at 5.

Professor Bleicher also issued a rebuttal report addressing certain deficiencies in the report of CMT's expert Dr. David Wyble (the "Bleicher Rebuttal Report," ECF No. 163-20). In the Rebuttal Report, Professor Bleicher's opinions were limited to criticizing Wyble's incorrect analysis that:

1) implies that CMT Orange and Rawhide are the same or visually similar colors merely because they both fall within the orange spectrum; and

2) fails to include a visual reference to the colors in Wyble's report.

*See* Bleicher Rebuttal Report at 2,4.

In offering all the opinions summarized above, Professor Bleicher relied upon his extensive academic and work experience in not only colors, but how humans perceive colors. Indeed, it is the human (consumer) perception of color that is most relevant in this case, not the scientific measurement of color using a machine and software. Professor Bleicher was an internationally renowned designer, artist, professor, and expert in color with over 40 years of experience and numerous publications, lectures, and testimonials to his name. Johnson Decl., ¶ 4. He taught university college courses on color for nearly 30 years, and authored a "must-have" textbook on color for 20 years. *Id.,* ¶¶ 4-5.

After he wrote the Bleicher Report and the Bleicher Rebuttal Report, and had his deposition taken by CMT counsel, Professor Bleicher unfortunately and suddenly passed away in March 2025. Johnson Decl., ¶ 6. Once his death was confirmed, Apex quickly informed CMT's counsel about his death and then developed a plan for how to replace his testimony based on Fourth Circuit precedent. *Id.* Apex proposed a substitute expert and attempted to negotiate with CMT on the parameters for the substitute expert's testimony in order to gain CMT's consent and efficiently resolve the problem, including offering to restrict the substitute expert's report to the identical topics of the Bleicher Report and the Bleicher Rebuttal Report. *Id.* But CMT refused to consent to any of Apex's proposals. Apex was then forced to file the Substitution Motion, which requests leave to disclose a substitute expert and sets forth in greater detail the circumstances and communications between the parties regarding Professor Bleicher's passing.

Nearly 4 weeks after being informed of Professor Bleicher's death, and over 2 weeks after being informed of Apex's plan to replace Professor Bleicher's testimony with a substitute expert per Fourth Circuit precedent, CMT filed the instant Motion. Ironically, CMT now seems to consent to a substitute expert provided that the substitute expert be restricted to "the scope of Mr. Bleicher's disclosed opinions" (Memorandum at 1, n.1)—precisely what Apex proposed.

However, regardless of whether CMT consents to the Substitution Motion, this Motion should be denied because Professor Bleicher has sufficient experience and expertise to issue and testify on the opinions within the Bleicher Report and the Bleicher Rebuttal Report, and any alleged errors in his methodology, if they even are errors, go to the weight of the testimony, not admissibility.

III. **ARGUMENT**

### A. To be qualified as an expert, an individual must be qualified with respect to the subject matter of the opinion actually proffered.

An expert can satisfy Rule 702's qualifications requirement in any one of five ways: "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also In re: Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Products Liab. Litig.*, 214 F. Supp. 3d 478, 496 (D.S.C. 2016) (noting the five ways set forth in Rule 702 are "disjunctive"). Whether an expert is qualified is judged liberally, and accordingly an expert's testimony is admissible if it employs any one of "scientific, technical, or other specialized knowledge" requirements. *See id.*

The test for exclusion is "a strict one," such that an expert "need not be precisely informed about all details of the issues raised in order to offer an opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791 (4th Cir. 1989). In performing its gatekeeping function, courts are not obligated to "determine that the proffered expert testimony is irrefutable or certainly correct," because, "as with all other admissible evidence, expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir.2006) (quoting *Daubert*, 509 U.S. at 596) (cleaned up). Accordingly, "any gaps in an expert's knowledge generally go to the weight of the witness's testimony, **not its admissibility**." *In re Levesque*, 653 B.R. 127, 149 (Bankr.

D.S.C. 2023) (emphasis added). Notably, "[t]he lack of industry-specific experience is not disqualifying." *Id.* (quotation omitted).

Accordingly, what matters is the expert's qualifications with respect to the opinions he or she actually purports to offer. *See, e.g.*, *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) (noting that "the test for exclusion is a strict one, and" to be excluded for lack of qualifications, "the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue **for which the opinion is proffered**.") (emphasis added). In other words, Professor Bleicher's qualifications are only relevant with regard to the topics on which he opined (namely, color and color comparison), and not for any other topic or field.

### B. Professor Bleicher was qualified to give the opinions he offered in his reports.

Professor Bleicher was well-qualified to opine on each of five topics summarized above and set forth in the Bleicher Report and Rebuttal Report (the "Bleicher Topics"). CMT's argument that Professor Bleicher is not a qualified to be a color scientist is no more than a strawman argument. Neither Apex nor Professor Bleicher ever claimed that Professor Bleicher was a color scientist, and none of Professor Bleicher's opinions rely on him being a color scientist.

#### 1. *Professor Bleicher was a color expert.*

While CMT seeks to reduce Professor Bleicher to an "art teacher," it cannot be seriously disputed that he was an expert on color. Indeed, Professor Bleicher quite literally wrote the textbook *Contemporary Color: Theory and Use*—among other widely circulated publications for academic and commercial audiences—regarding color theory, color psychology, and the use of color in product design, among other topics. Bleicher Report at 2-3. His experience with the psychology of color stretched back to at least his 1995 post-graduate coursework, and consisted of numerous publications, lectures, interviews, and teaching positions. Indeed, prior to his death
7

CMT's own color expert, Dr. Wyble, selected Professor Bleicher to present a paper at a June conference of the Inter-Society Color Counsel (ISCC). Deposition of Steven Bleicher, attached as Exhibit C to Johnson Decl. ("Bleicher Depo."), at 103:19-25. Professor Bleicher also served as a color consultant to Nike, one of the world's most famous brands. *See* Johnson Decl., ¶ 4. And just last year in another case involving color and trademark infringement, a federal court held that "Bleicher is qualified to render opinions in the fields of color theory and color psychology, including how people perceive colors." *Weems Indus., Inc. v. Teknor Apex Co.*, 757 F. Supp. 3d 854, 906 (N.D. Iowa 2024). The *Weems* court ultimately found Professor Bleicher's testimony persuasive in conducting its analysis. *See id.* at 923–25. Accordingly, Professor Bleicher was qualified in the topics of color theory, color perception, and color psychology—the very topics he opined upon in his reports.

2. *Professor Bleicher was qualified to opine on the topics within the Bleicher Report.*

Professor Bleicher's expertise in color means that he was particularly well qualified to opine on the three topics within the Bleicher Report. Professor Bleicher's first opinion was that the colors used on numerous different saw blades, including both CMT's and Apex's, could be considered to be shades of orange. His second opinion was that certain shades of orange used by third-parties were more similar to CMT Orange than Rawhide was to CMT Orange. And his third opinion was that visual observers would likely to be easily able to tell CMT Orange and Rawhide apart. The Memorandum unsurprisingly[2] avoids discussion of these opinions in favor of arguing

---

[2] CMT likely ignores discussing Bleicher's conclusions on the three topics in the Bleicher Report because CMT's own color expert <u>agreed with all of them</u>. Dr. Wyble agreed that a "color-normal human would be able to tell [CMT Orange and Rawhide colors] apart." Deposition of David Wyble, attached as Exhibit D to Johnson Decl. ("Wyble Depo."), 128:6-9, 129:7-131:23. Dr. Wyble agreed that a number of third-parties use colors closer to CMT Orange than Rawhide is to CMT Orange. Wyble Depo., 278:25-279:8. And Dr. Wyble agreed that CMT Orange, Rawhide, and the colors on the third party saw blades could all be considered variations of orange. Wyble Depo., 236:23-238:4.

8

that Professor Bleicher was not a color scientist. But CMT nowhere explains why Professor Bleicher needed to be a color scientist to make these three opinions. No such qualification was necessary, because Professor Bleicher's opinions for all of those topics were based on Professor Bleicher's 40-plus years of experience and expertise regarding color and "how people perceive colors." *Weems Indus.*, 757 F. Supp. 3d at 906.

Tellingly, the Memorandum completely ignores this experience. And yet, Professor Bleicher's experience is the precise type of experience relevant to this matter. In a trademark case, the relevant inquiry is whether an "ordinary consumer"—*i.e.,* people—is likely to be confused as to the source of the defendant's goods. *See, e.g.*, *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992). Consequently, the trademark infringement factors, including the similarity of the marks factor, are analyzed through the lens of how the products are "seen by the ordinary consumer." *See id.* In other words, this case is about people who perceive color with their eyes, not through spectrophotometer readings, color space numbers, or ΔE values.

It is thus flatly incorrect for CMT to claim that Professor Bleicher "has no qualifications in any relevant field." Memorandum at 5. Professor Bleicher's experience is in the human perception of color, and his opinions match to that experience. CMT's citation to *Zellers v. NexTech Ne., LLC*, 533 Fed. Appx. 192 (4th Cir. 2013) is therefore inapplicable, because *Zellers* is about **mis**matches between expert qualifications and proffered testimony. In *Zellers*, the court excluded three experts whose qualifications did not match to their proposed testimony: a neurologist was excluded from offering toxicology opinions because she was not qualified as a toxicologist, a toxicologist was similarly excluded because he had no qualifications regarding the toxicity of the substances at issue in the case, and a neuropsychologist and neurotoxicologist was excluded from offering opinions regarding the plaintiff's symptoms because he was not a medical doctor. *See id.* at 197–99. But in this case, Apex offered Professor Bleicher, an expert in color

9

theory, color perception, and color psychology, to opine on issues that exactly match that expertise. Accordingly, Professor Bleicher is unlike any of the experts excluded in *Zellers*.

Crucially, Professor Bleicher was also unlike the color expert excluded in the *SafeRack v. Bullard* order. Memorandum at 6 and Exhibit S. The *SafeRack* color expert did not have any specialized experience outside of color consultancy and aesthetics, and the Court noted that she had not "acquired knowledge in [psychology] through her experience, training or other skills." *Id.* at 4. By contrast, Professor Bleicher had acquired knowledge of color perception and color psychology through his training and experience beyond his degrees in fine arts; his opinions were informed by his decades of experience as a recognized expert in the field of color and color psychology with numerous publications and academic attributions. Indeed, Professor Bleicher served as an expert witness in color psychology in numerous cases, and was found to be qualified as an expert in color psychology and other color-related topics. *Weems Indus.*, 757 F. Supp. 3d at 906. Therefore *SafeRack* is inapposite.

### 3. Professor Bleicher was qualified to make the rebuttals of Dr. Wyble's report.

Professor Bleicher's expertise in color also means that he was well qualified to make the rebuttals of Dr. Wyble's report contained within the Bleicher Rebuttal Report. Professor Bleicher's rebuttal opinions were again limited to his own experience and expertise with color perception and psychology. First, Professor Bleicher criticized the Wyble Report's implication that both CMT Orange and Rawhide could be considered the same color or visually similar merely because they both could be considered variations within the penumbra of colors referred to as "orange" colorspace. And second, Professor Bleicher critiqued the Wyble Report's use of raw spectrophotometer data to describe the various colors without providing a visual reference.

Courts have been clear that "there is no requirement that experts share identical backgrounds to be able to opine about the same subject." *Pulse Med. Instruments, Inc. v. Drug*

*Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 511 (D. Md. 2012). And CMT cites no case supporting that proposition. Further, "an expert witness need not have an identical background as another expert witness to rebut the latter's testimony, so long as both witnesses are qualified to testify as experts on the same designated issues." *Id.*

While Dr. Wyble's academic and work experience are different from Professor Bleicher's, that does not mean that Professor Bleicher was unqualified to issue opinions regarding the Wyble Report's opinions on color. *See Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 361 (S.D.N.Y. 2023) ("[A] proper rebuttal expert's opinion is not required to be based on the same data as the expert opinion that it is offered to rebut."). As described extensively above, and as held by the *Weems Industry* court, Professor Bleicher was qualified to testify as an expert in color. And there can be no dispute that both of Professor Bleicher's criticisms of the Wyble Report centered around color, and human perceptions of color. Just as with the opinions in the Bleicher Report, what matters for a *Daubert* analysis is whether Professor Bleicher was qualified to offer the rebuttal opinions he **actually offered**. *See* § III(A), *supra*. There can be no doubt that Professor Bleicher was qualified to offer the rebuttals regarding color perception and theory.

        4. *Professor Bleicher did not seek to offer opinions outside his areas of expertise.*

Professor Bleicher never claimed to be a lawyer or trademark expert and none of his five opinions require expertise from these fields. The Memorandum's claim that Bleicher offered opinions on trademark law merely takes statements provided as background in the Bleicher Report and falsely claims that those background statements are Bleicher's opinions. For example, Professor Bleicher included certain background information regarding trademark applications with which he was familiar in order to provide context for his conclusions. But none of his

conclusions rely on or relate to trademark law or USPTO procedures. Even if Professor Bleicher had not passed away, he would not have offered opinions on these topics at trial.

Similarly, Professor Bleicher never claimed to be an expert in consumer research and was not offered to opine on consumer confusion. However, Professor Bleicher correctly described throughout his report how consumers—that is, human beings—would ordinarily perceive color. CMT does not suggest that sawblade consumers perceive color differently than any other group of people. Bleicher used the term "consumers" because that term is specific to the issue in this case. Use of "consumers" (rather than "observers," or "people with normal visual acuity," for example) in discussion about visual perception of color does not transform Bleicher's opinions into a different field. The opinions are all entirely focused on color and the human perception of color, fields in which Bleicher was an expert.

### C. CMT's complaints regarding Professor Bleicher go to issues of weight and credibility, not admissibility.

A *Daubert* inquiry concerns the admissibility of an expert's opinions, not the weight or credibility afforded to them. *See Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (determining the accuracy of the expert's calculations affected the weight and the credibility of the testimony, not its admissibility). Questions of fact about an expert's conclusions go to the weight and credibility of the testimony, not admissibility. *E.g.*, *Bresler*, 855 F.3d at 195; *Mountain Valley Pipeline, LLC v. 0.32 Acres of Land*, 127 F.4th 427, 435 (4th Cir. 2025) ("[T]he court should not resolve contested factual issues at the admissibility stage."). At the *Daubert* stage, the Court "should ask only whether the expert's methodology was reliable and was based on sufficient facts or data, keeping in mind that the expert 'need not be precisely informed about all details of the issues raised in order to offer an opinion.'" *Mountain Valley Pipeline*, 127 F.4th at 435–36 (determining the purported errors in the expert's report "were not at all obvious" and

noted the danger in "resolving factual disputes at the evidentiary stages.").

Here, none of the errors CMT accuses Professor Bleicher of making affect the admissibility of Professor Bleicher's testimony, if they can even be considered "errors" at all. For example, CMT claims that Professor Bleicher's color swatches do not match the colors of the saw blades. ECF No. 217 at 6–9. But Professor Bleicher based his color swatches on spectrophotometry readings CMT's color scientist Dr. Wyble admitted were correct. Wyble Depo. at 180:20–182:23; Bleicher Report at 6. And Professor Bleicher outlined how he used state-of-the-art software to precisely translate those spectrophotometer readings into the color swatches and charts in his report. Bleicher Depo. at 147:10-15; 187:12-188:12. Variations when converting between color spaces is expected (as CMT's own color expert agreed would happen – *see* Wyble Depo. at 107:12-110:4) and therefore any discussion as to variance of color goes to the weight of the testimony, not exclusion. The "series of . . . color blocks" that CMT presented to Professor Bleicher in his deposition do not indicate any error, because those documents claim to take a single color from a circle on the "Bleicher Color Wheel," but because the entire color wheel was a gradient with larger circles for readability there was no single color within those circles.

In other words, per CMT's own expert, Professor Bleicher used reliable data directly relevant to the dispute. Accordingly, CMT cannot with a straight face claim an error with Professor Bleicher's methodology—or claim that Professor Bleicher analyzed the "wrong colors." CMT's argument is instead a lower-order quibble about whether the exhibits within the Bleicher Report are helpful given some variation in the conversion to the colorspace for Photoshop. But that is a fact dispute regarding a mere calculation discrepancy. And because CMT's expert didn't provide any visual comparison of the colors (which was part of Professor Bleicher's critique), CMT hasn't even offered what they believe a "more accurate" comparison chart would look like.

13

Under Fourth Circuit law, calculational disputes like these do not go to the expert's reliability or admissibility – they go to the weight. *Bresler*, 855 F.3d at 195.

Additionally, there is nothing wrong with the Exhibit 7 in the Bleicher Report or the methodology Professor Bleicher used when compiling it. The table contains swatches showing the colors taken from the CMT Orange Trade Dress, the Crescent Orange Trade Dress, and selected third party saw blades. The swatches were colored by Professor Bleicher using a computer program that matched the raw spectrophotometer data. While CMT complains that Professor Bleicher used his own judgement in ordering the table (as opposed the CMT's preferred delta-E method), that is not an error in methodology. Professor Bleicher used his decades of experience in color and human perception of color to arrange the colors. As he explained throughout his deposition, certain colors catch human attention and eyes more than others, and therefore an expert's subjective arrangement of similar colors is often times more helpful than an arrangement that only looks at raw numbers.

CMT similarly provides no Fourth Circuit caselaw suggesting that its lower-order disputes regarding Professor Bleicher's visual aids somehow merit his exclusion. CMT claims Professor Bleicher used a two-dimensional color wheel that is "inherently error prone" and does not contain every possible color. ECF No. 217 at 7. In other words, CMT takes issue with a visual aid that Professor Bleicher employed to illustrate his conclusions. But this is neither a complaint regarding his conclusions themselves, nor the methodology by which he arrived at them. Use of a two-dimensional color wheel was appropriate because Professor Bleicher's conclusions would need to be displayed on paper, which even CMT's expert recognized would necessitate a two-dimensional presentation. *See* Depo of D. Wyble at 200:22-24. Professor Bleicher expressly stated that the visuals are a "visual approximation" of the raw data. Bleicher Report at 5. And even if Professor Bleicher's color wheel choice was an error, it is an error in presentation, not

methodology or conclusions.³ CMT has cited no case in which an expert was excluded on the grounds based on his visual aids.

Thus, each of CMT's so-called errors are either disputes regarding Professor Bleicher's choices for visual approximations of raw data, or complaints with certain visual aids. Whether these disputes can even be considered errors are necessarily disputes of fact that should not be decided at the admissibility stage. *Bresler*, 855 F.3d 178, 195 (4th Cir. 2017) (determining the accuracy of the expert's calculations affected the weight and the credibility of the testimony, not its admissibility); *Mountain Valley Pipeline*, 127 F.4th at 435–36 (determining the purported errors in the expert's report "were not at all obvious" and noted the danger in "resolving factual disputes at the evidentiary stages.").

In short, CMT has provided nothing to suggest that Professor Bleicher's opinions are anything other than relevant and reliable. As this matter is a trademark case concerning color, Professor Bleicher's opinions are within the relevant subject matter. The data used within the report was confirmed to be accurate by CMT's own color expert underscores that he analyzed the relevant colors. And as set forth above, CMT's Memorandum identifies no errors in Professor Bleicher's methodology which would affect his reliability, but instead merely rattles off a list of complaints that would be appropriate only in cross-examination if Professor Bleicher were to testify. Accordingly, the Court should deny the Motion.

IV. **CONCLUSION**

CMT's Motion seeks to capitalize on Professor Bleicher's death by attacking him for qualifications he did not need and never claimed to have, for conclusions he never claimed to

---

³ CMT's allegation Professor Bleicher "arbitrarily" arranged the colors in his Exhibit 7 is yet another quibble with his presentation. ECF No. 217 at 10–11. But Professor Bleicher's organization was based on his expertise and his report makes no false statements regarding how the colors were arranged. And even if this choice was an error (which it was not), it was an error in presentation, not methodology or conclusions.

15

have made, and for presentation choices that do not affect his admissibility as an expert were he still alive. But Professor Bleicher was an expert on color, as confirmed by his academic credentials, authorship, and a previous federal court decision. And Professor Bleicher's color expertise made him well-qualified to opine on the five topics in the Bleicher Report and the Rebuttal Report.

Needless to say, Professor Bleicher will not be appearing at trial. But nonetheless, the Court should deny CMT's Motion. Furthermore, the Court should award Apex its reasonable fees and costs incurred in responding to the Motion, because CMT knew that its Motion would be moot-on-arrival due to Professor Bleicher's death and moreover failed to raise credible arguments based on Fourth Circuit case law even if he were still alive.

DATED: June 13, 2025　　　　　　　　**WOMBLE BOND DICKINSON (US) LLP**

By: /s/ Aaron D. Johnson
Michael J. McCue
Aaron D. Johnson
David A. Jackson
Joy Tacy Allen Woller
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite. 2750
San Francisco, California 94111
(650) 687-8426
Michael.McCue@wbd-us.com
Aaron.Johnson@wbd-us.com
David.Jackson@wbd-us.com
Joy.Woller@wbd-us.com

Jason M. Sneed (NC Bar ID 29593)
Megan E. Sneed (NC Bar ID 38525)
SNEED PLLC
445 S. Main St., Suite 400
Davidson, North Carolina 28036
(844) 763-3347
Jsneed@Sneedlegal.com
Msneed@Sneedlegal.com

Attorneys for Defendants
Apex *Tool Group LLC and Apex Brands, Inc*

## CERTIFICATE OF USE OF ARTIFICIAL INTELLIGENCE

Pursuant to this Court's order of June 13, 2024 regarding the use of artificial intelligence in court filings, Defendants Apex Tool Group LLC and Apex Brands, Inc. hereby certify:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexus, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Signed June 13, 2025.

**WOMBLE BOND DICKINSON (US) LLP**

/s/  Aaron D. Johnson
Michael J. McCue
Aaron D. Johnson
David A. Jackson
Joy Tacy Allen Woller
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2750
San Francisco, California 94111
Michael.McCue@wbd-us.com
Aaron.Johnson@wbd-us.com
David.Jackson@wbd-us.com
Joy.Woller@wbd-us.com

Jason M. Sneed (NC Bar ID 29593)
Megan E. Sneed (NC Bar ID 38525)
SNEED PLLC
445 S. Main St., Suite 400
Davidson, North Carolina 28036
JSneed@sneedlegal.com
MSneed@sneedlegal.com

*Attorneys for Defendants/Counter-Plaintiffs*
*Apex Tool Group LLC and Apex Brands, Inc*

17

4924-8138-1961 v.5

RESPONSE TO MOTION TO EXCLUDE EXPERT STEVEN BLEICHER
3:24-CV-00137-TMR-DCK

Case 3:24-cv-00137-TMR-DCK     Document 241     Filed 06/13/25     Page 17 of 18

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 13th day of June, 2025, the foregoing RESPONSE TO CMT'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF APEX'S PROPOSED EXPERT STEVEN BLEICHER was served via electronic means through CM/ECF on the following counsel of record:

>Ward Davis (NC Bar ID 27546)
>Joshua B. Durham (NC Bar ID 25414)
>BELL, DAVIS & PITT
>227 W. Trade St., Suite 1800
>Charlotte, NC 28202
>(704) 227-0400
>ward.davis@belldavispitt.com
>jdurham@belldavispitt.com
>
>Edgar H. Haug (*pro hac vice*)
>Robert E. Colletti (*pro hac vice*)
>Mark Basanta (*pro hac vice*)
>HAUG PARTNERS LLP
>745 Fifth Avenue
>New York, NY 10151
>(212) 588-0800
>ehaug@haugpartners.com
>rcolletti@haugpartners.com
>mbasanta@haugpartners.com
>
>*Attorneys for Plaintiffs CMT USA, Inc.*
>*and CMT Untensili S.p.A.*

/s/ Aaron D. Johnson