# Exhibit D

# Exhibit D

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

----------------------------------------X

CMT USA, INC. and CMT UTENSILI S.P.A.,

Plaintiffs,

vs. Case No. 3:24-cv-00137

APEX TOOL GROUP LLC and APEX BRANDS, INC.,

Defendants.

----------------------------------------X

February 5, 2025

10:14 a.m.

VIDEOTAPED EXAMINATION BEFORE TRIAL of DAVID R. WYBLE, Ph.D., held at the office of Haug Partners, LLP, 745 Fifth Avenue, New York, New York 10151, before Roberta Caiola, a Notary Public of the State of New York.

A P P E A R A N C E S:

HAUG PARTNERS LLP
Attorneys for the Plaintiffs
CMT USA, INC. and CMT UTENSILI S.p.A.
745 Fifth Avenue
New York, New York 10151
(212) 588-0800
BY: ROBERT E. COLLETTI, ESQ.
rcolletti@haugpartners.com
MARK BASANTA, ESQ.
mbasanta@haugpartners.com

WOMBLE BOND DICKINSON (US) LLP
Attorneys for the Defendants APEX TOOL
GROUP LLC and APEX BRANDS, INC.
50 California Street, Suite 2750
San Francisco, California 94111
(650) 687-8426
BY: AARON D. JOHNSON, ESQ.
aaron.johnson@wbd-us.com

ALSO PRESENT:
Michael Bennett, Videographer

INDEX


| WITNESS: DAVID R. WYBLE, Ph.D. | PAGE |
|---|---|
| Mr. Johnson | 6 |
| Mr. Colletti | 299 |
| Mr. Johnson | 303 |


E X H I B I T S


| WYBLE | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of David R Wyble, Ph.D. | 11 |
| Exhibit 2 | Wyble Exhibit 1 | 13 |
| Exhibit 3 | Rebuttal Expert Report of David R Wyble, Ph.D. | 76 |
| Exhibit 4 | Wyble Exhibit 10 | 130 |
| Exhibit 5 | Wyble Exhibit 3 | 193 |
| Exhibit 6 | Wyble Exhibit 5 | 211 |
| Exhibit 7 | Wyble Exhibit 6 | 218 |
| Exhibit 8 | Document entitled "Shades of Orange/Brown Color," | 220 |
| Exhibit 9 | Wyble Exhibit 8 | 230 |
| Exhibit 10 | Wyble Exhibit 9 | 280 |


(Exhibits retained by the reporter and forwarded to U.S. Legal for production.)

D. Wyble

THE VIDEOGRAPHER: We are on the record beginning 10:14 a.m. on February 5, 2025.

Audio and video recording will continue to take place until all parties agree to go off the record.

This is the video recorded deposition of David R. Wyble taken in the matter of CMT USA, Inc. and CMT Utensili S.p.A., plaintiffs, versus Apex Tool Group LLC and Apex Brands, Inc., defendants, filed in the United States District Court, Western District of North Carolina, Charlotte Division.

This deposition is being held at the offices of Haug Partners LLP located at 745 Fifth Avenue in New York, New York.

My name is Michael Bennett. I am the videographer on behalf of U.S. Legal Support with headquarters located at 16825 North Chase Drive, Suite 900, Houston, Texas.

D. Wyble

The court reporter is Roberta Caiola, also on behalf of U.S. Legal Support.

I am not related to any party in this action, nor am I financially interested in the outcome.

Would counsel please identify themselves.

MR. JOHNSON: Yes.

This is Aaron Johnson for defendants Apex Tool Group LLC and Apex Brands, Inc.

MR. COLLETTI: Rob Colletti with Haug Partners for the plaintiffs, CMT.

And, Mark, I'll let you introduce yourself.

MR. BASANTA: Mark Basanta, also from Haug Partners, also on behalf of the plaintiff, CMT entities.

THE VIDEOGRAPHER: Thank you all very much.

Will the reporter please swear

D. Wyble
in the witness.
DAVID R. WYBLE, Ph.D., the witness herein, having been first duly sworn, testifies as follows:
EXAMINATION BY
MR. JOHNSON:
Q. Good morning, Dr. Wyble.
A. Good morning.
Q. Could you please state your full name for the record?
A. David Robert Wyble.
Q. And Dr. Wyble, do you understand that, today, you are being deposed in the case of CMT USA, Inc. and CMT Utensili S.p.A. versus Apex Tool Group LLC and Apex Brands, Inc.?
A. I do.
Q. And in this deposition, I'm going to be asking you some questions and you are going to be answering them under oath.
Do you understand that?
A. I do.
Q. And there's a few differences

D. Wyble

between this deposition and a typical conversation that I want to make sure you're aware of.

First, this court reporter is going to transcribe everything we say, and so, therefore, it is important that we do not talk over each other; and I would, therefore, ask that you wait until I'm finished asking a question before you answer it.

Is that acceptable?

A. Yes.

Q. Great. And I will do the same as well.

And because this is an oral transcription, the court reporter cannot indicate head nods or other gestures, and, thus, every answer needs to be verbal.

Can you agree to answer verbally?

A. Yes.

Q. And unlike a typical conversation, your answers today are under oath, and this subjects you to potential

D. Wyble

criminal charges of perjury for giving false, misleading, or incomplete testimony.

Do you understand this?

A. I do.

Q. Is there any reason, such as being under unusual stress, physical or mental condition, or being under the influence of any substance, that would prevent or limit you today from giving truthful answers to my questions?

A. No.

Q. And there is nothing wrong with asking me to repeat a question or explain a term, if you don't understand my question, or if I'm not speaking loud enough.

However, if you do answer my question, I am going to assume that you understood it.

Does that make sense?

A. Yes.

Q. And if you need clarification at any time, please feel free to ask me and I will try to clarify that question or rephrase it.

D. Wyble

And so, that limits the number of kind of in between, if you will, colors. Right?

CIELAB is an analog space, meaning there's no implied quantization, is the word I would use, to an integer value.

Q. So it could go to the decimal points, if you wanted to have --

A. CIELAB can have decimal place. RGB is an integer -- integer space.

Q. So is it fair, then, to say that CIELAB has more specificity?

Because it sounds like if there was a decimal place, you know, a CIELAB coordinate --

A. Yes.

Q. -- converting it to RGB, you likely will lose some detail there, because there's, by definition, fewer RGB --

A. Yes.

Q. -- locations?

A. Yes. Right. That's fair.

Q. Okay. But then you're saying, going from RGB to CIELAB, you don't lose

D. Wyble

that, or would you still potentially lose something?

A. No, because -- lose -- can you say that again? What?

Q. Sure.

So it sounds, from what you're saying, is that because there are fewer RGB coordinates than CIELAB coordinates, that, by definition, when you convert from RGB to CIELAB, you're going to have to choose a point that is a little bit more detailed than the RGB point; and so there is a little bit lost in that translation because the software doing the calculation is going to have to pick within that larger range of the RGB coordinate what specific CIELAB coordinate it wants to use, and, in particular, how much detail, how -- you know, what level of decimal point it wants to go to?

A. Um-hum. Okay.

I would agree with that.

Q. Okay. And then, so going back and forth, there could be some detail lost?

D. Wyble
A. Well, I don't want to imply that that happens kind of over and over again, right?
Q. Okay.
A. There's one -- when I go from CIELAB to SRGB, there's a potential for a small quantization error, we call it, meaning truncated, right, losing the decimal place.
When you go in the other direction, no, there isn't any detail lost; there isn't any specificity lost.
Q. But isn't the calculation, by definition, choosing a more detailed point, and therefore it is making a judgment call; because it's not giving you a range of CIELAB numbers, it's giving you a specific CIELAB coordinate, which is not going to be the same size and the color space as the RGB coordinate?
A. Well, you used the word "judgment," which I would take out of that. There's no judgment going on here.
Q. It's using the algorithm?

D. Wyble

A. Yes. It's a definitive mathematical equation that goes from SRGB to CIELAB.

Q. And do all software use that same equation?

A. They do.

Q. Could somebody develop software with a different equation?

A. Not in claim SRGB or CIELAB.

Q. Okay.

A. I mean, those are definitive, and they're referenced in my report. If you'd like, we can -- we can dig them out.

But they're -- those are established mathematical transforms that is well agreed on in the industry.

Q. Okay.

Then let's go to your next one, Section C, you mention CMYK?

A. Yes.

Q. And my understanding is this is mainly for printing; is that correct?

A. Yes.

Q. And how does it differ from

D. Wyble

experience would say that number is going to be small.

Now, is it a half or 1 or 2? That is what requires the visual experiment. But once we are at 2 delta Es of more than that, we can confidently say that a color-normal human would be able to tell them apart.

Q. Okay. But --

A. Again, in isolation, in isolation, large blocks of color in front of a human being.

Q. But if the delta E2000 is smaller than 2, you would need a visual experiment to know whether a color-normative person could tell them apart?

A. 2 is an arbitrary number, right?

Q. That's the number you gave, though.

A. I -- I said a half or 1 or 2. And I don't know the answer to that, because that -- that's the difficult

D. Wyble

question; when we ask at what point does a color-normal observer can actually perceive the tiniest difference, we would call that a just noticeable difference, and that would require some kind of experiment.

Q. Okay. So you cannot provide an opinion on whether a color-normative person can tell those two colors apart, the orange from CMT and the rawhide from Apex, without having a visual experiment run?

A. I don't think that's what I said.

Q. All right. So then explain -- what do you need, then, to be able to provide an opinion on whether a color-normative person can tell those two apart?

A. I can look at a delta E2000, between these two numbers, and know whether a color-normal person can tell them apart up to a point.

Q. Well, I believe that's in your report, right? Do you want to --

A. Which in particular are you

D. Wyble
talking about?
Q. The delta E between the two numbers.
A. No, it's not in the report. I already said that.
Q. But it's in the Apex materials?
A. It's in the Apex materials, yeah.
Q. So do you want to turn to that?
A. Sure. It's not in this one? There's no Apex here.
MR. COLLETTI: I don't think you marked it.
Do you want to mark it?
MR. JOHNSON: Sure.
Q. Dr. Wyble, do you happen to know which exhibit it is?
A. No.
Q. I believe it could have been Exhibit 10 to your rebuttal, which we will mark as 4.
(Exhibit 4, Wyble Exhibit 10, marked for identification.)
Q. Is this the number you were

D. Wyble

referring to?

A. Yes.

Q. Is this the document you were referring to?

A. Yes. So, by their measurements, this delta E2000 of 11.63, so I'm looking at page 2, the highlighted Crescent, right?

The question is, could a normal human tell the difference between this color and this color; when viewed in isolation, in large areas, could a normal human being tell the difference between those two colors?

They would -- oh, let's see. A normal human could tell the difference between those two orange shades, yes.

Q. Okay. And previously, we had talked about -- you mentioned half, 1, 2 being kind of the limit, and here the number you said was 11.63.

A. Yes.

Q. Is that exponential? What is the difference then between a 1, 2 to 11.63

D. Wyble
A. That was humor?
Q. It was. Lawyer humor.
A. Lawyer humor, great.
Yeah, I think we're still in kind of a saturated orange. Like, kind of like actually bright orange. I kind of like that color, what they've described it as.
Q. Okay. And then the final Crescent?
A. Yeah, that's -- that's a -- that's still again more a chromatic orange.
Q. So you call it chromatic orange?
A. Sure.
Q. I want to move on to Section D on page 23. Here you describe Bublitz' testing.
And in paragraph 71 you say, "the instrumentation and setup thereof by Bublitz appears to be generally correct."
What do you mean by generally correct?
A. I mean that the limited amount

D. Wyble

of information he gave about the experimental procedures that he used was generally correct.

Q. Okay. Do you have any reason to doubt the readings he took?

A. I think his readings were correct for what they were; meaning, I don't know if he's doing things the same way that I would have done them.

And the other thing that is slightly missing is some of the metadata around the measurement procedure, because he didn't include that.

Q. Okay. Did you take any measurements of a saw blade for this case?

A. No. The reported data in here are just -- are just from the Apex saw blade measurements.

Q. Did you -- have you ever taken a spectrophotometer reading of a CMT blade?

A. I have.

Q. And is that anywhere in the report?

A. It's not.

D. Wyble
Q. How many times did you take those readings?
A. Just once.
Q. Do you recall what they were?
A. I recall that they aligned with Bublitz' numbers, and so that was why we moved ahead with the Bublitz numbers.
Q. Okay. Did you take any spectrophotometer readings of a Crescent saw blade?
A. I did.
Q. How many times did you take those readings?
A. It was one session.
Q. Okay.
A. Yeah.
Q. And are those numbers in your report?
A. They're not.
Q. Did they also line up with Bublitz' numbers?
A. They did.
Q. And so -- okay.
Did -- for this case, did you

D. Wyble

take any spectrophotometer readings of any other saw blades, other than the CMT and Crescent saw blades?

A. I did not.

Q. And in your review of Bublitz' testimony, did you notice any errors in how he refers to color?

A. Refers means in terms of what?

Q. Discusses color.

MR. COLLETTI: Object to the form.

A. If there are any errors, I would say they were just errors of omission.

Q. What do you mean by that?

A. I mean what I mentioned before about metadata surrounding the measurement procedures that he didn't specify.

Q. So that's information he didn't include?

A. That's an omission, yes.

Q. Okay. But in how he refers to color and how he discusses color, you're not aware of any errors?

D. Wyble

MR. COLLETTI: Object to the form.

A. In terms of his measurement, no.

Q. Okay. How about his language?

MR. COLLETTI: Are you referring to something specific, counsel? I'm not following.

What do you mean by his language? Anywhere he's ever discussed color?

MR. JOHNSON: Yeah.

I mean, there's lots of discussion here about his testimony and the colors he referred to, and how he described colors; and so I'm asking the witness if any of those -- if he noticed any errors in those discussions.

MR. COLLETTI: In reviewing the documents that he reviewed?

MR. JOHNSON: Right.

THE WITNESS: Okay.

A. He is confused about color

D. Wyble
tolerance as opposed to color perception.
Q. Okay. Anything else?
A. That was the main problem I had.
Q. Okay. And what about with Cunningham's testimony?
A. He had a lot of testimony. I would have to go back and look at that.
Q. Okay. But nothing that you can recall right now?
A. Nothing as glaring, no.
Q. Okay.
I want to move on to page 26 and 27, and, in particular, the -- the color wheel from paragraph 26.
A. Yes.
Q. So did you review a number of documents where this wheel was shown?
A. I did.
Q. Did you choose those documents or were they chosen for you?
A. I reviewed all of the documents that I was provided.
Q. Gotcha.

D. Wyble
Were any of the uses of the -- this wheel, or a similar wheel, public-facing?
A. I don't know.
Q. Okay.
A. I mean, this -- most of the materials were labeled words like "sensitive" and things. So my guess is no.
But I -- I can't say I really know the answer to that.
Q. Okay. But none that you recall that were used by Apex to talk to the public?
A. I don't recall anything like that, no.
Q. Okay. Are you aware if Professor Bleicher relied on this color wheel at all in his report?
A. I don't know.
Q. Okay. And I know you are a color scientist, but are there ever times when a color approximation is useful?
A. In what sense?
Q. Any sense.

D. Wyble

A. In any sense at all?
Q. Yeah.
A. Well, sure.
If I go back to the bars we looked at, those were useful approximations to teach someone, or show examples of how people might see colors differently; but these are an approximation.
So, yeah.
Q. So even if a -- like, the -- those color bars you mentioned, even if those graphics are not 100 percent precise, there's still some utility in them?
MR. COLLETTI: Object to the form.
A. Is there a utility -- and, again, back to what's the context of the question.
Is there utility from an industrial color tolerancing perspective? I would say that would be -- might be a problem. If there's utility from an educational perspective, yeah, we can easily do that with -- with examples and

D. Wyble
estimations.
Q. What about --
A. What's the word you used, approximations?
Q. Yeah.
A. Yeah.
Q. What about in communicating a concept?
MR. COLLETTI: Object to the form.
A. Communicating a concept.
You mean like with reference to a -- a wheel like this?
Q. Or a bar like you had in the earlier example.
A. I have to go back to the -- the context, you know. What kind of precision do you want with that answer? And if you want a precise answer, then --
Sorry. What's the question again?
Q. Are color approximations -- so, by definition not --
A. Color approximations --

D. Wyble
Q. -- precise --
A. Okay, yeah.
Q. -- sometimes useful for communicating an idea?
A. I think --
MR. COLLETTI: Object to the form.
A. So, again, back to context, right? It depends on the precision of the answer that you're hoping to get.
Q. So they could be useful, it just depends on the context?
A. Well, in my examples in here, for example, color names are useful because I may say, what color car did you buy? And I say, it's blue. That's all the information I need. And that is sufficient, and it's an approximation, and it's fine.
Q. And you're communicating an idea --
A. You're com --
Q. -- but you don't need anything more precise?

D. Wyble

A. Right. But if we're in an industrial color tolerancing world, an objective world, then you need to be more precise.

Q. Okay. I like the car example. That's a good one.

We talked a lot about the 3D space and kind of the color systems.

A. Um-hum.

Q. Is there ever a time when you might want to collapse that to a 2D image or graph?

A. Well, I did a number of times in here. Figures 9 through 12, those are all those collapses, that projection.

Q. But that is a projection of a -- a 3D space?

A. Correct.

Q. So what about a 2D space? Are there ever times when you might want to do a 2D color space?

A. If we're talking a color space, a useful color space is three-dimensional --

D. Wyble

Q. Right.

A. -- by definition.

Q. But then are there times when you might not need that precision, and, to communicate, you use a 2D color space?

A. No, I wouldn't do that.

Q. What about the color bars in your report?

A. Those are examples meant as a teaching experiment.

Q. Is that not a useful 2D color space?

A. To answer the simple question that I asked, yes.

Q. Okay. So sometimes, 2D color space can be useful as an approximation?

A. Within the context of a very limited usage.

Q. Okay. I want to move on to a section that says Roman numeral VI on page 29, the title "Accepted Descriptions of the Color Orange."

Do you see that?

A. Got it.

D. Wyble

Q. And the purpose here was to determine the extent that the word orange would be applied to colors; is that correct?

How would you characterize this section and the data in it?

A. In each case, we -- we -- I -- in each case, I used a set of data from -- in the case of A, a specific individual, and in the case of B and C, a -- a body of individuals, to accumulate a series of colors that either the individual or the body of individuals considered orange.

Q. So the chart is not showing whether a target color is orange, just whether the group of people would consider it orange?

MR. COLLETTI: Object to the form.

A. The charts, meaning these?

Q. Yeah.

A. These charts?

The charts are just data.

MR. COLLETTI: Just so the

D. Wyble

record is clear, we're talking about the charts on page 32?

THE WITNESS: We're looking at, yeah, Figure 9 in this case.

Q. Okay.

A. Can you ask the question again?

Q. Sure.

Actually, I'll take it back. We'll -- we'll get to that later.

A. Okay.

Q. Let's actually look at Figure 9, which I believe is also -- I forget which exhibit that was.

A. It might be 5 or 6.

MR. COLLETTI: I think it's 3.

THE WITNESS: 3? Yes, that's correct.

MR. JOHNSON: So we'll mark this Exhibit 5, which is Exhibit 3.

MR. COLLETTI: So Wyble 5 is Exhibit 3 to his expert report.

MR. JOHNSON: Correct.

(Exhibit 5, Wyble Exhibit 3, marked for identification.)

D. Wyble

Q. And so, Dr. Wyble, could you walk us through these?

A. So specifically for Figure 9, I would go through what in exhibit what?

We are calling this Exhibit 5?

MR. COLLETTI: Correct. It's Wyble --

A. Wyble Exhibit 3, today's Exhibit 5.

Q. Correct.

A. So I'm just -- I'm going to read, because this is exactly what it says.

So the four projections shown in Figure 9 -- this is page 1 through 4 of Wyble Figure 3 -- Wyble Exhibit 3 -- are along the B star axis in the top left -- oops, sorry that is -- okay, these got changed in the order. Okay.

Then I'm going to have to go to Figure 9 in the report, just so we're about the --

Q. Sure.

A. -- switch.

Q. Yes, please.

D. Wyble
A. So the top left is looking down the B star axis. Along the A star axis in the top right. Along the L star axis in the bottom left. And then an oblique 3D view in the bottom right.
Q. Okay. And is it fair to say that these are plotting the coordinates from the Apex measurements?
A. These are plotting the coordinates of the Apex measurements of the saw blades identified by Bublitz as orange.
Q. Okay. And I believe you said the blue circle is the CMT?
A. The blue circle is Apex -- oh, sorry, Apex measurement of CMT.
Yes, you're right.
Blue, CMT. Green is Apex. And that's throughout.
Q. Okay. And -- so I'm looking at -- I guess this is the -- the L star axis, the first page in your exhibit?
A. In the exhibit, yes.
Q. And what are the -- the points around the blue one?

D. Wyble

A. You mean what specifically saw -- what saw blades are those?

Q. Yeah.

A. I'd have to -- that would take some time to go back and kind of figure out from the data.

Q. Do you have that data?

A. Do I have that data?

Q. Because I'm just looking at seven plots that are fairly close to the CMT plot --

A. Um-hum.

Q. -- and I was asking which one those are?

A. Yeah, I don't know.

Q. Is there any way for you to find that out?

A. We could use the -- if we have the Bublitz data here?

Q. Um-hum.

A. I don't know if we do or not. But if we have the Bublitz data, then, yes, we could -- it would take some time, but we could do that.

D. Wyble

Q. And why would it take time?

A. Well, because I would be just making estimates looking at where these lie, and it would actually be difficult to be sure, because we're going to go back and look at these in three dimensions, remember; so there would be some --

Q. Sure.

A. -- some -- some possibility for error.

Q. Okay.

A. I mean, for example, from page 1 to 2 here, it looks visually like there's a similar set of seven crosses around the blue.

Q. Right.

A. But if you go to page 3, it gets very different. It's a different viewpoint.

Q. Um-hum.

A. Because we're projecting down along another axis now.

Q. Right.

A. And so that tells me that that

D. Wyble

mapping from this visual, where these are on the plot to the data might be -- it might be problematic to make a deterministic -- a deterministic analysis, I guess.

Q. Do you know what software you used to make these plots?

A. Metlab.

Q. Metlab?

A. Yes.

Q. Does Metlab -- are they labeled in that software?

A. Are they labeled? No. The plots are just the plots, which is what you see --

Q. Plots are just plots.

There's no source file that would contain a legend, for example, of what each point is?

A. No.

Q. And the fact that, like you mentioned, these seven are closer to the CMT, does that mean their delta E would be smaller?

D. Wyble
A. So, again, given that we have a three-dimensional space, it's pretty difficult to conclude that from just looking at these plots.
I would want to go back and actually look at the delta Es. If I was interested in delta Es, I wouldn't use these plots.
Q. And why not?
A. Well, because -- because they are projections. Meaning, for example, if you go to page 1 of this exhibit where it's A star and B star, right?
Q. Um-hum.
A. I'm looking down the L star axis, which is the lightness, the white to black --
Q. Um-hum.
A. -- and so, therefore, if we take, for example, the two crosses that are above and to the right of the blue dot.
Q. This is on page 1 of your exhibit?
A. I'm on page 1 of the -- my

D. Wyble
Wyble Exhibit 3.
Q. I see it, yes.
The 2, top right?
A. You guys invented this stuff, not me.
Q. Next time, we'll use letters.
MR. COLLETTI: Howard separated the exhibits; that's the problem here.
THE WITNESS: Yes.
MR. JOHNSON: As they were sent to us. The pdfs were sent separately.
A. So -- so the point is, if we just consider those two. And they look visually, in this projection, pretty close together, right? We see that.
But there's nothing that says they aren't widely separated along that other axis, that it is not shown in this plot, necessarily because it's a piece of paper; it's a two-dimensional piece of paper.
Q. Sure.

D. Wyble
A. From their own marketing materials.
Q. That makes sense. I get it now.
And then so when you do the combined, you put in both?
A. I put both.
Q. I see. Okay.
Are you surprised that the online and physical measurements are different?
A. Not terribly.
MR. COLLETTI: I was just going to say, over an hour and a half. I know you're -- it seems like you're finishing up.
When you get to a good breaking point, just we should take a break.
MR. JOHNSON: Sure.
I think we're almost done with these charts.
Q. So just to confirm.
So the ovals on this combined chart, the last one, represent a 90 percent

D. Wyble

confidence interval for the combined data?
A. Yes.
Q. And this confidence interval is from these three sources?
A. Correct.
Q. I guess, what would be considered an orange color, or what those sources consider an orange color?
A. Yes.
Q. Could this be used to determine what is -- I know you're going to be mad -- but the pure orange, the true orange?
MR. COLLETTI: Let me be mad first. I object to the form of the question.
Go ahead.
A. I don't know how to do that.
Q. So this chart can't be used for that?
A. This chart answers a very specific question of what either an individual or a body of individuals considers orange.
Q. Okay. And so whether or not a

D. Wyble

point is closer to the center of this plot has no meaning as to whether or not that's a more orange than another color?

A. I would agree with that, yes.

MR. JOHNSON: Let's take a break.

THE VIDEOGRAPHER: Off the record, 3:38 p.m., February 5, 2025.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: On the record, 3:53 p.m., February 5, 2025.

BY MR. JOHNSON:

Q. Okay, Dr. Wyble, I just have a few more questions about the chart we were previously discussing. It shouldn't be too many.

First, I want to make sure we confirm that you did not perform a similar analysis for the word red, correct?

A. Correct.

Q. Could you have performed a similar analysis for the word red, using the similar methodology?

D. Wyble

Q. Right.

A. And that's the definition of color difference.

Q. Okay. But you see how somebody could subjectively -- we talked about the subjective views, people have different views on how close colors are.

So somebody could have a different view of a range in colors to be more similar versus others?

A. A person is free, subjectively, to do whatever they want, I guess, in that case. And if that's what this is, then I'm not really sure what the value is, if it's just Bleicher's subjective opinion of what colors are closer or not closer to CMT versus Crescent.

And, plus, it's not really relevant to the entire discussion. In fact, in my report is, are these orange?

Q. Well, that's not the question he's asking.

A. What question is he asking?

Q. I mean, he states in the

D. Wyble

report, right, that there are a number of third-party saw blades that have colors closer in connection to the CMT orange --

A. Okay.

Q. -- than rawhide.

A. Okay. I don't think we're in any disagreement there.

Q. Okay. I want to move on to paragraph 34. And here you state: "The differing opinions of these three individuals demonstrates the unreliability of the subjective approach that they have taken."

A. Yes.

Q. Why does that demonstrate the unreliability?

A. When we're relying on a single individual, like we are with a lot of Bleicher's -- Bleicher's entire testimony, his entire book is based on him, Steven Bleicher; and if we are to weigh that so heavily because of some background of his, then I think we have to acknowledge that it's not going to be the same as what other

CERTIFICATE

STATE OF NEW YORK )
: ss
COUNTY OF BRONX )

I, ROBERTA CAIOLA, a Certified Shorthand Reporter, do hereby certify:

That DAVID R. WYBLE, Ph.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand on February 6, 2025.

__________________________
ROBERTA CAIOLA