UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:24-CV-00137-TMR-DCK

| | |
|---|---|
| CMT USA, INC. and CMT UTENSILI S.p.A., <br><br> Plaintiffs, <br><br> v. <br><br> APEX TOOL GROUP LLC and APEX BRANDS, INC. <br><br> Defendants. | **CMT'S MEMORANDUM IN OPPOSITION TO APEX'S MOTION FOR LEAVE TO DESIGNATE A SUBSTITUTE EXPERT** |

I.  **Introduction**

During the parties' discussion of Apex's proposed substitute expert, CMT requested reasonable assurances, consistent with well-established case law, that any new expert would have qualifications comparable to Mr. Bleicher and be limited to offering the same opinions based on the same subject matter and data. Apex refused. Those refusals strongly indicate that Apex's motion is doubling as an attempt to find a more-qualified color expert who will bolster Apex's position. As detailed in CMT's pending *Daubert* motion, Mr. Bleicher lacked the education, training, and experience to offer opinions on color science, consumer research, and trademarks. A new expert potentially having better qualifications, different and/or broader opinions, and access to materials beyond those relied on by Mr. Bleicher would give Apex a do-over. That is improper.

Mr. Bleicher's passing, while tragic, does not reset the rules of litigation or permit Apex a do-over when the original expert was unqualified and is now unavailable. To the extent that Mr. Bleicher is not excluded under *Daubert*, any substitute must have comparable qualifications (an artist, not a scientist), who offers the same opinions based on the same materials.

## II. Argument

### A. Excluding Mr. Bleicher Under *Daubert* Would Render This Motion Moot

CMT has moved to exclude all of Mr. Bleicher's opinions and testimony under *Daubert*. Dkts. 216, 217. Briefing on that motion will be completed on the same day as briefing for this motion. As a matter of judicial efficiency and fairness, CMT respectfully submits that the Court should resolve the pending *Daubert* motion of Mr. Bleicher before turning to Apex's motion to substitute him. If the Court grants CMT's motion—and there are strong reasons it should—Apex's motion to substitute would be moot.

Courts have rejected attempts to substitute when the original expert's opinions would have been excluded. In *McDonald v. Wexford Health Sources, Inc.*, the court first excluded defendants' deceased expert under *Daubert* and then denied defendants' request to designate a new expert. 2016 U.S. Dist. LEXIS 47286, at *23-25 (N.D. Ill. 2016). The court reasoned that "[a]llowing the defendants to profit from the unfortunate happenstance of [the expert's] death by retaining a new expert would be an improper boon" as they would have no expert at all if the deceased expert had lived. *Id.* at *24. The deceased expert's "death does not clear the slate and allow the defendants to find a better expert who can overcome the deficiencies outlined in [the plaintiff's] *Daubert* motion." *Id*. The same logic applies here. Apex should not be allowed to substitute an expert to cure the fatal flaws in Mr. Bleicher's opinions.

### B. Mr. Bleicher's Opinions Are Immaterial and Ultimately Unhelpful

Apex perfunctorily applies the *Southern State* factors with little regard for the actual facts of this case. The case law on substitution of a deceased expert is limited, but what is clear is that substitution depends on the context of each case. Here, the issue is not whether substitution is theoretically permitted, but whether it should be allowed under the specific circumstances of this case.

Mr. Bleicher's opinions are immaterial to Apex's defenses and, in any event, are ultimately unhelpful. Apex argues that "color testimony is important to the case" and cites nineteen pages of its opening-summary brief. Dkt. 215 at 9 (citing Dkt. 164 at 9-27). But Apex's reliance on Mr. Bleicher is virtually nonexistent. The only reference to his testimony is to support this one statement: "Both parties' color experts agreed that [CMT's orange and Apex's orange] are distinguishable by normal humans." Dkt. 164 at 20. In other words, Apex cites Mr. Bleicher only for an undisputed fact: the shades of orange used by the parties on their saw blades are not identical. That is the extent of Apex's reliance on Mr. Bleicher in its affirmative summary judgment motion. His testimony is not cited or relied upon in any other substantive section, including those concerning Apex's core defenses of functionality, genericness, and abandonment, should any of those defenses survive summary judgment. *See* Dkt. 218-18 (Bleicher Tr.) at 19:9-20:4. Apex likewise only once references Mr. Bleicher's opinions in its other summary-judgment briefs (Dkt. 179 at 11), and the testimony it cites is Mr. Bleicher's erroneous analysis of Dr. Wyble's work (*see* Dkt. 217 at 15 (detailing Mr. Bleicher's misinterpretation of Dr. Wyble's work, attributable to his lack of expertise in color science)).

Moreover, the opinions he did offer were subjective and "would not help a juror, as a juror is just as capable of comparing the shades of two colors side by side." Dkt. 218-19 (*Daubert* order in *SafeRack, LLC v. Bullard Co.*, Case No. 2:17-cv-1613 (D.S.C. 2018), excluding a designer as a color expert because they lacked scientific education and training) at 5. And finally, his opinions were based on the wrong color samples (i.e., not the colors either party uses on their saw blades) and hence are unhelpful. *See* Dkt. 217 at 6-9.

### C. Apex is Seeking an Unfair Strategic Advantage, Not a True Substitution

Notwithstanding CMT's pending *Daubert* motion and the irrelevance of Mr. Bleicher's testimony, CMT would have consented to substitution if Apex had offered reasonable assurances

that it was not attempting to gain a strategic advantage. *See* Dkt. 215-2 (email correspondence) at 4 ("[CMT] would not oppose Apex substituting a new color expert for trial if that expert is a true one-for-one replacement for Professor Bleicher."). But Apex has refused to limit its substitute to one with similar qualifications as Mr. Bleicher or to keep the substitute to Mr. Bleicher's opinions and conclusions. *See* Dkt. 215-2 at 3-4, 6; Dkt. 215 at 7. Without such assurances, it becomes clear that Apex is seeking a do-over, which the Rules do not allow and this Court should not either.

### i. Apex's Substitute Expert Must Be an Artist, Like Mr. Bleicher, Not a Color Scientist

Apex seeks to replace Mr. Bleicher with an unnamed "color expert," but fails to acknowledge that Mr. Bleicher was not a color scientist. He was a painter, a sculptor, and an art teacher. His expertise was in using color, focusing on design, aesthetics, and evoking specific moods or responses in viewers through color. *See* Dkt. 219-1 (Dr. Wyble Rebuttal Report) ¶ 6. For instance, an artist knows how to combine or manipulate paint colors to produce a certain hue or a desired look or emotional effect. *See* Dkt. 219-1 ¶ 6. As an artist, Mr. Bleicher's views on color were ***subjective***, based on his own personal perceptions. Dkt. 218-18 at 106:6-8 (confirming that "an artist evaluating art is giving a subjection opinion"); Dkt. 219-1 ¶ 6. That contrasts sharply with how other kinds of colors experts approach color. As discussed in CMT's *Daubert* motion, there are critical differences between a color scientist and an artist. Dkt. 217 at 5-6.

A color scientist, like CMT's color expert Dr. Wyble, analyzes color ***objectively***, based on measurable properties such as wavelengths of reflected light and $\Delta E$ values (pronounced "delta E" values), often using instruments like spectrophotometers to determine how color-normal persons will perceive different colors. *See e.g.*, Dkt. 219-1 ¶¶ 7-8, 20-27. Mr. Bleicher and Dr. Wyble agree about these distinctions. Mr. Bleicher conceded that "color scientists are relying much more

on the instrumentation in terms of how they look at color," whereas an "artist evaluating [color] is giving a subjective opinion." Dkt. 218-18 at 105:6-106:8; *see also* Dkt. 219-1 ¶¶ 6-10.

The distinction is readily apparent in the differing education and training of artists and color scientists. Mr. Bleicher, who held a Masters in Fine Arts (MFA), candidly admitted that an MFA has "radically different coursework" from a masters program in color science, does not "include training using scientific instruments," does not "include methods for color measurement such as spectrophotometry," and did not "prepare [him] to evaluate color scientifically as opposed to artistically." Dkt. 218-18 at 104:1-105:14. In fact, Mr. Bleicher did not hold any scientific degree that would help him render opinions on the human perception of color. *See* Dkt. 218-18 at 102:14-103:8. He readily admitted that he had no training or experience in using spectrophotometers or interpreting spectrophotometry data, let alone expertise (Dkt. 218-18 at 23:15-25:3, 81:18-82:7, 100:1-12), even acknowledging that spectrophotometry "really comes out of color science and how color scientists look at color versus how artists and designers look at color. So it's a very kind of different way of looking at color than *we* might use in art or design" (Dkt 218-18 at 25:23-26:8) (emphasis added).

Courts consistently hold that a substitute expert must be a "true substitute," one having qualifications and expertise comparable to the original expert. *See Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, 2010 U.S. Dist. LEXIS 103744, at *6,11 (N.D. Ind. 2010) (requiring the substitute to have "a similar area of expertise"); *see also J.F. Abbott Lab'ys, Inc.*, 2017 U.S. Dist. LEXIS 37197, at *9 (S.D. Ill. 2017); *Ind. Ins. Co. v. Valmont Elec., Inc.*, 2003 U.S. Dist. LEXIS 17176, at *4, 15-16 (S.D. Ind. 2003); *see generally Haney v. Kavoukjian*, 2022 WL 1439041, at *4 (D.S.C. 2022) (allowing substitution of a deceased expert who was an attorney and professor of legal ethics, for a new expert, similarly an attorney and professor of legal ethics). A

substitution is only intended to put the moving party "in as good a position" as they would have held with the original expert; "it [is] not intended to allow the [moving party] to designate a superior [replacement]." *Adams v. Cooper Indus., Inc.*, 2007 U.S. Dist. LEXIS 99057, at *8 (E.D. Ky. 2007) (emphasis added). And where a party seeks "not a true substitute for [the incapacitated expert], but a better one," the court must deny substitution. *See Fid. Nat'l Fin., Inc. v. Nat'l Union Fire Ins. Co.*, 308 F.R.D. 649, 653-54 (S.D. Cal. 2015); *see also McDonald*, 2016 U.S. Dist. LEXIS 47286, at *23-25.

Apex states that its proposed substitute "will be a color expert," but Apex will not "make other guarantees regarding" their qualifications.[1] Dkt. 215-2 at 6. Apex's refusal to limit its search to an expert with Mr. Bleicher's qualifications—an artist, not a scientist—indicates it is seeking a better expert. Apex has indicated the new expert's testimony would address "the results of the spectrophotometer readings that have been done on CMT Saw Blades, Crescent Saw Blades, and Third Party Saw Blades" and "the Wyble Report's use of the raw spectrophotometry data to describe the various colors, without providing a visual reference" (Dkt. 215-2 at 3-4 (cleaned up))—two topics that Mr. Bleicher was unequivocally unqualified to opine on. Mr. Bleicher considered himself to be an "artist and designer," and most detrimentally, conceded that he was not a color scientist. Dkt. 218-18 at 26:14-19. Accordingly, Apex's substitute should be limited to the qualifications, skill set, and expertise of an artist. Allowing Apex to upgrade to a "better expert," especially one that brings new scientific training or methodologies, would be contrary to precedent and give Apex an unfair advantage. Courts have rejected such tactics.

---

[1] Apex's claim that there are "relatively few color experts" (Dkt. 215-2 at 6) ignores that there are hundreds of MFA programs in the U.S. (*see, e.g.*, U.S. NEWS & WORLD REPORT, https://www.usnews.com/best-graduate-schools/top-fine-arts-schools/fine-arts-rankings (listing 226 "Best Art Schools" having MFA programs)), who undoubtedly have similarly qualified art professors.

Finally, Apex's failure to identity its proposed expert further prejudices CMT because neither CMT nor the Court can evaluate whether the proposed substitute satisfies the requirements for substitution.

### ii. Apex's Substitute Expert Must Offer the Same Opinions as Mr. Bleicher

Apex refuses to limit the substitute expert to the opinions and conclusions offered by Mr. Bleicher. But this is required under the case law Apex relies on, which, even according to Apex, involves "circumstances substantially similar" to the present case. Dkt. 215 at 5 (citing *Johnson v. Air & Liquid Sys., Corp.*, 2020 WL 13605308, at *2 (E.D. Va. 2020)). In *Johnson*, the court only allowed substitution "because the expert can ***only provide the same opinions*** as were proffered by" the deceased expert. 2020 WL 13605308, at *2 (emphasis added). Apex has made no such guarantee and has in fact, indicated that the substitute expert is likely to provide different opinions than those provided by Mr. Bleicher. *See* Dkt. 215-2 at 6 ("We do not believe it is proper to provide any further guarantees as to the new expert's opinions, as it's important that the report be fully supported by the expert's views and experience."); *see also* Dkt. 215-2 at 3 ("[I]ndividuals may approach the subject of colors slightly differently . . . We cannot agree to put words in the mouth of any potential substituted expert."). Apex has also refused to limit the materials that its substitute expert will rely on to those used by Mr. Bleicher, who relied on only a handful of exhibits, including three of his own creation (Dkt. 218-14 (Bleicher Op. Report) at 4), which were based on and featured the wrong colors (Dkt. 217 at 6-9). Allowing a substitute expert to rely on broader or different evidence, or to issue different opinions, is not substitution, it is an impermissible do-over. There is a significant difference between an expert providing "opinions on the same limited number of topics" as Apex is proposing (Dkt. 215 at 7) and an expert providing the same opinions based on the same materials as is required by law.

Courts across the country "routinely require[]" that a substitute expert be strictly limited to the same subject matter, data, and analysis disclosed in the original report. *Medplace, Inc. v. Biothera, Inc.*, 2014 U.S. Dist. LEXIS 34495, at *12 (S.D. Ohio 2014); *see also Park v. Cas Enters., Inc.*, 2009 U.S. Dist. LEXIS 108160, at *11 (S.D. Cal. 2009) (requiring the substitute to "adopt the initial and rebuttal expert reports of" the incapacitated expert "in their entirety" and limiting "his opinions and theories and the bases for those opinions and theories . . . to those expressed in" the incapacitated expert's reports); *Shipp v. Arnold*, 2019 U.S. Dist. LEXIS 144977, at *3 (W.D. Ark. Aug. 27, 2019) (requiring "no meaningful change" in the subject matter, theories, and opinions expressed by the substitute expert); *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 21 (D.P.R. 2009); *Smith v. Tahsin Indus. Corp. U.S.A.*, 2025 U.S. Dist. LEXIS 37051, at *9 (N.D. Okla. Mar. 3, 2025).

The purpose of allowing substitution "is to put the movant in the ***same position*** it would have been in but for the need to change experts; it is ***not*** an opportunity to designate a better expert who holds differing or more advantageous opinions than the first expert." *Shipp*, 2019 U.S. Dist. LEXIS 144977, at *7-8 (emphasis added); *see also Kaepplinger v. Michelotti*, 2021 U.S. Dist. LEXIS 118883, at *23 (N.D. Ill. 2021) ("[T]he Court's ruling that substitution of [new expert] is appropriate . . . should not be taken as a second bite of the apple."); *Dunkin' Donuts Inc. v. N.A.S.T.*, 2005 U.S. Dist. LEXIS 16703, at *6-7 (N.D. Ill. 2005) (reasoning that a substitute expert must testify in "strict conformity" with the original expert).

*Fidelity National* is particularly instructive. There, the court had already significantly limited the scope of defendant's expert's opinions. *Fid. Nat'l*, 308 F.R.D. at 651. When the defendant's expert subsequently became medically incapacitated, the plaintiff agreed to allow a substitute, but limited to the incapacitated expert's "remaining opinions and conclusions" (that

were not excluded on *Daubert*). *Id*. The Court found that to be a "reasonable compromise." *Id*. The court found the defendant's refusal of that limitation to (i) belie the defendant's argument that it was "not seek[ing] a better expert, but simply an equal substitute for" its incapacitated expert, and (ii) "suggest that [defendant] may in fact be hoping to strengthen its trial position with a new and better expert, perhaps one whose opinion is shaped by the knowledge of the parties' arguments and Court rulings to date, and who is not subject to the limitations imposed upon" defendant's incapacitated expert. *Id.* at 653. The court refused to give defendant "a windfall advantage by substituting a new and better expert which would make irrelevant all the work done by [plaintiff] to date to defend against the [incapacitated expert's] original opinions." *Id.* at 655.

CMT offered Apex the same compromise as the plaintiff in *Fidelity National*. Dkt. 215-2 at 4. Apex similarly refused to accept it and yet still claims that it merely wishes "to maintain the status quo." Dkt. 215 at 7. This inconsistency, coupled with Apex's refusal to limit the new expert's testimony and material relied upon, confirms what is really happening: Apex intends to improperly capitalize on Mr. Bleicher's unfortunate passing by substituting his unsupported, unqualified, and irrelevant opinions with different opinions that erase the work CMT has done to challenge Mr. Bleicher's flawed opinions.

      **D.**      **Apex's Proposed Substitution Timeline Is For Purposes of Delay**

Apex has known of Mr. Bleicher's passing for at least a month and will have had almost two months by the time this motion is fully briefed, yet Apex asks for another 14 days just to find a new expert, followed by another 28-day period to prepare a short report on limited materials for which there already exists a template (i.e., Mr. Bleicher's opening report). That timeline is excessive and reflects a transparent effort to further delay these proceedings, especially in light of Apex's continued willful infringement of CMT's Orange Mark. *See* Dkt. 159 (CMT's summary judgment brief) at 8, 10. Apex should have identified an expert before filing this motion and

should be looking while this motion is pending.

**III. Conclusion**

For the foregoing reasons, CMT respectfully requests that the Court first rule on CMT's *Daubert* motion of Mr. Bleicher before deciding Apex's motion to substitute him. If the *Daubert* motion is denied and Apex is permitted to substitute a new expert, CMT respectfully requests that the Court limit the substitute to the same qualifications, opinions, data, and materials as Mr. Bleicher.

Dated: June 13, 2025

Respectfully submitted,

*/s/ Robert E. Colletti*
Edgar H. Haug (Admitted *pro hac vice*)
Robert E. Colletti (Admitted *pro hac vice*)
Mark Basanta (Admitted *pro hac vice*)
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, NY 10151
(212) 588-0800
ehaug@haugpartners.com
rcolletti@haugpartners.com
mbasanta@haugpartners.com

Ward Davis (NC Bar ID 27546)
Joshua B. Durham (NC Bar ID 25414)
**BELL, DAVIS & PITT**
227 W. Trade Street, Suite 1800
Charlotte, NC 28202
(704) 227-0400
ward.davis@belldavispitt.com
jdurham@belldavispitt.com

*Attorneys for Plaintiffs*
*CMT USA, Inc. and CMT Utensili S.p.A.*

## CERTIFICATE OF USE OF ARTIFICIAL INTELLIGENCE

Pursuant to this Court's order of June 13, 2024 regarding the use of artificial intelligence in court filings, Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A., through their undersigned counsel, hereby certify:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Signed this 13th of June, 2025 in New York, NY.

*/s/ Robert E. Colletti*
Robert E. Colletti (Admitted *pro hac vice*)
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, NY 10151
(212) 588-0800
rcolletti@haugpartners.com

*Attorney for Plaintiffs CMT USA, Inc.*
*and CMT Utensili S.p.A.*

## CERTIFICATE OF SERVICE

      I hereby certify that on June 13, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System. Service of same on any counsel of record will be accomplished through the Court's electronic filing system in accordance with Federal Rule of Civil Procedure 5(b)(2)(E).

                                              */s/ Robert E. Colletti*
                                              Robert E. Colletti