CMT USA, Inc. and CMT Utensili S.p.A.,

    Plaintiffs,

v.

Apex Tool Group LLC and Apex Brands, Inc.,

    Defendants.

**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR LEAVE TO DESIGNATE A SUBSTITUTE EXPERT**

## I. INTRODUCTION

Defendants Apex Tool Group LLC and Apex Brands, Inc.'s ("Apex") are entitled under Fourth Circuit law to designate a substitute color expert, and that expert should be permitted to issue a new expert report limited to the topics within the report of Apex's previous color expert. This is clear not only from the Memorandum submitted by Apex (ECF No. 215, the "Memorandum"), but also by the brief submitted by Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A. ("CMT") in opposition to the Memorandum (ECF No. 242, the "Opposition" or "Opp."). The Opposition not only avoids all analysis of the relevant legal standard and its factors, but also relies on case law that when properly reviewed actually supports Apex's position, as fully explained below.

CMT's entire Opposition appears to be premised on the belief that Apex was unhappy with Professor Bleicher's performance as an expert. But that is not the case. Professor Bleicher's experience teaching color, writing about color, and explaining color in previous litigation made him an ideal expert in explaining the differences and similarities between the relevant colors in this case, and it is only due to his death that Apex seeks to replace him. However, because he died and Apex was intended to rely upon his important testimony at trial, Apex should be granted leave to designate a substitute expert who will issue their own report limited to the topics and subjects

of that original report. This would not give Apex any advantage over their position had Professor Bleicher not died, but instead merely allow Apex to have a color expert who can testify based on their own knowledge, analysis and options, on the same specific and limited topics on which Professor Bleicher was prepared to testify.

## II. BACKGROUND

The factual background for Apex's Motion (ECF No. 214, the "Motion") was detailed in Apex's Memorandum. Memorandum at 2-4. But to briefly recap, this case involves alleged trademark rights in a trade dress that consists of the color orange as applied to circular saw blades which were allegedly infringed by Apex's use of a white, black, and Rawhide color combination on saw blades.

After the death of Apex's timely-disclosed color expert, Professor Bleicher, Apex attempted to get CMT's consent for the substitution of a new expert, and agreed that the substituted expert would be limited to the five detailed topics within Professor Bleicher's two reports:

1. The CMT Orange color, the Rawhide color, and the colors of numerous third-party competitor saw blades could all be described as shades of orange;

2. Numerous third-party saw blades use colors of orange that are closer to CMT Orange than Rawhide is to CMT Orange;

3. The difference between CMT Orange and Rawhide is visually distinct enough that ordinary observers are likely to easily distinguish between the two colors;

4. CMT's color expert's report incorrectly implied implies that CMT Orange and Rawhide are the same or visually similar colors merely because they both fall within the orange spectrum; and

5. CMT's color expert's report is unhelpful because it fails to include a visual reference to the colors referenced within it.

Memorandum at 3.

Since Apex filed the Motion, there have been a few relevant factual updates. First, the Court ordered this action "stayed pending the resolution of parties' respective motions for summary judgment," and that a "new trial date [would be set] as necessary." ECF No. 228 at 1.

And second, CMT filed a motion to exclude Professor Bleicher's testimony. Dkt. Nos. 216, 217. Neither of those factual updates impact the analysis of the Memorandum – namely, that under the law of the Fourth Circuit, Apex should be permitted to designate a new color expert due to the death of its previously-designated color expert.

### III. LEGAL STANDARD

Apex correctly set out in the Memorandum the five-factor test used by the Fourth Circuit to determine whether a late disclosure, such as a motion to substitute an alternative expert upon an expert's death, is permissible under Rule 37. *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003); Memorandum at 4. It's important to note that not only did the Opposition not refute this test, but the Opposition also did not even <u>address</u> this test and its factors.

Instead of analyzing the correct factors, however, the Opposition attempts to create a distinction between "whether substitution is theoretically permitted" and "whether it should be allowed" in this matter, but does not meaningfully engage with this contrived discrepancy and provides no case law in support. Opp. at 2. And the cases CMT cites in *its own opposition* apply the applicable districts' variation of the *Southern States* test. *See, e.g., Kaepplinger v. Michelotti*, 2021 WL 2633312, at **4-8 (N.D. Ill. June 25, 2021); *J.F. v. Abbott Lab'ys, Inc.*, 2017 WL 992781, at *2 (S.D. Ill. Mar. 15, 2017); *Medplace, Inc. v. Biothera, Inc.*, 2014 WL 1045960, at *2 (S.D. Ohio Mar. 17, 2014); *Park v. CAS Enters., Inc.*, 2009 WL 4057888, at *3 (S.D. Cal. Nov. 19, 2009). Therefore, these cases support Apex's position that the Court should use the *Southern States* factors to determine if Apex should be granted leave to designate a substitute expert.

To reiterate this standard, the factors are: "(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to

name the witness before trial; and (5) the importance of the testimony." *Southern States* at 597. Importantly, "[d]eath of an expert witness falls squarely within the category of circumstances that substantially justifies replacement, where the only question regarding justification is whether the party waited too long to notify the court of the need for a new expert." *Haney v. Kavoukjian*, 2022 WL 1439041, at *4 (D.S.C. May 5, 2022).

IV. **ARGUMENT**

    **A. Nothing within the Opposition contradicts that under the *Southern States* factors, Apex should be granted leave to designate a substitute color expert.**

Not only did CMT not address the *Southern States* test or the factors in the Opposition, but none of its arguments contradict the analysis in the Memorandum showing that the *Southern States* factors support giving Apex leave to designate a substitute color expert.

    1. <u>Both parties were surprised to hear about Professor Bleicher's passing and Apex quickly passed the information to opposing counsel.</u>

As explained in the Memorandum, the first factor favors granting leave to Apex to designate a substitute color expert because the surprise was equal to both parties and Apex quickly alerted CMT to Professor Bleicher's death. Memorandum at 5. CMT does not dispute this in the Opposition. Therefore, this factor weighs in favor of granting leave.

    2. <u>Without a set trial date, and with discovery for the substitute expert, both parties will have sufficient time and opportunity to cure any surprise that resulted from Profess Bleicher's unexpected passing.</u>

The second factor favors granting leave to Apex to designate a substitute color expert because any surprise to CMT as a result of Professor Bleicher's death can be cured through standard expert discovery and depositions for the substitute color expert. Memorandum at 6-7. Since the Motion was filed, the Court stayed the trial pending a ruling on the parties' cross-motions for summary judgement. ECF No. 228. With no set trial date this factor favors grating leave <u>even more</u>, because there is plenty of time for expert discovery, motion practice, and any other steps

required in order to cure CMT's surprise from Professor Bleicher's death, the designation of a substitute expert, and the substitute expert's report.

CMT does not allege in the Opposition that any of the above is incorrect, or that CMT would be unable to cure its surprise. Its only argument related to this factor is a claim that Apex could get "an unfair advantage" if the substitute expert has "new scientific training or methodologies." (Opp. At 6.) But this is not a valid reason under *Southern States* for claiming that the second factor weighs against granting leave. Not only has Apex agreed that any substitute expert will be a color expert, just as Professor Bleicher was, and the report will be restricted to the same five topics that were in Professor Bleicher's reports, but without a trial date there is no surprise that cannot be cured through standard discovery and motion practice. Therefore, this factor weighs in favor of granting leave.

> 3. <u>Designating a substitute expert would not disrupt trial because there is no trial date and proceedings in this matter have been stayed.</u>

As explained in the Memorandum, the third factor favors granting leave to Apex to designate a substitute expert because at the time the Motion was filed the trial was far enough in the future that it would not need to be disrupted for the designation and related discovery of a substitute color expert. Memorandum at 7-8. Because the Court has since stayed the trial, this factor weighs even more in favor of granting leave. CMT does not dispute this in the Opposition, or make any claim that granting leave would disrupt the trial. Therefore, this factor weighs in favor of granting leave.

> 4. <u>There was no failure on the part of Apex because Professor Bleicher had been timely designated and the need for a substitute expert only arose due to his death.</u>

The fourth factor weighs in favor of granting leave because the need for the substitute expert is not due to any failure from Apex, but only due to the unexpected death of its initial color expert. Professor Bleicher's initial report, rebuttal report, and deposition testimony were timely.

CMT did not dispute any of these facts in the Opposition, and made no claim that Apex's need to designate a substitute expert was due to any failure on Apex's part. Therefore, this factor weighs in favor of granting leave.

### 5. It is crucial for Apex to have a color expert.

The fifth factor weighs in favor of granting leave because a color expert's testimony, which was to be provided by Professor Bleicher at trial, is essential for Apex's ability to defend against CMT's claims. Important aspects of the claims in this case include the differences between the colors used in CMT's trade dress and Apex's trade dress, as well as comparisons between the colors of the many third parties that use orange on their saw blade trade dresses. Apex was counting on Professor Bleicher to provide this testimony and explain these issues to the jury, as well as to rebut misleading and incorrect testimony from CMT's own color expert. Apex is unable to replace that testimony with any other witness who is not a color expert. The fact that CMT engaged its own color expert, and has emphasized the importance of color in its briefs (*e.g.*, ECF No. 159 at 9-14), further shows the importance of this testimony.

CMT's only arguments against the importance of Apex's color expert are that Professor Bleicher was only cited a few times in Apex's summary judgment briefs, and that his opinions were "subjective." Oppo. at 3. Neither of these take away from the importance of the testimony. First, the arguments within the summary judgment briefs do not contain all the arguments Apex plans to use at trial. Second, even a short reference or argument can be important or crucial to a defense. And third, Professor Bleicher's opinions and testimony were not subjective and instead based on his decades of experience with color.

Weighing these factors shows that all five support granting Apex leave to designate a substitute color expert and provide a schedule the expert to issue a report and for the parties to conduct the relevant discovery surrounding the substitute expert's opinions.

### B. CMT's since-filed *Daubert* motion against Professor Bleicher's testimony does not affect Apex's motion for leave to designate a substitute expert.

After Apex filed its motion for leave to designate a substitute expert (and nearly four weeks after Apex informed CMT about Professor Bleicher's death), CMT filed a motion to exclude Professor Bleicher's testimony. ECF No. 216. Prior to Apex alerting CMT's counsel of Professor Bleicher's death, CMT had never mentioned filing a *Daubert* motion against Professor Bleicher. **Exhibit A,** Declaration of Aaron D. Johnson ("Johnson Decl.") at ¶ 3. In the Opposition, CMT claims that this post-filed motion, if granted, would "moot" Apex's designation of a substitute expert, and encourages the court to rule on its *Daubert* motion first. Opp. at 2. But this is incorrect.

First, this argument is only relevant if CMT's *Daubert* motion against Professor Bleicher is granted. Apex strongly believes that Professor Bleicher's experience, report, and testimony show that he was extremely well-qualified to opine on the color issues in this case, and that his testimony should not be excluded, as set forth fully in Apex's brief opposing the *Daubert* motion. ECF No. 241.

Second, even if the Court were to grant CMT's *Daubert* motion against Professor Bleicher, under Fourth Circuit law that doesn't mean Apex should not be granted leave to designate a substitute expert. CMT cites only a single case from outside the circuit in support of that position. And that case is distinguishable. In that case, the initial expert report did "not include most of [the relevant] information," did "not address *Daubert's* most basic requirements," and did not even include background information on the "alleged Crestor study" which was heavily relied upon by the expert who had died. *McDonald v. Wexford Health Sources, Inc.*, 2016 WL 1383191, at **6, 8 (N.D. Ill. Apr. 7, 2016). As a result, the report at issue was so lacking that any new expert would need to include a significant amount of new information and there was "no genuine question as to admissibility under Rule 702." *Id*. at *7. This is not the case here. Here, Apex has agreed that the

substitute expert would only include in their report the same five topics that were covered by Professor Bleicher's Reports. Memorandum at 3. And CMT's *Daubert* motion against Professor Bleicher doesn't allege that his report was missing any crucial information or study—instead it claims that Professor Bleicher is not qualified (despite having taught about color and written books about color for nearly 30 years) and disputes the methods Professor Bleicher chose for presenting the visual differences and similarities between the relevant colors. ECF No. 217. None of these allegations, even if true, come close to the significant deficiencies of the report in *McDonald.*

A number of other courts have permitted designation of a substitute expert, even when a *Daubert* motion has been filed against the original expert. *See, e.g., generally, Smith v. Tahsin Indus. Corp. U.S.A.*, 2025 WL 673646 (N.D. Okla. Mar. 3, 2025) (mooting a pending *Daubert* motion against a deceased expert, granting the substitution request and the drafting of a new expert report, and then reconsidering the *Daubert* motion against the newly substituted expert and his new report); *Hejduk v. Ethicon Inc.*, 2020 WL 6870861, at *2 (M.D. Fla. Apr. 7, 2020) (granting a request to substitute expert even though a *Daubert* motion against original expert had been fully briefed, because there was time for the parties to "depose the newly designated expert, file a Daubert motion if warranted, issue a new rebuttal report by Defendants' case-specific expert, and take a supplemental deposition").

Therefore, the *Daubert* motion CMT filed after Apex filed this Motion should not affect the court's analysis of its granting of this Motion.

### C. If he had not died, Professor Bleicher would have been an excellent color expert witness.

CMT's Opposition appears based on the premise that Apex was dissatisfied with Professor Bleicher and is trying to use his death to replace him with a color expert that is better. *See, e.g.,* Opp. At 6 ("it is seeking a better expert"). But this is simply not the case and is unsupported by

4897-5226-8622.4 - 8 -
Case 3:24-cv-00137-TMR-DCK   Document 243   Filed 06/20/25   Page 8 of 19

DEFENDANTS' REPLY ISO
MOTION FOR LEAVE
3:24-CV-00137-TMR-DCK

any evidence. Apex had been very happy with Professor Bleicher's performance, report, and testimony because he excelled in precisely the areas Apex was looking for: explaining color, similarities between colors, and differences between colors to the Court and members of the jury who might not have experience with the technical aspects of color, in addition to explaining in plain English why CMT's color expert's analysis is incorrect and misleading. While CMT emphasizes in the Opposition the differences between a "scientist" and an "artist" (completely disregarding Professor Bleicher's ample qualifications regarding color), Apex disagrees that such a distinction is the most important part of a color expert's qualifications. Instead, the important aspect is a color expert with experience analyzing and explaining color to lay audiences. Professor Bleicher's many decades of experience as a professor and author, and his past experience testifying as an expert in other color-related trademark infringement litigation, made him an excellent and well-qualified expert for this case. If it had not been for his death, Apex would not be attempting to designate a substitute expert.

**D. Apex's proposed limitations on the substitute expert are proper and sufficient.**

CMT contends that it would have "consented to substitution if Apex had offered reasonable assurances that it was not attempting to gain strategic advantage," and feels that Apex is "seeking a do-over." Opp. at 3-4. CMT's fears are unfounded and incorrect. Apex *did* give assurances and suggested limitations beyond those normally imposed within the Fourth Circuit, but CMT rejected Apex's proposals.

CMT's argument is two-tiered: Apex's "substitute should be limited to the qualifications, skill set, and expertise of an artist"; and Apex's substitute expert must offer the exact same opinions on the same subject matter as Professor Bleicher. *See, generally,* Opp. at 4-9. Both arguments are incorrect, and addressed in turn below.

/ / /

### 1. Professor Bleicher's Substitute Does Not Have to Be an Exact Clone of Professor Bleicher.

Courts have been clear that when a substitute expert for a deceased expert is required, "[a]ny such substitute expert would necessarily have a different background, so any observations about [the deceased expert's] specific qualifications would be advisory." *McDonald*, 2016 WL 1383191, at *5. There is no requirement that the substitute expert have attended the same schools, have the same degree, or even be of the same profession—what matters is that the substitute expert also be qualified to testify on the same topics as the original expert. And here, Professor Bleicher was a color expert with decades of experience teaching and writing about color, who had experience testifying about color in federal court, and who had previously been qualified as a color expert by a federal court. Those are the important aspects of his qualifications, and Apex has been clear that it will be seeking another color expert as a substitute for Professor Bleicher, who will be qualified to testify on the exact same five topics as Professor Bleicher. Memorandum at 3. Apex hopes that the substitute expert will also have Professor Bleicher's deposition, trial, and author experience, but there are very few color experts and Apex might not be able to find one. None of the cases CMT cites required that a substitute expert have the same background or education as the deceased expert. While CMT apparently wants the Court to require that Apex find an exact clone of Professor Bleicher, that is not what the law, or common sense, requires.

For example, in *Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, the court granted leave to designate a substitute expert, who had not yet been identified, and required only that the new expert have a "similar" area of expertise. 2010 WL 3892860, at **3, 4 (N.D. Ind. Sept. 30, 2010) ("The substitute expert must have 'a similar area of expertise' as [the previous expert] and will be permitted to conduct his own investigation and reach his own conclusions, as long as he addresses the same subject matter as [the previous expert's] report without meaningful

changes."). And in *J.F. v. Abbott Lab'ys, Inc.*, the court granted a request for substitution a month before trial, finding that "Courts routinely find good cause when unexpected circumstances, outside of the moving party's control, prevent a declared expert from testifying," and held that the yet-to-be identified substitute expert only needed to "have a *similar* area of expertise . . . ." 2017 WL 992781, at **2 n.2, 3 (S.D. Ill. 2017) (emphasis added).

And while CMT cites to *Haney v. Kavoukjian* for the proposition that a substitute expert should have the same occupation as the original expert, the court in that case did not require such a limitation. 2022 WL 1439041, at *1 (D.S.C. May 5, 2022). Instead, the court permitted the substitute expert because he was also an "ethics and professional liability expert," the same type of expert as the deceased expert. *Id*. While they happened to have the same occupation, that was merely mentioned as background and not as any requirement. *Id.*

Similarly, here Apex is seeking a color expert as a substitute for its original color expert who died. It has agreed that the expert will also be qualified to testify regarding color, and will be qualified to testify on the same five topics covered by Professor Bleicher's report and testimony. Memorandum at 3. Additional restrictions on top of that are not only not required by law, they would significantly hamper and delay Apex's ability to find the substitute expert.

Plaintiffs classify Professor Bleicher as a "painter, sculptor, and an art teacher," "not a color scientist." Opp. at 4. But this is an incredibly warped and disingenuous view of Professor Bleicher. As explained in its *Daubert* response brief, Apex selected Professor Bleicher as its color expert precisely because of his impressive qualifications regarding color: over thirty years of experience with the psychology of color, consisting of numerous publications, lectures, interviews, teaching positions, and the authorship of a textbook on color theory, color psychology, and the use of color in product design. ECF No. 241 at 7-8. CMT's own expert had recognized Professor Bleicher's expertise in color, inviting the deceased to present at a conference. ECF No. 241 at 8.

And, importantly, other courts have recognized Professor Bleicher's expertise, most recently in *Weems Indus., Inc. v. Teknor Apex Co.*, 757 F.Supp.3d 854, 906, 923-25 (N.D. Iowa 2024), where the court held that "Bleicher is qualified to render opinions in the fields of color theory and color psychology, including how people perceive colors," and ultimately found Professor Bleicher's testimony to be persuasive in its own analysis of a trademark infringement dispute based on color. Professor Bleicher was undoubtedly a color expert.

While CMT cites to a website on MFA programs to support its claim that similar professors are a dime a dozen (Opp. at 6 n.1), that doesn't mean that any of those professors will have Professor Bleicher's decades of experience writing about color, his experience testifying in previous litigations about color trademarks, and his experience of being previously qualified as an expert by a federal court. Color experts with such experience are very rare and hard to find and Apex should not be required to find one that has the exact same educational background of Professor Bleicher. Instead, all that the law requires, and what Apex has already committed to doing, is finding a color expert similarly qualified to testify on the topics at issue.

### 2. The substitute expert must be allowed to author their own report on the same topics as Professor Bleicher's reports.

While Apex agreed that the substitute color expert will be restricted in their report to only providing opinions on the same topics as were covered by Professor Bleicher's reports, the substitute expert should be allowed to author their own report on those topics. As a decision that CMT itself cites in its opposition brief states, "Although the substitute expert's testimony and report are generally restricted to the same subject matter as the prior expert, the substitute is not normally required to simply adopt the prior expert's conclusions verbatim . . . . Rather, the substitute expert should have the opportunity to express his opinions in his own language after reviewing the evidence and performing whatever tests prior experts on both sides were allowed to

perform." *Lincoln Nat'l Life Ins. Co.*, 2010 WL 3892860, at *3 (cleaned up).

Likewise, here Apex's substitute color expert should be permitted to draft their own report on those topics, to ensure that they are testifying on the basis of their own knowledge and belief. The Rule 702 standard *obligates* the substitute expert to conduct their own analysis and testing, and not simply demonstrate "unblinking reliance" on Professor Bleicher's opinions, even if the conclusions are the same. *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 719 (D.S.C. 2019) (quoting *In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999), *amended,* 199 F.3d 158 (3d Cir. 2000)); *Mooring Capital Fund, LLC v. Knight*, 388 F. App'x 814, 820 (10th Cir. 2010) ("An expert is not entitled to testify to opinions that rely on the opinion of another expert, simply because the other is an expert.").

CMT misrepresents facts by arguing that Apex "refuses to limit the substitute expert to the opinions and conclusions offered by Mr. Bleicher" and "indicated that the substitute expert is *likely* to provide different opinions than those provided by Mr. Bleicher." Opp. at 7 (emphasis added). Apex believes that its offer to limit the substitute expert to opining on five identical topics on which Bleicher also opined (three topics in the opening report and two as rebuttal) is proper under Fourth Circuit case law; it was CMT who refused to compromise. And CMT misrepresents *Johnson v. Air & Liquid Sys., Corp.*, which, while stating that the substitute expert would provide the "same opinions" as the original expert, meant the same *topics* and not the same *conclusions*—this can be seen by the court designating a schedule for the substitute expert's "report" and the opposing party's "rebuttal report"—things that would not be necessary if the intention was for the substitute expert to merely adopt the original expert's report and conclusions. 2020 WL 13605308, at **2, 3 (E.D. Va. March 27, 2020). CMT's proposal that the substitute expert be seemingly limited to adopting Professor Bleicher's reports and opinions verbatim simply belies the case law cited in its own brief.

Furthermore, the implied definition of "limited" that Plaintiffs suggest is much more restrictive

than cases it cites to support those very arguments. For example, in *Shipp v. Arnold*, the court held that a substitute expert's opinions "need not be identical" to the previous experts, they just need to be "substantively similar and cannot be contrary to or inconsistent" with the former expert's opinions. 2019 WL 4040597, at *3 (W.D. Ark. Aug. 27, 2019). In *Medplace*, the court granted a request for substitution of a new expert, and only required that the new expert's report be "'substantially similar' to those presented in [the previous expert's] comprehensive reports," not *exactly identical*. 2014 WL 1045960, at *4. And in *Morel v. Daimler-Chrysler Corp.*, the court required only that the "[The new expert] proceed with his testimony as any other expert would with the caveat that he address the same subject matter as [the previous expert] without meaningful changes . . . . [The new expert] should have the opportunity to express his opinions in his own language after reviewing the evidence and performing whatever tests prior experts on both sides were allowed to perform."). 259 F.R.D. 17, 22 (D.P.R. 2009) (citations omitted)). And in *Smith*, the court granted a substitution of expert and held the new expert's report—described as "more robust" and "including additional analysis and new opinions" by the party opposing substitution—was acceptable and "functionally identical". 2025 WL 673646 , at **3-4. *See also Kaepplinger*, 2021 WL 2633312, at *7 ("[the new expert's] testimony should be limited to the same subject matter as [the old expert] without any meaningful changes. This does not require that [the new expert] parrot every opinion put forth by [the old expert] at his deposition—the Court will not compel an expert to state an opinion with which he does not agree."); *Park*, 2009 WL 4057888, at *3 (reopening expert discovery for the substitute expert and stating that any "prejudice to [the party opposing substitution] in having to reopen expert discovery to proceed with an expert deposition pales in comparison to the prejudice [the party requesting substitution] would face in having to proceed without a damages expert.").

      Therefore, as shown above, even CMT's cases support Apex's position that its substitute

expert be limited only to the same five topics as Professor Bleicher's reports, but be able to issue their own report on those topics.

Significantly, in no instance has Apex said that the substitute expert will provide opinions contrary to those of Professor Bleicher. In fact, *Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 2005 U.S. Dist. LEXIS 16703, at *2 (N.D. Ill. Aug. 10, 2005), cited by CMT, is completely distinguishable from the present situation because *Dunkin' Donuts* dealt with a new expert who "produced an entirely new [expert report] that did not conform to any such limitation at all." As explained above, Apex has offered to limit its new expert's testimony sufficiently; as also explained above in *Lincoln*, the substitute expert still needs to be able to use their own language to express their opinions, background, and reasoning. *Lincoln Nat'l Life Ins. Co.*, 2010 WL 3892860, at *3. Apex remains willing to stay within these parameters.

And while CMT calls the *Fidelity National* "particularly instructive," it misrepresents the holding: the court in *Fidelity National* denied the moving party's request to designate a substitute expert, not because one party had rejected a compromise offered by the other party to limit the substitute expert's testimony, but because of the substantial delay—nine months—in alerting the opposing party to the withdrawal of an expert. 308 F.R.D. at 654-55. And the court expressly stated that it likely would have granted the request to designate a substitute expert had the party "timely notified [opposing party] and the Court of [the expert's] withdrawal." *Id*. at 654. The "windfall" referred to in the decision was not related to the substitute expert drafting a new report, but the late date of motion, "after *Daubert* rulings and multiple orders on summary judgment, and mere months before the pretrial conference." *Id.* None of those are applicable here, and therefore *Fidelity National* is distinguishable and not as instructive as CMT suggests.

Instead, just as the court in *Johnson* did, under Fourth Circuit case law the Court should issue a scheduling order allowing Apex's substitute expert to draft their own report limited to the five topics

Case 3:24-cv-00137-TMR-DCK    Document 243    Filed 06/20/25    Page 15 of 19

from Professor Bleicher's reports, and permitting CMT's experts to respond, if needed, with any rebuttal reports through standard expert discovery. Apex has already agreed to limit the substitute expert's testimony to those topics, and case law supports the understanding that substitute opinions and testimony can be in the new expert's own voice and reasoning.

### E. CMT, not Apex, is the cause of any delay.

CMT attempts to misrepresent the timeline surrounding Professor Bleicher's death and Apex's request for a substitute expert. As fully explained in the Memorandum, Apex notified CMT's counsel of Professor Bleicher's death less than a week after confirming his death. Memorandum at 3. The very next week, Apex notified CMT that it would be moving to designate a substitute expert and requested CMT's consent. *Id.* The only delay since then has been due to CMT's refusal to consent to the substitution, and therefore Apex being required to file the contested motion. Even while the motion is pending, Apex has not been idle and is actively looking for a substitute expert. Johnson Decl., ¶ 4. Finally, while CMT has been the cause of the delay, the delay and the proposed timeline for the designation and discovery around the substitute expert does not harm either party, since the Court has stayed the trial date.

Additionally, CMT cites no support for its proposition that Apex should have identified an expert *before* filing this motion, Opp. at 9, creating an unnecessary catch-22: if Apex filed a substitution request *after* selecting a new expert, CMT would have complained of delay because of the time taken to find the new expert; because Apex filed a request for substitution *before* identifying an expert, CMT complains of a "transparent" effort to "further delay" proceedings. Opp. at 9. Apex need only refer to decisions discussed above where courts had no problem granting a substitution of expert without the moving party having identified the specific expert.

Therefore, if the stay is removed, the Court should issue a new schedule with deadlines for Apex to designate a substitute expert, that expert to serve their report, and for the parties to engage

in proper exert discovery on the opinions contained within that report.

## V. CONCLUSION

For the foregoing reasons, Apex respectfully requests that the Court grant its Motion, and provide a schedule for Apex to find and disclose a competent substitute color expert, have the expert serve a report, have CMT's experts provide a rebuttal report, if necessary, and conduct depositions, if necessary. Despite CMT's arguments to the contrary, Apex acted promptly, has no intention of gaming this situation to its advantage, and is already in the process of interviewing and selecting a substitute if the Court grants Apex's motion.

DATED: June 20, 2025  WOMBLE BOND DICKINSON (US) LLP

By: */s/Aaron D. Johnson*
Michael McCue
Aaron D. Johnson
David A. Jackson
Joy Tacy Allen Woller
50 California Street, Ste. 2750
San Francisco, CA 94111
(415) 433-1900
Michael.McCue@wbd-us.com
Aaron.Johnson@wbd-us.com
David.Jackson@wbd-us.com
Joy.Woller@wbd-us.com

SNEED PLLC
Jason M. Sneed (NC Bar No. 29593)
Megan Sneed (NC Bar No. 38525)
445 South Main Street, Suite 400
Davidson, NC 28036
Tel: 844-763-3347
JSneed@SneedLegal.com
MSneed@SneedLegal.com
Litigation@SneedLegal.com

*Attorneys for Defendants/Counter-Plaintiffs
Apex Tool Group LLC and Apex Brands, Inc.*

## CERTIFICATE OF USE OF ARTIFICIAL INTELLIGENCE

Pursuant to this Court's order of June 13, 2024 regarding the use of artificial intelligence in court filings, Defendants Apex Tool Group LLC and Apex Brands, Inc. hereby certify:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexus, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Signed June 20, 2025.

**WOMBLE BOND DICKINSON (US) LLP**

/s/ Aaron D. Johnson
Michael J. McCue
Aaron D. Johnson
David A. Jackson
Joy Tacy Allen Woller
50 California Street, Suite 2750
San Francisco, California 94111
Michael.McCue@wbd-us.com
Aaron.Johnson@wbd-us.com
David.Jackson@wbd-us.com
Joy.Woller@wbd-us.com

Jason M. Sneed (NC Bar ID 29593)
Megan E. Sneed (NC Bar ID 38525)
SNEED PLLC
445 S. Main St., Suite 400
Davidson, North Carolina 28036
JSneed@sneedlegal.com
MSneed@sneedlegal.com

*Attorneys for Defendants/Counter-Plaintiffs Apex Tool Group LLC and Apex Brands, Inc*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of June 2025, the foregoing DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR LEAVE TO DESIGNATE A SUBSTITUTE EXPERT was served via electronic means through CM/ECF on the following counsel of record:

>Ward Davis (NC Bar ID 27546)
>Joshua B. Durham (NC Bar ID 25414)
>BELL, DAVIS & PITT
>227 W. Trade St., Suite 1800
>Charlotte, NC 28202
>(704) 227-0400
>ward.davis@belldavispitt.com
>jdurham@belldavispitt.com
>
>Edgar H. Haug (*pro hac vice*)
>Robert E. Colletti (*pro hac vice*)
>Mark Basanta (*pro hac vice)*
>HAUG PARTNERS LLP
>745 Fifth Avenue
>New York, NY 10151
>(212) 588-0800
>ehaug@haugpartners.com
>rcolletti@haugpartners.com
>mbasanta@haugpartners.com
>
>*Attorneys for Plaintiffs CMT USA, Inc. and CMT Untensili S.p.A.*

>/s/ Aaron D. Johnson