**UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:24-CV-00137-TMR-DCK**

CMT USA, INC. and CMT UTENSILI S.p.A.,

      Plaintiffs,

      v.

APEX TOOL GROUP LLC and APEX
BRANDS, INC.

      Defendants.

**PLAINTIFFS' PRETRIAL
MEMORANDUM OF LAW**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................2

I.      INTRODUCTION .................................................................................................................1

II.     RELEVANT LEGAL STANDARDS ...................................................................................2

        A.      Plaintiffs' Claims...................................................................................................2

        B.      Trade Dress and Trademarks ................................................................................3

        C.      Trademark Infringement Under 15 U.S.C. § 1114................................................4

                i.      *Owns a Valid Mark* ..................................................................................4

                ii.     *In Commerce Without Authorization* .......................................................5

                iii.    *In Connection with the Sale, Distribution, and Advertisement of Goods*..................................................................................................5

                iv.     *Likelihood of Confusion*..........................................................................5

        D.      Establishing Likelihood of Confusion ..................................................................6

                i.      *The Strength of the Mark* .......................................................................6

                        a.      *Conceptual Strength*....................................................................7

                        a.      *Commercial Strength*...................................................................9

                ii.     The Similarity of the Two Marks to Consumers .......................................9

                iii.    *The Similarity of the Goods That the Marks Identify* .............................12

                iv.     *The Similarity of the Facilities used by the Markholders*.........................12

                v.      *The Similarity of Advertising used by the Markholders* ..........................12

                vi.     *Intent* .....................................................................................................12

                vii.    *Actual Confusion* ...................................................................................13

                viii.   *Quality* ...................................................................................................14

                ix.     *Sophistication of the Consuming Public*.................................................14

        E.      Genericness............................................................................................................15

i

## TABLE OF AUTHORITIES

**Cases**

*Am. Online, Inc. v. AT&T Corp.*,
    243 F.3d 182 (4th Cir. 2001) .......................................................................................15

*Amp Inc. v. Foy*,
    540 F.2d 1181 (4h Cir. 1976) ......................................................................................13

*AMP Inc. v. Foy*,
    540 F.2d 1181 (4th Cir. 1976) .......................................................................................9

*Anheuser-Busch, Inc. v. L & L Wings, Inc.*,
    962 F.2d 316 (4th Cir. 1992) .........................................................................................6

*Aromatique, Inc. v. Gold Seal, Inc.*,
    28 F.3d 863 (8th Cir. 1994) ...........................................................................................3

*Artus Corp. v. Nordic Co.*,
    512 F. Supp. 1184 (W.D. Pa. 1981) ............................................................................11

*Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*,
    187 F.3d 363 (4th Cir. 1999) .........................................................................................3

*Black & Decker Corp. v. Positec USA Inc.*,
    2015 WL 1543262 (N.D. Ill. 2015) .............................................................................11

*CareFirst of Md., Inc. v. First Care, P.C.*,
    434 F.3d 263 (4th Cir. 2006) .................................................................................passim

*George & Co., LLC v. Imagination Entm't Ltd.*,
    575 F.3d 383 (4th Cir. 2009) ..............................................................................5, 7, 12

*Georgia Pacific Consumer Products, LP v. Von Drehle Corp.*,
    618 F.3d 441 (4th Cir. 2010) .......................................................................................11

*Glover v. Ampak, Inc.*,
    74 F.3d 57 (4th Cir. 1996) ...........................................................................................15

*Grayson O Co. v Agadir Int'l LLC*,
    856 F.3d 307 (4th Cir. 2017) ...................................................................................9, 10

*H Marvin Ginn Corp. v. Internal Ass'n of Fire Chiefs, Inc.*,
    782 F.2d 987 (Fed. Cir. 1986) .....................................................................................15

*Levi Strauss & Co. v. Blue Bell Inc.*,
    632 F.2d 817 (9th Cir. 1980) .......................................................................................11

*Lexington Mgmt. Corp. v. Lexington Capital Partners¸*
    10 F. Supp. 2d 271 (S.D.N.Y. 1998) ............................................................8

*Lois Sportswear, USA, Inc. v. Levi Strauss & Co,*
    799 F.2d 867 (2d Cir. 1986) ...................................................................12

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*,
    43 F.3d 789 (4th Cir. 2001) ................................................................5, 13

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    454 F.3d 108 (2d Cir. 2006) ...................................................................11

McGraw-Edison Co. v. Walt Disney Prods.,
    787 F.2d 1163 (7th Cir. 1986) ..................................................................8

*Milwaukee Electric Tool Corp. v. Freud*,
    2019 WL 6522400 (W.D.N.C., August 9, 2024) .........................................14

*Osem Food Indus. v. Sherwood Foods, Inc.*,
    917 F.2d 161 (4th Cir. 1990) ..................................................................13

*Paddington Corp. v. Attiki Imps. & Distribs.*,
    996 F.2d 577 (2d Cir. 1993) ................................................................6, 13

*People for the Ethical Treatment of Animals v. Doughney*,
    263 F.3d 359 (4th Cir. 2001) ...................................................................5

*Pizzeria Uno Corp. v. Temple*,
    747 F.2d 1522 (4th Cir. 1984) ................................................ 6, 12, 13, 14

*Qualitex Co. v. Jacobson Prods. Co.*,
    *514 U.S. 159 (1995)* ......................................................................1, 7, 8

*Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*,
    227 Fed. Appx. 239 (4th Cir. 2007) ........................................................8, 9

*Retail Servs, Inc. v. Freebies Publ'g*,
    364 F.3d 535 (4th Cir. 2004) ...........................................................1, 5, 15

*Rosetta Stone, Ltd. v. Google, Inc.*,
    676 F.3d 144 (4h Cir. 2012) .............................................................passim

*SafeRack LLC v. Bullard Co.*,
    350 F. Supp. 3d 438 (D.S.C. 2018) ...................................................8, 10, 15

*Sara Lee Corp. v. Kayser-Roth Corp.,*
    81 Fed. 455 (4th Cir. 1996) ................................................................6, 14

*Sea-Roy Corp. v. Parts R Parts, Inc.*,
    1999 U.S. LEXIS 3383 (4th Cir. Mar. 4, 1999) ...........................................................13

*Super Duper, Inc. v. Mattel, Inc.*,
    382 Fed. Appx. 308 (4th Cir. 2010)........................................................................9, 11

*Team Tires Plus, Ltd. v. Tires Plus, Inc.*,
    394 F.3d 831 (10th Cir. 2005) ...................................................................................12

*The Youngstown Sheet & Tube Co.*,
    149 U.S.P.Q. (BNA) 656 (P.T.O. Mar. 24, 1966) ........................................................10

*T-Mobile US, Inc. v. Aio Wireless LLC*,
    991 F. Supp. 2d 888 (S.D. Tex. 2014) ..........................................................................9

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992) ......................................................................................................3

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,
    888 F. 3d 651 (4th Cir. 2018) ....................................................................................10

*Vonrosenberg v. Lawrence*,
    412 F. Supp. 3d 612 (D.S.C. 2019) ..............................................................................7

**Statutes**

15 U.S.C. § 1057(b) ..............................................................................................................5

15 U.S.C. § 1065 ...............................................................................................................2, 5

15 U.S.C. § 1114 ...............................................................................................................2, 3

15 U.S.C. § 1114(a) ..........................................................................................................2, 5

15 U.S.C. § 1125(a) ..........................................................................................................2, 3

15 U.S.C. § 1127 ..................................................................................................................5

**Other Authorities**

McCarthy on Trademarks and Unfair Competition .......................................................4, 11, 15

*Restat. 3d of Unfair Competition*, § 21 ...............................................................................5

Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A. ("Plaintiffs" or "CMT"), through counsel and pursuant to the Individual Rules & Practices in Civil Cases for Judge Timothy M. Reif Paragraph 6.B.ii, hereby submit this pretrial memorandum of law in their case against Defendants Apex Tool Group LLC and Apex Brands, Inc. (collectively, "Apex" or "Defendants").

## I. INTRODUCTION

> "We conclude that, sometimes, a color will meet ordinary legal trademark requirements. And, when it does so, no special legal rule prevents color alone from serving as a trademark." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 161 (1995).

In 1995, the Supreme Court held that color can be a protected trademark if it has acquired distinctiveness through secondary meaning. *Qualitex*, 514 U.S. at 162-66 (when color attains a "secondary meaning," it "identifies and distinguishes a particular brand."). Four years after *Qualitex*, CMT, a manufacturer of premium woodworking tools, applied for a federal registration to protect its orange circular saw blades from trademark infringement. On January 10, 2006, the U.S. Patent and Trademark Office ("USPTO") officially registered CMT's trademark for the color orange as applied to "[c]ircular blades for power saws for cutting wood" (the "Registered Mark"). Order, at 3-5 (Dkt. 254). In granting the registration, the USPTO necessarily found that CMT's use of the color orange was sufficiently distinctive to establish an association between the trademark (orange as applied to circular, woodcutting saw blades) and the source of the product (CMT). *See, e.g., Retail Servs, Inc. v. Freebies Publ'g,* 364 F.3d 535, 538 (4th Cir. 2004) ("Saying that a trademark has acquired 'secondary meaning' is shorthand for saying that a descriptive mark *has become* sufficiently distinctive to establish a mental association in buyers' minds between the alleged mark and a single source of the product.") (emphasis added).

Consistent with the Trademark Manual of Examining Procedure ("TMEP"), CMT's registration does not specify a particular pantone; instead, it protects "the color orange" on CMT's

circular, woodcutting saw blades. *See* Reg. No. 3,038,625; *see also* TMEP § 807.07(a)(ii). Because the trademark was continuously used and unchallenged for five years following registration, CMT's Registered Mark is incontestable. *See* 15 U.S.C. § 1065. CMT's Registered Mark is, and has always been, strong. The color orange is an essential element and source-identifying feature of CMT's brand. CMT now seeks to enforce the full scope of protection afforded by the Lanham Act and Supreme Court precedent. At trial, CMT will prove by a preponderance of the evidence that Apex infringed its Registered Mark.

On December 18, 2025, the Court dismissed several of Apex's counterclaims and affirmative defenses, including Apex's (i) cancellation counterclaim on a functionality theory; (ii) cancellation counterclaim on a fraud theory; (iii) cancellation counterclaim on an abandonment theory; (iv) affirmative defense on unclean hands; and (v) affirmative defense based on both laches and waiver. The remaining issues for trial are trademark infringement and genericness. *See* Order (Dkt. 254). It is Defendants' burden to prove their last remaining cancellation counterclaim, which is based on a genericness theory.

## II. RELEVANT LEGAL STANDARDS

### A. Plaintiffs' Claims

The Lanham Act imposes liability for infringement of a registered mark and for unfair competition. *See* 15 U.S.C. § 1114(a) (trademark infringement); *id.* § 1125(a) (unfair competition). Plaintiffs seek a judgment and declaration that Defendants have infringed CMT's Registered Mark under 15 U.S.C. § 1114 (Count I), infringed CMT's trademark rights in the color orange on circular woodworking blades under common law (Count II) and 15 U.S.C. § 1125(a) (Count III), engaged in unfair competition under 15 U.S.C. § 1125(a) (Count IV) and under common law (Count V); and are liable for trademark dilution under N.Y. Gen. Bus. L. 360-1 (Count VI).

Plaintiffs' claims for trademark infringement (Counts I, II, III) and unfair competition (Count IV, V)) are governed by the same legal standard and are evaluated by the same essential elements as trademark infringement under the Lanham Act (15 U.S.C. § 1114 (Count I)). It follows *a fortiori* that if Plaintiff satisfies the requirements for trademark infringement under 15 U.S.C. § 1114 (Count I), then it satisfies the elements of its other infringement and unfair competition claims under federal law and common law.

### B.    Trade Dress and Trademarks

CMT has owned a federally registered trademark for 20 years. However, the Court correctly observed that "the color orange as applied to the CMT saw blades is a trade dress, not a trademark." Order, at 7 n.2. Trade dress encompasses a product's "size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 369 (4th Cir. 1999) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 763 n.1 (1992)). As courts have recognized, trade dress is *a type of* trademark that may be registered and enforced under the Lanham Act. *See Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 868 (8th Cir. 1994) ("The difference between trade dress and trademark is no longer of importance in determining whether trade dress is protected by federal law. Trade dress, regardless of whether it is registered, is protectable under Section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a)); *see also* McCarthy on Trademarks and Unfair Competition, § 8.1 [*hereinafter* McCarthy]. Thus, the legal distinction between trademark and trade dress is "largely historical" (McCarthy § 8.1).

Plaintiffs do not dispute these doctrinal principles. Plaintiffs are, however, concerned that a jury may not appreciate the distinction between a registered color trademark and a simple description of a product's overall appearance, particularly because of Defendants' attempt to conflate these legal terms. While "likelihood of confusion" is assessed in the context of the

product's overall appearance as encountered in the marketplace, that principle does not expand the scope of CMT's trademark. Here, the protected feature of CMT's blade is the color orange as applied to the surface of the circular, woodcutting saw blade. The jury may consider other aspects of the blade solely as context for how the color orange is perceived. Plaintiffs seek to enforce its *trademark* for the color orange, not to argue that Defendants have infringed CMT's entire unregistered trade dress or overall product design.

Further, Plaintiffs believe that "trade dress" is vague, technical, and may convey a weaker or more abstract concept to a jury than the well-understood term "trademark."[1] The color orange as applied to CMT's blades are not just a cosmetic feature; it is an incontestable trademark. Because trade dress is a *type* of trademark, and because all relevant legal standards are identical, Plaintiffs intend to refer to the '625 registration for what it is: a trademark.

### C. Trademark Infringement Under 15 U.S.C. § 1114

"To establish trademark infringement under the Lanham Act, a plaintiff must prove: (1) that it owns a valid mark; (2) that the defendant used the mark 'in commerce' and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers." *Rosetta Stone, Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4h Cir. 2012) (quoting 15 U.S.C. § 1114(a)).

#### i. *Owns a Valid Mark*

Under the Lanham Act, a certificate of registration "arms the registrant with *prima facie* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's

---

[1] Plaintiffs further note that the majority of trade dress infringement cases involve unregistered trade dress, which may reinforce the impression that "trade dress" is more closely associated with unregistered product features than with federally registered trademarks.

4

ownership of the mark, and of the registrant's exclusive right to use the registered mark." *Retail Servs.*, 364 F.3d at 542 (quoting 15 U.S.C. § 1057(b)) (internal citations omitted). After five years of continuous and unchallenged use, a registered mark "may become 'incontestable,' 15 U.S.C. § 1065, and cannot then be challenged as descriptive and lack secondary meaning." *Restat. 3d of Unfair Competition*, § 21. A mark's status as "incontestable" is "conclusive evidence" of its validity. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 789, 930 (4th Cir. 2001).

### ii. *In Commerce Without Authorization*

The Lanham Act makes clear that "[t]he word 'commerce' means all commerce which may lawfully be regulated by Congress." *See* 15 U.S.C. § 1127. "Use in commerce" is defined as "the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right in a mark. *Id.*

### iii. *In Connection with the Sale, Distribution, and Advertisement of Goods*

In the Fourth Circuit, the third element of trademark infringement—that the defendant used the mark (or an imitation of it) in connection with the sale, offering for sale, distribution, or advertising of goods—is interpreted broadly. *See, e.g, People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 365 (4th Cir. 2001) (finding that actual sales are not required; mere interference satisfies this element).

### iv. *Likelihood of Confusion*

The final element of trademark infringement, the crux of Plaintiffs' case-in-chief, is that the defendant's use of the mark is likely to confuse consumers. *Rosetta Stone, Ltd.*, 676 F.3d at 152. "A likelihood of confusion exists if 'the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question.'" *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009) (internal citations

omitted).  The Fourth Circuit has adopted nine factors relevant to determine likelihood of confusion:

> (i) the distinctiveness of the senior mark; (ii) the similarity of the two marks; (iii) the similarity of the goods or services that the marks identify; (iv) the similarity of the facilities employed by the parties to transact their business; (v) the similarity of advertising used by the parties; (vi) the defendant's intent in adopting the same or similar mark; (vii) actual confusion; (viii) the quality of the defendant's product; and (iv) the sophistication of the consuming public.

*Sara Lee Corp. v. Kayser-Roth Corp.,* 81 Fed. 455, 463-64 (4th Cir. 1996) (citing *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir. 1984) and incorporating the final two factors).  This list "is not intended to be exhaustive or mandatory" and "there is no need for each factor to support the plaintiff's position."  *Rosetta Stone,* 676 F.3d at 153-54.  These factors are not intended to provide a "rigid formula for infringement," but "only a guide—a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992). "Some factors may, depending on the case, be more important" than others.  *Sara Lee Corp.,* 81 Fed. at 463.

### D.    Establishing Likelihood of Confusion

#### i.    *The Strength of the Mark*

The strength of a trademark is "the first and paramount factor" in evaluating likelihood of confusion.  *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir. 1984).  A mark is strong when it "seems to the consumer uniquely intended to indicate a product's source;" it is strong "whether or not the consumer is familiar with the mark or knows the source."  *Paddington Corp. v. Attiki Imps. & Distribs.*, 996 F.2d 577, 585 (2d Cir. 1993); *see also* 15 U.S.C. § 1127 (trademarks "indicate the source of the goods, *even if that source is unknown*.") (emphasis added).  Courts in the Fourth Circuit evaluate both the conceptual strength and the commercial strength of the mark. *CareFirst of Md.*, *Inc. v. First Care, P.C.*, 434 F.3d 263, 269-70 (4th Cir. 2006).

### a. *Conceptual Strength*

Conceptual strength is a measure of a mark's distinctiveness. *Id.* Here, the analysis focuses on the "graphical 'peculiarity'" of the mark. *CareFirst*, 434 F.3d 263, at 269 ("Measuring a mark's conceptual or inherent strength focuses on the linguistic or graphical 'peculiarity' of the mark."). The mark's conceptual strength, or "peculiarity," is measured by classifying the mark as generic, descriptive, suggestive, or arbitrary. *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 394 (4th Cir. 2009) (describing each category). While not conclusive, determinations of the USPTO constitute *prima facie* evidence of a mark's distinctiveness; Plaintiffs are entitled to a presumption that CMT's registered mark is distinctive. *George & Co., LLC*, 575 F.3d at 395 ("the determination of the USPTO . . . constitutes *prima facie* evidence of whether a mark is descriptive or suggestive."); *see also Vonrosenberg v. Lawrence*, 412 F. Supp. 3d 612, 644 (D.S.C. 2019) ("Further, the Court presumes secondary meaning, necessary to find the descriptive marks distinctive for purposes of trademark protection, as the marks have all achieved incontestable status."). In the context of this presumption, the court then assesses the strength or weakness of the mark. *Id.*

For color trademarks, courts have found that a mark is strong when it is placed in a context that is "unusual and distinctive." *See Qualitex*, 514 U.S. at 163 ("[C]ustomers may come to treat a particular color on a product or its packaging (say, *a color that in context seems unusual*, such as pink on a firm's insulating material or red on the head of a large industrial bolt) as signifying a brand.") (emphasis added); *see Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 227 (2d Cir. 2012) ("By placing the color red *in a context that seems unusual*, and deliberately tying that color to his product, Louboutin has created an identifying mark firmly associated with his brand") (cleaned up) (emphasis added); *see also SafeRack*, 350 F. Supp. 3d at

450 (holding that "SafeRack has a strong mark" because "there is no dispute SafeRack placed *the color orange in a context that seems unusual and distinctive*") (emphasis added).

Further, courts recognize that a color trademark "does not need to be constrained to a single color and some color variance does not negate a strong mark." *SafeRack LLC v. Bullard Co.*, 350 F. Supp. 3d 438, 449 (D.S.C. 2018). Moreover, and consistent with *Qualitex*, courts have held that modest variations in color do not undermine secondary meaning, provided the color continues to function as a source identifier. *See, e.g., T-Mobile US, Inc*, 991 F. Supp. 2d 888, 910-11. Other factors relevant to the strength of a mark include the length of use, the exclusivity of use within the particular product market, and the extent of promotion. *See SafeRack*, 350 F. Supp. 3d at 449 (considering SafeRack's advertising slogan, exclusive use in the marketplace, and advertising expenditures to evaluate the mark's strength).

Finally, "[a] strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *CareFirst of Md., Inc.,* 434 F.3d at 270 (internal citations omitted). Third-party use in unrelated markets is less probative than use within the same product class. *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 227 Fed. Appx. 239, 243 (4th Cir. 2007) (evidence of third-party use is "not as persuasive as use within the same product class."). Indeed, third-party registrations of similar trademarks "affect the distinctiveness of a mark 'only to the extent that the similar marks are promoted by their owners or recognized by the consuming public.'" McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1171 (7th Cir. 1986); *Lexington Mgmt. Corp. v. Lexington Capital Partnersi¸*10 F. Supp. 2d 271, 281 (S.D.N.Y. 1998) (collecting cases holding that "third-party trademarks depends wholly upon their usage.").

### a. *Commercial Strength*

"The second step in the 'strength of the mark' analysis is to consider the mark's commercial strength, a concept similar to the 'secondary meaning' inquiry considered in evaluating a mark's validity.'" *Renaissance Greeting Cards, Inc.*, 227 Fed. Appx. at 243. Commercial strength refers to whether "a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *See CareFirst of Md.*, Inc., 434 F.3d 263 at 269. A trademark's official registration may be considered when assessing a mark's secondary meaning. *See also T-Mobile US, Inc. v. Aio Wireless LLC*, 991 F. Supp. 2d 888, 914 (S.D. Tex. 2014) ("T-Mobile's [color] mark is strong for the same reasons it has acquired second meaning.").

In *Perini*, the Fourth Circuit set forth six factors to consider in assessing the acquisition of secondary meaning: "(1) advertising expenditures, (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Grayson O Co. v Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

### ii. The Similarity of the Two Marks to Consumers

As a preliminary matter, the Fourth Circuit has held that if a jury finds a trademark to be strong (*see supra* Section III.D.i), the second comer has a duty to adopt a mark that is *substantially different* to avoid a finding of infringement. *See Super Duper, Inc. v. Mattel, Inc.*, 382 Fed. Appx. 308, 314 n.4 (4th Cir. 2010) ("In light of our opinion in *AMP Inc. v. Foy*, 540 F.2d 1181 (4th Cir. 1976), we also reject Super Duper's challenge to the district court's instruction that if the jury found Mattel's trademarks to be strong marks, 'Super Duper's trademarks (as the latecomer) must be substantially different from Mattel's trademarks to avoid a finding of infringement.' *See AMP Inc.,* 540 F.3d at 1187 (citing 'a respectable body of authority' that holds that 'the second comer

has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.'"")).  In other words, if CMT's mark is deemed to be strong, Apex had a duty to adopt a *substantially* dissimilar mark to avoid confusion.

In assessing the similarity of the marks, the Fourth Circuit has established that the marks do not need to be identical; rather, they must be sufficiently similar in appearance "with *greater weight* given to the dominant or salient portions of the marks."  *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F. 3d 651 (4th Cir. 2018) (emphasis added).  The dominant feature of a mark is "whatever is most noticeable in actual conditions."  *Id.* (quoting *Grayson O*, 856 F.3d at 317). "Courts give the dominant part of a mark more weight when assessing similarity because consumers are more likely to confuse marks with dominant similar features than marks with less noticeable similar features."  *Id.*  Further, "[w]here the goods and services are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products."  McCarthy § 23:20.50.

With respect to color marks, "[t]he fact that marks may use different shades of the [mark's] color does not preclude a finding of similarity."  *SafeRack LLC*, 350 F. Supp. 3d at 450; *see also* McCarthy § 7:45.70 ("If the decision maker thinks that the ordinary purchaser or user will see the color as a source indicator, and see them as close enough as to be likely to confuse, source of affiliation, then infringement will be found even though the color shades are not identical.").  The question is whether the marks are sufficiently similar to cause confusion, not whether the "specific shade comports perfect to prior use."  *Id.; see also The Youngstown Sheet & Tube Co.,* 149 U.S.P.Q. (BNA) 656 (P.T.O. Mar. 24, 1966) (finding that gold and orange are substantially similar when used by both parties in similar ways).

10

"Trademarks are not to be evaluated in a side by side comparison test, such as a meticulous comparison in court." *Super Duper, Inc. v. Mattel, Inc.*, 382 Fed. Appx. 308, 315 (4th Cir. 2010) (discussing jury instructions) (citations omitted). "Rather, it is the overall impression created by the trademark from the ordinary consumer's *cursory observation* in the marketplace that will or will not lead to a likelihood of confusion." *Id.* (emphasis added). This is well-established. *See, e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006) ("The district court erred because it based its determination that confusion between the Vuitton and Dooney & Bourke marks was unlikely at least in part on an overemphasized side-by-side comparison. This is suggested by the district court's comment that 'no amount of expert opinion, legal analysis, or demonstrative evidence can overcome the clarity that comes from direct observation.'") (internal citations omitted).

Merely because each party labels its products does not preclude a finding of confusion. *See, e.g., Black & Decker Corp. v. Positec USA Inc.*, 2015 WL 1543262 (N.D. Ill. 2015) ("In fact, labeling may increase confusion where trade dresses are otherwise similar because consumers might infer a relationship between the parties."); *Artus Corp. v. Nordic Co.,* 512 F. Supp. 1184, 1190-91 (W.D. Pa. 1981) ("A dissimilarity in names will often prove ineffective in preventing confusion caused by the general similarity in appearance of the product."); *Levi Strauss & Co. v. Blue Bell Inc.*, 632 F.2d 817 (9th Cir. 1980) (finding that extensive labeling was not sufficient to avoid confusion as to source in the post-sale context).

Finally, post-sale confusion is actionable under the Lanham Act. *See Georgia Pacific Consumer Products, LP v. Von Drehle Corp.*, 618 F.3d 441, 453 (4th Cir. 2010) ("Fourth Circuit case law makes room for the factfinder to consider confusion among the non-purchasing public in the likelihood-of-confusion inquiry") (internal citations omitted). Although post-sale confusion is

critical when the trademark's reputation is at risk (*id.*), courts also consider post-sale confusion when assessing the similarity of the two marks. *See, e.g., Lois Sportswear, USA, Inc. v. Levi Strauss & Co*, 799 F.2d 867, 872-74 (2d Cir. 1986) ("In the post-sale context, this striking similarity no doubt will cause consumers to transfer the goodwill they feel for appellee to appellants, at least initially. This misuse of goodwill is at the heart of unfair competition.").

### iii.    *The Similarity of the Goods That the Marks Identify*

In the Fourth Circuit, it is well-established that the goods in question need not be identical or in direct competition with each other. *See George & Co., LLC*, 575 F.3d 383, 397. The "use of a mark on a directly competitive good is more likely to create confusion than the use of the same mark on a distantly related good." *Team Tires Plus, Ltd. v. Tires Plus, Inc.,* 394 F.3d 831 (10th Cir. 2005).

### iv.    *The Similarity of the Facilities used by the Markholders*

When considering the similarity of facilities, courts assess whether confusion is likely based on "how and to whom the respective goods of the parties are sold, and the key question is whether both products [are] sold in similar channels of trade." *Rosetta Stone*, 676 F.3d at 155 (internal citations omitted).

### v.    *The Similarity of Advertising used by the Markholders*

When comparing advertising, courts analyze a variety of factors, including "the media used, the geographic areas in which advertising occurs, the appearance of the advertisements, and the content of the advertisements." *See CareFirst,* 434 F.3d at 269-70; *Pizzeria Uno*, 747 F.2d at 1535.

### vi.    *Intent*

"If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts

to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." *Pizzeria Uno*, 747 F.2d at 1535. While intent to confuse the public is strong evidence, it is not required to find a likelihood of confusion. *See* 1 Trademark Surveys: A Litigator's Guide ¶ 5.17("Of course, the junior user who negligently, ignorantly, or innocently stumbles into confusing the public is still an infringer.").

Courts may infer intent from the surrounding circumstances, including whether the defendant was aware of plaintiffs' mark and the degree of similarity of the respective marks. 1A Gilson on Trademarks § 5.09. Knowledge of the plaintiffs' mark is critical. *See Lone Star Steakhouse,* 43 F.3d at 933 (finding bad faith where defendant expanded its use of the challenged mark after receiving notice of lawsuit and actual consumer confusion); *see also Paddington Corp*., 996 F.2d at 587 ("In determining a defendant's intent, 'actual or constructive knowledge' of the prior user's mark or dress may indicate bad faith.'").

When analyzing intent, courts look to whether a second comer deliberately copied a senior user's mark, violating their duty to avoid consumer confusion. *Sea-Roy Corp. v. Parts R Parts, Inc.*, 1999 U.S. LEXIS 3383, at *9 (4th Cir. Mar. 4, 1999) (analyzing the duty to avoid confusion under "intent"). Apex, as a second comer, had a duty to avoid likelihood of confusion. *Osem Food Indus. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990) ("This court, indeed, has previously observed that a 'respectable body of authority' has recognized 'that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.'") (quoting *Amp Inc. v. Foy*, 540 F.2d 1181, 1187 (4h Cir. 1976)).

### vii. *Actual Confusion*

It is not necessary for Plaintiffs to show actual confusion; if the use of the contested mark is likely to cause a *likelihood* of confusion, the owner of the registered trademark is entitled to

relief. *Pizzeria Uno*, 747 F.2d at 1527. When "actual confusion" is proffered, it "can be demonstrated by both anecdotal and survey evidence" but "neither category is necessarily required to prove actual confusion." *Rosetta Stone,* 676 F.3d at 155. Survey evidence favors the plaintiff when it demonstrates a level of confusion above ten percent. *See Sara Lee*, 81 F.3d 455 at 466-67 n. 15 (collecting cases holding that "survey evidence indicating ten to twelve percent confusion was sufficient to demonstrate actual confusion.").

### viii.    *Quality*

"Consideration of the quality of the defendant's product is most appropriate in situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." *Sara Lee Corp.*, 81 F.3d at 467. This factor applies with "less frequency than the previous seven." *Id.*

### ix.    *Sophistication of the Consuming Public*

When consumers are purchasing expensive or specialized products, there is a presumption that they exercise greater care, reducing the risk of confusion between similar marks. *See Perini Corp.*, 915 F.2d at 127 (collecting cases where the sophistication of the consumer, particularly in high-cost or highly specialized markets, precludes a likelihood of confusion); *see also* McCarthy, § 23:100 ("If the less knowledgeable consumer also buys the goods and it is likely that he or she will be confused, then there is trademark infringement at the consumer level.").

In cases involving power tools, courts have found that the "relevant public" includes both professionals and the general public. *See Milwaukee Electric Tool Corp. v. Freud*, 2019 WL 6522400, at *10 (W.D.N.C., August 9, 2024) (in its genericness analysis, finding that the "relevant public" included "both members of the general public and persons employed in professions that use [power] tools.").

### E.    Genericness

"To become generic, the *primary* significance of the mark must be its indication of the nature or class of the product or service, rather than an indication of source." *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996) (internal citations omitted). As noted above, the registration of a mark is "*prima facie* evidence that the registered term is not generic in the eyes of the relevant public." *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 182 (4th Cir. 2001) (noting that registration confers a "significant procedural advantage" on the registrant).

The "evidence must demonstrate the generic understanding of the mark from the viewpoint of the relevant public." *Glover v. Ampak*, 74 F.3d 57, 59 (4th Cir. 1996) ("[O]nly by showing that the public understands by the mark the class of goods or services of which the trademarked product or service is a part can that party . . . carry its burden."). Evidence offered to rebut the presumption of validity may come from various sources, including "purchaser testimony, consumer surveys, listings and dictionaries, trade journals, newspapers, and other publications." *Glover*, 74 F. 3d at 59; *Retail Servs.*, 364 F.3d at 544.

In its December 18, 2025 Order, the Court held that genericness involves a two-step inquiry:

> First, what is the genus of goods or services at issue? Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?

Order, at 9 (citing *H Marvin Ginn Corp. v. Internal Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 990 (Fed. Cir. 1986)). Color trademarks face the same test. *See SafeRack LLC*, 350 F. Supp. 3d at 454.

As the Court concluded, the genus in this case are circular saw blades for cutting wood. *See* Order, at 10. The Court held that the "relevant public" consists of "actual and potential consumers of circular saw blades for power saws, regardless of the material to be cut." *Id.*, at 13.

Thus, the question at hand is whether CMT's registered trademark is understood by the relevant public *primarily* to refer to circular, woodcutting saw blades.