UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:24-CV-00137-TMR-DCK

| | |
|---|---|
| CMT USA, INC. and CMT UTENSILI S.p.A., <br><br> Plaintiffs, <br><br> v. <br><br> APEX TOOL GROUP LLC and APEX BRANDS, INC. <br><br> Defendants. | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION IN LIMINE NO. 2: TO PRECLUDE TWO DOCUMENTS AND TESTIMONY FROM IAN CUNNINGHAM AND SCOTT BUBLITZ** |

Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A. (collectively, "CMT" or "Plaintiffs"), through counsel, respectfully move this Court for an Order precluding certain testimony from Ian Cunningham and Scott Bublitz, employees of Defendants Apex Tool Group LLC and Apex Brands, Inc. (collectively, "Apex" or "Defendants"), and to exclude Messrs. Cunningham's and Bublitz's "Spectrophotometry and Color Measurement" (Ex. A; Ex. B) and the saw blades identified therein.

## I. INTRODUCTION

As explained in Plaintiffs' Motion in Limine to Exclude the Marksmen Report and its Underlying Saw Blades (Dkt. 266), Apex's counsel hired Marksmen Brand Protection Services ("Marksmen") during discovery to purchase thirty-five saw blades allegedly exhibiting some percentage of the color "orange" (the "Marksmen Blades"). *See id.*, at 3-4. The Marksmen Blades were preselected by counsel without regard to consumer perception or marketplace reality, and the record affirmatively demonstrates that they originate from small, unestablished manufacturers with no meaningful U.S. presence. *Id.* at 7-9. Because U.S. consumers do not encounter the Marksmen Blades, among others reasons, Plaintiffs seek to exclude both the Marksmen Report and the third party Blades contained within it.

In addition to the Marksmen Report, which memorializes the purchasing of saw blades chosen by counsel, Apex's counsel shipped "two boxes" of saw blades to Apex employees, Ian Cunningham and Scott Bublitz, for testing. Ex. C 21:3-22:11. Mr. Cunningham is Apex's Vice President of Design and Mr. Bublitz is a Senior Manager of Industrial Design at Apex. Ex. D 9:8-15 (Cunningham); Ex. E 7:19-8:1 (Bublitz). Opposing counsel intends to call both employees as *fact* witnesses at trial. *See* Pretrial Order. Mr. Bublitz was tasked with performing a spectrophotometry reading[1] on the counsel-supplied blades, while Mr. Cunningham measured the

---

[1] Mr. Bublitz testified that the purpose of the spectrophotometry readings was "to compare the similarities and differences in saw blades that were between yellow and red." Ex. C 30:11-17.

amount of allegedly "orange" color on the front of each blade. *See* Ex. D 185:12-16 ("Q. So is it fair to say that Mr. Bublitz did the spectrophotometer readings and that you did the analysis relating to the area, the color area? A. Correct."); *see also* Ex. D 198:23-199:15 (measuring "orange" on only one side of each blade).

The result is a counsel directed testing exercise that was memorialized ("Spectrophotometry and Color Measurement Analysis" or "Analysis") but it suffers from the same defects as the Marksmen Report, and more. Plaintiffs respectfully move to exclude (i) any testimony or opinions from Messrs. Cunningham and Bublitz derived from this testing and (ii) all third-party blades, including the saw blades identified in the Marksmen Report and the thirteen additional blades in this Analysis from trial under Federal Rules of Evidence 402, 403, and 701.

*First,* spectrophotometer comparisons (i.e. color measurements) of unrelated third party products have no bearing on likelihood of confusion or genericness. Both inquiries turn on how "ordinary consumers" (confusion) or the "relevant public" (genericness) perceive certain saw blades. Comparing CMT's distinct shade of "orange" to the color of obscure, unrelated saw blades, many from manufacturers with *de minimis* or virtually non-existent sales is of no assistance to the jury and risks substantial confusion.

*Second*, Apex's counsel continued to expand its cherry-picked universe of "orange" saw blades, by adding thirteen additional third-party blades to the testing pool, without any showing that U.S. consumers encounter these products. Apex's counsel supplied the blades to be tested. *See* Ex. C 22:5-7. The inclusion of these blades, selected by counsel and given to these witnesses, infects the Analysis with the same fatal flaw that warrants exclusion of the Marksmen Report. *See, e.g.,* Dkt. 266, at 12-15.

*Third*, it is manifestly improper for two *fact* witnesses to perform testing, presumably at counsel's direction, that they do not understand and then offer opinions based on that testing, which was performed entirely outside the safeguards of Federal Rule of Evidence 702. *See* FED. R. EVID. 702 (requiring a *qualified* expert to opinions that are *reliable* and *relevant*). Neither Mr. Cunningham nor Mr. Bublitz was disclosed as an expert. Accordingly, as fact witnesses offering lay testimony, Messrs. Cunningham and Bublitz should be precluded from offering opinions based on or derived from their test results. *See* FED. R. EVID. 701.

## II.     RELEVANCE

Quite simply, spectrophotometer comparisons have no bearing on a likelihood of confusion analysis. Confusion is assessed from the perspective of "ordinary consumers." *Anheuser-Busch, Inc. v. L&L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992) ("In other words, an unauthorized use of a trademark infringes the trademark holder's rights if it is likely to confuse an 'ordinary consumer' as to the source or sponsorship of the goods."). "Ordinary consumers" do not use spectrophotometers.[2] These readings provide *no insight* into how consumers perceive CMT's or Apex's products. Further, the percentage of alleged orange color on a blade says nothing of how consumers encounter products in the market or perceive them as a whole.

As to genericness, that inquiry turns on whether the relevant public understands CMT's trademark to primarily refer to the entire genus of goods, namely, circular, woodworking, saw blades. *See* Order, at 10 (Dkt. 254). Again, the "relevant public" does not use spectrophotometers, nor do these instruments demonstrate consumer understanding, marketplace exposure, or widespread use. Nor does Mr. Cunningham's flawed measurement of "orange" on the blades

---

[2] Mr. Cunningham testified that the spectrophotometer produces a "mechanical" reading, completely divorced from human perception, indicating that such an analysis *does not* address how consumers perceive these saw blades. *See* Ex. D 193:13-194:10.

advance any factual issue related to genericness. It fails to establish how consumers perceive the color or whether they associate it with an entire product class.

Finally, Messrs. Cunningham and Bublitz testified that they did not to take any steps to assess consumer perception. Mr. Bublitz admitted that he was unaware of any effort by Apex to understand how consumers perceive the color orange, whether color affects purchasing decisions, and whether consumers perceive the blades as orange at all. Ex. E 177:20-178:3; 182:23-183:3 ("Q. So there was nobody saying whether color – they perceived the color to be orange or not? A. No, I didn't do that type of study. It was purely the numerical spectrophotometer readings.").

## III. CONSUMER PERCEPTION

Mr. Cunningham, Apex's VP of Design for the past decade, confidently testified that he did not recognize "most" of the saw blades included in his own Report:

> Q. Do you know – do you recognize all of the blades that you tested?
>
> A. I mean, I recognize them from doing – putting the document together.
>
> Q. Would you have recognize them before that?
>
> A. No way. Most, I would not.
>
> Q. Why not?
>
> A. They're just unfamiliar brands to me.

Ex. D 201:15-23; *see also* Ex. D 204:18-21 ("Q. But you don't recognize any of the brands that are listed here as – you know, don't recognize them? A. Oh, no."). The reason is unsurprising; these brands have no meaningful presence on the U.S. market and, quite simply, U.S. consumers are not exposed to them.

Indeed, the 35 blades overlapping with the Marksmen Blades as well as the thirteen additional saw blades included in the Spectrophotometry and Color Measurement Analysis suffer from the same defects as the Marksmen Blades. *See* Dkt. 266, at 12-15. However, the newly

– 5 –

included manufacturers are even more remote and obscure; the Analysis now includes blades from HomeTai, Ezarc, Bates Choice, and Horusdy. *See* Ex. A, at -25513 (HomeTai); -25515 (Ezarc); -25520 (Bates Choice); -25521 (Horusdy); *see also* Ex. B (line 28) (HomeTai); (line 30) (Ezarc); (line 35) (Bates Choice); (line 36) (Horsudy). Each of these manufacturers have no market share in the U.S. *See* Ex. F, at Ex. 8.0. In fact, 10 of the 13 new blades have no U.S. market share, two of the remaining blades have less than 1% share, and the final blade is produced by Diablo, which Messrs. Cunningham and Bublitz acknowledge is roughly 90% red. *See* Ex. A, at -25511; Ex. B, at -25569 (the "average Delta E" is 20.89). Unlike the Marksmen Blades, no "investigator" documented the purchase of these blades and Defendants have put forth no evidence that they were, in fact, for sale in the U.S. Thus, Plaintiffs have no insight on whether these blades are even available in the relevant market.

## IV.   IMPROPER LAY TESTIMONY

Messrs. Cunningham and Bublitz are not experts. In fact, both employees testified that they lacked a basic understanding of the testing purportedly performed. The Analysis begins with Mr. Bublitz's spectrophotometry readings, yet Mr. Bublitz acknowledged that he is not neither an "expert," nor a "scientist," and does not understand how the spectrophotometer functions. Ex. E 64:10; Ex. C 12:17-13:8. His "methodology" consisted of dimming the lights in his office, placing the spectrophotometer on a blade, pressing a button on his cell phone, and recording a number. Ex. E 64:7-15; 65:21-66:6. Unsurprisingly, Mr. Bublitz did not document the testing process. Ex. C 37:10-13.

The spectrophotometer's reading, called "Delta E," purportedly measures the difference between two color samples. Ex. E 71:9-11. But Mr. Bublitz could not explain what "Delta E" actually measures, admitting that he did not "understand the full science behind it." *Id.* at 73:17-25. Nor did he understand how it is calculated. Ex. C 49:15-18 ("Q. But you don't understand

the math behind the Delta E? A. Not fully, no."); *see also id.* at 49:22-50:1 (explaining that "Delta E" is a "complex formula" but Mr. Bublitz has no understanding of it because he is "not a mathematician."). Mr. Cunningham fares no better. During his deposition, Mr. Cunningham referred technical questions regarding the spectrophotometer to Mr. Bublitz. *See, e.g.,* Ex. D 188:6-7 ("Scott knows how to operate the machine. I don't.").

## V. CONCLUSION

Plaintiffs respectfully request that the Court exclude Messrs. Cunningham and Bublitz from testifying about the Spectrophotometry and Color Measurement Analysis and any opinions or conclusions derived from it pursuant to Federal Rules of Evidence 402, 403, and 701. Further, this Motion seeks to exclude *all* third-party blades under Federal Rules of Evidence 402 and 403.

Dated: February 3, 2026

Respectfully submitted,

/s/ Joshua B. Durham
Ward Davis (NC Bar ID 27546)
Joshua B. Durham (NC Bar ID 25414)
**BELL, DAVIS & PITT**
227 W. Trade Street, Suite 1800
Charlotte, NC 28202
(704) 227-0400
ward.davis@belldavispitt.com
jdurham@belldavispitt.com

/s/ Robert E. Colletti
Edgar H. Haug (*pro hac vice*)
Robert E. Colletti (*pro hac vice*)
Brian Auricchio (*pro hac vice*)
Malorie Ruggeri (*pro hac vice*)
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, NY 10151
(212) 588-0800
ehaug@haugpartners.com
rcolletti@haugpartners.com
bauricchio@haugpartners.com
mruggeri@haugpartners.com

*Attorneys for Plaintiffs*
*CMT USA, Inc. and CMT Utensili S.p.A.*

## CERTIFICATE OF USE OF ARTIFICIAL INTELLIGENCE

Pursuant to this Court's order of June 13, 2024 regarding the use of artificial intelligence in court filings, Plaintiffs CMT USA, Inc. and CMT Utensili S.p.A., through their undersigned counsel, hereby certify:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Signed this 3rd of February, 2026 in New York, NY.


/s/ Robert E. Colletti
Robert E. Colletti (*pro hac vice*)
**HAUG PARTNERS LLP**
745 Fifth Avenue
New York, NY 10151
(212) 588-0800
rcolletti@haugpartners.com

*Attorney for Plaintiffs CMT USA, Inc.
and CMT Utensili S.p.A.*

# CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System. Service of same on any counsel of record will be accomplished through the Court's electronic filing system in accordance with Federal Rule of Civil Procedure 5(b)(2)(E).


/s/ Joshua B. Durham
Joshua B. Durham (NC Bar ID 25414)
**BELL, DAVIS & PITT**
227 W. Trade St., Suite 1800
Charlotte, NC 28202
(704) 227-0400
jdurham@belldavispitt.com