UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:24-CV-00137-TMR-DCK

CMT USA, INC. and CMT UTENSILI S.P.A.,

    Plaintiffs,

v.

APEX TOOL GROUP LLC and APEX
BRANDS, INC.,

    Defendants.

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR FEES**

## I.    Introduction and Summary

Apex respectfully submits that this case was exceptional for at least four reasons. First, CMT's case on the merits was exceptionally weak. Little more needs to be said than the jury deliberated for approximately one hour before finding non-infringement after a four-day trial. The jury's verdict was not surprising given: (a) the stark differences in appearance between the parties' products, including the use of different colors and prominent placement of distinctive brand names on the faces of the products and packaging; (b) the absence of non-hearsay evidence of actual confusion despite over four years of co-existence; (c) CMT's inability to construct a likelihood of confusion survey that was not fundamentally flawed; and (d) Apex's likelihood of confusion survey showing 0% confusion. This was not a close case. It should never have been filed, and CMT's decision to do so in and of itself warrants an exceptional case finding.

Second, at trial CMT repeatedly ignored Court orders by trying to backdoor in evidence that the Court had plainly excluded (often multiple times). The most blatant examples included:

- Although the Court had excluded spectrophotometry readings, CMT attempted to introduce and use them through its expert Dr. Wyble;

- Although the Court had excluded Mr. Banduch's testimony (in-part due to CMT's motion arguing that his opinions and testimony were unreliable), CMT attempted to present Mr. Banduch as a witness during its case-in-chief;

- Although the Court excluded testimony regarding a declaration signed by Matt King, a distributor who sold both parties' products, CMT attempted to designate numerous lines of Mr. King's deposition testimony where he described that very declaration; and

- Although the Court had excluded reasonable royalty damages, CMT attempted to introduce evidence of such damages in its opening argument.

Third, despite knowing that Apex had sent multiple responses to CMT's cease-and-desist letters explaining why there was no infringement and urging CMT to reconsider its ill-advised infringement claims, during closing arguments, in an effort to paint Apex as the party who acted the "wrong" way, CMT repeatedly misrepresented to the jury that Apex ignored those letters.[1] (*See* ECF No. 410, Trial Transcript Vol. IV, 197:17-25; 199:1-3; 224:5-7).

Finally, throughout the case CMT took unreasonable positions on several discovery issues both offensively and defensively. The net result is that Apex was forced to file and respond to six discovery motions. The Court ruled in Apex's favor ***on all of those motions***, underscoring the unreasonable nature in which CMT litigated the case.[2]

## II. Procedural History

Apex introduced its allegedly infringing Crescent-branded rawhide-colored circular sawblades in the Spring 2021. On November 5, 2021, CMT sent Apex a cease-and-desist letter claiming that the Crescent blades infringed CMT's trade dress rights. (ECF No. 150-28 at 8-11). The parties thereafter exchanged a handful of letters through January 2022, including two letters from Apex explaining why there was no likelihood of confusion due to the differences in colors, the differences in the overall appearances of the saw blades (including prominent placement of

---

[1] Apex's responses to CMT's pre-suit cease-and-desist letters can be found at ECF No. 164-10 at pp. 6-8, 15-19.

[2] Indeed, the most recent example of CMT's unreasonable litigation approach involves CMT's refusal to consent to a modest three-day extension for Apex to file this motion. Apex's request was based on difficulties compiling old Lewis Roca invoices due to a change in accounting systems when Lewis Roca merged into Womble Bond Dickinson. CMT nevertheless refused to consent, underscoring not only its unreasonable approach to this litigation, but more importantly, the need for a fees award to deter CMT from litigating in a similar manner in the future.

brand names), and the substantial number of third-party saw blades that also contained shades of orange. (ECF No. 164-10 at pp. 6-8, 15-19).

Apex heard nothing further from CMT until approximately 1 ½ years later, when CMT filed suit in the Southern District of New York. (ECF No. 1). CMT's decision to file suit in New York was itself curious considering neither party had any operations there, whereas both had operations in the Western District of North Carolina. Apex thus moved to transfer the case to the Western District of North Carolina, and that motion was granted on January 30, 2024. (ECF No. 44).

The case was ultimately tried over four days from June 22-25, 2026. The jury deliberated for approximately one hour before returning a unanimous verdict of non-infringement.

### III. Statement of Relevant Facts

#### a. The Merits Were One-Sided.

The Court was privy to the relative substantive merits. In short, the jury found no infringement after deliberating for approximately one hour. The jury's prompt verdict was unsurprising considering: (a) the colors of the parties' blades are distinctly different, and both show their respective brand names on the faces of the blades and packaging; (b) CMT had no non-hearsay evidence of actual confusion despite over four years of co-existence; (c) CMT presented no non-CMT witnesses to testify about purported confusion; (d) CMT could not construct a likelihood of confusion survey that was not fundamentally flawed; and (e) Apex's likelihood of confusion survey showed 0% confusion.

#### b. At Trial, CMT Ignored Several Court Orders by Attempting to Introduce Evidence and Elicit Testimony that had Clearly Been Excluded.

##### 1. CMT Attempted to Admit Testimony Regarding Spectrophotometer Readings Despite the Court Previously Excluding them at CMT's Request.

CMT filed a Motion in Limine to exclude spectrophotometer readings, which was granted.

(Dkt.268-269, and Order at Dkt.362). The court's order stated that not only were those readings excluded, but also testimony relying on them. *Id.* ("Because the testimony and analyses of Mr. Cunningham and Mr. Bublitz are inadmissible on relevance grounds, the court need not consider plaintiff's other proposed grounds for exclusion. . . . The court grants plaintiffs' second motion in limine."). Despite the Court's clear order, CMT attempted to introduce testimony relying on these readings through its color expert, Dr. Wyble, giving rise to an objection from Apex. In response to the objection CMT represented to the Court that it had no intention of introducing any evidence or testimony from Dr. Wyble regarding the spectrophotometry readings. (ECF No. 408, Trial Trans. Vol. II, at pp. 70-73). Yet just a few minutes later CMT did just that. (*Id*. at 85:16-25, 86:1-3).

### 2. CMT Attempted to Designate Testimony Discussing a Declaration that the Court had Previously Excluded.

CMT filed a Motion in Limine to exclude the testimony and declaration from Matthew King, who is a third-party distributor who sold products from both Apex and CMT. (ECF No. 273). The Court granted that motion in-part, excluding any testimony about the "Declaration of Mr. King, any Exhibits related thereto, and any testimony related to that Declaration." (ECF No. 362 at p. 15). Despite the Court's clear order, at trial CMT again tried to designate testimony that was excluded, claiming that it should be allowed to present testimony of Mr. King describing his declaration. (ECF No. 398). The Court sustained Apex's objection, making it abundantly clear that CMT's efforts to introduce such testimony contradicted the Court's prior order: "this Court excluded and I quote the declaration of Mr. King, comma, any exhibits related there to, comma and any testimony related to that declaration, end quotation. In light of that ruling, the Court directs the parties to omit any deposition designations that discuss or refer to the deposition of Mr. King . . . . " (ECF No. 409, Trial Trans. Day III, at pp. 121-123).

### 3. CMT Attempted to Designate Testimony from Mr. Banduch Despite its Belief that Mr. Banduch was Unqualified and his Testimony was Unreliable and Irrelevant.

CMT filed a Motion in Limine to exclude Mr. Banduch's testimony, calling him "unqualified, methodologically unreliable, and irrelevant to the issues the jury will decide." ECF No. 274. In an effort to streamline trial, Apex subsequently informed the Court that it "no longer intend[ed] to call Mr. Leslie Banduch as a witness at trial." ECF No. 347. The Court then ruled that "plaintiffs' motion to exclude the opinions and testimony of Mr. Banduch is now moot." ECF No. No. 362. Despite that clear order and CMT's prior arguments that Mr. Banduch's testimony was unreliable and irrelevant, CMT attempted to designate and use Mr. Banduch's testimony at trial, including in its opening argument. After an extended colloquy with CMT's counsel regarding the issue and impropriety of CMT's efforts, the Court reiterated its position, concluding "That's that." (ECF No. 414, Trial Trans. Day 1, at pp. 27-31).

### 4. CMT Attempted to Introduce Evidence of Reasonable Royalty (and Unjust Enrichment) Damages Even Though the Court Had Previously Excluded Such Damages.

Weeks before trial the Court entered an order precluding reasonable royalty damages. (ECF No. 362, at pp. 28-32). At trial, CMT nevertheless attempted to introduce evidence of such damages in its opening argument. (ECF No. 414, Trial Trans. Day 1, at pp. 28, 43).

### c. CMT Made Misrepresentations During Closing Arguments.

The theme of CMT's closing argument revolved around trying to convince the jury that CMT was the party who acted the "right" way and Apex was the party who acted the "wrong" way. CMT thus commenced its closing with the following statement:

> I cannot, in 25 minutes or 30 minutes, go through all the evidence in this case. It's impossible. There's too much of it, right? So I'm going to rely on you to think about what is really, really important that you need to look at and you should look at if you think it's important.
>
> So ask yourself, who's right here? Who's wrong? Who did the right thing? Who

didn't do the right thing? . . .

(ECF No. 410, Trial Trans. IV, at 193:10-16). To support its theme, CMT then misrepresented to the jury several times that Apex ignored and otherwise refused to respond to CMT' pre-suit cease-and-desist letters, forcing CMT to file suit:

- "After that, CMT sees what they're doing and sends them a cease-and-desist letter, says, please - - here's our registration, please respect our trademark rights, stop doing what you're doing, don't infringe our trademark rights. What did Apex do. ***They ignored it, completely ignored it, did nothing.*** They didn't change their color, they didn't modify anything, ***they didn't reach out to CMT. They didn't try to resolve the matter. They didn't try to compromise.*** They didn't try to take a license." (*See* ECF No. 410, Trial Trans. IV, 197:17-25) (emphasis added);

- "***So did Apex do the right thing***? You are the only one that can make that decision. . . . They found out about the cease-and-desist letter, ***but they just ignored it and went on with their business. And that's how it went.***") (*Id.* at 199:1-3) (emphasis added);

- "They haven't sued anyone, except for Apex, ***because Apex wouldn't respond, Apex wouldn't cooperate, they wouldn't do anything except ignore.***" (*Id.* at 224:5-7) (emphasis added).

CMT did so despite being fully aware that Apex sent multiple responses to CMT's pre-suit cease-and-desist letters, each time explaining the reasons that Apex believed there was no infringement and encouraging CMT to be more reasonable. (*See* ECF No. 164-10 at pp. 6-8, 15-19). There is no legitimate justification for CMT's misrepresentations, particularly during a phase as important as closing arguments.

### d. CMT Took Unreasonable Litigation Positions on Numerous Issues Throughout the Course of the Litigation.[3]

Throughout much of the case CMT took unreasonable positions on a host of discovery issues. Apex was thus forced to file and respond to six discovery motions, all of which were resolved in Apex's favor.

---

[3] Two of these motions are the subject of Apex's separate fees motion filed on July 8, 2026. (ECF No. 405-406). Apex includes them herein because they comprise part of the overall pattern of CMT's unreasonable litigation conduct.

### 1. CMT Forced Apex to Obtain a Protective Order Precluding the Deposition of Apex's CEO.

CMT repeatedly attempted to take the deposition of Apex's CEO, asserting without support that he had unique and specialized knowledge that other Apex employees could not provide. Apex thus moved for a protective order. (ECF No. 87-88). After reviewing CMT's opposition (ECF No. 94), the Court granted Apex's motion, finding in relevant part that CMT's arguments were not supported by the record:

> This testimony cited by Plaintiffs does not show that Roberts had unique or specialized knowledge, or that he is better suited to testify in this case than other employees. Rather, the foregoing testimony indicates that CEO Roberts was "kept informed" at quarterly meetings about what was "going on," but that was he was *not* directly involved. As such, it seems that other sources that are more convenient, less burdensome, and/or less expensive can provide most, if not all, the information Plaintiffs seek.

(ECF No. 120, at 8-9). Notably, the order further stated that Apex could file a motion seeking a reasonable fee award after discovery was complete if the parties could not agree on a reasonable award. *Id*. at 9. The parties were unable to reach agreement on such an award.

### 2. CMT Filed a Motion to Compel Information that was not only Work Product, but also that was not even Responsive to CMT's Discovery Requests.

CMT moved to compel the production of communications between Apex's litigation counsel and Marksmen, along with communications between Apex's litigation counsel and third-party saw blade manufacturers. (ECF No. 114-115). Magistrate Judge Keesler described CMT's motion as seeking "all communications between Apex's law firm Lewis Roca Rothgerber Christie LLP ('Lewis Roca') and third-party Marksmen Brand Protection ('Marksmen'), along with all related documents," and "all communications between Apex and/or Lewis Roca and third-party saw blade manufacturers, along with all related documents." (ECF No. 246 at 6–7).

Apex opposed CMT's motion, arguing that CMT was seeking communications from Apex's counsel, and that the requested communications were either already produced, not responsive to

any proper document request, or protected attorney work product. (ECF No. 127; ECF No. 246 at 9–11). Apex also sought an award of costs and reasonable expenses incurred in opposing CMT's motion. *Id*. at 11.

Magistrate Judge Keesler denied CMT's motion, finding that the communications CMT sought were not responsive to any of CMT's discovery requests, that most of the communications CMT sought had already been produced, and that the communications CMT sought were likely work product. (ECF No. 246 at 4, 13-14, 20). Magistrate Judge Keesler thus found the motion ill-advised and awarded Apex its reasonable fees incurred in responding. *Id*. at 20.

Undeterred, CMT thereafter filed Rule 72(a) objections (ECF No. 247 at 1–2), to which Apex responded. (ECF No. 251 at 1–3, 15–20). The Court thereafter denied CMT's Rule 72 objections and affirmed the fees award. (ECF No. 368).

### 3. CMT's Motion for Sanctions Concerning Interrogatory No. 6.

CMT moved for sanctions based on Apex's response to Interrogatory No. 6. (ECF No. 204-205). After reviewing Apex's opposition (ECF No. 231), Magistrate Judge Keesler denied CMT's motion and awarded Apex its reasonable fees and costs incurred in connection with same. (ECF No. 246 at 19-20).

Undeterred, CMT again filed Rule 72 objections. (ECF No. 247 at 1–2). After reviewing the relevant filings, the Court affirmed Magistrate Judge Keesler's Order, including the fees award. (ECF No. 368).

### 4. CMT Refused to Consent to a Substitute Expert, Even After the Original Expert Passed Away Unexpectedly.

When Apex's color expert unfortunately passed away, after issuing two reports and having his deposition taken, CMT unreasonably refused to consent to a substitute color expert, forcing Apex to file a motion for leave to designate a substitute color expert. (ECF No. 214-215). After reviewing CMT's opposition (ECF No. 242), the Court granted Apex's motion. (ECF No. 334).

Undeterred, CMT again filed Rule 72 objections. (ECF No. 335, 338). After reviewing the relevant filings, the Court affirmed Magistrate Judge Keesler's Order. (ECF No. 368).

### 5. CMT Refused to Provide Information on Relevant Enforcement Activities.

CMT refused to provide information regarding whether it had engaged in any enforcement activities in the two decades between obtaining a registration for the asserted trade dress and the cease-and-desist letter it sent to Apex. Apex was thus forced to file a motion to compel. (ECF No. 110-112). After reviewing CMT's opposition (ECF No. 124), the Court granted Apex's motion, finding that CMT's discovery responses were "at best, incomplete." (ECF No. 246, at p. 6).

### 6. CMT Refused to Provide Information and Documents Regarding Related Products.

CMT refused to provide information and documents relating to other types of circular saw blades (which are also sold by CMT and its competitors, in the same stores, and to the same consumers), on the basis that they were not the precise goods at issue in the case. Apex was thus forced to move to compel (ECF No. 73-74), which was granted in large part. (ECF No. 85 at 14).

## IV. Argument

### a. Apex Was the Prevailing Party.

CMT brought several claims for relief for federal trademark infringement, unfair competition, and dilution under the Lanham Act. (ECF No. 37 at Counts 1, 3, 4, and 6). CMT lost all of those claims. Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. §1117(a).

A party prevails "when actual relief on the merits of [their] claim materially alters the legal relationship between the parties by modifying the [counterparty's] behavior in a way that directly benefits the [prevailing party]." *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992). Applied to trademark infringement cases, a defendant who defeats the plaintiff's infringement claim is the

prevailing party because the plaintiff can no longer sue the defendant for the alleged acts of infringement and thus the relationship between the parties has been materially altered. *See, e.g., Citi Trends, Inc. v. Coach, Inc.*, 780 Fed. Appx. 74, 78-79 (4th Cir. 2019) (judgment that permanently bars the plaintiff from reasserting its trademark claims against the defendant confers prevailing party status on the defendant); *Eagle Forum v. Phyllis Schlafly's American Eagles*, 498 F. Supp. 3d 1024, 1035-36 (S.D. Ill. 2020) (defendant who defeated trademark infringement claim at summary judgment was the prevailing party because the plaintiff could no longer stop the defendant's ability to continue using the allegedly infringing mark to compete with the plaintiff).

Here, Apex is the prevailing party. There can be no legitimate dispute that the primary claims in the litigation were CMT's Lanham Act claims. The jury promptly found no infringement, and in doing so rejected CMT's claims for over $4 million in damages (over $12 million if CMT's request for trebling had been granted) and injunctive relief.

This result holds even though Apex did not prevail on its counterclaims, as CMT's affirmative infringement claims were clearly the crux of the case. *See, e.g., Propel Peo, Inc. v. Roach*, 2022 WL 22887136 at *6-7 (D.S.C. May 4, 2022) (defendants were the prevailing parties in Lanham Act case even though the plaintiffs prevailed on certain claims, because the plaintiffs' Lanham Act claims formed the central basis of the case and thus the defendants' "success in this case surpasses that of the plaintiffs.") (citing *Shum v. Intel Corp.*, 629 F.3d 1360, 1371 (Fed. Cir. 2010); *Hayward Industries, Inc. v. Blueworks Corp.*, 2024 WL 3930968 at *4 (W.D.N.C. Aug. 23, 2024) (finding plaintiff the prevailing party even though the defendant won several claims in the litigation); *see also Ira Green, Inc. v. Military Sales & Serv. Co.*, 775 F.3d 12, 28 (1st Cir. 2014) ("[T]he district court retains discretion to award costs to a party who, though losing on some claims, substantially prevails in the case as a whole. A classic example of a case in which this discretion may appropriately be exercised is one in which a defendant, though losing on a

counterclaim, succeeds in warding off a predominant claim." (citations omitted)); *Testa v. Vill. of Mundelein*, 89 F.3d 443, 447 (7th Cir. 1996) ("the 'prevailing party' is the party who prevails as to the **substantial** part of the litigation") (emphasis in original); *Slane v. Mariah Boats, Inc.*, 164 F.3d 1065, 1068 (7th Cir. 1999) ("[W]hen one party gets substantial relief it 'prevails' even if it doesn't win on every claim.").

### b. This Case was Exceptional for Several Reasons.

Under Fourth Circuit law, "a district court may find a case 'exceptional' and therefore award attorneys' fees to the prevailing party when it determines, in light of the totality of the circumstances, that (1) there is an unusual discrepancy in the merits of the positions taken by the parties based on the non-prevailing party's position as either frivolous or objectively unreasonable, (2) the non-prevailing party has litigated the case in an unreasonable manner; or (3) there is otherwise the need in particular circumstances to advance considerations of compensation and deterrence." *Georgia-Pac. Consumer Products LP v. von Drehle Corp.*, 781 F.3d 710, 721 (4th Cir. 2015), *as amended* (Apr. 15, 2015) (cleaned up). All three bases exist here.

First, the merits were one-sided making CMT's infringement claims objectively unreasonable: (1) there were stark differences in appearance between the parties' products, including the use of different colors and prominent placement of distinctive brand names on the faces of the products and packaging; (2) there was no non-hearsay evidence of actual confusion despite over four years of co-existence; (3) CMT could not construct a likelihood of confusion survey that was not fundamentally flawed; and (4) Apex's likelihood of confusion survey showed 0% confusion. It was thus not surprising that the jury found no infringement so quickly. *See Segars v. Atl. Coast Line R. Co.*, 286 F.2d 767, 771 (4th Cir. 1961) ("The short period of deliberation in such cases may indicate only that the members of the jury felt that the evidence was overwhelming in favor of the party receiving the verdict."); *United States v. Barta*, No. 12 CR 00487, 2013 WL

4854355 at *23 (N.D. Ill. Sept. 11, 2013), *aff'd sub nom. United States v. Buenrostro*, 781 F.3d 864 (7th Cir. 2015) (concluding the jury's finding of a verdict in under four hours following a two-week multi-defendant bribery trial indicative "that the jurors found the evidence against the defendants to be quite strong and easy to understand."); *EagleView Techs., Inc. v. Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 52 (D.N.J. 2021) ("This case was not close. After a two-week trial, the jury reached a verdict in about two hours. Plaintiff won every significant issue at trial as well. Other courts have assessed enhanced damages, in part, because of how quickly the jury reached their verdict."); *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 315 F. Supp. 3d 977, 1014 (N.D. Ill. 2018), *aff'd in part, vacated in part, rev'd in part sub nom. Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341 (Fed. Cir. 2019) ("This case was not close. TTI lost on every issue at trial after less than two hours of jury deliberation.").

Second, CMT litigated unreasonably from the inception. Despite having no operations in New York, CMT originally filed suit in the Southern District of New York, forcing Apex to move to transfer to the Western District of North Carolina. The Court granted that motion after finding that the transfer factors largely favored such a transfer. (*See* ECF No. 44, at pp. 4-9). CMT thereafter took unreasonable offensive and defensive positions throughout much of the case, resulting in a slew of discovery motions, all of which were decided in Apex's favor. Then at trial CMT repeatedly attempted to introduce evidence in contravention of clear orders from the Court. To make matters worse and in an effort to save its sinking ship, during closing arguments CMT made several misrepresentations to the jury.

After the jury returned its verdict so quickly, one would think that CMT may reset its mindset and take a more reasonable approach post-trial. One would be wrong. CMT has since refused to consent to pay reasonable fees in connection with two fee orders that have been affirmed by this Court, and most recently refused to consent to a mere three-day extension for Apex to file

this motion. That is neither reasonable nor professionally courteous.

All of these factors strongly favor a fee award that will deter CMT from repeating its transgressions in the future. *See*, *e.g.*, *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 209 (2016) ("a court may order fee-shifting because of a party's litigation misconduct, whatever the reasonableness of his claims or defenses. . . . Or a curt may do so to deter . . . overaggressive assertions of copyright claims.") (citing cases); *TE-TA-MA Truth Foundation-Family of URI, Inc. v. World Church of the Creator*, 392 F.3d 248, 261-263 (7th Cir. 2004) (attorney's fees can be awarded where party "unreasonably increased the cost of defending against its trademark suit" due to "litigation conduct"); *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc. Marquis Mills, Int'l, Inc.*, No. 15-cv-10154, 2023 WL 3815276, at *13 (S.D.N.Y. June 5, 2023) ("fee award separately is warranted to deter unreasonable litigation conduct" including "flout[ing] prior court rulings" and "fail[ing] to provide such information in full [during discovery]"), vacated and remanded on other grounds. *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 156 F.4th 1259 (Fed. Cir. 2025).

### c. Apex's Fees Were Reasonable Under the Lodestar Approach.

The Supreme Court has determined that the proper "starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" (the "Lodestar" amount). *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "There is a strong presumption that the lodestar figure . . . represents a 'reasonable' fee." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986).

As set forth in the Morrow Declaration, Apex seeks an award of $2,776,688.89 in fees, which is the Lodestar amount. Morrow Decl., ¶4. This amount does not reflect the total amount or value of services rendered, but rather the lower amount charged to Apex after write-offs and discounts to standard rates ranging from 14% to 40%. *Id.* at ¶¶6, 7. The amount Apex seeks is further limited to the five primary attorneys handling this case as well as the lead paralegal: Mr.

Morrow, Ms. Woller, Mr. Johnson, Mr. Jackson, Mr. Underwood, and Ms. Wildman, and does not include fees charged by other attorneys, paralegals, and other legal professionals. *Id.* at ¶¶3, 8. The fees Apex seeks to recover are thus a portion of the total fees—which included a total of 8,769.70 hours in attorney, paralegal, and legal professional time spread over three years of litigation—at an effective average hourly rate of $390. *Id.* at ¶4. The fees are supported by copies of the actual invoices sent to Apex, as well as charts showing summary and detailed information. *Id.* at ¶¶6, 7, Ex. 1.[4] As detailed below and in the Morrow Declaration, the hours and the rates billed and requested are fully justified under the circumstances.

### 1. The Hours Worked Were Reasonable.

To determine the reasonableness of the hours worked, the Fourth Circuit uses the following twelve factors set forth in *Barber*:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Barber*, 577 F.2d at 226 n. 28. "The court is to consider all twelve factors, but need not robotically list each factor or comment on those factors that do not apply." *Dodeka, L.L.C. v. AmrolDavis*, 2010 WL 3239117, at *2 (E.D.N.C. Aug. 16, 2010).[5]

### 1. Factors 1-3.

The fees sought are 7,122.9 hours out of a total of 8,769.7 hours in attorney and paralegal time spread over nearly three years of litigation. Morrow Decl., ¶¶4, 6. The primary work

---

[4] Redactions have been applied to protect sensitive personal address information and financial institution information such as bank account and routing numbers.

[5] Factors 10 and 11 are negligible and thus not discussed in detail below.

performed related to at least the following tasks: (a) evaluating the complaint, exhibits thereto and advising Apex regarding various response options in view of same; (b) preparing a motion to transfer; (c) preparing the answer and counterclaims; (d) negotiating and preparing a protective order; (e) negotiating and preparing a Rule 26(f) Report; (f) preparing multiple sets of discovery requests; (g) responding to written discovery requests from CMT; (h) reviewing, coding and producing documents responsive to CMT's discovery requests; (i) reviewing CMT's written responses and documents produced in response to Apex's discovery requests; (j) preparing multiple emails and letters outlining deficiencies in CMT's discovery responses and document production; (k) engaging in multiple meet and confer conferences regarding discovery issues; (l) preparing a privilege log and reviewing/analyzing CMT's privilege log; (m) preparing, filing, and filing a reply in support of a discovery motion to obtain CMT's documents on saw blades; (n) responding to and fighting CMT's efforts to take the deposition of Apex's CEO, including filing a motion for protective order; (o) preparing for, taking, and defending 18 fact depositions; (p) reviewing and analyzing four expert reports from CMT, and taking the depositions of those experts; (q) evaluating and retaining five rebuttal experts, and working with those experts to prepare rebuttal reports, and defending their depositions; (r) holding meet and confers with opposing counsel and preparing and filing a motion in support of a substitute expert due to death of Apex's initial color expert and CMT's refusal to agree to a substitute expert; (s) responding to multiple CMT discovery motions filed after the close of discovery; (t) preparing a motion for summary judgment and supporting papers; (u) responding to CMT's motion for summary judgement; (v) preparing for trial, including all pretrial submissions; (w) participating in a four day jury trial; and (x) providing advice to Apex throughout the case. *Id.* at ¶5.[6]

---

[6] As shown by the bills and spreadsheets attached to the Morrow Declaration, this list is far from exclusive, and many additional tasks were performed.

Such work was reasonable and necessary, particularly in view of: (a) the number of claims asserted; (b) the case subject matter (primarily trademark infringement), (c) the amount of damages claimed by CMT; (d) the difficulties and delays encountered in obtaining discovery from CMT; and (e) the multiple motions that were required during discovery in order to obtain relevant documents from CMT and prevent CMT from harassing Apex's CEO. *Id.* at ¶9. Further, the skill and experience of the attorneys who worked for Apex was appropriate in view of the nature, type and extent of the claims and damages asserted. *Id.* Consequently, the case was staffed with attorneys who were experts in litigating intellectual property disputes. *Id.*

### 2. **Factor 4.**

Regarding Factor 4, the opportunity costs to the attorneys primarily responsible for litigating this case have been extensive. Mr. Jackson has billed over 1,600 hours to this matter, Mr. Johnson over 2,100 hours, Mr. Underwood over 800 hours, Ms. Woller over 900 hours, and Mr. Morrow over 400 hours. *Id.* at ¶6. These five attorneys contributed significant portions of their available time to this case at a significant opportunity cost to other litigation matters that would have occupied such time. *Id.* at ¶10. The same is true of the other attorneys, paralegals and legal assistants who worked on this case. *Id.*

### 3. **Factors 5 and 12.**

The Morrow Declaration affirms that based on his experience in litigating intellectual property disputes for over 25 years, the hours worked and amount charged to Defendants in this case were reasonable. *Id.* at ¶¶9, 11. This opinion is supported by decisions from other cases involving claims similar to those raised here. *See, e.g., Uhlig, LLC v. Shirley*, 895 F. Supp. 2d 707, 719 (D.S.C. 2012) (awarding $1.8 million in attorneys' fees for a complex civil litigation involving roughly a dozen claims, including trade secret misappropriation, copyright infringement, and assorted contract claims, where the amount in controversy was approximately $11 million); *Mattel,*

*Inc. v. MGA Entertainment, Inc.,* 801 F.Supp.2d 950, 958 (C.D. Cal. 2011) (awarding $2,172,000 in attorney's fees in a trade secret case to the prevailing party); and *ICE Corp. v. Hamilton Sundstrand Corp.,* 432 Fed. Appx. 732 (10th Cir.2011) (affirming the district court's award of attorney's fees amounting to $1,134,438.25 to prevailing party in trade secrets case).[7]

### 4. Factors 6 and 8.

Regarding Factor 6, the results achieved exceeded expectations at the outset of the case, particularly given CMT's demands. Prior to filing suit CMT demanded injunctive relief in the form of Apex essentially shuttering its circular saw blade business. And at trial CMT relied on an expert analysis seeking in excess of $4 million in damages, which if trebled would exceed $12 million. Consequently, the results obtained exceeded expectations considering the amount in controversy.

### 5. Factor 7.

This factor does not appear applicable, although the litigation was unnecessarily prolonged by CMT's decision to originally file suit in the Southern District of New York, which found that the Western District of North Carolina was a more appropriate venue.

### 6. Factor 9.

The experience, reputation and ability of the attorneys that represented Apex were significantly tailored to the complex requirements of this case. The five attorneys who handled most of the defense work have focused their careers on trademarks and litigating intellectual property disputes. Morrow Decl. at ¶9.

Based on the above, Apex respectfully submits that the *Barber* factors support finding that the amount of hours billed to Apex was reasonable.

### 2. The Rates Charged to Apex Were Reasonable.

---

[7] The reasonableness of fees sought by Apex is further supported by the fact that the fees awards from these cases were made over a decade ago, when rates were much lower.

After considering the hours expended, the Court should next consider the reasonableness of the hourly rate(s) requested. *Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994). The attorneys' hourly rates should be set "at the 'prevailing market rates in the relevant community.'" *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). The best guide in this fact-intensive determination is the rate "attorneys earn from paying clients for similar services in similar circumstances," as demonstrated through evidence of rates previously collected from that client. *Id*. at 175. The relevant market for determining reasonable hourly rates is the community in which the Court sits. *Id.* "Thus, a fully compensatory fee will include compensation for all hours reasonably expended at market rates in the relevant community, and market rates may be proved by the rate which clients normally and willingly pay the petitioning attorneys." *Id.*

Applied here, the effective average rate charged to Apex was approximately $390 per hour, which constitutes a significant discount from standard rates and is quite low compared to average rates charged by other comparable firms for intellectual property cases. Morrow Decl. at ¶¶4, 11. Publicly available data also supports this position. Specifically, the 2025 AIPLA Report of the Economic Survey shows that the average rate charged in intellectual property cases was $525 in 2024. (*See* Ex. A, 2025 AIPLA Report, at p. 16).[8]

Further, as the Fourth Circuit has observed, the best evidence of reasonable rates is evidence of rates previously collected from that client. *Rum Creek*, 31 F.3d at 175. Applied here, Apex has paid all of defense counsel's invoices over the last three years. Morrow Decl. at ¶5. The hourly rates of WBD's attorneys are supported and accepted by Apex based on the strength of defense counsels' reputation in the legal community, the amount at stake, and the competitive nature of those rates for the services rendered.

---

[8] The survey further shows that for firms having over 100 practitioners (like Apex's counsel's firm, Womble Bond Dickinson), the average rates were $797. *Id.*

Based on the above, Apex respectfully submits that the rates charged were reasonable.

### d. There is no Need to Apportion Apex's Fees.

Although statutory recovery of attorneys' fees is generally limited to those fees directly related to specific claims, "where all of [a] plaintiff's claims arise from the same nucleus of operative facts and each claim was inextricably interwoven with the other claims, apportionment of fees is unnecessary." *Laschkewitsch*, 2017 WL 4976442, at *3 ("Apportioning fees is unnecessary and unrealistic, and [Defendant] can recover its attorneys' fees under section 75-16.1(2)."); *see also Monster Daddy v. Monster Cable Products, Inc.*, No. 6:10-1170, 2014 WL 2780331, at *11 (D.S.C. June 19, 2014) ("'a prevailing party in a case involving Lanham Act and non-Lanham Act claims can recover attorneys' fees only for time spent litigating the Lanham Act claims' unless the Lanham Act and non-Lanham Act claims are so intertwined that it is impossible to differentiate between work done on claims.") (quoting *Gracie v. Gracie,* 217 F.3d 1060, 1069 (9th Cir. 2000). All claims and counterclaims in this litigation were inextricably interwoven and based on the same nucleus of operative facts—namely, CMT's claims that Apex's use of the Crescent Trade Dress on circular sawblades infringed CMT's trademark rights. Accordingly, all claims and counterclaims are so intertwined that apportionment is unwarranted.

### V. Conclusion

For the foregoing reasons, Apex respectfully requests that the Court grant its motion and award it reasonable attorneys' fees in the amount of $2,776,688.89.

DATED: July 29, 2026    **WOMBLE BOND DICKINSON (US) LLP**

By: <u>/s/ David Jackson</u>
John F. Morrow, Jr.
Aaron D. Johnson
David A. Jackson
Joy Tacy Allen Woller
One West Fourth Street
Winston-Salem, NC 27101
(336) 721-3600
John.Morrow@wbd-us.com
Aaron.Johnson@wbd-us.com
David.Jackson@wbd-us.com
Joy.Woller@wbd-us.com

Attorneys for Defendants
*Apex Tool Group LLC and Apex Brands, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 29th day of July, 2026, the foregoing

DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR FEES was served via electronic means

through CM/ECF on the following counsel of record:

Edward B. Davis (NC Bar ID 27546)
Joshua B. Durham (NC Bar ID 25414)
BELL, DAVIS & PITT
227 W. Trade St., Suite 1800
Charlotte, NC 28202
(704) 227-0400
ward.davis@belldavispitt.com
jdurham@belldavispitt.com

Edgar H. Haug (*pro hac vice*)
Robert E. Colletti (*pro hac vice*)
Malorie Ruggeri (*pro hac vice*)
Brian E. Auricchio (*pro hac vice*)

HAUG PARTNERS LLP
745 Fifth Avenue
New York, NY 10151
(212) 588-0800
ehaug@haugpartners.com
rcolletti@haugpartners.com
mruggeri@haugpartners.com
bauricchio@haugpartners.com

*Attorneys for Plaintiffs CMT USA, Inc.*
*and CMT Utensili S.p.A.*

/s/ Aaron D. Johnson
Attorneys for Defendants
*Apex Tool Group LLC and Apex Brands, Inc.*